UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MICHAEL and CATHERINE BURKE,<br><br>                  Plaintiffs,<br><br>                  v.<br><br>KATE WALSH, in her official capacity as Secretary of the Massachusetts Executive Office of Health and Human Services; LINDA SPEARS, in her official capacity as Commissioner of the Massachusetts Department of Children & Families; LAURIE SULLIVAN, in her personal capacity and in her official capacity as the Area Director of the Western Regional Office of the Massachusetts Department of Children & Families; ANNA MOYNAHAN, in her personal capacity and in her official capacity as the Regional Clinical Director of the Massachusetts Department of Children & Families; THERESA HARRIS, in her personal capacity and in her official capacity as the Regional Program Manager of the Massachusetts Department of Children & Families; DAWN SWEETMAN, in her personal capacity and in her official capacity as an ADLU Supervisor of the Massachusetts Department of Children & Families; TYWANNA JONES, in her personal capacity and in her official capacity as an ADLU Social Worker for the Massachusetts Department of Children & Families; CAITLYN LEVINE, in her personal capacity and in her official capacity as a Mental Health Specialist for the Massachusetts Department of Children & Families; STACY CLARK, in her personal capacity and in her official capacity as a Quality Assurance Supervisor for the Massachusetts Department of Children & Families; and EUPHEMIA MOLINA, LUZ ESTRADA, and ANGEL EMERSON in their personal capacities and in their official capacities as License and Training Supervisors for the Massachusetts Department of Children & Families,<br><br>                  Defendants. | CIVIL ACTION<br>No. 1:23-cv-11798-MGM<br><br><br><br><br><br>**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' PARTIAL MOTION TO DISMISS** |

## **<u>TABLE OF CONTENTS</u>**

INTRODUCTION ......................................................................................................... 1

REGULATORY FRAMEWORK ................................................................................... 2

    Initiation of Application Process for Foster Care License ...................................... 3

    Standards Governing Licensure of Foster Parents and Foster Care Homes ....................... 5

    Licensing Determination ....................................................................................... 5

FACTUAL AND PROCEDURAL BACKGROUND ....................................................... 7

ARGUMENT ............................................................................................................... 14

    I.     THE COMPLAINT FAILS TO SET FORTH SUFFICIENT
          ALLEGATIONS OF PERSONAL INVOLVEMENT BY ANY OF
          THE DEFENDANTS NAMED IN THEIR INDIVIDUAL
          CAPACITIES. ................................................................................. 14

    II.    THE INDIVIDUAL CAPACITY CLAIMS ARE ALSO BARRED
          BY THE DOCTRINE OF QUALIFIED IMMUNITY ......................................... 18

CONCLUSION ............................................................................................................ 22

## INTRODUCTION

The Massachusetts Department of Children and Families ("Department") is responsible for ensuring the well-being of children in its custody who are cared for by foster parents. To carry out this weighty responsibility, the Department has promulgated regulations governing the standards and process for licensing of foster parents. *See* 110 Code Mass. Regs. §§ 7.100 et seq. The regulations are aimed at ensuring that the Department approves licenses for only those applicants who demonstrate the ability to meet a foster child's basic needs, including—of particular significance here—by "promot[ing] the physical, mental, and emotional well-being of a child placed in [their] care, including supporting and respecting a child's sexual orientation or gender identity." *Id*. § 7.104(1)(d). The regulations also require that applicants demonstrate an ability "to respect and make efforts to support the integrity of a child's racial, ethnic, linguistic, cultural and religious background." *Id*. § 7.104(1)(e).

The Department denied the foster care license application submitted by plaintiffs Catherine and Michael Burke based on its determination that they had failed to demonstrate their ability to meet the two foregoing requirements. *See* Verified Complaint (ECF No. 6) ("Compl.") ¶¶ 143-44 & Ex. 5. The Burkes have challenged that denial by filing this action against the Secretary of the Massachusetts Executive Office of Health and Human Services and Commissioner of the Department (in their official capacities) and ten Department employees (in both their official and individual capacities). *Id*. ¶¶ 21-32.[1] The Burkes allege that, because they

---

[1] The ten defendants named in their individual as well as official capacities are Laurie Sullivan, Regional Director of the Department's Western Regional Office; Anna Moynahan, Regional Clinical Director; Theresa Harris; Regional Program Manager; Dawn Sweetman, a supervisor in the Department's Adoption Development Licensing Unit; Tywanna Jones, a social worker in that Unit; Caitlyn Levine, a Department mental health specialist; Stacy Clark, a Quality Assurance Supervisor; and Euphemia Molina, Luz Estrada, and Angel Emerson, all of whom are License and Training Supervisors. *See* Compl. ¶¶ 23-32.

voiced their religious beliefs about marriage, sexuality, and gender identity during the Department's licensing process, the denial of their application was based on those beliefs, allegedly in violation of their First Amendment rights to free exercise of religion and freedom of speech. *Id.* ¶¶ 7, 111-17, 138-41; *id.* Counts I-V.  The Burkes request that the Court enjoin defendants from "from declining to issue a foster care license" to them "on the basis of their religious beliefs, speech, and exercise [of religion]," and further order the ten defendants named in their individual capacities to pay them compensatory and nominal damages. *Id.*, Prayer for Relief ¶¶ (c), (f).

Because the Complaint fails to set forth particularized allegations against any of the defendants named in their individual capacities, and because in any event those defendants enjoy qualified immunity against the individual-capacity claims, those claims should be dismissed. The Department's denial of the Burkes' license application was based on their failure to satisfy a regulation requiring *all* foster care applicants, regardless of religious beliefs, to demonstrate the ability to meet a foster child's basic physical and emotional needs, including by supporting and respecting a child's sexual orientation or gender identity.  Notwithstanding the Burkes' attempt to re-cast the Department's license denial as "discrimination" based on their religion, they had no clearly established federal constitutional right to be exempted from the Department's regulation.

## REGULATORY FRAMEWORK

The Massachusetts Legislature has vested the Department with authority to provide substitute care for children "when the family itself or the resources available to the family are unable to provide the necessary care and protection to insure the rights of any child to sound health and normal physical, mental, spiritual and moral development."  Mass. Gen. Laws ch. 119, § 1.  In carrying out its role to ensure proper substitute care for children in such circumstances, the Department is bound by the Legislature's directive that "[t]he health and

2

safety of the child shall be of paramount concern and shall include the long-term well-being of the child."  *Id*.; *see Magazu v. Dep't of Child. & Families*, 473 Mass. 430, 431-32 (2016).

In accordance with its statutory authority, the Department has promulgated regulations setting forth general eligibility requirements as well as the process and standards governing licensure of foster and pre-adoptive parents.  *See* Mass. Gen. Laws ch. 119, § 37 (authorizing Department to "make rules and regulations concerning the administration of its duties"); 110 Code Mass. Regs. § 7.100 (general eligibility requirements for foster and pre-adoptive parents); *id*. § 7.104 (licensure standards for foster and pre-adoptive parents).[2]

**Initiation of Application Process for Foster Care License**

The Department recruits foster families throughout the Commonwealth through a variety of means, including community events, written materials, group information sessions, and a dedicated telephone line to answer questions from prospective foster families.  *See* Department of Children and Families Policy # 23-01, "Licensing of Foster, Pre-Adoptive, and Kinship Families" (effective February 27, 2023) ("Licensing Policy") (Compl. Ex. 3) at 13-14.  When an individual contacts the Department about becoming a foster parent, the Department conducts an "initial screening process" to determine whether the applicant and household members meet the Department's "initial eligibility criteria."  *See* 110 Code Mass. Regs. § 7.100(2).  Those "initial eligibility criteria," set forth in 110 Code Mass. Regs. §§ 7.100(3) and (4), include numerous baseline requirements, such as that the applicant's home meets the physical standards set forth in 110 Code Mass. Regs. § 7.105, *see id*. § 7.100(4)(a),  and that the applicant has a stable source of

---

[2] These regulatory licensure standards govern both those applicants who seek to eventually adopt a child placed in their foster care ("pre-adoptive parents") and those applicants who seek to serve as temporary foster parents (*i.e.*, with the expectation that the child will be reunified with his or her biological parents at a future time).  For the sake of brevity, the Department uses the term "foster parents" in this memorandum to refer to both "foster" and "pre-adoptive" parents unless necessary to distinguish between them.

income and stable housing history, *see id*. §§ 7.100(4)(c).  As part of the initial screening process, the Department also conducts a background check to ensure the applicant and household members lack a disqualifying criminal background or history of having committed child abuse or neglect.  *See* Licensing Policy at 14-17.

During or after the initial screening process, the Department provides the applicant with an application form and additional materials, including information about the evaluation process and the standards governing licensing.  *See* 110 Code Mass. Regs. §§ 7.103(1)-(5).  An applicant who meets the initial eligibility criteria proceeds to the Department's "Caregiver and Training Assessment" process, which entails a more thorough assessment to determine whether the applicant has "the capacity and dedication to become a foster parent."  *See* Licensing Policy at 17.  The caregiver training process includes at least three visits conducted by a licensed social worker.  *See* Licensing Policy at 19-22; *see also* 110 Code Mass. Regs. § 7.107.[3]  As part of the visits, the social worker must interview each parent individually at least once and together at least once; the social worker also interviews other household family members as well as non-household members who frequent the home.  *See* Licensing Policy at 19-22.  An applicant also is required to complete a training program approved by the Department.  *Id*. at 23-24; 110 Code Mass. Regs. § 7.107(1).

Through the assessment process outlined above, the social worker gathers information bearing on whether the applicant and home meet the licensing standards set forth in 110 Code Mass. Regs. §7.104 (standards governing licensure as a foster parent) and § 7.105 (standards governing foster care home).  *See id*. § 7.107(2)(m) (describing assessment process).

---

[3] In some instances (as in the Burkes' case), the caregiver assessment is conducted by a private agency under contract with the Department. *See* Compl. ¶ 110 & Ex. 2 at 3.

4

**Standards Governing Licensure of Foster Parents and Foster Care Homes**

To obtain a license—which is required to become a foster parent—an applicant "must demonstrate, to the satisfaction of the Department," enumerated attributes reflecting the applicant's ability to provide for a child's basic needs, including "the ability: (a) to assure that a child placed in his or her care will experience a safe, supportive, nurturing and stable family environment . . . free from abuse or neglect"; "(b) to assure that a child . . . will be provided with adequate food, clothing, shelter, supervision and other essential care at all times"; "(c) to assure that a child . . . will be provided with routine and emergency medical and dental care"; "(d) to promote the physical, mental, and emotional well-being of a child placed in his or her care, including supporting and respecting a child's sexual orientation or gender identity"; "(e) to respect and make efforts to support the integrity of a child's racial, ethnic, linguistic, cultural and religious background"; and "(q) to assume and carry out all other responsibilities of a foster/pre-adoptive parent as detailed in the standard written agreement between the Department and foster/pre-adoptive parents."  110 Code Mass. Regs. § 7.104(1).

**Licensing Determination**

At the completion of the assessment process, the social worker makes a licensing recommendation to a supervisor, who sends it to the Department's Area Program Manager; and, if the recommendation is to approve a license, the social worker may also make a placement recommendation that "take[s] into account any wishes of the foster/pre-adoptive parents about the type of child they want to foster and the capacities of the foster parent."  *See* Licensing Policy at 25-27; *id*. at 45.  The Department then assigns a "Licensing Review Team," which reviews the licensing recommendation and decides whether to approve the application.  *Id*. at 25-27.  The Team includes the licensing and training social worker and supervisor; the regional

program manager; the foster family social worker supervisor; the area office supervisor or

manager; and a regional manager or regional quality assurance supervisor.  *Id*. at 26.

Within ten days of the decision by the Licensing Review Team, the Department provides

the applicant with written notice of the decision including, in the case of a decision denying

licensure, notice of the applicant's right to challenge the decision by requesting a fair hearing.

Licensing Policy at 27; 110 Code Mass. Regs. § 7.107(6).  If the Department grants a license to

the applicant, the Department enters into a written agreement with the applicant, to be renewed

annually, setting forth "a statement of the responsibilities of the foster/pre-adoptive parent."  110

Code Mass. Regs. § 7.111.[4]  The written agreement reflects the fact that, in contrast to the

constitutionally based liberty interest that biological parents have in the care and custody of their

children, *see Santosky v. Kramer*, 455 U.S. 745, 753 (1982), a foster parent's relationship with a

child "has its source in state law and contractual arrangements," *Smith v. Org. of Foster Families*

*for Equal. and Reform*, 431 U.S. 816, 845 (1977).  An applicant for a license as a foster parent

thus has no "right" (constitutional or otherwise) to a license in the first instance; rather, an

applicant may obtain a license only if the applicant meets the applicable licensing requirements.

*See Magazu*, 473 Mass. at 432-33, 445-46 (upholding Department's denial of plaintiffs'

application for foster care license where plaintiffs, whose use of corporal punishment on their

---

[4] The written agreement contains, among other things, "a statement of any limitations on the
identity or individual characteristics of children who may be placed in the foster/pre-adoptive
home."  110 Code Mass. Regs. § 7.111(4).  Contrary to plaintiffs' suggestion, this provision does
not give the Department "discretion to license a family while taking into account their beliefs on
gender and sexuality when making placement decisions."  *See* Compl. ¶ 93.  It has nothing to do
with the licensing decision at all.  Rather, this statement is a function of the fact that the
Department's regulations elsewhere prescribe physical requirements for foster homes, *see* 110
Code Mass. Regs. § 7.105, which sets forth conditions relating to bedroom arrangements that
differ depending on whether a foster child is placed with a sibling or not and minimum square
footage requirements that differ for kinship placements as compared to non-kinship placements.

own children was based on their religious beliefs, did not meet licensing requirement prohibiting use of corporal punishment against a foster child).

**Standards Governing Placement of Children with Foster Care Parents**

The Department's regulations also set the framework for the Department's decisions concerning the placement of children in its custody.  The overriding consideration in all out-of-home placement decisions is "the best interests of the child, based upon safety, well-being and permanency of the child and the child's individual needs."  110 Code Mass. Regs. § 7.101(1). The regulations enumerate specific factors to be considered, including the proximity of the prospective foster placement to the child's biological family; the individual needs of a child and capacity of prospective foster parents to meet those needs; and whether a prospective placement can also serve as the placement for any of the child's siblings.  *Id*.  The regulations direct the Department to consider various placement resources in a particular order, with first consideration given to a kinship placement.  *Id*.

**FACTUAL AND PROCEDURAL BACKGROUND**[5]

**The Burkes' Application to Be Foster Parents and Initial Assessment of the Application**

In January 2022, the Burkes applied for a license to serve as foster parents.  Compl. ¶ 102.[6]  As part of the application process, they attended the Western Regional MAPP Training[7]

---

[5] The factual background is drawn from the Complaint's factual allegations and exhibits, and other information of which the court may take judicial notice.  *See Haley v. City of Boston*, 657 F.3d 39, 46 (1st Cir. 2011).

[6] In Compl. ¶ 102, the Burkes allege that they applied to be "resource parents"; elsewhere in the Complaint, they specify that they were willing to serve as "temporary caregivers," *i.e.*, by becoming foster parents, and that they "were also open to adopting children."  *Id*. ¶¶ 46-47.  For brevity and consistency, *see supra* footnote 2, the Department uses the term "foster parents" when discussing the Burkes' application and Department's licensing determination.

[7] "MAPP" is an acronym for "Massachusetts Approach to Partnerships in Parenting."  *See* Massachusetts Approach to Partnerships in Parenting (MAPP) Trainings,

in May and June 2022.  *Id.* ¶ 103.  The Burkes assert that they were "taken aback" during one of

the sessions because an instructor allegedly stated that "parents who were not willing to affirm

same-sex relationships and transgender identities should not be [foster] parents."  *Id.* ¶ 105.

After the training, an unidentified Department employee allegedly "expressed a somewhat more

moderate tone, essentially stating that this wasn't the case and that [the Department] understood

that there were people of different backgrounds there."  *Id.* ¶ 106.

       In October 2022, the Department referred the Burkes to 18 Degrees' Adoption

Management Services ("18 Degrees"), a private agency with which the Department contracted to

conduct an assessment of the Burkes and their home.  *See* Compl. ¶ 110 & Ex. 2 at 3.  Linda-

Jeanne Mack of 18 Degrees interviewed the Burkes and prepared a license study report for the

Department.  *See* Compl. ¶¶ 109-10, 123 & Ex. 2.  As reflected in that report, Mack spoke with

the Burkes about many topics, including their personal and mental health histories; their desire to

adopt a child; their parenting styles and household rules; their interests and activities; and their

Catholic faith.  *See* Compl. Ex. 2 at 2-14.  The Burkes expressed their interest in parenting a

child between the ages of 4 and 12 years old; their openness to fostering a child of any racial,

ethnic, or cultural background; and the fact that they were not comfortable parenting a child

already diagnosed with Autism Spectrum Disorder, a child with "extreme physical needs that

would require heavy lifting," or a child known to have "violent outbursts and elopements."  *Id*. at

13-14; *see* Compl. ¶¶ 118-20.

       The report reflected that Mack had "many challenging conversations with [the Burkes]

about religion and how they would treat a child or youth who identifies as a minoritized sexual

---

https://www.mass.gov/guides/massachusetts-approach-to-partnerships-in-parenting-mapp-
trainings (last visited November 7, 2023).

or gender identity."  Compl. Ex. 2 at 3; *see* Compl. ¶¶ 111-17.  According to the report, the

Burkes "immediately identified the importance of their religious identity in the first interview

with [Mack]" and told her about their experience at the MAPP Training.  Compl. Ex. 2 at 3.  At

that time, Mack "began an initial conversation . . . about their feelings regarding parenting

children and youth who identify as LGBTQIA++."  Compl. Ex. 2  at 10.[8]  Ms. Burke

"immediately said, 'let's take the T out of it.'"  *Id*.  Mack chose to hold off asking about "youth

who identify as trans or out of the gender binary" until the couple's individual interviews, but

she did go on to ask how the Burkes would feel if their child identified as lesbian, gay, bisexual,

queer, or any other sexuality.  *Id*.  Ms. Burke responded: "[T]here's nothing wrong with it, I'm

going to love you the same, but I believe you would need to live a chaste life."  *Id*.  Mr. Burke

"appeared more open," stating that he would want to have a conversation with the child and his

wife.  *Id*.  Both expressed that this would not change how they treat their child and that they

would "cross that bridge when and if they got to it."  *Id*.

　　　　Mack sent an e-mail to the Department after her first meeting with the Burkes, expressing

a concern that "they are not supportive of LGBTQIA+ youth."  Compl. ¶ 124 & Ex. 1 at 12.  She

wrote that she would "need to work through" her "concerns," and, cautious of her own "bias,"

asked "how this played out in MAPP."   Compl. Ex. 1 at 12-13; *see* Compl. ¶ 128.[9]

　　　　Shortly thereafter, Mack met with Ms. Burke for her individual interview.  Compl. Ex. 2

at 10.  Ms. Burke stated that she "does not believe in gender affirming care for children," "does

---

[8] "Research reveals that LGBTQ youth are overrepresented in foster care.  Like other foster
youth, they are disproportionately youth of color."  Massachusetts Commission on Lesbian, Gay,
Transgender, Queer, and Questioning Youth, *LGBTQ Youth in the Massachusetts Child Welfare
System: A Report on Pervasive Threats to Safety, Wellbeing, and Permanency*, 9 (July 29, 2021),
available online at https://www.mass.gov/doc/commission-report-on-dcf/download.

[9] The exhibits to the Complaint do not reflect whether the Department responded.

not believe that a child who has not fully developed is able to understand the ramifications of 'gender reassignment,'" and does not think it is "fair to 'condemn a child to a lifetime of doctors appointments and pain.'" *Id.* Ms. Burke called gender affirming care "chemical castration." *Id.* When Mack asked what would happen if Ms. Burke's child decided, at age 18, to transition genders or express their gender identity "outside of what is binary," Ms. Burke responded: "I would feel sad for them, they're not going to understand the ramifications." *Id.* at 11. Ms. Burke continued to say that "she's not sure how it will impact her relationship with her child but that she will continue to try to prevent her child from 'doing anything that can't be changed.'" *Id.* Ms. Burke told Mack that she "understood why [Mack] was asking her such questions but that it is hard to know how she will react in a hypothetical situation." *Id.*

Mack "directly asked [Ms. Burke] if she would throw a child out of the home or send a child to conversion therapy." Compl. ¶ 117 & Ex. 2 at 11. Ms. Burke initially responded that "there are different definitions of conversion therapy reporting" and reported her understanding that "in Canada conversion therapy is considered a parent reaffirming their child's born gender." Compl. Ex. 2 at 11. After Mack described her understanding of conversion therapy, Ms. Burke said she "would never throw a child out who is LGBTQIA+ and would not use what [Mack] described conversion therapy to be." Compl. ¶ 117 & Ex. 2 at 11.

One week later, Mack interviewed Mr. Burke, who said that he "want[s] to be able to have discussions . . . with his child that take the 'long term' into account, believing that the child may see a gender identity change as something that 'looks shiny' versus 'truly believing that I am this way.'" Compl. Ex. 2 at 11. Mr. Burke shared his belief that "we're in an instant gratification culture." *Id.* He told Mack that he "wouldn't want his child to have [to] go through painful things that they don't know the long term of," *id.*, and that he "believes in limiting doctor

visits to only what is necessary to keep things normal for a child and therefore would likely not consider any type of gender affirming care while the child is under 18." *Id.* at 12.

When Mack asked Mr. Burke about his views on same-sex relationships, he shared that he had attended "many friends' weddings who have been gay" and that he "would likely attend his child's wedding if they married someone of the same sex regardless of his beliefs." Compl. Ex. 2 at 12. He said, "[h]ate the sin, not the sinner," sharing his belief that "Catholics do not hate lesbians or gay people[,] it is the act that they have an issue with because they look at marriage as between a woman and a man and that sex is an act of marriage." *Id.* He told Mack he does not believe in conversion therapy. *Id.*

In her license study report, Mack summarized her interviews with the Burkes and shared her impression that they had "many strengths." Compl. ¶ 126 & Ex. 2 at 15. At the same time, Mack remained "apprehen[sive] about recommending them as a [foster] family due to the couple's views related to people who identify as LGBTQIA++." Compl. ¶ 127 & Ex. 2 at 15. Mack wrote: "The couple expressed that they are not open to gender affirming care and believe that partnership outside of heterosexual relationships is a sin. They are heavily involved in their Catholic Church and cite their religious views as their primary reason for seeing LGBTQIA++ individuals in this way." Compl. Ex. 2 at 15. Mack noted that "it is hard to predict the future and there is no way to guarantee the gender identity of a child over time." *Id.* Because of this, Mack recommended that the Department approve plaintiffs' application "with conditions, specifically around religion and LGBTQIA++ related issues." Compl. ¶ 125 & Ex. 1 at 9. Mack's report was approved by a clinical supervisor at 18 Degrees and sent to the Department. *See* Compl. Ex. 1 at 7-9.

11

**The Department's Denial of the Burkes' Application**

One of the individually named defendants, Tywanna Jones, served as the Burkes'

caseworker for the Department and their primary point of contact.  *See* Compl. ¶¶ 130, 134.

After the Burkes completed their interviews, Jones informed them that her supervisor had

approved the license study and that "[i]t now sits with management team for their review and

decision."  *Id*. ¶ 131 & Ex. 1 at 6.

On March 31, 2023, the Department's Licensing Review Team ("LRT") met to review

the Burke's application.  Compl. ¶ 133.  The LRT consisted of all of the defendants named in

their individual capacities, except for Laurie Sullivan.  *Id.* ¶ 134; *see supra* footnote 1.

According to Jones's dictation note, "the LRT clinical decision was that [the couple] would not

be affirming to a child who identified LGBTQIA."  Compl. Ex. 1 at 3.  The LRT thus determined

that the Burkes' application be denied.  *Id.*; *see* Compl. ¶ 138.

The LRT updated the license study to record its decision, writing:  "[Department] policy

requires that licensed foster parents help keep children safe and provide them with a sense of

normalcy.  The Department expects that foster parents support connections to the child's racial,

ethnic, linguistic, cultural, and religious background, sexual orientation and gender identity.

Based on this famil[y's] beliefs about children who identify as LGBTQIA+ and after a careful

review of this assessment by the regional DCF licensing and training review team, the

Department is unable to issue a license for them to foster/adopt at this time."  Compl. Ex. 2 at 15;

*see* Compl. ¶¶ 141-42 & Ex. 1 at 3.

Jones notified the Burkes, by telephone, of the LRT's decision on the same day it was

made (March 31, 2023).  Compl. ¶ 140 & Ex. 1 at 2.  The Department also notified them by

letter.  *See* Compl. ¶¶ 143-44 & Ex. 5.  In that correspondence, signed by Dawn Sweetman

12

(another of the individually named defendants), the Department explained that it was unable to license the Burkes because they had failed to demonstrate the ability "to promote the physical, mental, and emotional well-being of a child placed in his or her care, including supporting and respecting a child's sexual orientation or gender identity," as required by 110 Code Mass. Regs. § 7.104(1)(d), and "to respect and make efforts to support the integrity of a child's racial, ethnic, linguistic, cultural, and religious background," as required by 110 Code Mass. Regs. § 7.104(1)(e).  Compl. Ex. 5 at 1.  The Department informed the Burkes of their right to appeal the decision, through a fair hearing process, and provided instructions for doing so. at 1-3.

The Burkes requested a fair hearing and sought a copy of their file from the Department. Compl. ¶ 147.  Upon reviewing the file, the Burkes identified what they perceived to be "discriminatory statements and decisions made by [the Department]."  *Id.* ¶ 148.  The Burkes then withdrew their request for a fair hearing and instead filed this suit.  *See id.* ¶ 150.

**The Filing of the Complaint**

The Verified Complaint names twelve defendants: Kate Walsh, in her official capacity as Secretary of the Massachusetts Executive Office of Health and Human Services, Compl. ¶ 21; Linda Spears, in her official capacity as Commissioner of the Massachusetts Department of Children and Families, *id.* ¶ 22; the nine members of the Burkes' LRT, in their official and individual capacities, *id.* ¶¶ 24-32; and Laurie Sullivan, Regional Director of the Department's Western Regional Office, in her official and individual capacities, *id.* ¶ 23.[10]

---

[10] Spears has since stepped down as Commissioner.  Her successor—Acting Commissioner Staverne Miller—is automatically substituted as a defendant pursuant to Fed. R. Civ. P. 25(d). Additionally, although the Complaint identifies Sullivan as an "Area Director," *see* Compl. ¶ 23, her title is Regional Director.

As to the defendants named in their individual capacities, the Complaint only mentions the nine defendants who were members of the LRT, by name, in two places: the portion of the Complaint identifying them as parties and LRT members, *see* Compl. ¶¶ 24-32; and one additional paragraph repeating a list of those nine defendants by name and position title, *id*. ¶ 134.  The Complaint only mentions defendant Sullivan by name in one paragraph identifying her by title, and asserting that "[h]er role means that she has authority over and responsibility for the Burkes' license denial."  *Id.* ¶ 23.

The Complaint asserts five causes of action under 42 U.S.C. § 1983 against all defendants, alleging that they violated the Burkes' First Amendment rights of free exercise of religion (Counts I-IV) and freedom of speech (Count V).  Each of these claims allegedly arises from the Department's final decision denying the Burkes' license application or some collective action by the LRT; they say nothing about the actions of individual LRT members or Sullivan.  *See*, *e.g.*, Compl. ¶¶ 165, 175, 189, 195, 207.  Even so, the Complaint seeks nominal and compensatory damages against the ten defendants named in their individual capacities, along with declaratory and injunctive relief against all defendants.  Compl. Prayer for Relief ¶¶ (a)-(h).

## <u>ARGUMENT</u>

**I.    THE COMPLAINT FAILS TO SET FORTH SUFFICIENT ALLEGATIONS OF PERSONAL INVOLVEMENT BY ANY OF THE DEFENDANTS NAMED IN THEIR INDIVIDUAL CAPACITIES.**

The claims asserted against the defendants named in their individual capacities should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6), because the Complaint does not adequately plead "personal involvement" by any of those defendants, a prerequisite to state a claim for relief against such officials under 42 U.S.C. § 1983.

Under Fed. R. Civ. P. 8(a), a complaint must set forth specific allegations attributable to each defendant, as each defendant is entitled to "fair notice of what the plaintiff's claim is and

14

the grounds upon which it rests." *Educadores Puertoriquenos en Accion v. Hernandez*, 367 F.3d 61, 66 (1st Cir. 2004) (citation and internal quotation marks omitted).  A complaint does not survive dismissal where a plaintiff merely asserts claims "collectively against the defendants." *McCants v. O'Leary*, No. 13-12505, 2013 WL 5726144, *3 (D. Mass. Oct. 17, 2013).  Rule 8(a) thus is "violated where a plaintiff, by engaging in 'group pleading,' fails to give each defendant fair notice of the claims against it." *Holmes v. Allstate Corp.*, No. 11 Civ. 1543, 2012 WL 627238, *22 (S.D.N.Y. Jan. 27, 2012), report and rec. adopted No. 11 Civ. 1543, 2012 WL 626262 (S.D.N.Y. Feb. 27, 2012).

This pleading requirement is particularly important in the context of civil rights, since "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). "Since there is no *respondeat superior* liability under section 1983 . . . , liability in damages can only be imposed upon officials who were *involved personally* in the [alleged] deprivation of constitutional rights" at issue. *Pinto v. Nettleship*, 737 F.2d 130, 132 (1st Cir. 1984) (emphasis added); *see Febus-Rodriguez v. Betancourt-Lebron*, 14 F.3d 87, 91-92 (1st Cir. 1994) (public official sued individually under § 1983 "may be found liable only on the basis of his own acts or omissions").  This element of "personal involvement" is an absolute "prerequisite to an award of damages under § 1983," *Rahman v. Fisher*, 607 F. Supp. 2d 580, 585 (S.D.N.Y. 2009) (citation and internal quotation marks omitted), and must be plausibly alleged so as to show that "each individual defendant was a cause of the violation," *Sanchez v. Pereira-Castillo*, 590 F.3d 31, 41 (1st Cir. 2009).

Here, Plaintiffs fail to set forth any *individualized* allegations of wrongful conduct by any of the ten defendants named in their individual capacities.  Plaintiffs allege that nine of those

defendants (Anna Moynahan, Theresa Harris, Dawn Sweetman, Tywanna Jones, Caitlynn Levine, Euphemia Molina, Stacy Clark, Luz Estrada, and Angel Emerson) were members of the Department's Licensing Review Team that denied plaintiffs' application for a foster care license. *See* Compl. ¶ 134.  Plaintiffs further allege—in a series of paragraphs containing identical allegations (except for the defendant's name and job title)—that "as a member of the Licensing Review team" that denied the Burkes' license application, each of the above nine defendants "was directly involved in the Burkes' license denial."  *See* Compl. ¶¶ 24-32.  Plaintiffs then lump all nine defendants together in one additional paragraph containing the conclusory statement that, "[a]s members of the [License Review Team], each of these individuals was personally and directly involved in the decision on the Burkes' license."  Compl. ¶ 135.[11]

Additional allegations describing the Department's denial of the Burkes' license application likewise do not identify any particular actions by any of the individually named defendants, instead referring generically to the "LRT [License Review Team]" or "the Department."  *See* Compl. ¶ 138 (alleging that the "LRT decided to deny" the Burkes' application); *id*. ¶ 139 (alleging that "[t]he LRT's notes do not indicate any reason for the denial" other than the Burkes' beliefs regarding sexual orientation and gender identity); *id*. ¶ 141 (alleging that the "LRT accepted the license study written by Mack" and added its own conclusion at the end of the study); *id*. ¶ 142 (quoting statement at end of Mack's license study, *see* Compl. Ex. 2 at 15, explaining why "the Department is unable to issue a license for them to

---

[11] Consistent with *Iqbal*, 556 U.S. at 681, courts in the First Circuit "disregard all conclusory allegations that merely parrot the relevant legal standard."  *Hernandez-Cuevas v. Taylor*, 723 F.3d 91, 102 (1st Cir. 2013) (citation omitted).

foster/adopt at this time").[12]

Plaintiffs' undifferentiated allegations about the collective action of "the Licensing Review Team" do not suffice to state a claim for personal liability against any of the individually named defendants under 42 U.S.C. § 1983.  *See McCants*, 2013 WL 5726144, at *3 (complaint was subject to dismissal for failure to meet pleading requirements, where plaintiff's § 1983 claims were "primarily asserted collectively against the defendants" and where plaintiff "does not clearly link specific factual allegations of wrongdoing against each defendant," such that "it is virtually impossible to cull out the causes of action asserted against each of the defendants individually").

Plaintiffs likewise fail to set forth any particularized allegations against the tenth individually named defendant—Laurie Sullivan, the Department's Regional Director for the Western Regional Office.  Indeed, the Complaint contains only one paragraph identifying Sullivan by name; there, plaintiffs merely state generically that Sullivan "has authority over and responsibility for the Burkes' license denial," *see* Compl. ¶ 23, without specifying *any* individualized actions by Sullivan that violated plaintiffs' rights.  To the extent plaintiffs intend to assert a claim against Sullivan based on her supervisory oversight of any of the other defendants, the Complaint's "conclusory statements" and "factually threadbare recitals" that Sullivan has "authority" and "responsibility" for the denial of the Burkes' license application do not state a claim against Ms. Sullivan for personal liability under § 1983.  *Iqbal*, 556 U.S. at 678; *see Penate v. Hanchett*, 944 F.3d 358, 367 (1st Cir. 2019) ("[s]upervisors cannot be held liable

---

[12] Plaintiffs also cite a statement in the Department's dictation notes that "Issue(s) of concern for which the couple's license study was denied is based on the couple's statements/responses regarding placement of children who identified LGBTQIA," Compl. ¶ 138 (quoting Compl. Ex. 1 at 3).  Yet again plaintiffs do not link the "concern" to any individual member of the LRT, as would be a prerequisite to establishing any potential personal liability under plaintiffs' theory.

under a theory of respondeat superior," and "[l]iability cannot rest on a defendant's position of authority alone"); *Feliciano-Hernandez v. Pereira-Castillo*, 663 F.3d 527, 533-34 (1st Cir. 2011) (conclusory allegations insufficient to establish supervisor liability claim, which requires "affirmative link between the behavior of a subordinate and the action or inaction of his supervisor . . . such that the supervisor's conduct led inexorably to the constitutional violation" and showing that "the official had actual or constructive notice of the constitutional violation") (citations omitted).

## II. THE INDIVIDUAL CAPACITY CLAIMS ARE ALSO BARRED BY THE DOCTRINE OF QUALIFIED IMMUNITY.

At the appropriate time, upon a developed evidentiary record, all defendants will move for judgment on the ground that they did not violate plaintiffs' First Amendment rights to free exercise of religion and free speech.  For now, this Court should dismiss the damages claims against the individual defendants because they are barred by the doctrine of qualified immunity.

Under that doctrine, government officials are shielded from the burdens of litigation and the threat of ruinous personal liability "so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Estate of Rahim by Rahim v. Doe,* 51 F.4th 402, 410 (1st Cir. 2022) (citation omitted); *Ablordeppey v. Walsh*, __ F.4th __, 2023 WL 7013383, *3 (1st Cir. 2023).[13]  "'Clearly established' means that, at the time of the [official's] conduct, the law was 'sufficiently clear'

---

[13] While courts employ a two-prong approach—asking: "(1) whether the defendant violated the plaintiff's constitutional rights and (2) whether the right at issue was 'clearly established' at the time of the alleged violation," *Estate of Rahim by Rahim*, 51 F.4th at 410—the Court here need not engage in the first prong of the analysis because, even if the rights asserted by plaintiffs did exist, they were not "clearly established" at the time of the conduct alleged.  *Penate*, 944 F.3d at 366 ("Courts need not engage in the first inquiry [of the qualified immunity analysis] and may choose, in their discretion, to go directly to the second.").

that every 'reasonable official would understand that what he [or she] is doing' is unlawful." *Dist. of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (citation omitted).  This requires "a high degree of specificity" in order to reach "the crucial question whether the official acted reasonably in the particular circumstances." *Id.* (internal citations and quotation marks omitted).

Applying these principles here, the individual capacity claims must be dismissed.  To begin with, and as explained in Section I, the Complaint asserts the same four claims against all the individually named defendants, regardless of their differing employment capacities and responsibilities.  Plaintiffs do not make specific factual allegations of wrongdoing against any of these defendants, but rather rest on broad, conclusory allegations that are themselves insufficient to state a claim under *Iqbal*, 556 U.S. at 678, and other governing law.  As such, each of these defendants are entitled to the protection of qualified immunity—including immunity from suit—because the allegations do not plausibly show a violation of clearly established law that is "particularized" to each defendant.  *See White v. Pauly*, 580 U.S. 73, 79 (2017).

Turning from the facts to the law, to defeat qualified immunity, a legal principle must be "'settled law,' which means it is dictated by 'controlling authority' or a 'robust consensus of cases of persuasive authority.'"  *Wesby*, 538 U.S. at 63 (internal citations omitted); *see id.* (further stating, "[t]o be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent").  Neither the Supreme Court nor the First Circuit has found a First Amendment violation based on a child welfare agency's action in enforcing a requirement that all foster parents promote "the physical, mental, and emotional well-being of a child placed in his or her care," 110 Code Mass. Regs. § 7.104(1)(d), through the denial of a license to an applicant who is unwilling to support a child's sexual orientation or gender identity. The patchwork of cases cited in the Complaint also falls short, as many of those cases simply

state general principles of constitutional law and none comes close (individually or together) to establishing a "constitutional norm" regarding the free exercise and free speech rights of individuals applying to serve as foster parents. *Estate of Rahim by Rahim*, 51 F.4th at 410 (noting that, "[w]hile a case 'directly on point' is not required, 'existing precedent must have placed the statutory or constitutional question beyond debate'") (citation omitted).[14]

The Supreme Court's decision in *Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021), does not suggest otherwise. In *Fulton*, Philadelphia insisted that a religiously affiliated foster care agency agree to a contract provision prohibiting discrimination against prospective foster parents based on their sexual orientation. The Court held in pertinent part that the City's policy violated the Free Exercise Clause because the anti-discrimination provision "incorporate[d] a system of individual exemptions, made available . . . at the 'sole discretion' of the [City's Commissioner of Human Services]," *Fulton*, 141 S.Ct. at 1878, and thus was not generally applicable. *Id.* at 1881-82. In sharp contrast here, applicable Department regulations do not grant the individually named employees *any* discretion to waive the requirement that a foster-

---

[14] Neither *Lasche v. New Jersey*, No. 20-2325, 2022 WL 604025, *5 (3d Cir. Mar. 1, 2022) (unreported decision), cited at Compl. ¶ 173, nor *Blais v. Hunter*, 493 F. Supp. 3d 984 (E.D. Wash. 2020), cited at Compl. ¶ 12, is binding on this Court, and the two cases do not amount to a "consensus" of "persuasive authority." *See Wesby*, 583 U.S. at 66, n.8 (questioning but not deciding "what precedents—other than [the Supreme Court's]—qualify as controlling authority for purposes of qualified immunity"). Indeed, in *Lasche*, after finding that the defendants had not demonstrated a "neutral, generally applicable" basis for removing the plaintiffs' foster child and suspending their foster-parent license after they shared their religious views on same-sex marriage, the Third Circuit remanded the matter for "initial consideration of the qualified-immunity defense." 2022 WL 604025, at *4. The district court then held that the defendants were entitled to qualified immunity due to the lack of "any Supreme Court or Third Circuit precedent demonstrating that suspension of Plaintiffs' foster license in retaliation for imparting their religious views regarding homosexuality to their foster child violated a clearly established constitutional right." *Lasche v. New Jersey*, No. 18-17552, 2022 WL 17250731, *5 (D.N.J. Nov. 28, 2022). Separately, although *Blais* involves somewhat closer (yet distinguishable) facts, an out-of-circuit district court decision is "insufficient as a matter of law to meet [the plaintiffs'] burden." *Estate of Rahim by Rahim*, 51 F.4th at 413.

parent applicant demonstrate the ability to promote the well-being of a child placed in their care, 110 Code Mass. Regs. § 7.104(1)(d), and to respect and support the integrity of the child's racial, ethnic, linguistic, cultural, and religious background, *id*. § 7.104(1)(e).  Plaintiffs attempt to obscure this fact by highlighting two other Department regulations, one allowing exemptions from a requirement that a foster parent be a United States citizen or have achieved other permanent resident status, *see* 110 Code Mass. Regs. § 7.104(6), and the other allowing exemptions from a requirement limiting the maximum number of foster children placed in a home, *see id.* § 7.105(12).  *See* Compl. ¶¶ 175-79.  But the operative legal question under the Free Exercise Clause is whether the particular regulation at issue is neutral and generally applicable—not whether some *other* regulation, having no bearing on the Department's denial of plaintiff's license application, may provide exceptions in certain circumstances.  *See Fulton*, 141 S.Ct. at 1878 (provision prohibiting discrimination against prospective foster families based on sexual orientation was not generally applicable because the provision *itself* included "a formal system of entirely discretionary exceptions").  As such, nothing in *Fulton* can reasonably be construed to have put defendants on notice that denial of the Burkes' license application based on their failure to demonstrate an ability to support a child's sexual orientation or gender identity would violate the First Amendment by virtue of the existence of exemptions in other regulatory provisions that did not form the basis for the Department's denial of the Burkes' license application.[15]

---

[15] Similarly, the Department's obligation to consider any limitations on the characteristics of children who may be placed in a particular foster home, pursuant to 110 Code Mass. Regs. § 7.111(4), would not alert a reasonable official that *Fulton* would prohibit them from denying the Burkes' application on the facts presented here.  *See* Compl. ¶¶ 92-93 (citing 110 Code Mass. Regs. § 7.111(4)).  As explained above, *see supra* footnote 4, this regulation governing placement does not authorize the Department to grant a waiver from its initial licensing

*Fulton* likewise does not clearly establish any rule that the First Amendment is violated by the mere existence of "individualized assessment[s]" as to whether a particular applicant demonstrates the ability to promote a child's well-being in conformance with applicable regulations.  *See* Compl. ¶¶ 159-62.  The Court's concern in *Fulton* was that exemptions from Philadelphia's contractual anti-discrimination provision were "made available . . . at the 'sole discretion'" of a city official.  141 S.Ct. at 1878.  *Fulton* does not suggest, however, that government officials are constrained from exercising their professional judgment in applying a regulation that has no exemptions; and *Fulton* did not give rise to a "clearly established" right on the part of foster parents to obtain a license notwithstanding their inability to satisfy a regulation—like the Department's—that has no exemptions.

## <u>CONCLUSION</u>

For the reasons set forth above, the Court should dismiss the claims in the Complaint asserted against the defendants named in their individual capacities.

---

requirement; rather, it merely recognizes that certain physical aspects of a foster parent's home, *i.e.*, those involving space limitations and bedroom arrangements, may affect placement decisions by the Department *after* an applicant has satisfied all of the licensing requirements, including the requirement to support a child's sexual orientation or gender identity.

Respectfully submitted,

ANDREA JOY CAMPBELL
ATTORNEY GENERAL

*/s/ Amy Spector*
Amy Spector (BBO No. 557611)
Kimberly Parr (BBO No. 679806)
Assistant Attorneys General
Government Bureau
One Ashburton Place
Boston, MA 02108
(617) 963-2076
amy.spector@mass.gov
kimberly.parr@mass.gov

Dated:  November 7, 2023

<u>**CERTIFICATE OF SERVICE**</u>

I certify that this document, filed through the Court's ECF system on November 7, 2023, will be sent electronically to registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Amy Spector*
Amy Spector
Assistant Attorney General