UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| MICHAEL BURKE and CATHERINE BURKE, | * * * * | |
| Plaintiffs, | * * | |
| v. | * * | Civil Action No. 23-11798-MGM |
| KATE WALSH, in her official capacity as Secretary of the Massachusetts Executive Office of Health and Human Services, ET AL., | * * * * | |
| Defendants. | * | |

MEMORANDUM AND ORDER REGARDING
DEFENDANTS' PARTIAL MOTION TO DISMISS
(Dkt. No. 59)

June 5, 2024

MASTROIANNI, U.S.D.J.

I.  INTRODUCTION

Michael and Catherine Burke ("Plaintiffs") sought to become foster parents through the Massachusetts Department of Children & Families ("DCF"). They participated in a rigorous pre-license process, which included training, interviews, and assessments, and DCF acknowledged their strengths as prospective foster parents. However, Plaintiffs—practicing Catholics who espoused traditional religious beliefs about marriage and sexuality—were denied a foster parent license because DCF determined "they would not be affirming to a child who identified as LGBTQIA."[1] (Dkt. No. 6-1 at 3.)

---

[1] The court takes judicial notice that LGBTQIA, in this context, stands for lesbian, gay, bisexual, transgender, queer or questioning, intersex, and asexual. *See, e.g.*, Massachusetts Department of Children & Families, *LGBTQ: A Guide for Working with Youth and Families* (Spring 2015), available at: https://www.mass.gov/doc/lgbtq-a-guide-for-working-with-youth-and-families/download.

1

Plaintiffs brought suit under 42 U.S.C. § 1983, asserting claims for violations of their free exercise and free speech rights and seeking declaratory, injunctive, and monetary relief. Defendants Kate Walsh (Secretary of the Massachusetts Office of Health and Human Services) and Linda Spears (Commissioner of DCF) are sued only in their official capacities. Defendants Laurie Sullivan (Area Director of the Western Regional Office of DCF), Anna Moynahan (Regional Clinical Director of DCF), Theresa Harris (Regional Program Manager of DCF), Dawn Sweetman (Adoption Development Licensing Unit ("ADLU") Supervisor for DCF), Tywanna Jones (ADLU Social Worker for DCF), Caitlyn Levine (Mental Health Specialist for DCF), Stacy Clark (Quality Assurance Supervisor for DCF), Euphemia Molina (License and Training Supervisor for DCF), Luz Estrada (License and Training Supervisor for DCF), and Angel Emerson (License and Training Supervisor for DCF) are sued in both their personal and official capacities. Defendants filed a partial motion to dismiss only the individual-capacity claims. Plaintiffs oppose Defendants' motion, except as to Defendant Sullivan, as Plaintiffs concede they "do not have knowledge sufficient to allege [Sullivan's] personal participation" in the foster parent license application denial. (Dkt. No. 65 at 6 n.3.)

The court will dismiss the individual-capacity claims against Defendant Sullivan, without prejudice. Otherwise, however, the court will deny Defendants' partial motion to dismiss.

## II.    BACKGROUND

The following facts, which are construed in a light most favorable to Plaintiffs, come from Plaintiffs' complaint and attachments thereto. Plaintiffs, lifelong residents of western Massachusetts, married in 2018. They were both raised as Catholics and continue to serve in active roles in the local Catholic Church. Catherine Burke has experience working with special needs children in education as a substitute teacher and a paraprofessional. Michael Burke served in the Marine Corps from 2002-2006, including a deployment in Iraq; he suffered post-traumatic stress disorder ("PTSD"), for

2

which he successfully sought treatment and from which he has gained "compassion and insight into the needs of others who suffer from trauma." (Dkt. No. 6 ¶ 38.)

In light of health issues which would make it difficult for them to become natural parents, Plaintiffs decided they wanted to become adoptive parents and pursued adoption through a private agency. Although the agency completed a home study and recommended Plaintiffs be approved as adoptive parents, Plaintiffs discontinued the process before they were matched with a child because the cost of private adoption proved too expensive. Plaintiffs then began exploring adoption through DCF as an alternative.

The DCF foster parent license process involves multiple stages of individualized assessment and training. Following an initial eligibility screening, DCF undertakes an "Application Review," which entails a home visit and background checks. *See* 110 C.M.R. §§ 7.100(1), 7.103, 7.107. (*See also* Dkt. No. 6-3 at 14-16.) The next stage is the "Caregiver Training and Assessment," which entails a more "thorough assessment of the family's caregiving capacity" as well as DCF-approved "foster parent training." (Dkt. No. 6-3 at 17, 23-24.) *See* 110 C.M.R. § 7.107(1). In addition, a License and Training Social Worker ("LTSW") must visit the prospective foster family at least three times, including at least two visits to the family's home, and interview the prospective parents both individually and together. The LTSW then completes a comprehensive assessment, which must include "confirmation that the applicant(s) . . . meet the standards established by 110 C.M.R. 7.104." 110 C.M.R. § 7.107(2)(m). (*See also* Dkt. No. 6-3 at 24-25.) Section 7.104, in turn, sets forth the "Standards for Licensure as a Foster/Pre-adoptive Parent," and requires that a foster parent applicant "demonstrate, to the satisfaction of the Department," 17 separate subjective qualities, including the ability "to promote the physical, mental, and emotional well-being of a child placed in his or her care, including supporting and respecting a child's sexual orientation or gender identity."

3

110 C.M.R. § 7.104(1)(d).[2] The LTSW's comprehensive assessment includes a licensing recommendation as well as "any placement recommendations," which "take[s] into account any wishes of the foster/pre-adoptive parents about the type of child they want to foster and the capabilities of the foster parent." (Dkt. No. 6-3 at 25, 45.) Following the LTSW's comprehensive assessment, a License Review Team ("Team") is assembled to examine the information gathered during the earlier stages of the license application process and ultimately decides whether to approve or deny the foster parent license application. After a license is granted, DCF enters into a written agreement with the applicant, which includes "a statement of any limitations on the identity or individual characteristics of children who may be placed in the foster/pre-adoptive home." 110 C.M.R. § 7.111(4). In addition, before any placement occurs, DCF must provide the prospective foster parents "with sufficient information about the child to enable [them] to determine whether to accept placement of the child." 110 C.M.R. § 7.112(1); *see also id.* ("The foster/pre-adoptive parent will receive information about the service plan for the child, behavior management guidelines and techniques, the child's medical needs, the child's educational needs, current health and education information and/or records available, legal status and any other special conditions or requirements.").[3]

Plaintiffs first extensively researched the DCF adoption system and decided they were willing to adopt children who might eventually be reunified with their birth families as well as those who could not be reunified. Plaintiffs were also willing to adopt sibling groups and children with certain special needs, and "[t]hey were . . . happy to welcome a child of any racial, cultural or ethnic

---

[2] DCF provides the LTSW with a number of suggested sample questions directed at the various criteria, including, under "Cultural Humility," questions specifically asking about the applicants' religious beliefs, practices, affiliations, and any religious expectations or requirements for children living in the home. (Dkt. No. 6-3 at 42.)

[3] Moreover, pursuant to DCF's LGBTQIA+ Nondiscrimination Policy, "[t]he Department matches children to foster families who can best meet their needs and maintains an electronic record of affirming placements that can best support the needs of LGBTQIA+ children." (Dkt. No. 6-4 at 2.)

background into their family." (Dkt. No. 6 ¶ 50.) In January of 2022, Plaintiffs applied through DCF to become foster parents.

In May and June of 2022, Plaintiffs attended the Western Regional Massachusetts Approach to Partnership in Parenting ("MAPP") Training, as required. The training spanned multiple weeks, and Plaintiffs attended every session. A MAPP Training instructor reported to DCF that Plaintiffs

> seem to have a solid understanding of how trauma can effect people, as Michael spoke openly about his PTSD as a Veteran. Both of them were active participants throughout MAPP and their comments often helped to enrich the training. It is anticipated that they will work cooperatively with DCF throughout their adoption journey.

(Dkt. No. 6-1 at 14.) Plaintiffs "were taken aback during one of the sessions that discussed care for LGBTQ children," as "[a]n instructor stated that parents who were not willing to affirm same-sex relationships and transgender identities should not be [foster] parents." (Dkt. No. 6 ¶ 105.) After that class, however, another DCF employee "expressed a somewhat more moderate tone, essentially stating that [the instructor's statement] wasn't the case and that DCF understood that there were people of different backgrounds there." (*Id.* ¶ 106.) This experience left Plaintiffs "fearful that they would be discriminated against due to their Catholic religious beliefs." (*Id.* ¶ 107.)

In October of 2022, DCF contracted with 18 Degrees' Adoption Management Services, a private agency, to perform the comprehensive assessment of Plaintiffs' foster license application. Linda-Jean Mack, a social worker employed by 18 Degrees, served as the LTSW and conducted in-depth interviews of Plaintiffs. During these interviews, Plaintiffs "were troubled that much of the questioning centered around their views on sexuality and their response if a child were, in the future, to struggle with gender dysphoria or to identify as gay or lesbian," with approximately one third of the time in the interviews spent on these questions. (*Id.* ¶ 111.) Plaintiffs responded "that they would love and accept their child, no matter his or her future sexual orientation or struggles with gender identity." (*Id.* ¶ 112.) However, Plaintiffs "conveyed their Catholic religious beliefs that marriage is between a woman and a man and that sexual relations are to be kept within the bounds of such a

5

marriage." (*Id.* ¶ 114.) Plaintiffs also shared their religious views on gender identity, explaining they "would not assist a medical gender transition for a hypothetical future child." (*Id.* ¶ 115.) Instead, Plaintiffs explained "that they would want to have frank, loving conversations with the child before any life-altering surgeries to fully understand what else might be going on in that child's life"; but "[r]egardless of the child's actions, [Plaintiffs] would continue to love that child." (*Id.* ¶ 116.) When Catherine was "directly asked . . . if she would throw a child out of the home or send a child to conversion therapy," she responded that "she would never throw a child out who is LGBTQIA+ and would not use what [Mack] described conversion therapy to be." (*Id.* ¶ 117 (quoting Dkt. No. 6-2 at 11).)

After Mack's first meeting with Plaintiffs, she sent an email to Defendant Dawn Sweetman, an ADLU Supervisor for DCF, asking if Sweetman had any notes from the MAPP training regarding Plaintiffs. (Dkt. No. 6-1 at 12.) Mack informed Sweetman that she "had some concerns that [Mack] will need to work through with them," explaining that Plaintiffs "had the 'right answers' but they are not supportive of LGBTQIA+ youth." (*Id.*) Mack stated that Michael "seems much more open and they can think critically about how they'd respond as parents, but their faith is not supportive and neither are they." (*Id.*) In addition, Mack stated:

> The couple does have a lot of strengths though and really seems to understand adoption/foster case. They have been doing a ton of reading and 'get it' in terms of identity, trauma, etc. I don't want to let me bias play in but I'm curious how this played out in MAPP.

(*Id.* at 12-13.)

In submitting her comprehensive assessment, Mack ultimately recommended "approval with conditions, specifically around religion and LGBTQIA++ related issues." (*Id.* at 9.) Mack's comprehensive assessment highlighted Plaintiffs' "many strengths," explaining:

> Due to their own mental health and history of traumatic experiences, [Mack] believes that they would be able to truly connect and support a child in a meaningful way. They are aware of how to care for themselves and can envision themselves using their own

6

> self care to help a child placed in their home. They have also spent significant time researching the unique challenges faced by children in foster care and children who have experienced adoption. They have clearly put a great deal of thought into their plan to adopt through the Department of Children and Families.

(Dkt. No. 6-2 at 15.) However, Mack expressed

> some apprehension about recommending them as [foster parents] due to the couple's views related to people who identify as LGBTQIA++. The couple expressed that they are not open to gender affirming care and believe that partnership outside of heterosexual relationships is a sin. They are heavily involved in their Catholic Church and cite their religious views as their primary reasons for seeing LGBTQIA++ individuals in this way. Unfortunately, it is hard to predict the future and there is no way to guarantee the gender identity of a child over time.

(*Id.*)

On March 31, 2023, the License Review Team met to review Plaintiff's file. The Team consisted of Anna Monahan, Regional Clinical Director at DCF; Theresa Harris, Regional Program Manager at DCF; Dawn Sweetman, ADLU Supervisor; Tywanna Jones, DCF Social Worker; Caitlyn Levine, DCF Mental Health Specialist; Euphemia Molina, DCF License and Training Supervisor; Stacy Clark, DCF Quality Assurance Supervisor; Luz Estrada, DCF License and Training Supervisor; and Angel Emerson, DCF License and Training Supervisor. Each of these Defendants, as members of the Team, "was personally and directly involved in the decision on [Plaintiffs'] license." (Dkt. No. 6 ¶ 135; *see also id.* ¶¶ 24-32.) A narrative of the Team's meeting states they acknowledged Plaintiffs' strengths, "including their willingness to parent a child w[ith] moderately significant medical, mental health and behavioral needs, their openness to maintaining birth family connections and resiliency regarding their respective mental health." (Dkt. No. 6-1 at 3.) However, the Team's narrative next states: "Issue(s) of concern for which the couple's license . . . was denied is based on the couple's statements/responses regarding placement of children who identified LGBTQIA. The [Team] clinical decision was that [Plaintiffs] would not be affirming to a child who identified LGBTQIA." (*Id.*) The Team largely adopted Mack's comprehensive assessment but exercised its discretion to insert the following conclusion: "Based on this famil[y's] beliefs about

7

children who identify as LGBTQIA+ and after a careful review of this assessment by the regional DCF licensing and training review team, the Department is unable to issue a license for them to foster/adopt at this time." (Dkt. No. 6-2 at 15.) Plaintiffs received a letter from ADLU Supervisor Sweetman stating that DCF was "not able to license you and your home as an unrestricted foster or adoptive family" because "there are specific licensing standards which have not been met." (Dkt. No. 6-5.) The letter cited 110 C.M.R. § 7.104(1)(d) and (e), which require that applicants "demonstrate, to the satisfaction of the Department the ability . . . to promote the physical, mental, and emotional well-being of a child placed in his or her care, including supporting and respecting a child's sexual orientation or gender identity; . . . [and] to respect and make efforts to support the integrity of a child's racial, ethnic, linguistic, cultural and religious background." (*Id.* (quoting 110 C.M.R. § 7.104(1)(d), (e).)

Plaintiffs initially filed an appeal within DCF but, after receiving their file and other information regarding the denial, withdrew their request and proceeded to file this action. In Count I, Plaintiffs assert a claim for violation of their free exercise rights based on the theory that DCF's licensing policy was not "generally applicable," under *Fulton v. City of Philadelphia*, 593 U.S. 522 (2021), because the licensing decision entails an individualized assessment. In Count II, Plaintiffs assert a claim for violation of their free exercise rights based on the theory that DCF's licensing policy was not "generally applicable," under *Tandon v. Newsom*, 593 U.S. 61 (2021), because it treats "comparable secular activity more favorably than religious exercise," *id.* at 1296. In Count III, Plaintiffs assert a claim for violation of their free exercise rights based on the theory that DCF's licensing assessment expressed hostility to their religion, under *Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n*, 5584 U.S. 617 (2018). In Count IV, Plaintiffs assert a claim for violation of their free exercise rights based on the theory that DCF's licensing policy is not "neutral," under *Carson v. Makin*, 596 U.S. 767 (2022) and *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449 (2017),

because it targets religious beliefs for disfavored treatment. In Count V, Plaintiffs assert a claim for violation of their free speech rights based on the theory that DCF sought to compel Plaintiffs "to speak contrary to [their] beliefs on a significant issue of personal conviction, all in order to eliminate ideas that differ from its own," under *303 Creative LLC v. Elenis*, 600 U.S. 570, 598 (2023).

### III.   STANDARD OF REVIEW

To survive a Rule 12(b)(6)[4] motion to dismiss for failure to state a claim, a complaint must contain "sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). A facially plausible claim contains pleaded facts that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* However, when the well-pleaded facts only "permit the court to infer . . . the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)). In evaluating the sufficiency of the factual allegations contained in the complaint, the court must be careful to credit the factual assertions made by the plaintiff while disregarding "legal conclusions," such as "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.* at 678. Ultimately, determining whether a complaint states a plausible claim for relief is a context-specific inquiry, requiring the reviewing court to draw on its judicial experience and common sense. *Id.* at 679.

### IV.   DISCUSSION

Defendants raise two arguments in support of their partial motion to dismiss the individual-

---

[4] Although Defendant's partial motion to dismiss cites both Rule 12(b)(1) and Rule 12(b)(6), it is clear from Defendants' briefing that there is no subject-matter jurisdiction challenge under Rule 12(b)(1). The court therefore analyzes the motion to dismiss under Rule 12(b)(6).

capacity claims. First, they argue the complaint fails to set forth particularized allegations against the individual-capacity Defendants. Second, they argue that the individual-capacity Defendants are entitled to qualified immunity. The court rejects both arguments.

A. Group Pleading

Defendants first argue that Plaintiffs' complaint uses improper "group pleading" by asserting allegations collectively against the nine members[5] of the Team, rather than setting forth individualized allegations of wrongful conduct against these individual-capacity defendants. Thus, according to Defendants, Plaintiffs' complaint fails to give these defendants fair notice of the claims against them and thereby violates Fed. R. Civ. P. 8(a). The court does not agree.

The First Circuit recently expressed "some doubt about [the defendant's] argument that the complaint's failure to specify between the two defendants should necessarily result in dismissal," as "[c]ertain information . . . may often be unavailable to the plaintiff at this early stage of the litigation." *Rodriguez-Rivera v. Allscripts Healthcare Sols., Inc.*, 43 F.4th 150, 172 (1st Cir. 2022). In doing so, the First Circuit favorably cited *Zond, Inc. v. Fujitsu Semiconductor Ltd.*, 990 F. Supp. 2d 50, 53-54 (D. Mass. 2014). In *Zond*, the court explained that "group pleadings are not, prima facie, excluded by Rule 8(a)"; rather, "[a]t the motion to dismiss stage a complaint generally will only be dismissed where it is entirely implausible or impossible for the grouped defendants to have acted as alleged." *Id.* at 53 (internal quotation marks omitted). The *Zond* court held that "despite making allegations in the second amended complaint against the Fujitsu corporate group, Zond provides each individual defendant with fair notice of each claim alleged against it," noting that "the consistency of the subject of the pleading in this case, despite its group format, means that it can be reasonably inferred that each and every allegation is made against each individual defendant." *Id.* at 53-54. Courts in this

---

[5] As mentioned, the individual-capacity claims against Defendant Laurie Sullivan will be dismissed without prejudice, in light of Plaintiffs' concession that they "do not have knowledge sufficient to allege her personal participation in [Plaintiffs'] denial." (Dkt. No. 65 at 6 n.3.)

10

district have reached the same conclusion in civil rights cases, given that "there is no heightened pleading requirement in civil rights actions." *Galego v. City of Fall River*, 2023 WL 8039295, at *7-8 (D. Mass. Nov. 20, 2023); *see also Perrot v. Kelly*, 2023 WL 2939277, at *15-17 (D. Mass. Feb. 15, 2023); *Echavarria v. Roach*, 2017 WL 3928270, at *3-4 (D. Mass. Sept. 7, 2017); *Carter v. Newland*, 441 F. Supp. 2d 208, 213-14 (D. Mass. 2006).

Here, Plaintiffs have adequately alleged that the Team, collectively, denied Plaintiffs' license application and that each of the nine remaining individual-capacity defendants were personally and directly involved in the team's decision. (*See* Dkt. No. 6 ¶ 135; *see also id.* ¶¶ 24-32.) This is not a case where it is "entirely implausible" or "impossible" for the grouped defendants to have acted in this manner. *Zond*, 990 F. Supp. 3d at 53. Nor, contrary to Defendants' argument, are the allegations of personal involvement merely "conclusory." *See Rodriguez-Vives v. Puerto Rico Firefighters Corps of Puerto Rico*, 743 F.3d 278, 286 (1st Cir. 2014) ("A conclusory allegation, however, is one which simply asserts a legal conclusion, such as 'I was retaliated against,' not a specific factual allegation, such as 'my supervisor threw a book at me,' that merely lacks some surrounding context."). Moreover, to the extent that these individual defendants acted disparately during the license application review process, those differences may be explored during discovery and Defendants "may argue at a later stage in the litigation that Plaintiffs cannot make the required evidentiary showing" to support individual liability. *Cota v. U.S. Bank Nat'l Ass'n*, 2016 WL 922784, at *6 (D. Me. Mar. 10, 2016). At this stage, however, Plaintiffs' "group pleading" suffices.

B. <u>Qualified Immunity</u>

Defendants next argue that the individual-capacity claims are barred by qualified immunity. Plaintiffs respond by arguing that Defendants, at this stage, have waived their qualified immunity arguments as to four of their five counts by failing to set forth, in their opening brief, specific

arguments as to those four counts and only developing an argument as to Count I, regarding *Fulton v. City of Philadelphia*, 593 U.S. 522 (2021). The court agrees.

In addressing qualified immunity, Defendants' memorandum of law in support of the motion to dismiss is clearly focused on Count I of Plaintiffs' complaint. (See Dkt. No. 62 at 18-22.) In Count I, Plaintiffs assert that DCF's licensing policy is not "generally applicable" under *Fulton*, because it entails an individualized assessment, governed by its own discretion, akin to the "individualized exemptions" in *Fulton*. (Dkt. No. 6 ¶¶ 158-60.) Defendants' opening brief addresses this claim and argues the DCF regulations are unlike the anti-discrimination policy at issue in *Fulton*, but the brief does not include any argument (much less a developed argument) addressing Plaintiffs' four other claims in advancing a qualified immunity defense. *See Haley v. City of Boston*, 657 F.3d 39, 49 (1st Cir. 2011) (explaining that "it is the party suing, not the party sued, who enjoys the right to frame the claims asserted in a complaint"); *Iacobucci v. Boulter*, 193 F.3d 14, 22 (1st Cir. 1999) (explaining that "the scope of the protection afforded by the doctrine of qualified immunity is claim-specific"); *see also Guzman-Rivera v. Rivera-Cruz*, 98 F.3d 664, 666 (1st Cir. 1996) (explaining that qualified immunity is an affirmative defense and may be waived at the motion-to-dismiss stage but reasserted at later stages). Arguments "adverted to in a cursory fashion, unaccompanied by developed" explanation are deemed waived. *Rodriguez v. Municipality of San Juan*, 659 F.3d 168, 175-76 (1st Cir. 2011); *see Coons v. Indus. Knife Co.*, 620 F.3d 38, 44 (1st Cir. 2010) (explaining that "the district court was 'free to disregard' the state law argument that was not developed in Coon's brief" (quoting *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 260 (1st Cir. 1999))); *Tejada-Batista v. Morales*, 424 F.3d 97, 103 (1st Cir. 2005) (deeming as waived an argument that "describes qualified immunity doctrine in general terms but makes no effort to apply it to the facts of this case").

Here, Defendants' opening brief's passing references, in a generalized manner, to Plaintiffs' "free exercise and free speech rights" and "individual capacity claims," (Dkt. No. 62 at 19-20),

12

without specifically addressing Plaintiff's legal theories under Counts II through V, is clearly insufficient. *See Rocafort v. IBM Corp.*, 334 F.3d 115, 121-22 (1st Cir. 2003) ("Passing reference to legal phrases and case citation without developed argument is not sufficient to defeat waiver. . . . Instead, a party has a duty to incorporate all relevant arguments in the papers that directly address a pending motion." (internal quotation marks and citations omitted)); *see also Velez-Ramirez v. Puerto Rico through Sec'y of Just.*, 827 F.3d 1554, 158 n.2 (1st Cir. 2016) (deeming as waived "passing reference" to an argument). Moreover, "[t]hat the [defendants] elaborated on" qualified immunity in their "reply brief and at oral argument does not salvage" the defense as to Counts II through V, because "'arguments developed for the first time in a reply brief are waived.'" *Alfred S. v. Kijakazi*, 2023 WL 4838318, at *2 n.1 (D. Me. July 27, 2023) (quoting *Small Just. LLC v. Xcentric Ventures LLC*, 873 F.3d 313, 323 n.11 (1st Cir. 2017)); *see also Napert v. Gov't Emps. Ins. Co.*, 2013 WL 3989645, at *2 n.4 (D. Mass. Aug. 1, 2013). Accordingly, the court finds Defendants have waived the qualified immunity defense as to Counts II, III, IV, and V, for purposes of their motion to dismiss.

As to Count I, the court concludes Defendants are not entitled to qualified immunity on the merits. "Under [the Supreme] Court's precedents, a plaintiff may carry the burden of proving a free exercise violation in various ways, including by showing that a government entity has burdened his sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'" *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022). As noted, Count I addresses the "generally applicable" requirement and asserts the policy here is not "generally applicable" because "it 'invite[s]' the government to consider the particular reasons for a person's conduct" by providing an individualized, discretionary assessment, which amounts to "'a mechanism for individualized exemptions.'" *Fulton*, 141 S. Ct. at 1877 (quoting *Emp. Div., Dep't of Hum. Res. of Oregon v. Smith*, 494 U.S. 872, 884 (1990)); *see Kennedy*, 597 U.S. at 525-26 ("Failing either the neutrality or general applicability test is sufficient to trigger strict scrutiny," which requires the government to

13

demonstrate "its course was justified by a compelling state interest and was narrowly tailored in pursuant of that interest").

The doctrine of qualified immunity provides government officials with immunity "from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Ablordeppey v. Walsh*, 85 F.4th 27, 32 (1st Cir. 2023) (internal quotation marks omitted). In particular, the court must determine "whether the right at issue was clearly established at the time of the alleged violation," *id.* (internal quotation marks omitted), such that a "reasonable official would understand that what he is doing is unlawful," *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018). The court must therefore focus "on specific facts and not on the right in the abstract, . . . but 'the very action in question [need not] ha[ve] previously been held unlawful.'" *El Dia Inc. v. Governor Rossello*, 165 F.3d 106, 109 (1st Cir. 1999) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "Rather, 'a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful.'" *Id.* (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997).

The court concludes it was clearly established, in 2023, that DCF's individualized and discretionary assessment of Plaintiffs' foster license application was not a "generally applicable" policy and thus was subject to strict scrutiny. Under the governing regulations, DCF considers 17 different subjective criteria, all of which must be demonstrated "to the satisfaction of the Department," when deciding on a foster license application. 110 C.M.R. § 7.104(1). One of these requirements, upon which Defendants relied in denying Plaintiffs' application, is "to promote the physical, mental, and emotional well-being of a child placed in his or her care, including supporting and respecting a child's sexual orientation or gender identity." 110 C.M.R. § 7.104(1)(d). In addition, the regulations provide that after an applicant is licensed, DCF enters into a written agreement with

14

the applicant, which can include "a statement of any limitations on the identity or individual characteristics of children who may be placed in the foster/pre-adoptive home." 110 C.M.R. § 7.111(4). DCF therefore wields enormous discretion in both assessing a foster license application and in the ultimate foster placement.

As the Supreme Court reiterated in *Fulton* in 2021, laws such as this are not "generally applicable," because they permit "the government to grant exemptions based on the circumstances underlying each application," similar to the "good cause" standard used by states in earlier Supreme Court decisions regarding unemployment benefits. *Fulton*, 593 U.S. at 534 (citing *Smith*, 494 U.S. at 884); *see Smith*, 494 U.S. at 884 (explaining that "[t]he *Sherbert* test . . . was developed in a context that lent itself to individualized governmental assessment of the reasons for the relevant conduct," as "[t]he 'good cause' standard created a mechanism for individualized exemptions"); *see also Church of Lukumi Babalu Ave. Inc. v. City of Hialeah*, 508 U.S. 520, 537 (1993) ("[B]ecause it requires an evaluation of the particular justification for the killing, this ordinance represents a system of 'individualized governmental assessment of the reasons for the relevant conduct'" amounting to "individualized exemptions from a general requirement" (quoting *Smith*, 494 U.S. at 884)). Thus, "[a] law is not generally applicable if it 'invite[s]' the government to consider the particular reasons for a person's conduct by providing 'a mechanism for individualized exemptions.'" *Fulton*, 593 U.S. at 533 (quoting *Smith*, 494 U.S. at 884); *see Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 685 (9th Cir. 2023) (explaining that *Fulton* held "that the mere existence of government discretion is enough to render a policy not generally applicable"). The Supreme Court has explained that "where the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of religious hardship without compelling reason." *Fulton*, at 534 (quoting *Smith*, 494 U.S. at 884).

15

Here, "[l]ike the good cause provision in *Sherbert* [*v. Verner*, 374 U.S. 398 (1963)]" and the anti-discrimination provision at issue in *Fulton*, Plaintiffs plausibly allege that the regulations "incorporate a system of individual exemptions" by providing DCF the discretion ("to the satisfaction of the Department") to decide how and when to apply the various subjective criteria. *Fulton*, 593 U.S. at 535; *see id.* at 537 (explaining a policy is not "generally applicable" if "it 'invite[s] the government to decide which reasons for not complying with the policy are worthy of solicitude'").

One example of the clarity of the law in this regard is *Blaise v. Hunter*, 493 F. Supp. 3d 984 (E.D. Wash. 2020), which addressed strikingly similar facts in the foster license context in 2020, *before* the Supreme Court's decision in *Fulton*. *See El Dia*, 165 F.3d at 110 n.3 (explaining that out-of-circuit precedent may be considered and, "[a]mong other factors, the location and level of the precedent, its date, its persuasive force, and its level of factual similarity . . . may all be pertinent to whether a particular precedent 'clearly establishes' law for purposes of a qualified immunity analysis"); *see also Barton v. Clancy*, 632 F.3d 9, 22 (1st Cir. 2011). In *Blaise*, the court explained that "the Department," as is true here, "encourages licensors to consider an applicant's religious beliefs and stances on LGBTQ+ rights, and a distinctive feature of the foster care licensing process is the licensor's subjective assessment of various criteria." *Id.* at 999; *see Fellowship of Christian Athletes*, 82 F.4th at 688 ("While screening for such qualities may further important interests . . . , the very fact that they require a case-by-case analysis is antithetical to a generally applicable policy."). In *Blaise*, "Department regulations and policies force[d] the [plaintiffs] into a dilemma: adhere to their religion and give up the benefit of a foster care license or forsake their religion and get a foster care license." *Id.*

Plaintiffs faced the same fundamental dilemma in this case: they could renounce their religious beliefs and receive a foster license, or they could adhere to those beliefs and forfeit the

16

license. *See Sherbert*, 374 U.S. at 404 ("It is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege," as "the imposition of such a condition upon even a gratuitous benefit inevitably deter[s] or discourage[s] the exercise of First Amendment rights of expression," and "to condition the availability of benefits upon [the applicant's] willingness to violate a cardinal principle of her religious faith effectively penalizes the free exercise of her constitutional liberties."); *see also Trinity Lutheran Church of Columbia*, 582 U.S. at 462. As Plaintiffs argue, "[t]he law was . . . clearly established that, given the high degree of discretion present in the child welfare system, Defendants could not use their discretion to exclude those with [Plaintiffs'] religious beliefs—unless they could pass strict scrutiny." (Dkt. No. 65 at 14.)

"A government policy can survive strict scrutiny only if it advances 'interests of the highest order' and is narrowly tailored to achieve those interest." *Fulton*, 593 U.S. at 541 (quoting *Lukumi*, 508 U.S. at 546. Defendants, however, ask that the court not "decide at this early stage whether the Department's conduct survives strict scrutiny," as "Defendants did not move to dismiss on that basis" and "the resolution of the partial motion to dismiss does not require it." (Dkt. No. 76 at 6 n.7.) Therefore, the court need not decide, at this stage, whether it was also clearly established that Defendants' conduct would not withstand strict scrutiny analysis under these circumstances.

## V.    CONCLUSION

For these reasons, the court ALLOWS Defendants' partial motion to dismiss as to the individual-capacity claims against Defendant Sullivan, which are dismissed without prejudice, but otherwise DENIES the motion.

It is So Ordered.

                                                                                 /s/ Mark G. Mastroianni
                                                                                 MARK G. MASTROIANNI
                                                                                 United States District Judge