UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MICHAEL and CATHERINE BURKE, | |
| Plaintiffs, | |
| v. | C.A. No. 3:23-cv-11798-MGM |
| KIAME MAHANIAH, in his official capacity as Secretary of the Massachusetts Executive Office of Health and Human Services, *et al.* | **Leave to file a brief of 30 pages granted on March 11, 2026 [Docket No. 167]** |
| Defendants. | **ORAL ARGUMENT REQUESTED** |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
THEIR MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................................... ii

TABLE OF AUTHORITIES ............................................................................................... iii

PRELIMINARY STATEMENT ............................................................................................ 1

STATEMENT OF FACTS ..................................................................................................... 2

      A.    The Burkes' Application for a Foster Parent License. ............................. 2

      B.    DCF's Foster Parent Licensing Requirements Regarding LGBTQ+ Children. ...... 3

      C.    The Policy Rationale for the LGBTQ+ Requirements. ........................... 4

      D.    The Burkes' License Study and the LGBTQ+ Requirements. ................. 6

      E.    The Licensing Review Team Meeting and Decision on the Burkes' Application. . 7

ARGUMENT ....................................................................................................................... 8

  I.    The Individual Defendants Are Entitled to Summary Judgment Because the Burkes Cannot Show a Violation of a "Clearly Established" Constitutional Right........................ 9

      A.    In 2023, Binding Precedent Supported that DCF Could Impose Licensing Requirements to Protect Children Even If Their Effect Was to Exclude Applicants Due to Sincerely Held Religious Beliefs. .................................................. 10

      B.    *Fulton v. City of Philadelphia* Did Not Clearly Establish that DCF's LGBTQ+ Requirements Are Unconstitutional........................................................ 12

      C.    No Other Binding Authority Clearly Established that the LGBTQ+ Requirements Were Unconstitutional in March 2023. ................................................. 15

      D.    Courts Continue to Debate the Constitutionality of Policies Analogous to DCF's LGBTQ+ Requirements in 2025...................................................... 17

      E.    A Reasonable Social Worker Would Have Applied the LGBTQ+ Requirements to Advance DCF's Objective of Protecting Vulnerable Children in its Custody. ..... 19

  II.    All Defendants Are Entitled to Summary Judgment Because DCF Did Not Violate the Burkes' First Amendment Rights. ................................................................... 20

      A.    DCF's LGBTQ+ Requirements Are Not Hostile to Religion. ............................. 21

      B.    DCF's LGBTQ+ Requirements Are Neutral and Generally Applicable, and Thus Subject to Rational Basis Review. ...................................................... 22

      C.    DCF's LGBTQ+ Requirements Survive Strict Scrutiny Because They Are Narrowly Tailored to Its Compelling Interest in Protecting LGBTQ+ Children. . 23

      D.    DCF's LGBTQ+ Requirements Do Not Unlawfully Compel Speech. ................. 26

CONCLUSION.................................................................................................................... 30

## **TABLE OF AUTHORITIES**

**Statutes:**

42 U.S.C. § 1983............................................................................................................... 8
Mass. Gen. Laws c. 119, § 1 ........................................................................................... 20
Mass. Gen. Laws c. 258, § 1............................................................................................ 30

**Regulations:**

102 Code Mass. Regs. §§ 1.00, et seq ........................................................................... 14
110 Code Mass. Regs. § 7.104(1)(d) ................................................................................ 3
110 Code Mass. Regs. § 7.104(1)(g) .............................................................................. 30

**Rules:**

Fed. R. Civ. P. 56........................................................................................................... 9
3d Cir. Internal Operating P. 5.7 ................................................................................... 17

**Cases:**

*303 Creative LLC v. Elenis*, 600 U.S. 570 (2023) ....................................... 16, 28-29, 30
*Ablordeppey v. Walsh*, 85 F.4th 27 (1st Cir. 2023).......................................................... 10
*Alfano v. Lynch*, 847 F.3d 71 (1st Cir. 2017)........................................................ 9, 10, 19
*Antonucci v. Winters*, No. 2:24-CV-783, 2025 WL 569928 (D. Vt. Feb. 20, 2025) .................... 18
*Ashcroft v. al-Kidd*, 563 U.S. 731 (2011)........................................................................ 10
*Bates v. Pakseresht*, 146 F.4th 772 (9th Cir. 2025) ................................................ 18, 24
*Belsito Commc'ns, Inc. v. Decker*, 845 F.3d 13 (1st Cir. 2016) ................................... 9, 14
*Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675 (1986) ............................................ 27
*Bilida v. McCleod*, 211 F.3d 166 (1st Cir. 2000).......................................................... 20
*Blais v. Hunter*, 493 F. Supp. 3d 984 (E.D. Wash. 2020)..........................................18-19,
*Blais v. Wash. State Dep't of Children, Youth & Families*,
     No. 2:20-cv-187 (E.D. Wash. Jun. 4, 2021) ......................................................... 19
*Bd. of Cnty. Commissioners v. Umbehr*, 518 U.S. 668 (1996).................................... 30
*Care and Protection of Walt*, 478 Mass. 212 (2017)................................................... 27
*Carson as next friend of O. C. v. Makin*, 596 U.S. 767 (2022) ..................................... 15
*Christian Legal Soc. Chapter v. Martinez,* 561 U.S. 661 (2010)................................ 29
*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993) .......... 15, 22, 23, 25
*Connor B. ex rel. Vigurs v. Patrick*, 774 F.3d 45 (1st Cir. 2014) ................................ 14
*Doe ex rel. Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518 (3d Cir. 2018) ................ 24
*Davis v. Scherer*, 468 U.S. 183 (1984)........................................................................ 20
*DeToledo v. County of Suffolk*, 379 F. Supp. 2d 138 (D. Mass. 2005)......................... 20
*District of Columbia v. Wesby*, 583 U.S. 48 (2018) ........................................................ 9
*Estate of Rahim by Rahim v. Doe*, 51 F.4th 402 (1st Cir. 2022) ....................... 9, 10, 19, 21
*Escalera-Salgado v. United States*, 911 F.3d 38 (1st Cir. 2018)...................................... 9
*Eves v. LePage*, 927 F.3d 575 (1st Cir. 2019) ......................................................... 2, 9
*Foote v. Ludlow School Committee*, 128 F.4th 336 (1st Cir. 2025) ........................... 1, 23
*Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461 (2025) ............................................ 28
*Fulton v. City of Philadelphia*, 593 U.S. 522 (2021)........................................12-14, 16, 23
*Garcetti v. Ceballos,* 547 U.S. 410 (2006) ................................................................. 30

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006) ................. 25
*Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988). ............................................................ 27
*Johnson v. California,* 543 U.S. 499, 515 (2005) .......................................................................... 14
*Kennedy v. Bremerton*, 597 U.S. 507 (2022) ................................................................. 15, 16, 21
*Kisela v. Hughes*, 584 U.S. 100 (2018) .......................................................................................... 2
*L.M. v. Town of Middleborough*, 103 F.4th 854, 880 (1st Cir. 2024) ............................... 24, 27-28
*Lasche v. New Jersey*, No. CV 18-17552 (FLW),
    2022 WL 17250731, (D.N.J. Nov. 28, 2022) ...................................................................... 17
*Lasche v. New Jersey*, No. 20-2325, 2022 WL 604025 (3d Cir. Mar. 1, 2022) ......................... 17
*Lawless v. Town of Freetown*, 63 F.4th 61, 67 (1st Cir. 2023) ................................................... 14
*Magazu v. Dep't of Child. & Fams.*, 473 Mass. 430 (2016) ....................... 2, 10-12, 14, 16, 24, 28
*Mahanoy Area Sch. Dist. v. B. L.*, 594 U.S. 180 (2021) ....................................................... 27, 29
*Mahmoud v. Taylor*, 606 U.S. 522 (2025). .................................................................................. 22
*Masterpiece Cakeshop v. Colorado C.R. Comm'n*, 584 U.S. 617 (2018) .......... 13, 15, 16, 21, 22
*Metromedia, Inc. v. City of San Diego*, 453 U.S. 490 (1981) ..................................................... 30
*Mullenix v. Luna*, 577 U.S. 7, 12 (2015) ..................................................................................... 10
*Pearson v. Callahan*, 555 U.S. 223 (2009) ........................................................................... 17, 19
*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) ........................................................................... 25
*Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14 (2020). ............................................ 25
*Savard v. Rhode Island*, 338 F.3d 23 (1st Cir. 2003) ........................................................... 10, 18
*Schwartz v. Booker*, 702 F.3d 573 (10th Cir. 2012) ................................................................... 14
*Segrain v. Duffy*, 118 F.4th 45 (1st Cir. 2024) ........................................................................... 19
*Smith v. Org'n of Foster Families for Equality & Reform*, 431 U.S. 816 (1972) ...................... 29
*St. Mary Cath. Par. in Littleton v. Roy*, 154 F.4th 752, 769 (10th Cir. 2025) ........................... 13
*Swartz v. Sylvester*, 53 F.4th 693 (1st Cir. 2022) .................................................................. 22-23
*Tandon v. Newsom*, 593 U.S. 61 (2021) .............................................................................. 15, 24-25
*Tinker v. Des Moines Indep. Comm. Sch. Dist.*, 393 U.S. 503 (1969) .................................. 27-28
*Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449 (2017). ............................ 15
*West Virginia State Board of Ed. v. Barnette*, 319 U.S. 624 (1943) .............................. 16, 28, 29
*White v. Pauly*, 580 U.S. 73 (2017) .............................................................................................. 15
*Williams-Yulee v. Fla. Bar*, 575 U.S. 433 (2015) ...................................................................... 26
*Wuoti v. Winters*, No. 2:24-CV-614,
    2025 WL 569909 (D. Vt. Feb. 20, 2025) ................................................... 18, 22, 24, 28

## PRELIMINARY STATEMENT

On March 31, 2023, nine child welfare workers employed by the Massachusetts Department of Children and Families ("DCF" or "Department") attended a Licensing Review Team ("LRT") meeting to determine whether Plaintiffs Michael and Catherine Burke ("the Burkes") met DCF's licensing requirements to become foster parents for children in DCF custody. One such requirement was that applicants must demonstrate the ability to support and respect a foster child's sexual orientation and gender identity. This requirement was supported by a substantial body of research concerning the unique dangers facing LGBTQ+[1] children in foster care, and the harmful effects to "closeted" and "out" LGBTQ+ children living in homes that do not offer such support and respect. DCF has a compelling interest in protecting the physical and psychological well-being of these children in its custody. *Foote v. Ludlow School Committee*, 128 F.4th 336, 356-57 (1st Cir. 2025) ("State actors have 'a compelling interest in protecting the physical and psychological well-being of minors.' That interest is at its apex when [it] seeks to protect children who are particularly vulnerable, such as transgender minors.") (citation omitted).

Based on undisputed statements the Burkes made during the application process, the LRT determined the Burkes could not satisfy this requirement. Neither DCF regulations nor policies contained exceptions to this requirement, and the LRT had no authority to waive it or create an exception. As a result, DCF denied the Burkes' application for a foster parent license. The LRT's decision to deny the application conformed to DCF's policies and regulations—which had never before been challenged—and advanced DCF's mission of protecting vulnerable children in its care.

The Burkes assert that this decision violated their First Amendment rights of free exercise

---

[1]    LGBTQ+ is an acronym that typically stands for lesbian, gay, bisexual, transgender, queer or questioning, and other diverse sexual orientations or gender identities or expressions. Defendants' Statement of Undisputed Material Facts ("SOF") at ¶ 6.

of religion (Counts I-IV) and freedom of speech (Count V).  They assert all claims against twelve Defendants—three government officials in their official capacities only, and all nine LRT members in both their official and individual capacities.  Summary judgment is warranted on all claims.

The Burkes seek money damages from each LRT member, but these individual capacity claims are barred by qualified immunity, which protects government employees from personal liability unless they both violated the Constitution and the "'unlawfulness of their conduct was clearly established at the time.'"  *Eves v. LePage*, 927 F.3d 575, 582-83 (1st Cir. 2019) (citation omitted).  To make this showing, "existing precedent must have placed the statutory or constitutional question beyond debate."  *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (cleaned up).  Qualified immunity applies here, as the Burkes' claims were in no way "beyond debate" in March 2023.  The LRT members applied the operative licensing requirements, as they are obligated to do, and denied a license to applicants who could not meet them.  At the time of the LRT's decision (and even now), no controlling case or other authority "clearly established" that DCF's requirements were unlawful.  Indeed, binding precedent *supported* that DCF could impose licensing requirements to protect children, even if those requirements may exclude applicants with certain religious beliefs.  *See Magazu v. Dep't of Child. & Fams.*, 473 Mass. 430 (2016).

Qualified immunity also applies and the official capacity claims fail because DCF's decision did not violate the Constitution.  DCF's requirements were not hostile to religion, are neutral and generally applicable, were narrowly tailored to achieve a compelling interest, and do not improperly compel speech.

## STATEMENT OF FACTS

### A.    The Burkes' Application for a Foster Parent License.

In January 2022, the Burkes applied to DCF for a license to serve as foster parents.  SOF

¶ 1-2.  The Burkes expressed a desire to foster children aged 4 to 12 years old who had an established goal of adoption (rather than reunification).  *Id.* ¶ 2.  Among other things, the application process included an in-depth written assessment of their ability to meet DCF licensing requirements that is called a license study, home study, or caregiver assessment.  *Id.* ¶ 95-96.

**B.      DCF's Foster Parent Licensing Requirements Regarding LGBTQ+ Children.**

The Burkes were required to comply with all licensing requirements, including regulations and policies related to a foster child's sexual orientation and gender identity (hereinafter, collectively, the "LGBTQ+ Requirements").[2]  To start, at the time of the Burkes' application, DCF regulations required that applicants demonstrate the ability to "promote the physical, mental, and emotional well-being of a child placed in his or her care, including supporting and respecting a child's sexual orientation or gender identity."  110 Code Mass. Regs. § 7.104(1)(d); SOF ¶ 3-4.

Next, DCF's LGBTQIA+ Nondiscrimination Policy became effective June 30, 2022 and provided as of March 31, 2023 that (1) foster parents "must be respectful of how individuals ask to be identified and use the terms an individual uses to describe themselves," (2) "[c]hildren/youth in care are allowed to express themselves through clothing, accessories, hairstyles, and other means of expression consistent with their identities," and (3) foster parents "do not make attempts to convince LGBTQIA+ children/youth to reject or modify their sexual orientation, gender identity, or gender expression."  SOF ¶ 5, 7-13.

Further, DCF's "Licensing of Foster, Pre-Adoptive, and Kinship Families" policy (the "Licensing Policy") became effective on February 27, 2023, after the Burkes' initial application

---

[2]      The regulation cited in this section was changed on December 12, 2025, and the policies cited in this section were correspondingly amended.  All quotations and citations to the LGBTQ+ Requirements describe the provisions in effect on March 31, 2023, when the LRT determined that the Burkes could not meet the then-existing licensing requirements.

but before DCF's decision on March 31, 2023. SOF ¶ 14. The Licensing Policy provided that DCF "expects that foster parents will . . . support connections to the child's . . . sexual orientation and gender identity." *Id.* ¶ 15-16. Additionally, DCF's Foster Child Bill of Rights provides that "[e]very foster child: Shall be treated with respect by . . . foster parents . . . without regard to . . . sexual orientation, [and/or] gender identity." *Id.* ¶ 18.

The LGBTQ+ Requirements applied regardless of an applicant's religion, and none allowed for any exceptions. SOF ¶ 4, 9, 11, 13, 16, 19-22. From June 2021 to August 2023, foster parent applicants who self-identified as Catholic were just as likely, statistically, to receive a DCF foster parent license as applicants who did not self-identify as Catholic. *Id.* ¶ 23, 90-93.

### C.    The Policy Rationale for the LGBTQ+ Requirements.

The LGBTQ+ Requirements were designed to protect the particularly vulnerable population of LGBTQ+ youth in foster care. In 2021, the Massachusetts Commission on LGBTQ Youth (the "Commission"), which is an independent state agency, issued a report with several "alarming" findings concerning LGBTQ+ youth in foster care, including that LGBTQ+ foster children are overrepresented in foster care, and face "[s]ignificant threats to wellbeing" with "resulting harm" that is "profound and sometimes irreversible." SOF ¶ 35-59. The Commission found that LGBTQ youth have worse experiences in the child welfare system compared to non-LGBTQ peers, including higher rates of mistreatment and hospitalization for emotional reasons, and a higher number of placements. *Id.* ¶ 42. The Commission found that "[n]on-affirming [foster] placements expose young people to feelings of shame, isolation, and confusion, and can discourage them from discussing other sensitive issues with caregivers." *Id.* ¶ 44. The Commission concluded that "[r]ejecting behavior" by foster caregivers "combined with frequent moves significantly impacts mental and emotional health," and that foster children have reported "feeling that in order

to achieve permanency, they needed to hide their LGBTQ identity." *Id.* ¶ 45-46. It also found that "LGBTQ youth who reported having been in foster care were three times as likely as other LGBTQ youth to have attempted suicide in the previous year." *Id.* ¶ 48. In light of these findings, the Commission issued a series of recommendations, including that DCF enact an LGBTQ nondiscrimination policy and revise its licensing materials "to better identify the abilities of prospective foster . . . parents to support LGBTQ youth." *Id.* ¶ 54-59. It described "the status quo for LGBTQ youth in DCF" as "an emergency" and urged DCF to make "improving outcomes," including permanency, for LGBTQ+ youth in foster care "a high priority." *Id.* ¶ 37, 59.

The Commission's findings and recommendations reflect peer-reviewed research showing that caregiver support for LGBTQ+ youth is strongly linked to better health outcomes, including higher self-esteem, lower rates of substance abuse, depression, and anxiety, and reduced suicide risk. SOF ¶ 69-71, 73, 75, 78, 84-85. Similarly, peer-reviewed research, as well as a report issued by the federal Substance Abuse and Mental Health Services Administration (SAMHSA) aiming to summarize the "professional consensus" in 2023, determined that unsupportive caregiver behaviors, such as trying to change a child's LGBTQ identity or refusing to use the name or pronouns that match the child's identity, increase the risk for serious mental health outcomes. *Id.* ¶ 67-68, 71, 74, 76-77, 79. For youth who are closeted or in the early stages of understanding their LGBTQ+ identity, being in an unsupportive home can cause additional distress and discourages coming out, including to avoid jeopardizing their family placement. *Id.* ¶ 72, 74, 80-83.

Consistent with this research and the Commission's recommendations, DCF implemented the LGBTQ+ Requirements. SOF ¶ 60, 65-67. DCF's paramount concern is the health, safety, and long-term well-being of the children in its custody, including providing a "safe, nurturing, and permanent family" for each child. *Id.* ¶ 24-26. The LGBTQ+ Requirements allowed for no

exceptions, because children disclose LGBTQ+ identities at all ages, and DCF has no way of knowing which children will ultimately develop and disclose such identities. *Id.* ¶ 61-64, 88-89. The LGBTQ+ Requirements strive to reduce placement disruptions, which are destabilizing and harmful, particularly when based upon a child's LGBTQ+ identity. *Id.* ¶ 27-34, 67, 74, 81-82, 88-89. DCF is unable to ensure that a child who is or may later identify as LGBTQ+ will receive supportive care in a stable environment unless *all* foster families are required to meet that minimum standard for licensure. *Id.* ¶ 17, 61-64, 88-89.

**D.    The Burkes' License Study and the LGBTQ+ Requirements.**

In 2022, DCF assigned a contractor, 18 Degrees, to prepare a comprehensive license study of the Burkes. SOF ¶ 98. During interviews with the Burkes, an 18 Degrees employee, Linda-Jean Mack ("Mack"), obtained information about a variety of topics relevant to licensing, including the Burkes' approach to parenting children and youth who are or may identify as LGBTQ+. *Id.* ¶ 99-122. The Burkes agree that Mack accurately captured their comments in the license study. *Id.* ¶ 124. Among other things, the Burkes shared stories about their past refusals to respect the pronouns used by trans adults, and both stated they would not use the pronouns of a child in their care, unless those pronouns comport with their views of biological sex and gender identity. *Id.* ¶ 109, 111, 113, 120. The Burkes further explained they would not support gender affirming care, which Mrs. Burke characterized as "chemical castration," and they believe people are either male or female and should remain that way. *Id.* ¶ 100, 102, 104-05, 108, 112, 119-21. Mr. Burke stated the act of homosexuality is a sin, and he "[h]ate[s] the sin [of homosexuality], not the sinner." *Id.* ¶ 117. Both Burkes stated that partnership outside of heterosexual relationships is a sin, and that LGBQ people must remain "chaste" throughout their lives. *Id.* ¶ 101, 118, 121.

Mack submitted the Burke license study to DCF and recommended the Burkes be licensed

6

by DCF "with some conditions."  SOF ¶ 125, 129.  Mack noted the Burkes are "open to a variety of children who have different levels of need, including children who are blind or deaf, have moderate medical needs, and have histories of mental health challenges," as well as "older children, up to age 12, and sibling sets." *Id.* ¶ 126.  Mack's recommendation stated that the Burkes' "willingness to parent a child with these types of challenges has outweighed [her] worry about their potential unwillingness to accept an LGBTQIA++ child in the future." *Id.* ¶ 127.  Mack made this recommendation even though DCF regulations and policies did not permit exemptions from the LGBTQ+ Requirements, let alone permit an applicant's willingness to foster certain types of children to act as a counterbalance to exempt such applicant from satisfying the LGBTQ+ Requirements. *Id.* ¶ 20-22.  As a contractor, Mack can make a recommendation to DCF, but DCF decides whether to issue a foster parent license. *Id.* ¶ 128.

### E.    The Licensing Review Team Meeting and Decision on the Burkes' Application.

The Licensing Policy became effective on February 27, 2023, before the licensing decision regarding the Burkes was made on March 31, 2023.  SOF ¶ 14.  The Licensing Policy created Licensing Review Teams ("LRTs") and authorized those teams to decide whether to approve or deny a specific foster family applicant. *Id.* ¶ 130-32.  To determine whether a license applicant satisfies applicable requirements, the LRT participates in a meeting to discuss the applicant's skills, knowledge, and capacity to provide a physically and emotionally safe environment for foster children, based upon all the information gathered about the applicant. *Id.* ¶ 132-35.  At the end of the meeting, the LRT decides to approve or deny the applicant, or if necessary, to defer decision until additional information can be obtained. *Id.* ¶ 136.  The Licensing Policy expressly authorizes the LRT to "modif[y]" any licensing recommendation contained in a license study. *Id.* ¶ 137.

On March 31, 2023, an LRT convened to consider the Burkes' application, with nine DCF

employees in attendance. SOF ¶ 139-53. This was the first LRT meeting to occur in the region, and no LTR member had previously participated in an LRT meeting. *Id.* ¶ 157. None was responsible for creating or enacting the LGBTQ+ Requirements. *Id.* ¶ 154. During the meeting, the nine LRT members discussed the Burkes' ability to satisfy DCF's then-applicable licensing standards and their concerns that a child placed in the Burkes' care for adoption may identify as LGBTQ+. *Id.* ¶ 158. The record is devoid of any indication that any LRT member expressed any anti-religious hostility or hostility to the Burkes' Catholic faith, or that any LRT member demeaned, insulted, or disparaged the Burkes' religion, including their religious beliefs about sexual orientation or gender identity or expression. *Id.* ¶ 155-56, 158-60. Indeed, the Burkes' connection to their church was considered a "strength" by LRT members. *Id.* ¶ 159.

The LRT members determined that the Burkes were unable to meet the LGBTQ+ Requirements. *See supra* § B; SOF ¶ 160-62. The LRT did not adopt the license study's recommendation because DCF's Licensing Policy required denial. SOF ¶ 160. Per the policy, an LRT could not weigh the applicant's disqualifying inability to satisfy the LGBTQ+ Requirements against any other factor, including the applicant's willingness to foster children with certain needs. *Id.* ¶ 20-22, 138. Nor did the policy allow the LRT to grant an exception or accommodation by placing a child who does not currently identify as LGBTQ+ with the applicants, since it is impossible to know at the time of placement whether or how the child's identity will change in the future. *Id.* ¶ 61-64, 88-89. On or around March 31, 2023, DCF informed the Burkes that their application had been denied because they could not meet specific licensing standards. *Id.* ¶ 163.

## ARGUMENT

The Burkes assert five causes of action under 42 U.S.C. § 1983, alleging the Defendants violated the Burkes' First Amendment rights under the Free Exercise Clause (Counts I-IV) and the

Free Speech Clause (Count V).  Each of these claims arises from the LRT's decision to deny the Burkes' foster license application on March 31, 2023.  *See, e.g.*, Compl. ¶ 165, 175, 189, 195, 207. As described below, summary judgment is warranted on all claims because there is no genuine dispute of fact and Defendants are entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.

"When a defendant invokes qualified immunity, the burden is on the plaintiff to show that the defense is inapplicable." *Escalera-Salgado v. United States*, 911 F.3d 38, 41 (1st Cir. 2018). Government workers are entitled to qualified immunity unless the plaintiff demonstrates that "(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *Eves*, 927 F.3d at 582-83 (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 62-63 (2018)).  "The prongs need not be addressed in order, and an [official] may be entitled to immunity based on either prong." *Estate of Rahim by Rahim v. Doe*, 51 F.4th 402, 410 (1st Cir. 2022).  "The doctrine's prophylactic sweep is broad: it leaves unprotected only those officials who, 'from an objective standpoint, should have known that their conduct was unlawful.'" *Alfano v. Lynch*, 847 F.3d 71, 75 (1st Cir. 2017) (citation omitted).

Here, the nine LRT members are entitled to qualified immunity under either prong: none had any reason to believe their conduct was unlawful, and no constitutional violation occurred. Because no constitutional violation occurred, the official capacity claims must also fail.

**I.    The Individual Defendants Are Entitled to Summary Judgment Because the Burkes Cannot Show a Violation of a "Clearly Established" Constitutional Right.**

On the "clearly established" prong of qualified immunity, the Burkes must demonstrate the specific First Amendment rights they assert "were so clearly established that a reasonable [official] should have known how they applied to the situation at hand." *Belsito Commc'ns, Inc. v. Decker*, 845 F.3d 13, 23 (1st Cir. 2016).  This requires the Burkes to *first* "spotlight 'controlling authority' or 'a robust consensus of cases of persuasive authority' (if there is one) that forbade [Defendants]

from acting as [they] did." *Id.* at 23 (citation omitted). In other words, existing precedent "as of [the] particular date" of the alleged violation, *Savard v. Rhode Island*, 338 F.3d 23, 27-28 (1st Cir. 2003), "must have placed the . . . constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). *Second*, the Burkes "must also show that an objectively reasonable [official] would have known that his conduct violated the law." *Estate of Rahim*, 51 F.4th at 410 ("The plaintiff's burden to demonstrate that the law was clearly established is thus a heavy burden indeed.") (quotations and citation omitted). The Burkes cannot make either required showing.

In March 2023, no controlling case or robust consensus of authority required the LRT to disregard DCF's LGBTQ+ Requirements and license the Burkes. Courts "typically look only to precedents from the United States Supreme Court, federal appellate courts, and the highest court of the state in which a case arises to gauge whether a particular right is clearly established." *Alfano*, 847 F.3d at 78. Courts must "not . . . define clearly established law at a high level of generality." *al-Kidd*, 563 U.S. at 742. The dispositive question is "'whether the violative nature of *particular conduct* is clearly established.'" *Mullenix v. Luna,* 577 U.S. 7, 12 (2015) (quoting *al-Kidd*, 563 U.S. at 742). This inquiry "'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Id.* (citation omitted). Thus, a plaintiff must point to "case law clearly establishing applicable law that guarantees him the precise constitutional protections he claims." *Ablordeppey v. Walsh*, 85 F.4th 27, 33 (1st Cir. 2023).

### A. In 2023, Binding Precedent Supported that DCF Could Impose Licensing Requirements to Protect Children Even If Their Effect Was to Exclude Applicants Due to Sincerely Held Religious Beliefs.

Here, no case established that the LRT was not constitutionally permitted to deny the Burkes a license. In fact, in 2016, the Massachusetts Supreme Judicial Court held that DCF can lawfully apply a licensing requirement meant to protect children in its custody even where the

requirement may, in effect, exclude certain applicants due to their religious beliefs. *Magazu v. Dep't of Child. & Fams.*, 473 Mass. 430 (2016). At issue in *Magazu* were DCF's licensing requirements prohibiting foster families from using corporal punishment in their household, even as to their own biological children. *Id.* at 434, 438-39. The Magazus informed DCF that, "in accordance with their sincerely held Christian beliefs, they use appropriate corporal punishment on their own two daughters as a matter of loving parenting and biblical understanding." *Id.* at 441. DCF declined to license them because they did not meet its licensing requirement regarding corporal punishment. *Id.* at 434. The Magazus challenged DCF's decision as, among other grounds, an unconstitutional burden on "their right to the free exercise of religion." *Id.* at 441.[3]

The Supreme Judicial Court disagreed. It accepted that "the Magazus [were] compelled to make a choice" between "adher[ing] to the teachings of their religion and . . . , thereby forfeiting the opportunity to become foster parents" or "abandon[ing] this particular religious tenet in the hope of being approved as foster parents." *Id.* at 444-45. Despite this burden on religious beliefs, the Supreme Judicial Court held that DCF had "a sufficiently compelling interest to justify this burden"—"'protect[ing] children from actual or potential harm.'" *Id.* at 445 (citation omitted). DCF could not create "an exception" for those "who employ physical discipline in conformity with their religious beliefs" because that "would severely undermine the department's substantial interest in protecting the physical and emotional well-being of children whose welfare has been entrusted to the department's care." *Id.* Moreover, it was "neither realistic nor feasible" for DCF to implement an exception by "plac[ing] with the Magazus children who have *not* suffered neglect

---

[3]     Although the challenge was made under Massachusetts's Constitution, "the scope of protection afforded the right to freely exercise one's religion under the Massachusetts Constitution is *greater* than that afforded by the United States Constitution." *Magazu,* 473 Mass. at 442 (citation omitted) (emphasis added). If a policy does not violate the free exercise provision of the Massachusetts Constitution—as in *Magazu*—it necessarily does not violate the U.S. Constitution.

or abuse" because DCF cannot know "the precise nature and scope of their prior trauma." *Id.*

Similarly, here, DCF's LGBTQ+ Requirements were intended to protect LGBTQ+ children in its custody. And, as in *Magazu*, the mere fact that the Burkes could not satisfy those requirements, whether due to their religion or otherwise, does not clearly establish that denying their license application was unconstitutional. To the contrary, in March 2023, *Magazu* stood for the proposition that DCF was not required to grant religious exemptions to licensing requirements, where doing so would "undermine [DCF's] substantial interest in protecting the physical and emotional well-being of children whose welfare has been entrusted to [DCF's] care." *Magazu*, 473 Mass. at 445. No intervening binding authority has undermined *Magazu*'s holding or reasoning. Thus, the most analogous binding authority in March 2023 supported the LRT members' reasonable belief that they could apply the LGBTQ+ Requirements, even if an applicant did not meet the requirements due to sincerely held religious beliefs.

**B.    *Fulton v. City of Philadelphia* Did Not Clearly Establish that DCF's LGBTQ+ Requirements Are Unconstitutional.**

The Burkes' Complaint relies heavily on *Fulton v. City of Philadelphia*, 593 U.S. 522 (2021), but the "particular conduct" in *Fulton* was not comparable to the LRT's decision to deny the Burkes a foster parent license. In *Fulton,* Philadelphia froze its referrals to a Catholic charitable foster agency ("agency") that "would not certify same-sex couples to be foster parents due to its religious beliefs about marriage." *Id.* at 526-27. The agency did "not seek to impose [its religious] beliefs on anyone else," such as foster children. *Id.* at 542. The agency's contract with Philadelphia contained an express provision that an agency "shall not reject . . . prospective foster or adoptive parents, for Services based upon . . . their . . . sexual orientation . . . unless an exception is granted by the Commissioner or the Commissioner's designee, in his/her sole discretion." *Id.* at 535. Just prior to the referral freeze, a high-level city official made public statements critical of

the agency's religious beliefs about marriage.  *Id.* at 531.

The Supreme Court held that the city's actions were subject to strict scrutiny because the agency contract created "a formal mechanism for granting exceptions" to the anti-discrimination provision at the "sole discretion" of the Commissioner, which rendered the provision "not generally applicable."  *Id*. at 537.  To deny a "'religious hardship'" exemption to the agency, Philadelphia had to have a "'compelling reason.'"  *Id.*  at 535.  Importantly, the Court accepted that the city's interest "in the equal treatment of prospective foster parents and foster children" was "a weighty one," because "'gay persons and gay couples cannot be treated as social outcasts or as inferior in dignity and worth.'"  *Id.* at 542 (quoting *Masterpiece Cakeshop v. Colorado C.R. Comm'n*, 584 U.S. 617, 631 (2018)).  But Philadelphia's policy could not withstand strict scrutiny because its "system of exceptions under the contract" was not narrowly tailored.  *Id.* at 541-42.

The factual differences between this case and *Fulton* are significant.  First, DCF's LGBTQ+ Requirements contained no express exceptions that could be granted at the discretion of any DCF official, let alone by an individual LRT member.  That a requirement must be met "to the Department's satisfaction" does not mean it can be waived, much less in the "sole discretion" of any DCF official.  *Fulton*, 593 U.S. at 535.  Instead, this language merely recognizes that each assessment is applicant-specific, and all applicants must meet all licensing requirements.  This is entirely unlike a contract provision that specifically allows "an exception [to be] granted" and so creates a "system of individual exemptions."  *See id.*; *see also St. Mary Cath. Par. in Littleton v. Roy*, 154 F.4th 752, 769 (10th Cir. 2025), *cert. petition pending* (No. 25-581) ("Unrelated exceptions do not mean that the challenged portion of a law lacks general applicability.")

Second, the government interests in each case are distinct.  In *Fulton*, a private foster agency refused to work with same-sex foster *parents* but did "not object . . . to placing gay and

lesbian children." *Id.* at 530. *Fulton* thus did not address the welfare of LGBTQ+ *children* in foster care, and the Supreme Court had no occasion to consider how a state's obligations toward foster children in its custody may be weighed against prospective foster parents' religious beliefs. *See Magazu*, 473 Mass. at 445; *see also Connor B. ex rel. Vigurs v. Patrick*, 774 F.3d 45, 53 (1st Cir. 2014) (assuming without deciding the state has a "constitutional duty" toward children in foster care); *Schwartz v. Booker*, 702 F.3d 573, 580 (10th Cir. 2012) ("[F]oster children have a substantive due process right to 'protection while in foster care.'") (citation omitted).

Finally, *Fulton*'s conclusion that strict scrutiny applied in the circumstances of that case "'says nothing about the ultimate validity of any particular law; that determination is the job of the court applying strict scrutiny.'" *Johnson v. California*, 543 U.S. 499, 515 (2005) (citation omitted). Even if *Fulton* is read to mean that strict scrutiny should apply here, the nine LRT members could not be expected to predict how a court in future litigation would undertake a strict scrutiny analysis of the LGBTQ+ Requirements that DCF tasked them with implementing. *See Belsito Comm., Inc.*, 845 F.3d at 23 ("Public officials . . . need not be legal savants to win a qualified-immunity case.").

In sum, *Fulton* did not "place[] the legal question" of the LRT's licensing decision "beyond debate such that any reasonable official would have appreciated the illegality of the conduct in question." *Lawless v. Town of Freetown*, 63 F.4th 61, 67 (1st Cir. 2023). DCF did not task the nine LRT members with deciding whether to grant an exception under a contractual waiver provision to a foster care licensing agency that refused to certify same sex foster parents.[4] Because the LRT faced an entirely different question from the one in *Fulton*, that case could not place the LRT members on notice that their denial decision would violate the First Amendment.

---

[4]     DCF's regulations for "Agencies Offering Child Placement and Adoption Services," *see* 102 Code Mass. Regs. §§ 1.00, *et seq*. are unrelated to the Burkes' license denial.

**C.      No Other Binding Authority Clearly Established that the LGBTQ+ Requirements Were Unconstitutional in March 2023.**

The Complaint cites other Supreme Court cases, but none involves foster parent licensing requirements.  These cases say nothing about how a state, in enacting its policies, may weigh its interest in protecting the welfare of foster children against the First Amendment rights of foster parent applicants, let alone how individual social workers may apply such policies.

Unlike here, many of the Free Exercise cases cited in the Complaint involve situations where the state expressly excluded religious organizations or practices in the interest of avoiding a perceived Establishment Clause violation.  *See, e.g., Kennedy v. Bremerton*, 597 U.S. 507 (2022) (school district could not prevent football coach from praying on field after game); *Carson as next friend of O.C. v. Makin*, 596 U.S. 767 (2022) (Maine could not disallow tuition vouchers for religious-based private schools); *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449 (2017) (Missouri could not provide grants for playground resurfacing to secular, but not religious, schools).  These cases come nowhere close to clearly establishing a right that is "'particularized' to the facts of [this] case."  *White v. Pauly*, 580 U.S. 73, 79 (2017) (citation omitted).  The LGBTQ+ Requirements are facially neutral toward religion, and the state's interest involves the protection of a vulnerable population of children in DCF custody.  Other cases in the Complaint dealt with COVID-19 restrictions that permitted secular but not religious gatherings, even though less restrictive alternatives were readily identifiable, *see Tandon v. Newsom*, 593 U.S. 61 (2021); policies that targeted religious practices precisely *because of* their religious nature, *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993); or state action that was openly hostile to religion by calling it "despicable," *Masterpiece Cakeshop*, 584 U.S. at 635.

The general propositions of law in these cases do not give fair notice to a reasonable social worker in March 2023 that they were required by the Free Exercise Clause to disregard DCF policy

and take it upon themselves to craft an exception that would undermine the very reason the policy existed in the first place. None of these cases conflict with *Magazu*'s careful analysis of a prospective foster parent's religious beliefs and the state's compelling interest in ensuring foster families meet requirements intended to protect children. Indeed, none involved a social worker's consideration of the best interests of children in state custody at all. The law does not require social workers to predict how the intricacies of Free Exercise doctrines will apply in novel situations. *See Masterpiece Cakeshop*, 584 U.S. at 640 ("The outcome of cases like this *in other circumstances* must await further elaboration in the courts.") (emphasis added); *Fulton*, 593 U.S. at 542 (acknowledging the state's "weighty" interest "in the equal treatment of prospective foster parents and foster children") (quoting *Masterpiece Cakeshop*, 584 U.S. at 631). None of the cases cited in the Complaint's four Free Exercise counts clearly established that an exception to DCF's LGBTQ+ Requirements had to be created for the Burkes.

Nor do any of the Free Speech cases establish that the particular conduct at issue here would violate the Constitution. *Kennedy* involved a high school targeting religious expression by a coach precisely *because* it was religious in nature. 597 U.S. at 542. The other two cases cited in the Complaint related to "compelled speech" where, as discussed *infra* II.D, the state "sanction[ed]" members of the public or schoolchildren for refusing to "speak as the State demands" in the interest of achieving ideological conformity. *303 Creative LLC v. Elenis*, 600 U.S. 570, 589 (2023); *West Virginia State Board of Ed. v. Barnette*, 319 U.S. 624 (1943). The LRT members did not threaten any punishments based on the Burkes' speech. None of these cases involved what limits the state may constitutionally place on how licensed foster parents interact with the foster children placed in their care. *See supra* II.D. Certainly, none of these cases would have placed social workers on notice that they were obligated by the Constitution to ignore a

licensing requirement aimed at protecting children in DCF custody from harm.

The only circuit-level case in the Complaint about foster parent licensing, *Lasche v. New Jersey*, No. 20-2325, 2022 WL 604025 (3d Cir. Mar. 1, 2022), is an unpublished Third Circuit case that is not even binding within its own circuit, let alone controlling for child welfare workers in Massachusetts. *See* 3d Cir. Internal Op. P. 5.7. Moreover, the Third Circuit did not decide the ultimate result of either qualified immunity prong. *Lasche,* 2022 WL 604025 at *9. On remand, the district court *granted* qualified immunity to the child welfare officials "because [plaintiffs] cannot point to any Supreme Court or Third Circuit precedent demonstrating that suspension of [plaintiffs'] foster license in retaliation for imparting their religious views regarding homosexuality to their foster child violated a clearly established constitutional right." *Lasche v. New Jersey*, No. CV 18-17552 (FLW), 2022 WL 17250731, at *5 (D.N.J. Nov. 28, 2022). Further, that case involved an ad hoc license suspension versus application of a generally applicable and publicly available policy, as occurred here. *Lasche*, 2022 WL 604025 at *1-3.

In sum, no controlling authority or robust consensus of persuasive authority placed the LRT members on notice in March 2023 that they had to either refuse to comply with DCF's LGBTQ+ Requirements or else risk personal liability under the Free Speech or Free Exercise clauses.

### D. Courts Continue to Debate the Constitutionality of Policies Analogous to DCF's LGBTQ+ Requirements in 2025.

Even now, nearly *three years* after the LRT meeting, the question of whether analogous licensing requirements pass constitutional muster remains unsettled. "'[I]f judges . . . disagree on a constitutional question, it is unfair to subject [government workers] to money damages for picking the losing side of the controversy.'" *Pearson v. Callahan*, 555 U.S. 223, 245 (2009) (citation omitted). This is the case here, and therefore qualified immunity must follow.

In February 2025, a federal district court issued two decisions declining to preliminarily

enjoin a Vermont requirement, enacted in 2022, that is similar to DCF's LGBTQ+ Requirements. *Wuoti v. Winters*, No. 2:24-CV-614, 2025 WL 569909 (D. Vt. Feb. 20, 2025); *Antonucci v. Winters*, No. 2:24-CV-783, 2025 WL 569928 (D. Vt. Feb. 20, 2025), *consolidated appeal dismissed and opinions vacated* (2d Cir. No. 25-678, Feb. 25, 2026).  As to free speech, the district court held that Vermont's policies do not "compel [the plaintiffs] to change their beliefs, or to make any statements that disavowed those beliefs," and that any restrictions on speech "are at most incidental to rules of conduct designed to promote healthy and affirming homes."  *Wuoti*, 2025 WL 569909 at *5. As to free exercise, the district court applied rational basis review, because the policies "both facially and as applied, are neutral and generally applicable."  *Id.* at *8.  It held Vermont's policies did not "target[] religious practices or religious applicants," and focused on a foster parents' "abilit[y] to comply" with licensing standards, regardless of whether their objections are religious or secular.  *Id.* at *7-8.  Finally, the district court held that, even under strict scrutiny, the policies were narrowly tailored to "the compelling interest of protecting the health and welfare of LGBTQ youth."  *Id.* at *9.  The *Wuoti* opinion in 2025 illustrates that "the discernible contours of the law" could not have been not clearly established in March 2023.  *Savard*, 338 F.3d at 28.

While other cases involving similar policies have resolved differently, the variance in decisions demonstrates that no "robust" consensus of "settled" case law existed in March 2023.[5] Among these, *Blais v. Hunter*, 493 F. Supp. 3d 984 (E.D. Wash. 2020), cited in the Complaint, is an out-of-circuit district court case and is not a controlling authority for qualified immunity

---

[5]    In July 2025, the Ninth Circuit, in a split decision, enjoined a similar policy in *Bates v. Pakseresht*, 146 F.4th 772 (9th Cir. 2025), reversing the district court.  Defendants disagree with the analysis and outcome in *Bates*, but in any case, *Bates* could not contribute to a "consensus of persuasive authority" where it post-dated the LRT's decision in 2023 and where its own reasoning shows the fact-specific and unsettled nature of the inquiries.  Because the plaintiffs did not assert individual capacity claims, the Ninth Circuit had no occasion to consider qualified immunity.

purposes. *See Alfano*, 847 F.3d at 78 (rights can be clearly established by "precedents from the United States Supreme Court, federal appellate courts, and the highest court of the state in which a case arises"); *Segrain v. Duffy*, 118 F.4th 45, 58 (1st Cir. 2024) (observing that even "[t]wo out-of-circuit decisions" did not establish "a sufficient consensus of persuasive authority"). Further, *Blais* concerned a preliminary injunction and was not a final determination on the merits.[6] Where, as here, judges "'disagree on a constitutional question,'" it is "'unfair'" to subject social workers to the risk of personal liability and money damages. *Pearson*, 555 U.S. at 245.

Neither the First Circuit nor the Supreme Court has settled the issue before this Court. At most, the Burkes can show a still-unsettled legal landscape about constitutional challenges to other state policies to protect LGBTQ+ foster children in other circuits. In March 2023, when the LRT convened, these questions were entirely open, and they remain so today.

### E.    A Reasonable Social Worker Would Have Applied the LGBTQ+ Requirements to Advance DCF's Objective of Protecting Vulnerable Children in its Custody.

In addition to identifying a clearly established right supported by a robust consensus of cases, the Burkes "must also show that an objectively reasonable [official] would have known that his conduct violated the law." *Estate of Rahim*, 51 F.4th at 410. No objectively reasonable LRT member on March 31, 2023, would have reached that conclusion—just as none of the nine members of the LRT did here. In 2021, an independent state agency admonished that DCF had "not taken steps to ensure" that "all of its homes are affirming." SOF ¶ 53. In 2023, DCF implemented a number of new policies that aimed to address that identified deficit. *Id.* ¶ 60. The Burkes were among the first applicants reviewed under those new policies, and the nine LRT members were convening an LRT for the first time in their region. *Id.* ¶ 157. On the single license

---

[6]    Due to a settlement, no final decision on the merits issued. *Blais v. Wash. State Dep't of Children, Youth & Families*, No. 2:20-cv-187 (E.D. Wash. Jun. 4, 2021), ECF No. 85-1, at 2.

application before them, the LRT members applied DCF's regulations and policies.

A reasonable, objective child welfare worker in that position would have denied the Burkes' application. These requirements had never been challenged, let alone overturned or deemed unconstitutional, and there is no evidence they were enacted for any improper purpose. To the contrary, their purpose was to better serve a particularly vulnerable population of children in DCF custody, after the Commission identified several troubling findings about LGBTQ+ youth in foster care. SOF ¶ 35-60. As social workers are aware, DCF's "paramount concern" in all its work is the welfare of children. *See* Mass. Gen. Laws c. 119, § 1.

Government officials generally "should conform their conduct to applicable statutes and regulations." *Davis v. Scherer*, 468 U.S. 183, 194-95 (1984). Because neither DCF regulations nor policies provided any exceptions to the LGBTQ+ Requirements, SOF ¶ 4, 9, 11, 13, 16, 19-22, an applicant's inability to satisfy those requirements, for any reason, would be disqualifying. The Constitution does not require DCF employees to contravene applicable licensing requirements by creating an exception where none exists to avoid the risk of personal financial liability. *See DeToledo v. County of Suffolk*, 379 F. Supp. 2d 138, 149 (D. Mass. 2005) ("A rule encouraging low-ranking officers to second-guess the constitutionality of policies and procedures mandated by their superiors would appear neither constitutionally wise nor institutionally desirable."). Even if the nine LRT members were mistaken about the constitutionality of DCF's requirements—which is not the case—they were neither "'plainly incompetent'" nor did they "'knowingly violate the law'" merely by faithfully applying those requirements to the Burkes' application. *See Bilida v. McCleod*, 211 F.3d 166, 174 (1st Cir. 2000) (citation omitted). Qualified immunity applies.

## II. All Defendants Are Entitled to Summary Judgment Because DCF Did Not Violate the Burkes' First Amendment Rights.

Because the Burkes' official capacity claims are moot, *see* Dkt. Nos. 110-111 & 120, and

the LRT members are protected in their individual capacity by qualified immunity as described above, there is no need to determine the constitutionality of the LRT's 2023 licensing decision, including under the first prong of the qualified immunity defense. *See Estate of Rahim*, 51 F.4th at 410. Should the Court reach the question, summary judgment is appropriate for all Defendants because DCF's licensing decision did not violate the Burkes' First Amendment rights.

## A.    DCF's LGBTQ+ Requirements Are Not Hostile to Religion.

The Burkes allege that DCF's LGBTQ+ Requirements are hostile to religion, Compl. ¶ 183-92 (Count III), but there is no evidence that DCF was hostile to the Burkes' religious beliefs or that DCF drafted the LGBTQ+ Requirements to target religious beliefs.

The Complaint cites *Masterpiece Cakeshop*, where the Supreme Court held a Colorado state commission had unconstitutionally issued a citation to a baker who refused to bake a cake for a same-sex wedding because the commission did not "proceed in a manner neutral toward and tolerant of [the baker's] religious beliefs." 584 U.S. at 638. Specifically, commission officials had openly disparaged the baker's religious view "by describing it as despicable, and also by characterizing it as merely rhetorical," and compared his views on gay marriage to vast historical crimes. *Id.* at 635. Further, the state disparately considered the baker's "religious objections" as compared to three other bakeries' "conscience-based objections." *Id.* at 636-37. The Supreme Court noted, however, "the State's interest *could have* been weighed against [the baker's] sincere religious objections in a way consistent with the requisite religious neutrality that must be strictly observed," if not for the decisionmakers' overt hostility to the baker's religious beliefs. *Id.* at 639 (emphasis added); *see also Kennedy,* 597 U.S. at 525 n.1 (noting policies are "'set aside'" "without further inquiry" only where "'official expressions of hostility' to religion accompany laws or policies burdening religious exercise") (quoting *Masterpiece Cakeshop*, 584 U.S. at 639).

Here, by contrast, no "official expressions of hostility" to religion accompany DCF's LGBTQ+ Requirements.  *See id.*  The record contains no evidence of any DCF policymaker or LRT member expressing hostility to religion.  Indeed, DCF considers it a "strength" when prospective foster parents like the Burkes are involved in a church, as indicative of strong support within their community.  SOF ¶ 159.  The mere recognition that the Burkes attributed their attitudes toward LGBTQ+ individuals to their religious faith does not constitute hostility.  Rather, hostility denotes a personal moral judgment on an individual's religious beliefs.  *See, e.g., Masterpiece Cakeshop,* 584 U.S. at 634-36.  Absent the overt hostility at play in *Masterpiece Cakeshop*, DCF is constitutionally permitted to weigh its compelling interest in protecting the welfare of LGBTQ+ foster youth against objections, including the Burkes' religious objections.  *See id.* at 639.

### B.    DCF's LGBTQ+ Requirements Are Neutral and Generally Applicable, and Thus Subject to Rational Basis Review.

"[T]he government is generally free to place incidental burdens on religious exercise so long as it does so pursuant to a neutral policy that is generally applicable."  *Mahmoud v. Taylor*, 606 U.S. 522, 564 (2025).  Here, the Burkes' free exercise claim is subject to rational basis review because DCF's LGBTQ+ Requirements are both neutral and generally applicable.  *See Wuoti,* 2025 WL 569909, at *8 (applying rational basis to Vermont's analogous requirement).  The Burkes contend the LGBTQ+ Requirements should be subject instead to strict scrutiny because they allegedly "target" religious beliefs and disfavor religious people (Count I), treat other secular activities more favorably than their religious exercise (Count II), and serve as a religious gerrymander (Count IV).  None of these theories is supported by competent evidence.

"[T]he minimum requirement of neutrality is that a law not discriminate on its face."  *Lukumi*, 508 U.S. at 533.  Additionally, "[t]o qualify as neutral, a policy must not target religious beliefs or practices 'because of their religious nature.'"  *Swartz v. Sylvester*, 53 F.4th 693, 700 (1st

Cir. 2022) (quoting *Fulton*, 593 U.S. at 533) (emphasis added).  "To qualify as generally applicable, a policy cannot selectively burden conduct motivated by religion while simultaneously exempting the conduct's secular counterpart."  *Id.*

Here, DCF's LGBTQ+ Requirements were silent on religion and did not target religious exercise.  They applied to *all* prospective foster parents to achieve the goal of protecting LGBTQ+ children, and no exceptions were permitted.  SOF ¶ 4, 9, 11, 13, 16, 19-22.  There is no "religious gerrymander" or "selective burden" on religious applicants when the challenged requirements can equally exclude secular applicants.  The ability to support and respect a child's sexual orientation and gender identity is neither expressly nor inherently tied to religious beliefs—indeed, the Burkes themselves attribute their views in part to entirely secular sources, such as the rules of English grammar or health-related concerns about certain medical interventions.  SOF ¶ 123.  A law that is neutral and generally applicable is upheld if it is "rationally related to a legitimate governmental interest."  *Swartz*, 53 F.4th at 700 (citation omitted).  DCF's LGBTQ+ Requirements further a compelling interest, *see supra* Facts § C; *infra* II.C, so they have far more than a rational basis.

### C.    DCF's LGBTQ+ Requirements Survive Strict Scrutiny Because They Are Narrowly Tailored to Its Compelling Interest in Protecting LGBTQ+ Children.

DCF's LGBTQ+ Requirements also withstand a higher level of scrutiny because they "advance[] 'interests of the highest order' and [are] narrowly tailored to achieve those interests." *Fulton*, 593 U.S. at 541 (quoting *Lukumi*, 508 U.S. at 546).  Here, DCF had a compelling interest— derived from the Commonwealth's constitutional and statutory duties toward children in foster care—in protecting the physical, mental, and emotional well-being of foster children who are or who may later identify as LGBTQ+.  The First Circuit has recognized that "State actors have 'a compelling interest in protecting the physical and psychological well-being of minors,'" *Foote*, 128 F.4th at 356-57 (citation omitted), and "[t]hat interest is at its apex" when seeking to "protect

23

children who are particularly vulnerable, such as transgender minors." *Id.* (quoting *Doe ex rel. Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 528-29 (3d Cir. 2018) (holding that school had compelling interest in protecting the physical and mental well-being of transgender children)); *see also L.M. v. Town of Middleborough*, 103 F.4th 854, 880-81 (1st Cir. 2024), *cert denied*, 145 S.Ct. 1489 (school district could reasonably consider shirt saying "There Are Only Two Genders" "to demean the identity of transgender and gender-nonconforming . . . students" by "directly den[ying] the self-conceptions" of those students); *Wuoti*, 2025 WL 569909, at *9 (recognizing "[t]he compelling interest of protecting the health and welfare of LGBTQ youth"); *Bates*, 146 F.4th at 798-99 (acknowledging "valid objective in promoting the health and safety of LGBTQ children in foster care"). Moreover, "the State has a compelling interest to protect children from actual or potential harm," and this "is especially true with respect to foster children whose need for safety, security, and stability is readily apparent." *Magazu*, 473 Mass. at 445 (citation omitted).

DCF's LGBTQ+ Requirements sought to advance the state's compelling interest by ensuring that LGBTQ+ children—who are overrepresented in foster care and who cannot all be identified in advance, SOF ¶ 40-41, 61-64—would be placed with prospective foster parents who are able to support the child's sexual orientation and gender identity, where peer-reviewed research has shown the harmful effects of non-supportive home environments. *Id.* ¶ 67-89; *see Wuoti,* 2025 WL 569909, at *8 (explaining Vermont's similar requirements "were prompted by feedback from various stakeholders, and by recent research"). DCF acted in response to grave concerns, expressed in the 2021 Commission Report, that LGBTQ+ youth experienced worse outcomes in foster care than non-LGBTQ+ youth, and DCF was not doing enough to ensure LGBTQ+ children received the required level of support and protection in DCF custody. *Id.* ¶ 51.

Further, DCF's LGBTQ+ Requirements were narrowly tailored to achieve DCF's

compelling interest, and no alternative would have achieved that interest as effectively.  "[N]arrow tailoring requires the government to show that measures less restrictive of the First Amendment activity could not address its interest[.]"  *Tandon*, 593 U.S. at 63; *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006) (courts examine "the asserted harm of granting specific exemptions to particular religious claimants").  Here, DCF's denial of the Burkes' application was not "more severe than has been shown to be required to prevent" the risks of harm to LGBTQ+ foster children that prompted the policies to be enacted.  *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 18 (2020).  Granting a license with the "condition" that the Burkes would not receive placement of an LGBTQ+ foster child was not a viable option, because it is not possible to predict which children will identify as LGBTQ+, and LGBTQ+ identities may be disclosed at varying times.  SOF ¶ 61-64.  Nor is a "wait and see" approach, where children are placed in unsupportive homes with the expectation that the placement could be changed if an LGBTQ+ identity emerges, equally effective at protecting DCF's compelling interests.  This alternative could cause different harms to a child, from being intrusively "monitored" for the emergence of an LGBTQ+ identity, to feeling unable to disclose an emerging LGBTQ+ identity due to shame or fear of placement instability, to potentially being removed from a placement due to their sexual orientation or gender identity.  *Id.* ¶ 27-34, 74, 80-83, 88-89. These harms undermine DCF's compelling interest in ensuring the safety of LGBTQ+ foster children.

DCF's LGBTQ+ Requirements also were not underinclusive.  A law is underinclusive, and therefore not narrowly tailored, when it "plac[es] strict limits on" certain activities while allowing other activities that "create the same problem."  *Reed v. Town of Gilbert*, 576 U.S. 155, 172 (2015).  But the LGBTQ+ Requirements did not leave "appreciable damage" to the safety of LGBTQ+ foster children "unprohibited."  *Lukumi*, 508 U.S. at 547 (citation omitted).  Allowing foster

parents to express preferences regarding placements—including regarding the gender, religion, or race of prospective foster children—does not create the same risks. The matching process aims to find the "best fit" for any given foster child from within the pool of available foster homes. The LGBTQ+ Requirements recognize that this process does not fully protect LGBTQ+ foster children, who may not yet be aware of that identity or may not immediately disclose it, and whose risk of harm in unsupportive households was established by stakeholder feedback and a body of peer-reviewed research broadly accepted in the field. SOF ¶ 37-89.

Nor is existing placement instability within the DCF system reason to conclude the LGBTQ+ Requirements are unconstitutional. Despite DCF's best efforts to ensure a child's "first placement is their only placement," SOF ¶ 28, DCF is sometimes required to interrupt placements for a variety of reasons, including when a foster child develops a serious mental or physical condition that a foster family cannot handle. But this is never the desired outcome, and any attempt to analogize this type of placement instability is misplaced because being LGBTQ+ is not a medical condition or mental health disorder, and so the harm addressed by the LGBTQ+ Requirements is not "comparable." *See Williams-Yulee v. Florida Bar*, 575 U.S. 433, 449 (2015) (policy is only underinclusive where it "regulates one aspect of a problem while declining to regulate a different aspect of the problem that affects its stated interest *in a comparable way*").

The LGBTQ+ Requirements were narrowly tailored to achieve a compelling government interest, so the denial decision did not violate the Burkes' Free Exercise rights under any theory.

### D.    DCF's LGBTQ+ Requirements Do Not Unlawfully Compel Speech.

The Burkes separately contend under the First Amendment's Free Speech clause that DCF's LGBTQ+ Requirements unconstitutionally compelled them to "affirm a viewpoint with which they do not agree" on LGBTQ+ issues. Compl. ¶ 208 (Count V). The Burkes are mistaken.

First, long-standing Supreme Court precedent permits the government to regulate speech involving children when the state stands in place of the children's parents. When school authorities assume responsibility for children, they act "*in loco parentis*, to protect children." *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 684 (1986). The "doctrine of *in loco parentis* treats school administrators as standing in the place of students' parents under circumstances where the children's actual parents cannot protect, guide, and discipline them." *Mahanoy Area Sch. Dist. v. B. L.*, 594 U.S. 180, 187, 189 (2021). Courts "must apply the First Amendment 'in light of the special characteristics of the school environment,'" and "[o]ne such characteristic" is that schools "stand *in loco parentis*." *Id.* at 187 (citation omitted). In these circumstances, restrictions on speech are given "special leeway." *Id.* at 187-88. The state can lawfully restrict speech if doing so is "reasonably related to legitimate pedagogical concerns." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988). And, when acting *in loco parentis*, the state can restrict speech that would be "materially disrupt[ive]" or would infringe upon the "rights of others." *Tinker v. Des Moines Indep. Comm. Sch. Dist.*, 393 U.S. 503, 513 (1969); *L.M.*, 103 F.4th at 878-82.

To an even greater degree than schools, DCF stands in place of children's parents who cannot adequately protect and care for them. *See Care and Protection of Walt*, 478 Mass. 212, 219-23 (2017). DCF's purpose is to protect those children, including children who are or may be LGBTQ+ but have not disclosed their identities, and safeguard their physical and emotional well-being while they are in DCF custody. *Id.*; SOF ¶ 24-25. The risks of placing children in homes that are not supportive and respectful are significant and consequential, SOF ¶ 37-89, as are the repercussions of disrupting placements, *id.* ¶ 24-34. DCF, acting *in loco parentis*, established the LGBTQ+ Requirements to address these risks, protect the children in its care from psychological harm, and avoid any material disruption of their placements. *See L.M.*, 103 F.4th at 878-82

27

(holding that, "under *Tinker*'s material-disruption limitation," a school could restrict speech that it reasonably interpreted as "demean[ing] the gender identities of other[s]," and reasonably forecasted would be materially disruptive because of its "negative psychological impact").

Moreover, DCF's LGBTQ+ Requirements primarily regulated conduct, with only an incidental effect on protected speech. Therefore, they are constitutional if they "advance[] important governmental interests unrelated to the suppression of free speech and do[] not burden substantially more speech than necessary to further those interests." *See Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 495-96 (2025); *see id.* at 478 (a law with "only an incidental effect on protected speech" is "subject to intermediate scrutiny") (citation omitted). The LGBTQ+ Requirements addressed how foster parents *act* to support and respect the gender identity or sexual orientation of foster children and functioned as "rules of conduct designed to promote healthy and affirming homes." *Wuoti*, 2025 WL 569909, at \*5. And DCF has an important—indeed, compelling—interest in protecting LGBTQ+ foster children from the harms associated with non-supportive home environments, just as DCF has an interest in protecting foster children from the harms associated with corporal punishment. *See Magazu*, 473 Mass. at 431-33.

The compelled speech doctrine does not apply. Speech undertaken incidental to a family's provision of foster care is different in kind from the two compelled speech cases in the Complaint. Compl. ¶ 204-05. In those cases, the government imposed affirmative "sanctions" on individuals who did not "speak as the State demands." *303 Creative*, 600 U.S. at 589. In *303 Creative*, the sanction involved "compulsory" remedial training, "periodic compliance reports," and "monetary fines." *Id*. In *Barnette*, a state law required all students to salute the flag under threat of expulsion, transfer to "reformatories maintained for criminally inclined juveniles," and prosecution of parents "for causing delinquency." 319 U.S. at 629-30. DCF never imposed or threatened any punishment

on the Burkes.[7]  *See also Christian Legal Soc. Chapter v. Martinez,* 561 U.S. 661, 682 (2010) ("In diverse contexts, our decisions have distinguished between policies that require action and those that withhold benefits.")  Nor is DCF attempting to impose a particular view across society, unlike in *303 Creative*, where Colorado's application of its antidiscrimination law sought "to compel [] speech in order to 'excis[e] certain ideas or viewpoints from the public dialogue.'"  600 U.S. at 588 (citation omitted).  Here, the LGBTQ+ Requirements did not regulate the general marketplace of ideas, and the Burkes have always been free to engage in "the public dialogue."  *See id.*  The only speech that is incidentally regulated is speech undertaken within the foster parent's relationship to a child in state custody.  Taken to its logical conclusion, the Burkes' compelled speech argument would not permit the state to regulate *any* speech made by foster parents in relation to foster children in custody.  *Cf. Mahanoy*, 594 U.S. 187-88 (observing that schools can regulate "'indecent,' 'lewd' or 'vulgar,' speech" and speech that "promotes 'illegal drug use'").  That is not and cannot be the standard, as the state must have the ability to prevent foster parents from engaging in speech that would, for example, belittle, harass or degrade a foster child.

Instead, just as school administrators acting *in loco parentis* may place limits on speech within the school environment, DCF must be able to place limits on speech within the foster home as a permissible condition on the home's license.  "[U]nconstitutional conditions precedents span a spectrum," with one end comprising "government employees, whose close relationship with the government requires a balancing of important free speech and government interests," and the other

---

[7]      Notably, the rights of foster parents are based on "state law and contractual arrangements," not a constitutional right.  *See Smith v. Org'n of Foster Families for Equality & Reform*, 431 U.S. 816, 845 (1972).  The Burkes' right to a foster care license from DCF is conditioned, as a matter of state law, on satisfaction of DCF's licensing requirements.  The Burkes are not compelled to give up something to which they are constitutionally or otherwise entitled, unlike, for example, the students in *Barnette*.  *See* 319 U.S. at 629-30.

involving individuals like "claimants for tax exemptions, users of public facilities, and recipients of small government subsidies," who are "more like ordinary citizens whose viewpoints on matters of public concern the government has no legitimate interest in repressing." *Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 680 (1996) (citations omitted).  Here, the "close" relationship between the government and licensed foster parents "requires a balancing of important free speech and government interests." *Id.*  Foster parents are "temporary contract service providers with a defined set of rights and responsibilities that clearly differs from those of a child's parents." *Kerins v. Lima*, 425 Mass. 108, 112 n. 6, 680 N.E.2d 32 (1997).[8]  The foster care system exists to protect children, not to provide a service to foster parents.  "[A]t times First Amendment values must yield to other societal interests." *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 501 (1981).  While it is not the role of state to shield members of the public from speech they may find "misguided, or even hurtful," *303 Creative*, 600 U.S. at 603 (citation omitted), the state's role is different when considering its obligations toward foster children in its custody.  Here, the state's interest in protecting LGBTQ+ foster children outweighs any incidental burden on foster parents' speech made in the course of providing caregiving services to foster children.  *See also Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006) (explaining in analogous public employee context that where speech "owes its existence" to an individual's contractual relationship with the state, restricting that speech "does not infringe any liberties" they "might have enjoyed as a private citizen").

## CONCLUSION

As described herein, Defendants respectfully request that this Court grant summary judgment in their favor on all counts of the Complaint.

---

[8]    Foster families are expressly treated as public employees in certain circumstances, such as with respect to confidentiality.  110 Code Mass. Regs. § 7.104(1)(g).  Foster parents are also "public employees" with respect to tort claims by a foster child.  Mass. Gen. Laws c. 258, § 1.

Respectfully submitted,

DEFENDANTS

By and through their Attorneys,

ANDREA JOY CAMPBELL
ATTORNEY GENERAL

/s/ *Grace Gohlke*
Grace Gohlke (BBO No. 704218)
Michael Shiposh (BBO No. 680131)
Benjamin E. Bryant (BBO No. 714077)
Assistant Attorneys General
One Ashburton Place
Boston, MA 02108
(617) 963-2527
grace.gohlke@mass.gov
michael.shiposh@mass.gov
benjamin.e.bryant@mass.gov

Dated:  March 13, 2026

## CERTIFICATE OF SERVICE

I certify that today, March 13, 2026 I caused this document to be filed through the Court's

ECF system, which cause it to be sent electronically to all registered members as identified on the

Notice of Electronic Filing (NEF) today, which includes all counsel of record.

/s/ *Grace Gohlke*
Grace Gohlke