UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

MICHAEL and CATHERINE BURKE,

               Plaintiffs,

          v.

KIAME MAHANIAH, in his official capacity
as Secretary of the Massachusetts Executive
Office of Health and Human Services, *et al*.

             Defendants.

CIVIL ACTION
No. 3:23-cv-11798-MGM

## DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Rule 56.1 and Fed. R. Civ. P. 56, Defendants Kiame Mahaniah, Staverne Miller, Laurie Sullivan, Anna Moynahan, Theresa Harris, Dawn Sweetman, Tywanna Jones, Caitlyn Levine, Stacy Clark, Euphemia Molina, Luz Estrada, and Angel Emerson (hereinafter, "Defendants"), respectfully submit this Statement of Undisputed Facts in Support of Their Motion for Summary Judgment.

**TABLE OF EXHIBITS**

| No. | Document Name | Bates Number |
|---|---|---|
| 1 | Burke Application and License Study in DCF's iFamily System | DCF-BURKE-000001 to 62 |
| 2 | DCF Policy #2006-01 (Family Resource Policy) | DCF-BURKE-005379 to 5439 |
| 3 | DCF Policy #23-01 (Licensing of Foster, Pre-Adoptive, and Kinship Families), as in effect on March 31, 2023 | DCF-BURKE-000267 to 324 |
| 4 | DCF Policy #23-02 (Safe and Supported Placements), as in effect on March 31, 2023 | DCF-BURKE-000325 to 347 |
| 5 | Michael Burke deposition transcript (excerpts) | ~ |
| 6 | Catherine Burke deposition transcript (excerpts) | ~ |
| 7 | Sharon Silvia 30(b)(6) deposition transcript (excerpts) | ~ |
| 8 | Virginia Peel 30(b)(6) deposition transcript (excerpts) | ~ |
| 9 | DCF Policy #2022-02 (LGBTQIA+ Nondiscrimination Policy), as in effect on March 31, 2023 | DCF-BURKE-000162 to 166 |
| 10 | Expert Report of Christopher Bellonci, served by Defendants pursuant to Fed. R. Civ. P. 26(a)(2) | ~ |
| 11 | Foster Child Bill of Rights | DCF-BURKE-000359 |
| 12 | DCF Non-Discrimination Notice | DCF-BURKE-000354 to 356 |
| 13 | Expert Report of Abbie Goldberg, served by Defendants pursuant to Fed. R. Civ. P. 26(a)(2) | ~ |
| 14 | Massachusetts Commission on LGBTQ Youth Report: LGBTQ Youth in the Massachusetts Child Welfare System (2021) | DCF-BURKE-000229 to 266 |
| 15 | Substance Abuse and Mental Health Services Administration, "Moving Beyond Change Efforts: Evidence and Action to Support and Affirm LGBTQI+ Youth," published 2023 (Exhibit 6 in the Deposition of Dr. Geeta Nangia) | ~ |
| 16 | Expert Report of Ralph Vetters, served by Defendants pursuant to Fed. R. Civ. P. 26(a)(2) | ~ |
| 17 | DCF Data Spreadsheet of Foster Homes with a Completed License Study from Jan. 1, 2021-August 31, 2023 | DCF-BURKE-C-000083 to 84 |

1

| No. | Document Name | Bates Number |
|---|---|---|
| 18 | DCF Data Spreadsheet of Foster Home Placement Availability for Fiscal Years 2021, 2022 & 2023 | DCF-BURKE-C-000081 |
| 19 | Tywanna Jones deposition transcript (excerpts) | ~ |
| 20 | License Study on 18 Degrees Letterhead | DCF-BURKE-6928 to 6959 |
| 21 | Anna Moynahan deposition transcript (excerpts) | |
| 22 | Emails between Nick Garrett (18 Degrees) and Dawn Sweetman (DCF) from January 10, 2023 4:14 PM through January 11, 2023 10:10 PM | DCF-BURKE-003313 to 3314 |
| 23 | Dawn Sweetman deposition transcript (excerpts) | ~ |
| 24 | Microsoft Teams Calendar invite sent by Anna Moynahan on March 27, 2023 with links to access two documents: (1) Catherine and Michael Burke License Study .docx; (2) CORI Statement.docx | DCF-BURKE-003031 |
| 25 | Luz Estrada deposition transcript (excerpts) | ~ |
| 26 | Angel Emerson deposition transcript (excerpts) | ~ |
| 27 | Email from Anna Moynahan to Dawn Sweetman on Friday, June 2, 2023 at 8:03 PM, Subject: "RE: Burke L&T team meeting attendance – " | DCF-BURKE-007236 to 7237 |
| 28 | Theresa Harris deposition transcript (excerpts) | ~ |
| 29 | Euphemia Molina deposition transcript (excerpts) | ~ |
| 30 | Stacy Clark deposition transcript (excerpts) | ~ |
| 31 | Caitlyn Levine deposition transcript (excerpts) | ~ |
| 32 | Defendants' Responses and Objections to Plaintiffs' First Set of Interrogatories to Official Capacity Defendants No. 3. | ~ |
| 33 | Denial Letter from Dawn Sweetman to Catherine and Michael Burke, dated March 31, 2023 | DCF-BURKE-003347 |
| 34 | 110 Code Mass. Regs. 7.000, *et seq.*, as in effect on March 31, 2023 | DCF-BURKE-006391 to 6462 |

## MATERIAL FACTS

**I.    The Burkes' Application for a Foster Parent License Issued by the Massachusetts Department of Children and Families**

1.    On or around January 5, 2022, Plaintiffs Michael Burke ("Mr. Burke") and Catherine Burke ("Mrs. Burke") (collectively, the "Burkes") applied to the Massachusetts Department of Children and Families ("DCF" or the "Department") for a Massachusetts license to serve as unrelated foster parents.  Ex. 1, Burke Application and License Study in DCF's iFamily System at DCF-BURKE-000001.

2.    The Burkes expressed a desire to foster children aged 4 to 12 years old who had an established goal of adoption (rather than reunification with their family of origin) and whose adoption would not be subject to a legal challenge by their family of origin.  Ex. 1, Burke Application and License Study in DCF's iFamily System at DCF-BURKE-000059.

**II.    DCF's Foster Parent Licensing Regulations and Policies**

3.    At the time of the Burkes' application, DCF regulations required that all foster parent applicants must demonstrate the ability "to promote the physical, mental, and emotional well-being of a child placed in his or her care, including supporting and respecting a child's sexual orientation or gender identity."  Ex. 34, 110 Code Mass. Regs. § 7.104(1)(d).[1]

4.    At the time of the Burkes' licensing decision on March 31, 2023, neither DCF regulations nor DCF policies included any exception to the requirement that foster parent applicants must promote the physical, mental, and emotional well-being of a child placed in his or

---

[1]    The regulation cited in this paragraph was changed on December 12, 2025, and several of the policies cited in subsequent paragraphs were correspondingly amended.  All quotations and citations to the LGBTQ+ Requirements describe the provisions in effect on March 31, 2023, the date the LRT determined that the Burkes could not meet the then-existing licensing requirements.  Exhibits reflect the regulations and policies as they were in effect on March 31, 2023, prior to the December 2025 revisions.

her care, including supporting and respecting a child's sexual orientation or gender identity.  Ex. 34, 110 Code Mass. Regs. § 7.104; Ex. 9, DCF Policy #2022-02 (LGBTQIA+ Nondiscrimination Policy) at DCF-BURKE-000162-66; Ex. 2, DCF Policy #2006-01 (Family Resource Policy) at DCF-BURKE-005379-5439[2]; Ex. 3, DCF Policy #23-01 (Licensing of Foster, Pre-Adoptive, and Kinship Families) at DCF-BURKE-000267-324; Ex. 4, DCF Policy # 23-02 (Safe and Supported Placements); Ex. 8, Peel 30(b)(6) Depo. at 131:10-132:8 (noting that no exceptions are granted for DCF's requirement that parents be "supporting and respecting [of] a child's sexual orientation or gender identity").

5.      DCF's LGBTQIA+ Nondiscrimination Policy became effective June 30, 2022 (the "LGBTQIA+ Nondiscrimination Policy"), and was in place at the time of the Burkes' licensing decision on March 31, 2023.  Ex. 1, Burke Application and License Study in DCF's iFamily System at DCF-BURKE-000001; Ex. 9, DCF Policy #2022-02 (LGBTQIA+ Nondiscrimination Policy) at DCF-BURKE-000162.

6.      "LGBTQ+" is an acronym that stands for lesbian, gay, bisexual, transgender, queer or questioning, with the "+" encompassing other diverse sexual orientations and/or gender identities or expressions.  Ex. 14, Massachusetts Commission on LGBTQ Youth Report (LGBTQ Youth in the Massachusetts Child Welfare System: A Report on Pervasive Threats to Safety, Wellbeing, and Permanency) at DCF-BURKE-000229; Ex. 16, Expert Report of Ralph Vetters at 5 (defining "LBGTQIA+").

7.      At the time of the Burkes' licensing decision on March 31, 2023, the LGBTQIA+ Nondiscrimination Policy provided that its "purpose . . . is to ensure that the Department's services,

---

[2]      DCF Policy #2006-01 (Family Resource Policy) was replaced, effective February 27, 2023, by DCF Policy #23-01 (Licensing of Foster, Pre-Adoptive, and Kinship Families) and DCF Policy # 23-02 (Safe and Supported Placements).  Ex. 8, Peel 30(b)(6) Depo. at 14:1-16.

programs, and placements are safe, affirming, and free from discrimination, harassment, and bullying for all children, youth, and families regardless of sex assigned at birth, gender identity, gender expression, or sexual orientation." Ex. 9, DCF Policy #2022-02 (LGBTQIA+ Nondiscrimination Policy) at DCF-BURKE-000163.

8.    At the time of the Burkes' licensing decision on March 31, 2023, the LGBTQIA+ Nondiscrimination Policy provided that foster parents "must be respectful of how individuals ask to be identified and use the terms an individual uses to describe themselves." Ex. 9, DCF Policy #2022-02 (LGBTQIA+ Nondiscrimination Policy) at DCF-BURKE-000163.

9.    At the time of the Burkes' licensing decision on March 31, 2023, neither DCF regulations nor DCF policies included any exception to the requirement that foster parents must be respectful of how individuals ask to be identified and use the terms an individual uses to describe themselves. Ex. 34, 110 Code Mass. Regs. § 7.104; Ex. 9, DCF Policy #2022-02 (LGBTQIA+ Nondiscrimination Policy) at DCF-BURKE-000162-66; Ex. 2, DCF Policy #2006-01 (Family Resource Policy) at DCF-BURKE-005379-5439; Ex. 3, DCF Policy #23-01 (Licensing of Foster, Pre-Adoptive, and Kinship Families) at DCF-000267-324; Ex. 4, DCF Policy # 23-02 (Safe and Supported Placements).

10.    At the time of the Burkes' licensing decision on March 31, 2023, the LGBTQIA+ Nondiscrimination Policy provided that "[c]hildren/youth in care are allowed to express themselves through clothing, accessories, hairstyles, and other means of expression consistent with their identities." Ex. 9, DCF Policy #2022-02 (LGBTQIA+ Nondiscrimination Policy) at DCF-BURKE-000165.

11.    At the time of the Burkes' licensing decision on March 31, 2023, neither DCF regulations nor DCF policies included any exception to the requirement that foster children are

allowed to express themselves through clothing, accessories, hairstyles, and other means of expression consistent with their identities.  Ex. 34, 110 Code Mass. Regs. § 7.104; Ex. 9, DCF Policy #2022-02 (LGBTQIA+ Nondiscrimination Policy) at DCF-BURKE-000162-66; Ex. 2, DCF Policy #2006-01 (Family Resource Policy) at DCF-BURKE-005379-5439; Ex. 3, DCF Policy #23-01 (Licensing of Foster, Pre-Adoptive, and Kinship Families) at DCF-000267-324; Ex. 4, DCF Policy # 23-02 (Safe and Supported Placements).

12.    At the time of the Burkes' licensing decision on March 31, 2023, the LGBTQIA+ Nondiscrimination Policy provided that foster parents "do not make attempts to convince LGBTQIA+ children/youth to reject or modify their sexual orientation, gender identity, or gender expression."  Ex. 9, DCF Policy #2022-02 (LGBTQIA+ Nondiscrimination Policy) at DCF-BURKE-000165.

13.    At the time of the Burkes' licensing decision on March 31, 2023, neither DCF regulations nor DCF policies included any exception to the requirement that foster parents do not make attempts to convince LGBTQ+ children/youth to reject or modify their sexual orientation, gender identity, or gender expression.  Ex. 34, 110 Code Mass. Regs. § 7.104; Ex. 9, DCF Policy #2022-02 (LGBTQIA+ Nondiscrimination Policy) at DCF-BURKE-000162-66; Ex. 2, DCF Policy #2006-01 (Family Resource Policy) at DCF-BURKE-005379-5439; Ex. 3, DCF Policy #23-01 (Licensing of Foster, Pre-Adoptive, and Kinship Families) at DCF-000267-324; Ex. 4, DCF Policy # 23-02 (Safe and Supported Placements).

14.    DCF's "Licensing of Foster, Pre-Adoptive, and Kinship Families" policy (the "Licensing Policy") became effective on February 27, 2023, and was in place at the time of the Burkes' licensing decision on March 31, 2023.  Ex. 3, DCF Policy #23-01 (Licensing of Foster, Pre-Adoptive, and Kinship Families) at DCF-BURKE-000267.

15.    At the time of the Burkes' licensing decision on March 31, 2023, the Licensing Policy provided that DCF "expects that foster parents will . . . support connections to the child's racial, ethnic, linguistic, cultural, and religious background, sexual orientation and gender identity, and community and family of origin."  Ex. 3, DCF Policy #23-01 (Licensing of Foster, Pre-Adoptive, and Kinship Families) at DCF-BURKE-000286.

16.    At the time of the Burkes' licensing decision on March 31, 2023, neither DCF regulations nor DCF policies included any exception to the requirement that foster parents must support connections to the child's sexual orientation and gender identity.  Ex. 34, 110 Code Mass. Regs. § 7.104; Ex. 9, DCF Policy #2022-02 (LGBTQIA+ Nondiscrimination Policy) at DCF-BURKE-000162-66; Ex. 2, DCF Policy #2006-01 (Family Resource Policy) at DCF-BURKE-005379-5439; Ex. 3, DCF Policy #23-01 (Licensing of Foster, Pre-Adoptive, and Kinship Families) at DCF-000267-324; Ex. 4, DCF Policy # 23-02 (Safe and Supported Placements).

17.    At the time of the Burkes' licensing decision on March 31, 2023, the Licensing Policy provided that foster parents must "create an environment in which children feel safe to express their emotions."  Ex. 3, DCF Policy #23-01 (Licensing of Foster, Pre-Adoptive, and Kinship Families) at DCF-BURKE-000284.

18.    DCF's Foster Child Bill of Rights provides that "[e]very foster child: Shall be treated with respect by . . . foster parents . . . without regard to race, ethnicity, sexual orientation, gender identity, religion and/or disability."  Ex. 11, DCF Foster Child Bill of Rights at DCF-BURKE-000359.

19.    Neither DCF regulations nor DCF policies include any exceptions to the requirement that foster children shall be treated with respect by foster parents without regard to sexual orientation or gender identity.  Ex. 34, 110 Code Mass. Regs. § 7.104; Ex. 9, DCF Policy

#2022-02 (LGBTQIA+ Nondiscrimination Policy) at DCF-BURKE-000162-66; Ex. 2, DCF Policy #2006-01 (Family Resource Policy) at DCF-BURKE-005379-5439; Ex. 3, DCF Policy #23-01 (Licensing of Foster, Pre-Adoptive, and Kinship Families) at DCF-000267-324; Ex. 4, DCF Policy # 23-02 (Safe and Supported Placements).

20.     At the time of the Burkes' licensing decision on March 31, 2023, neither DCF regulations nor DCF policies permitted or authorized DCF employees to create or grant exceptions to the requirements of 110 Code Mass. Regs. § 7.104(1)(d), the Licensing Policy, or the LGBTQIA+ Nondiscrimination Policy. Ex. 34, 110 Code Mass. Regs. § 7.104; Ex. 9, DCF Policy #2022-02 (LGBTQIA+ Nondiscrimination Policy) at DCF-BURKE-000162-66; Ex. 2, DCF Policy #2006-01 (Family Resource Policy) at DCF-BURKE-005379-5439; Ex. 3, DCF Policy #23-01 (Licensing of Foster, Pre-Adoptive, and Kinship Families) at DCF-000267-324; Ex. 4, DCF Policy # 23-02 (Safe and Supported Placements).

21.     At the time of the Burkes' licensing decision on March 31, 2023, neither DCF regulations nor DCF policies permitted or authorized DCF employees to issue a foster family license based on a balancing of an applicant's inability to satisfy the requirements of 110 Code Mass. Regs. § 7.104(1)(d), the Licensing Policy, or the LGBTQIA+ Nondiscrimination Policy against the applicant's willingness to foster children who have different levels of need, such as children who are blind or deaf, have moderate medical needs, have histories of mental health challenges, are up to age 12, or are part of a sibling set. Ex. 34, 110 Code Mass. Regs. § 7.104; Ex. 9, DCF Policy #2022-02 (LGBTQIA+ Nondiscrimination Policy) at DCF-BURKE-000162-66; Ex. 2, DCF Policy #2006-01 (Family Resource Policy) at DCF-BURKE-005379-5439; Ex. 3, DCF Policy #23-01 (Licensing of Foster, Pre-Adoptive, and Kinship Families) at DCF-000267-324; Ex. 4, DCF Policy # 23-02 (Safe and Supported Placements).

22.    At the time of the Burkes' licensing decision on March 31, 2023, the DCF regulations and policies described above (collectively "LGBTQ+ Requirements") applied to all foster parent applicants.  Ex. 34, 110 Code Mass. Regs. § 7.104(1)(d); Ex. 9, DCF Policy #2022-02 (LGBTQIA+ Nondiscrimination Policy) at DCF-BURKE-000162-66; Ex. 3, DCF Policy #23-01 (Licensing of Foster, Pre-Adoptive, and Kinship Families) at DCF-000267-324; Ex. 7, Silvia Depo. at 109:1-7 ("What I can say is that if we become aware because of circumstances, experiences that we have with them that they're not affirming, then that will be addressed[.]")

23.    At the time of the Burkes' licensing decision on March 31, 2023, DCF's Licensing Policy provided that: "The Department does not deny any adult the opportunity to become a foster family on the basis of race, color, age, biological sex, ethnicity, marital status, sexual orientation, gender identity or expression, religion, creed, ancestry, national origin, language, disability or veteran's status."  Ex. 3, DCF Policy #23-01 (Licensing of Foster, Pre-Adoptive, and Kinship Families) at DCF-BURKE-000279; *see also* Ex. 12, DCF Non-Discrimination Notice at DCF-BURKE-000354-55.

### III.    The Policy Rationale for DCF's LGBTQ+ Requirements

#### A.    DCF Strives to Advance the Long-Term Well-Being of Children.

24.    By statute, "the health and safety of the child shall be of paramount concern" to DCF "and shall include the long-term well-being of the child."  Mass. Gen. Laws ch. 119, § 1.

25.    DCF regulations provide that "[a]ll out-of-home placement decisions shall be made in the best interests of the child, based upon safety, well-being and permanency of the child and the child's individual needs."  Ex. 34, 110 Code Mass. Regs. § 7.101(1).

26.    As of March 31, 2023, the Licensing Policy provided that a "safe, nurturing, and permanent family is the goal for every child in Department care."  Ex. 3, DCF Policy #23-01 (Licensing of Foster, Pre-Adoptive, and Kinship Families) at DCF-BURKE-000268.

27.     DCF strives to achieve permanency and reduce placement disruptions for children in its care.  Ex. 3, DCF Policy #23-01 (Licensing of Foster, Pre-Adoptive, and Kinship Families) at DCF-BURKE-000268, DCF-BURKE-000284; Ex. 8, Peel 30(b)(6) Depo. at 128:20-129:16.

28.     As of March 31, 2023, DCF's Safe and Supported Placements Policy provided that, "the Department is committed to minimizing transitions for a child and making efforts to ensure the child's first placement is their only placement[.]"  Ex. 4, DCF Policy # 23-02 (Safe and Supported Placements) at DCF-BURKE-000333.

29.     Research shows that placement disruptions and instability can cause harm to children, and it is generally in the best interests of children to be placed in permanent, long-term family environments.  Ex. 13, Expert Report of Abbie Goldberg at 3; Ex. 4, DCF Policy # 23-02 (Safe and Supported Placements) at DCF-BURKE-000333, DCF-BURKE-000342, DCF-BURKE-000343.

30.     Children placed in foster care, who are separated from their primary caregivers, often show emotional and behavioral challenges, which are a manifestation of the grief, anger, and stress associated with the temporary or permanent loss of attachment figures.  Ex. 13, Expert Report of Abbie Goldberg at 4; Ex. 4, DCF Policy # 23-02 (Safe and Supported Placements) at DCF-BURKE-000339.

31.     Stable placements promote the development of a reparative or emotionally corrective attachment relationship and a subjective sense of relational permanence on the child's part; conversely, unstable placements disrupt the development of these positive relational outcomes.  Ex. 13, Expert Report of Abbie Goldberg at 5.

32.     Given the high risk of mental health issues among children in foster care (e.g. related to the separation they endure from parents, as well as a likelihood of early life maltreatment

and trauma), the risks associated with unstable placement trajectories are especially high.  Ex. 13, Expert Report of Abbie Goldberg at 5.

33.    As of March 31, 2023,  DCF's Safe and Supported Placements Policy provided that, "Children in foster care are separated from their parents, which means they are separated from those primary relationships that are crucial for their development. It is extremely important that foster children bond with their foster parents so that foster children feel safe and supported and family separation doesn't hinder their development."  Ex. 4, DCF Policy # 23-02 (Safe and Supported Placements) at DCF-BURKE-000339.

34.    Research shows that placement instability is associated with disruptions in children's social and ecological environment, including school, neighborhood, and friendship networks, and is often accompanied by poorer mental health, including negative long-term impacts such as substance use and negative educational and employment outcomes.  Ex. 13, Expert Report of Abbie Goldberg at 5.

## B.    The 2021 Massachusetts Commission on LGBTQ Youth Report

35.    The Massachusetts Commission on LGBTQ Youth (the "Commission") is an independent state agency that works to improve the ability of state agencies, including DCF, to serve LGBTQ young people.  Ex. 14, Massachusetts Commission on LGBTQ Youth Report (LGBTQ Youth in the Massachusetts Child Welfare System: A Report on Pervasive Threats to Safety, Wellbeing, and Permanency) at DCF-BURKE-000232; Mass. Gen. Laws ch. 3, § 67.

36.    On July 29, 2021, the Commission issued a report titled "LGBTQ Youth in the Massachusetts Child Welfare System, A Report on Pervasive Threats to Safety, Wellbeing, and Permanency."  Ex. 14, Massachusetts Commission on LGBTQ Youth Report (LGBTQ Youth in the Massachusetts Child Welfare System: A Report on Pervasive Threats to Safety, Wellbeing, and Permanency) at DCF-BURKE-000229-266.

37.      At the outset of the report, the Commission noted: "LGBTQ youth are suffering from a lack of safe, effective, and affirming services. . . . It is unusual for the Commission to issue a report describing the plight of youth involved with a single state system. We do so today because the status quo for LGBTQ youth in DCF is an emergency." *Id.* at DCF-BURKE-000233.

38.      The Commission's report "draws on national research, public records, information obtained over the course of the Commission's work with DCF, and interviews with youth and young adult contributors with lived experience of DCF involvement, service providers and child welfare professionals, foster parents, and advocates." *Id.* at DCF-BURKE-000234.

39.      In the report, the Commission summarized several "alarming" findings concerning LGBTQ foster youth, including that LGBTQ foster children face "[s]ignificant threats to wellbeing," with "resulting harm" that is "profound and sometimes irreversible." *Id.* at DCF-BURKE-000235.

40.      The Commission wrote that "Approximately 17 percent of Massachusetts students identify as LGBTQ," and that "Research reveals that LGBTQ youth are overrepresented in foster care," citing studies that included a 2019 study in New York City identifying 34 percent of foster youth as LGBT and another 2019 study in Cuyahoga County, Ohio that identified 32 percent of foster youth as LGBT. *Id.* at DCF-BURKE-000234, 238.

41.      The Commission noted "there is little reason to expect that the percentage is significantly lower" among youth in DCF custody and that "in the state's annual count of unaccompanied youth experiencing homelessness, 28 percent of respondents reporting a history of foster care identified as LGBTQ." *Id.* at DCF-BURKE-000239.

42.      The Commission concluded that LGBTQ youth have worse experiences in the child welfare system compared to their non-LGBTQ peers, and that LGBTQ youth in foster care report

higher rates of mistreatment and hospitalization for emotional reasons, have a higher number of placements, and may leave foster care with new or exacerbated trauma. *Id.* at DCF-BURKE-000239.

43.     The Commission determined that LGBTQ youth experience "[p]oor permanency outcomes . . . linked to inappropriate placements, frequent moves, and challenging transitions into adulthood." *Id.* at DCF-BURKE-000235.

44.     The Commission determined that "[n]on-affirming [foster] placements expose young people to feelings of shame, isolation, and confusion, and can discourage them from discussing other sensitive issues with caregivers." *Id.* at DCF-BURKE-000249.

45.     The Commission determined that foster children who aged out of foster care have reported "feeling that in order to achieve permanency, they needed to hide their LGBTQ identity." *Id.* at DCF-BURKE-000249.

46.     The Commission determined that "[r]ejecting behavior" by foster caregivers "combined with frequent moves significantly impacts mental and emotional health." *Id.* at DCF-BURKE-000249.

47.     The Commission's report provided examples of the consequences of placing children in unsupportive homes, including a "foster teen who developed attachment disorder after a lifetime of unstable placements, including one in a household where the foster parents spoke frequently about gay people being an 'abomination.'" *Id.* at DCF-BURKE-000249.

48.     The Commission's report also cited "research on suicidality among LGBTQ youth with a history of foster care involvement," which "found that LGBTQ youth who reported having been in foster care were three times as likely as other LGBTQ youth to have attempted suicide in the previous year." *Id.* at DCF-BURKE-000235.

49.     The Commission's report observed that the "accepted mainstream standard of care is to provide timely and comprehensive medical treatment for transgender youth," citing publications by the American Academy of Pediatrics and the Endocrine Society, and that "gender-affirming care can be lifesaving, as it is associated with lower rates of suicide ideation," citing three publications from scientific journals. *Id.* at DCF-BURKE-000241.

50.     The Commission also included narratives from youth who had been in DCF custody, including one youth who wrote that "DCF needs to better understand gender and better understand what LGBTQ foster kids need to stay alive. There would be fewer suicides in the LGBTQ community if they realized this." *Id.* at DCF-BURKE-000237.

51.     The Commission concluded that, based on the experiences of LGBT youth in DCF foster care, DCF was failing to "establish the safety, wellbeing, and permanency of children in the Commonwealth" "for LGBT youth in its care and custody." *Id.* at DCF-BURKE-000240.

52.     The Commission observed that "while state regulations require a foster or pre-adoptive parent applicant to be able to promote the wellbeing of a child, including supporting a child's sexual orientation or gender identity, DCF's policy omits the provision regarding sexual orientation and gender identity." *Id.* at DCF-BURKE-000255.

53.     The Commission further wrote that "While DCF may hope that all of its homes are affirming, the agency has not taken steps to ensure that is the case. In the meantime, LGBTQ young people suffer the consequences." *Id.* at DCF-BURKE-000261.

54.     To address these "distressing" findings, the Commission issued a series of recommendations, including that DCF develop and implement policies to protect LGBTQ youth, and more specifically, that DCF enact a comprehensive LGBTQ nondiscrimination policy. *Id.* at DCF-BURKE-000235.

55.     The Commission also called "screening mechanisms" "essential," such as adding to the suggested list of questions for social workers to ask during the licensing process questions "regarding how the individual would respond to fostering or adopting a child who later comes out as transgender" and "prompts about whether a family can affirm LGBTQ identities." *Id.* at DCF-BURKE-000261.

56.     The Commission also recommended that DCF revise its licensing materials "to better identify the abilities of prospective foster . . . parents to support LGBTQ youth." *Id.* at DCF-BURKE-000262.

57.     The Commission also recommended that DCF train caregivers to improve their understanding of LGBTQ identities and build skills for working with LGBTQ youth and their families. *Id.* at DCF-BURKE-000235.

58.     The Commission wrote that "[i]mplementing these recommendations" would both "help the child welfare system comply with state and federal nondiscrimination requirements" and "[e]ven more importantly," would "offer a path to interrupting the cycles of victimization, harm, and disruption in which LGBTQ foster youth are trapped." *Id.* at DCF-BURKE-000236.

59.     The Commission wrote that "improving outcomes" for LGBT youth who enter foster care "should be a high priority for the Commonwealth." *Id.* at *Id.* at DCF-BURKE-000235.

60.     To address the shortcomings identified by the Commission, and to better serve and protect the foster youth population who are or may be LGBTQ+, DCF issued the LGBTQIA+ Nondiscrimination Policy in 2022 and updated its Licensing Policy in 2023.  Ex. 8, Peel 30(b)(6) Depo. at 14:1-15:3, 128:3-19.

C.      **It Is Harmful for LGBTQ+ Children to Live in a Non-Affirming or Neutral Foster Home and Beneficial to Live in an Affirming Home.**

61.      It is not possible to determine or predict a child's ultimate sexual orientation or gender identity.  Ex. 16, Expert Report of Ralph Vetters at 1.

62.      DCF cannot know whether a child in its care is or may be LGBTQ+, because any child in DCF's care may be LGBTQ+.  Ex. 16, Expert Report of Ralph Vetters at 1; Ex. 8, Peel 30(b)(6) Depo. at 127:7-128:2; Ex. 5, Michael Burke Depo. at 169:1-5, 170:18-21.

63.      A foster child may identify internally as LGBTQ+ but may not have disclosed that identity to anyone.  Ex. 8, Peel 30(b)(6) Depo. at 127:16-17.

64.      A foster child may not yet identify as LGBTQ+ but will identify as LGBTQ+ in the future.  Ex. 8, Peel 30(b)(6) Depo. at 127:18.

65.      As of March 31, 2023, the LGBTQIA+ Nondiscrimination Policy recognized that "LGBTQIA+ children need families who will support them as they explore who they are and as they develop a positive self-identity and resilience."  Ex. 9, DCF Policy #2022-02 (LGBTQIA+ Nondiscrimination Policy) at DCF-BURKE-000164.

66.      As of March 31, 2023, the LGBTQIA+ Nondiscrimination Policy provided that "[s]upportive involvement from family is associated with better mental and physical health outcomes for LGBTQIA+ children."  Ex. 9, DCF Policy #2022-02 (LGBTQIA+ Nondiscrimination Policy) at DCF-BURKE-000164.

67.      DCF's policies responded to national research about "bad outcomes" for LGBTQ+ foster children, including "a higher suicide rate," "a higher homeless rate," higher drug use, issues related to mental health including depression, "a higher rate of disruption in the child welfare system," and a "higher rate of placement."  Ex. 8, Peel 30(b)(6) Depo. at 128:3-19.

68.     As of 2023, the Substance Abuse and Mental Health Services Administration (SAMHSA), an agency of the federal government, took the position that there was a professional consensus that: "Rejection and lack of social and emotional support from families and communities negatively impact the health of sexual and gender minority youth. Such behaviors can cause harm, particularly family rejection of sexual orientation and/or gender diversity." Ex. 15, SAMHSA 2023 Report, at 23 (Ex. 6 to Deposition of Dr. Geeta Nangia).

69.     Many studies have found that parent/caregiver support and affirmation is related to better mental health and self-esteem among LGBTQ+ youth.  Ex. 13, Expert Report of Abbie Goldberg at 7.

70.     A meta-synthesis of the research on parenting and LGBTQ+ youth mental health concluded that "parental support specific to sexual orientation is associated with [better] queer youth mental health outcomes, such as [lower risk of] substance use and depression … [as well as] suicidal ideation and suicidal behaviors."  Ex. 13, Expert Report of Abbie Goldberg at 7-8.

71.     Research highlights that parent/caregiver affirmation and support has an important, unique, and direct effect on LGBTQ+ youth mental health, independent of other sources of support, such as peer or teacher support.  Ex. 13, Expert Report of Abbie Goldberg at 8.

72.     LGBTQ+ youth often show hypervigilance in their interactions with peers and adults, including closeting behavior (e.g., declining to disclose an LGBTQ+ identity), and a greater reluctance to share information due to fear of mistreatment and/or rejection.  Ex. 13, Expert Report of Abbie Goldberg at 3.

73.     Interviews with LGBTQ+ youth and adults with a history of foster care involvement highlight their strong desire to have foster parents that accept and affirm their identity,

with many individuals identifying this as the most important quality of prospective carers, above and beyond most other valued characteristics.  Ex. 13, Expert Report of Abbie Goldberg at 9.

74.     Research shows that for youth who are closeted or in the early stages of understanding their emerging LGBTQ+ identity, being placed in an unsupportive or rejecting home can discourage them from coming out, including because doing so could jeopardize their relationship with their family placement.  Ex. 13, Expert Report of Abbie Goldberg at 6.

75.     Parental support and affirmation of LGBTQ+ youth are strongly linked in peer reviewed literature to better health outcomes, including higher self-esteem, lower rates of substance abuse, depression, and anxiety, and reduced suicide risk.  Ex. 10, Expert Report of Christopher Bellonci at 3-4.

76.     Peer-reviewed research reflects that even subtle forms of rejection, like discouraging LGBTQ+ friendships or withholding support, can negatively affect mental health. Ex. 10, Expert Report of Christopher Bellonci at 5 (citing Caitlin Ryan, David Huebner, Rafael M. Diaz, Jorge Sanchez; Family Rejection as a Predictor of Negative Health Outcomes in White and Latino Lesbian, Gay, and Bisexual Young Adults. *Pediatrics* January 2009; 123 (1): 346– 352).

77.     Peer-reviewed research reflects that lesbian, gay, and bisexual young adults who reported higher levels of family rejection during adolescence were 8.4 times more likely to report having attempted suicide, 5.9 times more likely to report high levels of depression, 3.4 times more likely to use illegal drugs, and 3.4 times more likely to report having engaged in unprotected sexual intercourse compared with peers from families that reported no or low levels of family rejection. Ex. 10, Expert Report of Christopher Bellonci at 4-5 (citing Caitlin Ryan, David Huebner, Rafael M. Diaz, Jorge Sanchez; Family Rejection as a Predictor of Negative Health Outcomes in White

and Latino Lesbian, Gay, and Bisexual Young Adults. *Pediatrics* January 2009; 123 (1): 346–352).

78.     Peer-reviewed research reflects that, for transgender and gender-diverse youth, parental support for gender affirmation (social, legal, or medical), including use of preferred pronouns, is a strong predictor of lower depressive symptoms.  Ex. 10, Expert Report of Christopher Bellonci at 5 (citing Belmont N, Cronin TJ, Pepping CA. Affirmation-support, parental conflict, and mental health outcomes of transgender and gender diverse youth. *International Journal of Transgender Health*. 2023 Sep 15;25(1):50-62).

79.     Efforts to change or suppress a child's sexual orientation, gender identity, or gender expression have been rejected as harmful by the American Academy of Child and Adolescent Psychiatry, the American Academy of Pediatrics, the American Psychiatric Association, the American Psychological Association, and the National Association of Social Workers, among others.  Ex. 10, Expert Report of Christopher Bellonci at 23.

80.     It becomes harder to identify as LGBTQ+ in situations where rejection can be expected based on a pattern of behaviors modeling that being LGBTQ+ is wrong or something to be ashamed of.  Ex. 10, Expert Report of Christopher Bellonci at 40; Ex. 13, Expert Report of Abbie Goldberg at 4.

81.     The harms of rejecting behaviors do not just accrue once the child has self-identified as LGBTQ+, but also include the period where a young person becomes aware of their LGBTQ+ identity but has yet to tell someone.  Ex. 10, Expert Report of Christopher Bellonci at 40.

82.     LGBTQ+ youth experience distress when they feel the need to conceal their identities, fear harassment and rejection, and the self-doubt that comes from being treated as if who they are is something to be ashamed of.  Ex. 10, Expert Report of Christopher Bellonci at 39.

83.     The experience of having one's sexuality, gender identity, or gender expression monitored or policed can be expected to cause harm.  Ex. 13, Expert Report of Abbie Goldberg at 3-4.

84.     As of 2023, the Substance Abuse and Mental Health Services Administration (SAMHSA), an agency of the federal government, took the position that there was a professional consensus that: "Gender affirmation, including social transition (e.g., changing one's name, pronoun, and/or appearance), is appropriate and beneficial for gender minority children and adolescents. Based on the youth's needs, gender-affirming medical care may be medically necessary." Ex. 15, SAMHSA 2023 Report, at 23-24.

85.     There is significant peer-reviewed evidence that medical and behavioral health care for transgender and gender diverse youth has positive effects on mental health and social functioning.  Ex. 16, Expert Report of Ralph Vetters at 19.

86.     The type of gender affirming care that may be medically recommended depends on the individual circumstances of the child, considered in consultation with a multidisciplinary care team and taking into account ongoing research about how to achieve the best outcomes for transgender children and adolescents.  Ex. 16, Expert Report of Ralph Vetters at 12.

87.     As of 2023, the American Academy of Child and Adolescent Psychiatry, American Academy of Family Physicians, American Academy of Pediatrics, American College of Obstetricians and Gynecologists, American College of Physicians, American Medical Association, American Osteopathic Association, American Psychiatric Association, American Psychological

Association, Endocrine Society and Pediatric Endocrine Society, U.S. Professional Association for Transgender Health, and World Professional Association for Transgender Health all opposed policies that limit access to or ban appropriate gender-affirming care. Ex. 15, SAMHSA 2023 Report, at 64.

88.　　DCF's concern in enacting the LGBTQ+ Requirements without any provision for waivers or exemptions was that if a foster parent is "unable to be affirming to a child who is LGBTQIA+," that child could suffer physical and mental harm, including "depression" or "suicide." Ex. 8, Peel Depo at 83:3-84:18; 88:12-15, 89:5-11.

89.　　DCF's concern in enacting the LGBTQ+ Requirements without any provision for waivers or exemptions was also that if a child were placed in a home that did *not* meet the LGBTQ+ Requirements and then "came out as LGBTQIA+, that that could be a placement that might disrupt." Ex. 8, Peel Depo at 107:2-17.

## IV.　DCF's Foster Family Population and Capacity

90.　　From January 1, 2021 to August 31, 2023, foster parent applicants who self-identified as Catholic were just as likely to receive a foster parent license as foster parent applicants who did not self-identify as Catholic. Ex. 17, DCF Data Spreadsheet of Foster Homes with a Completed License Study from Jan. 1, 2021-August 31, 2023 at DCF-BURKE-C-000083-84.

91.　　Between January 2021 and August 2023, DCF completed a license study for 6,986 total foster applicants, with 232 of those applicants self-identifying as Catholic. Ex. 17, DCF Data Spreadsheet of Foster Homes with a Completed License Study from Jan. 1, 2021-August 31, 2023 at DCF-BURKE-C-000083-84.

92.　　Out of the 6,754 applicants who did not self-identify as Catholic, DCF issued a foster parent license to 4,763 applicants (71%) and declined to issue a license to 1,737 applicants (26%), with the 253 applicants (4%) discontinuing their applications at some point in the process.

Ex. 17, DCF Data Spreadsheet of Foster Homes with a Completed License Study from Jan. 1, 2021-August 31, 2023 at DCF-BURKE-C-000083-84.

93.    For the subset of applicants who self-identified as Catholic, DCF issued a foster parent license to 163 applicants (70%) and declined to issue a license to 60 applicants (26%), with 9 applicants (4%) discontinuing their applications at some point in the process.  Ex. 17, DCF Data Spreadsheet of Foster Homes with a Completed License Study from Jan. 1, 2021-August 31, 2023 at DCF-BURKE-C-000083-84.

94.    Between July 1, 2020 and June 30, 2023, between 46% and 49% of the total capacity of DCF's licensed unrelated foster care homes and licensed contracted foster care homes was available, meaning that DCF had the ability to place between 2,662 and 3,609 additional children in available, unused placements located in licensed foster homes.  Ex. 18, DCF Data Spreadsheet of Foster Home Placement Availability for Fiscal Years 2021, 2022 & 2023 at DCF-BURKE-C-000081.

**V.    The Burkes' License Study**

95.    As part of the licensing process for foster parent applicants, a comprehensive assessment of each applicant is created that includes information from a variety of sources regarding the applicant's ability to provide safe and appropriate care for a child living in foster care and ability to meet each of DCF's licensing standards.  Ex. 34, 110 Code Mass. Regs. § 7.107(1); Ex. 2, DCF Policy #2006-01 (Family Resource Policy) at DCF-BURKE-005381, DCF-BURKE-005391-5395; Ex. 3, DCF Policy #23-01 (Licensing of Foster, Pre-Adoptive, and Kinship Families) at DCF-BURKE-000268-69, DCF-BURKE-000283-91, DCF-BURKE-000303.

96.    The comprehensive written assessment of each applicant is generally called a caregiver assessment, a home study, a licensing study, or a license study, and these terms are at times used interchangeably.  Ex. 21, Moynahan Depo. at 16:10-17, 28:13-20.

97.     One area of interest to DCF is an applicant's religious background because all applicants must be able to support the integrity of a foster child's own religious background.  Ex. 2, DCF Policy #2006-01 (Family Resource Policy) at DCF-BURKE-005392, DCF-BURKE-005419, DCF-BURKE-005425; Ex. 3, DCF Policy #23-01 (Licensing of Foster, Pre-Adoptive, and Kinship Families) at DCF-BURKE-000300, DCF-BURKE-000308; Ex. 34, 110 Code Mass. Regs. § 7.107(1)(e).

98.     Because Defendant Tywanna Jones experienced a personal tragedy and went on personal leave during the Burkes' application process, DCF retained 18 Degrees, a third-party contractor, to interview the Burkes and prepare a written license study regarding the Burkes.  Ex. 1, Burke Application and License Study in DCF's iFamily System at DCF-BURKE-000034; Ex. 19, Jones Depo. at 31:10-15, 245:3-14; Ex. 23, Sweetman Depo. at 70:3-12.

99.     An employee of 18 Degrees named Linda-Jean Mack ("Mack") interviewed the Burkes on more than one occasion and obtained information about a variety of topics.  Ex. 1, Burke Application and License Study in DCF's iFamily System at DCF-BURKE-000055-57.

100.    During Mack's conversations with the Burkes about parenting children or youth who identify as LGBTQ+, Mrs. Burke said, "let's take the T out of it."  *Id.* at DCF-BURKE-000055.

101.    When asked how they would feel if their child identified as LGBQ, Mrs. Burke shared, "there's nothing wrong with it, I'm going to love you the same, but I believe you would need to live a chaste life."  *Id.* at DCF-BURKE-000055.

102.    During Mack's individual interview with Mrs. Burke, Mrs. Burke stated that she does not believe in gender affirming care for children.  *Id.* at DCF-BURKE-000055.

103.    Mrs. Burke stated that she does not believe that a child who has not fully developed is able to understand the ramifications of "gender reassignment" and that it is not fair to "condemn a child to a lifetime of doctors appointments and pain." *Id.* at DCF-BURKE-000055.

104.    Mrs. Burke stated that gender affirming care is "chemical castration." *Id.* at DCF-BURKE-000055.

105.    Mrs. Burke stated that she would choose to reaffirm her child by letting them know that they are "perfect physically the way they are." *Id.* at DCF-BURKE-000055.

106.    Mrs. Burke stated that she would take a child to therapy to try to get to the "root of identity confusion," and that it would be important to monitor a child's internet usage at this point. *Id.* at DCF-BURKE-000055.

107.    Mrs. Burke stated that she "would feel sad for them," meaning the child, because "they're not going to understand the ramifications." *Id.* at DCF-BURKE-000056.

108.    Mrs. Burke stated that she would continue to try to prevent her child from "doing anything that can't be changed." *Id.* at DCF-BURKE-000056.

109.    When asked about using a person's preferred pronouns, Mrs. Burke stated, "I honestly don't know, I'm always someone who is very grounded in reality," noting that she doesn't believe people can choose their pronouns. *Id.* at DCF-BURKE-000056.

110.    Mrs. Burke stated that she would never throw a child out who is LGBTQ+ and would not use what Mack described conversion therapy to be. *Id.* at DCF-BURKE-000056.

111.    Mrs. Burke shared that a person she knew from theater production since they were "a little boy" had shared with her that they identified as she/they pronouns, and when that person said something along the lines of "we women" to Mrs. Burke, Mrs. Burke turned to them and said,

"you are not a woman," though she expressed remorse for this statement. *Id.* at DCF-BURKE-000056.

112.    During his interview with Mack, Mr. Burke stated that if his child identified as trans, he would want to talk about it and he "wouldn't want his child to have to go through painful things that they don't know the long term of. I don't want things to be painful and they'll have to go to a doctor every single month." *Id.* at DCF-BURKE-000056.

113.    Mr. Burke stated that he will not use a trans friend's preferred pronouns, and that his friend "understands" his view. *Id.* at DCF-BURKE-000056.

114.    Mr. Burke also stated that he has a gay friend who knows Mr. Burke will not change his views on homosexuality. *Id.* at DCF-BURKE-000056.

115.    When asked how he would feel if his son came home with a new boyfriend at age 24, Mr. Burke gave a thumbs up. *Id.* at DCF-BURKE-000056.

116.    Mr. Burke also gave a thumbs up when asked how he would feel if his son wanted to marry his boyfriend. *Id.* at DCF-BURKE-000056-57.

117.    Mr. Burke told Mack that "it's the act of homosexuality but it's also the sin. Hate the sin, not the sinner." *Id.* at DCF-BURKE-000057.

118.    Mr. Burke stated that Catholics do not hate lesbians or gay people, but rather the act that they have an issue with because they look at marriage as between a woman and a man and that sex is an act of marriage. *Id.* at DCF-BURKE-000057.

119.    Mr. Burke stated that he does not believe in conversion therapy, but he believes in limiting doctor visits to only what is necessary to keep things normal for a child and therefore would not consider any type of gender affirming care while the child is under 18. *Id.* at DCF-BURKE-000057.

120.    The Burkes told Mack that their family shares their beliefs about the sins of homosexuality and that there are only two genders, male and female.  *Id.* at DCF-BURKE-000057.

121.    The Burkes expressed that they are not open to gender affirming care and believe that partnership outside of heterosexual relationships is a sin.  *Id.* at DCF-BURKE-000060.

122.    Mack noted that the Burkes are heavily involved in their Catholic Church and cite their religious views as their primary reason for seeing LGBTQ+ individuals in this way.  *Id.* at DCF-BURKE-000060.

123.    At their depositions, the Burkes also attributed their views concerning preferred pronouns and gender affirming care to secular sources, such as the rules of English grammar or health-related concerns about certain medical interventions.  Ex. 6, Catherine Burke Depo. 157:17-158:18; Ex. 5, Michael Burke Depo. at 127:1-5.

124.    Mack accurately recorded the Burkes' statements and feelings regarding parenting children and youth who are or may identify as LGBTQ+.  Ex. 5, Michael Burke Depo. at 140:11-17, *see also* 121:12-22, 122:8-17, 123:4-137:22; Ex. 6, Catherine Burke Depo. at 176:15-17, *see also* 101:21-104:8, 139:1-13, 145:4-18, 147:7-148:12, 149:13-150:4, 155:5-169:22, 172:6-173:10, 174:14-175:7.

125.    Mack recommended that the Burkes be licensed as "foster to adopt parents . . . with some conditions."  Ex. 20, License Study on 18 Degrees Letterhead at DCF-BURKE-6959.

126.    Mack noted that the Burkes "are open to a variety of children who have different levels of need, including children who are blind or deaf, have moderate medical needs, and have histories of mental health challenges," as well as "older children, up to age 12, and sibling sets." Ex. 20, License Study on 18 Degrees Letterhead at DCF-BURKE-6959.

127.    Mack wrote that the Burkes' "willingness to parent a child with these types of challenges has outweighed [her] worry about their potential unwillingness to accept an LGBTQIA++ child in the future."  Ex. 20, License Study on 18 Degrees Letterhead at DCF-BURKE-6959.

## VI.    The Licensing Review Team Meeting and Decision on the Burkes' Application

128.    As a DCF contractor, Mack made a licensing recommendation to DCF, but DCF determines whether to issue a foster parent license.  Ex. 34, 110 Code Mass. Regs. § 7; Ex. 3, DCF Policy #23-01 (Licensing of Foster, Pre-Adoptive, and Kinship Families) at DCF-000267-324; Ex. 2, DCF Policy #2006-01 (Family Resource Policy) at DCF-BURKE-005379-5439; Ex. 7, Silvia 30(b)(6) Depo. at 173:2-13, 174:20-175:2; Ex. 8, Peel 30(b)(6) Depo. at 71:2-6; Ex. 19, Jones Depo. at 50:1-8; Ex. 21, Moynahan Depo. at 36:5-10.

129.    On January 10, 2023, 18 Degrees submitted Mack's license study of the Burkes to DCF.  Ex. 22, Garrett Email at DCF-BURKE-003313-14.

130.    The DCF employees tasked with deciding whether to license a foster family changed pursuant to the Licensing Policy, which became effective on February 27, 2023, before the Burke licensing decision was made on March 31, 2023.  Ex. 3, DCF Policy #23-01 (Licensing of Foster, Pre-Adoptive, and Kinship Families) at DCF-BURKE-000267, DCF-BURKE-000292; Ex. 2, DCF Policy #2006-01 (Family Resource Policy) at DCF-BURKE-005379, DCF-BURKE-005394.

131.    Prior to February 27, 2023, under DCF's then-effective Family Resource Policy, the decision whether to license a specific foster family applicant was generally made by three individuals: the Family Resource Worker assigned to the family, the Family Resource Supervisor, and the Area Director or Regional Director (or their designee).  Ex. 2, DCF Policy #2006-01 (Family Resource Policy) at DCF-BURKE-005394.

132.     Beginning on February 27, 2023, DCF's Licensing Policy created Licensing Review Teams and authorized them to decide whether to approve or deny a specific foster family applicant for licensure. Ex. 3, DCF Policy #23-01 (Licensing of Foster, Pre-Adoptive, and Kinship Families) at DCF-BURKE-000267, DCF-BURKE-000292.

133.     For foster family applicants, the Licensing Review Team generally consists of at least six individuals, including the Licensing and Training Social Worker assigned to the family, the Licensing and Training Supervisor, the Regional Program Manager, the Foster Family Social Worker Supervisor, the Ongoing Supervisor or Manager from the Area Office where the home is, and the Regional QA Supervisor or Regional Manager. Ex. 3, DCF Policy #23-01 (Licensing of Foster, Pre-Adoptive, and Kinship Families) at DCF-BURKE-000292.

134.     The Licensing Review Team is responsible for evaluating the license applicant and determining whether the applicant satisfies applicable DCF licensing standards. Ex. 3, DCF Policy #23-01 (Licensing of Foster, Pre-Adoptive, and Kinship Families) at DCF-BURKE-000292-93; Ex. 21, Moynahan Depo. at 77:11-22.

135.     To make this determination, the Licensing Review Team participates in a meeting to discuss the license applicant's skills, knowledge, and capacity to provide a physically and emotionally safe environment for foster children, which is based on information gathered throughout the licensing process, including information contained in the license study. Ex. 3, DCF Policy #23-01 (Licensing of Foster, Pre-Adoptive, and Kinship Families) at DCF-BURKE-000292-93.

136.     At the end of the meeting, the Licensing Review Team makes a decision to approve or deny the prospective foster family, or if necessary, to defer decision making until additional

information can be obtained.  Ex. 3, DCF Policy #23-01 (Licensing of Foster, Pre-Adoptive, and Kinship Families) at DCF-BURKE-000293.

137.    The Licensing Policy expressly authorizes the Licensing Review Team to "modif[y]" any licensing recommendation contained in a license study.  Ex. 3, DCF Policy #23-01 (Licensing of Foster, Pre-Adoptive, and Kinship Families) at DCF-BURKE-000292.

138.    As of March 31, 2023, the Licensing Policy did not permit the Licensing Review Team to grant a license based upon a balancing of an applicant's willingness to foster children with certain needs against the applicant's inability to satisfy the LGBTQ+ Requirements.  Ex. 3, DCF Policy #23-01 (Licensing of Foster, Pre-Adoptive, and Kinship Families) at DCF-000267-324; *see also* Ex. 34, 110 Code Mass. Regs. § 7.100 *et seq.*

139.    In early March 2023, Defendants Tywanna Jones and Dawn Sweetman approved the license study for submission to a Licensing Review Team.  Ex. 1, Burke Application and License Study in DCF's iFamily System at DCF-BURKE-000061; Ex. 19, Jones Depo. at 110:11-111:1, 111:17-112:2, 137:18-138:7, 145:11-22; Ex. 23, Sweetman Depo. at 150:13-16, 178:11-14.

140.    On or around March 27, 2023, Mack's license study of the Burkes was sent by Defendant Anna Moynahan to Defendants Stacy Clark, Theresa Harris, Tywanna Jones, Caitlyn Levine, Euphemia Molina, and Dawn Sweetman.  Ex. 24, Microsoft Teams Calendar invite sent by Anna Moynahan on March 23, 2027 with links to access two documents: (1) Catherine and Michael Burke License Study .docx; (2) CORI Statement.docx at DCF-BURKE-003031.

141.    Luz Estrada does not recall reviewing Mack's license study of the Burkes before the Licensing Review Team meeting, but it was her usual practice to read a license study before attending a Licensing Review Team meeting for a family.  Ex. 25, Estrada Depo. at 84:9-85:2.

142.    Angel Emerson also reviewed Mack's license study of the Burkes before the Licensing Review Team meeting.  Ex. 26, Emerson Depo. at 115:21-116:2.

143.    On March 31, 2023, a Licensing Review Team convened to consider the Burkes' application for a Massachusetts license to serve as unrelated foster parents.  Ex. 27, Email from Anna Moynahan to Dawn Sweetman on Friday, June 2, 2023 at 8:03 PM, Subject: "RE: Burke L&T team meeting attendance – " at DCF-BURKE-007236 to 7237.

144.    Defendants Anna Moynahan, Theresa Harris, Dawn Sweetman, Tywanna Jones, Caitlyn Levine, Stacy Clark, Euphemia Molina, Luz Estrada, and Angel Emerson participated in the Licensing Review Team meeting for the Burkes' application.  Ex. 27, Email from Anna Moynahan to Dawn Sweetman on Friday, June 2, 2023 at 8:03 PM, Subject: "RE: Burke L&T team meeting attendance – " at DCF-BURKE-007236 to 7237; Ex. 19, Jones Depo. at 177:10-178:3; Ex. 23, Sweetman Depo. at 264:7-14; Ex. 28, Harris Depo. at 77:5-16.

145.    As of March 31, 2023, Tywanna Jones was employed by DCF as a Social Worker in the Adoption Development and Licensing Unit.  Ex. 19, Jones Depo. at 14:6-12, 18:12-15.

146.    As of March 31, 2023, Dawn Sweetman was employed by DCF as an Adoption Development and Licensing Unit Supervisor.  Ex. 23, Sweetman Depo. at 11:8-10.

147.    As of March 31, 2023, Anna Moynahan was employed by DCF as a Regional Clinical Director for the Western Region.  Ex. 21, Moynahan Depo. at 18:17-22.

148.    As of March 31, 2023, Theresa Harris was employed by DCF as a Regional Program Manager for the Western Region.  Ex. 28, Harris Depo. at 14:18-15:2, 25:3-7.

149.    As of March 31, 2023, Angel Emerson was employed by DCF as a License and Training Supervisor. Ex. 26, Emerson Depo. at 12:6-8, 13:3-10.

150.     As of March 31, 2023, Luz Estrada was employed by DCF as a License and Training Supervisor.  Ex. 25, Estrada Depo. at 12:5-8.

151.     As of March 31, 2023, Euphemia Molina was employed by DCF as a Licensing and Training Supervisor.  Ex. 29, Molina Depo. at 17:1-4, 129:12-17.

152.     As of March 31, 2023, Stacy Clark was employed by DCF as a Quality Assurance Supervisor.  Ex. 30, Clark Depo. at 17:17-21.

153.     As of March 31, 2023, Caitlyn Levine was employed by DCF as a Mental Health Specialist.   Ex. 31, Levine Depo. at 9:13-16, 35:14-19.

154.     None of the nine members of the Licensing Review Team created or enacted DCF's LGBTQ+ Requirements.  Ex. 32, Defendants' Responses and Objections to Plaintiffs' First Set of Interrogatories to Official Capacity Defendants No. 3.

155.     Of the nine members of the Licensing Review Team, the Burkes interacted only with Jones and Sweetman.   Ex. 5, Michael Burke Depo. at 99:3-22, 103:4-6; Ex. 6, Catherine Burke Depo. at 55:18-56:21.

156.     Neither Jones nor Sweetman ever expressed or stated to the Burkes any hostility to their religious faith.  Ex. 5, Michael Burke Depo. at 101:1-3, 103:4-10; Ex. 6, Catherine Burke Depo. at 55:5-11, 115:4-6, 174:9-13.

157.     The Licensing Review Team meeting for the Burkes' application was the first Licensing Review Team meeting convened in the region, and therefore none of the members had ever previously participated in a Licensing Review Team meeting.  Ex. 28, Harris Depo. at 76:17-77:4, 77:17-78:3; Ex. 29, Molina Depo. at 187:11-19; Ex. 26, Emerson Depo. at 111:1-112:4; Ex. 31, Levine Depo. at 52:8-14; Ex. 23, Sweetman Depo. at 259:9-13.

158.    During the meeting, members of the Licensing Review Team discussed the Burkes' ability to satisfy DCF's LGBTQ+ Requirements and their concerns that a child placed in the Burkes' care for potential adoption may identify as LGBTQ+.  Ex. 23, Sweetman Depo. at 264:22-265:22; Ex. 26, Emerson Depo. at 121:10-19; Ex. 28, Harris Depo. at 90:10-20; Ex. 29, Molina Depo. at 191:22-192:19, Ex. 30, Clark Depo. at 114:6-20; Ex. 31, Levine Depo. at 40:11-17.

159.    Members of the Licensing Review Team considered it a "strength" that the Burkes were connected to their church community and had the support of their church.  Ex. 23, Sweetman Depo. at 181:18-182:17; Ex. 26, Emerson Depo. at 125:11-126:6, 138:16-139:6.

160.    The members of the Licensing Review Team determined that the Burkes did not meet DCF's LGBTQ+ Requirements because they would not promote the physical, mental, and emotional well-being of a child placed in their care by supporting and respecting the child's sexual orientation and gender identity.  Ex. 1, Burke Application and License Study in DCF's iFamily System at DCF-BURKE-000060; Ex. 3, DCF Policy #23-01 (Licensing of Foster, Pre-Adoptive, and Kinship Families) at DCF-BURKE-000286; Ex. 34, 110 Code Mass. Regs. § 7.104(1)(d); Ex. 9, DCF Policy #2022-02 (LGBTQIA+ Nondiscrimination Policy) at DCF-BURKE-000162-166; Ex. 8, Peel 30(b)(6) Depo. at 74:2-16; Ex. 19, Jones Depo. at 245:21-246:13, 249:14-250:2; Ex. 21, Moynahan Depo. at 164:12-17, 165:10-20, 197:12-18; Ex. 23, Sweetman Depo. at 400:20-401:22; Ex. 29, Molina Depo. at 166:5-167:3, 181:9-15, 192:7-19, 204:22-205:21; Ex. 31, Levine Depo. at 149:9-150:11.

161.    None of the members of the Licensing Review Team disagreed with the decision not to license the Burkes.  Ex. 28, Harris Depo. at 32:22-33:10; Ex. 29, Molina Depo. at 181:20-182:1; Ex. 31, Levine Depo. at 39:4-21.

162.     Defendant Anna Moynahan provided final approval of the decision concerning the Burkes' application.  Ex. 21, Moynahan Depo, 152:16-153:1.

## VII.    DCF Informs the Burkes of the Licensing Decision.

163.     On or around March 31, 2023, DCF sent a letter to the Burkes that their application to serve as unrelated foster parents had been denied because "there are specific licensing standards which have not been met."  The letter cited and quoted 110 Code Mass. Regs. § 7.104(1)(d)-(e) and the Foster Child Bill of Rights.  Ex. 33, Denial Letter from Dawn Sweetman to Catherine and Michael Burke, dated March 31, 2023 at DCF-BURKE-003347.

Respectfully submitted,

DEFENDANTS

By and through their Attorneys,

ANDREA JOY CAMPBELL
ATTORNEY GENERAL

/s/ *Grace Gohlke*
Grace Gohlke (BBO No. 704218)
Michael Shiposh (BBO No. 680131)
Benjamin E. Bryant (BBO No. 714077)
Assistant Attorneys General
One Ashburton Place
Boston, MA 02108
(617) 963-2527
grace.gohlke@mass.gov
michael.shiposh@mass.gov
benjamin.e.bryant@mass.gov

Dated:  March 13, 2026

## CERTIFICATE OF SERVICE

I certify that today, March 13, 2026, I caused this document to be filed through the Court's ECF system, which cause it to be sent electronically to all registered members as identified on the Notice of Electronic Filing (NEF) today, which includes all counsel of record.

/s/ *Grace Gohlke*
Grace Gohlke