# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MICHAEL and CATHERINE BURKE, | Civil Action No. 3:23-cv-11798-MGM |
| *Plaintiffs*, | |
| v. | **PLAINTIFFS' MEMORANDUM IN SUPPORT OF RENEWED MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| KIAME MAHANIAH, in his official capacity as Secretary of the Massachusetts Executive Office of Health and Human Services, *et al*. | |
| *Defendants*. | **LEAVE TO FILE GRANTED ON MARCH 11, 2026** |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ................................................................................................................1

STATEMENT OF FACTS ...................................................................................................2

    A.  Michael and Catherine Burke ....................................................................................2

    B.  DCF's need for foster families and process to become a foster parent ...........................3

    C.  DCF's policy is discretionary and applied inconsistently....................................................3

    D.  The Burkes are denied a foster care license because of their religious beliefs...................4

    E.  DCF alters the Burkes' report. ...................................................................................6

    F.  Procedural history ...................................................................................................6

LEGAL STANDARD.............................................................................................................7

ARGUMENT .......................................................................................................................8

I.  Defendants violated the Burkes' free exercise rights. ..........................................................8

    A.  DCF uses a system of individualized assessments (Count I).............................................9

    B.  DCF policies discriminate against religion as a category (Count II).................................12

    C.  DCF used both a religious gerrymander and religious hostility (Counts III and IV). .......15

        1.  The policy operates as a religious gerrymander (Count IV)........................................15

        2.  Defendants acted with religious hostility (Count III). ..................................................19

    D.  Defendants' actions fail strict scrutiny. .......................................................................22

II.  Defendants violated the Burkes' free speech rights (Count V). ..............................................26

III. The Burkes are entitled to injunctive, declaratory, and monetary relief................................27

CONCLUSION....................................................................................................................29

REQUEST FOR ORAL ARGUMENT ..................................................................................29

CERTIFICATE OF COMPLIANCE .....................................................................................30

CERTIFICATE OF SERVICE ..............................................................................................31

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bates v. Pakseresht,*
146 F.4th 772 (9th Cir. 2025) ............................................................................23, 26

*Blais v. Hunter,*
493 F. Supp. 3d 984 (E.D. Wash. 2020) ...............................................15, 16, 18, 19

*Carson v. Makin,*
596 U.S. 767 (2022).................................................................................................15, 19

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,*
508 U.S. 520 (1993) ................................................................................... *passim*

*Cintron v. Bibeault,*
148 F.4th 37 (1st Cir. 2025)...................................................................................7

*CoxCom, Inc. v. Chaffee,*
536 F.3d 101 (1st Cir. 2008) ..................................................................................28

*eBay Inc. v. MercExchange, L.L.C.,*
547 U.S. 388 (2006)...................................................................................................28

*El Dia, Inc. v. Rossello,*
165 F.3d 106 (1st Cir. 1999) ............................................................................. 7-8, 19

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist.,*
82 F.4th 664 (9th Cir. 2023) .................................................................8, 9, 14, 15

*French v. Merrill,*
15 F.4th 116 (1st Cir. 2021)....................................................................................8

*Fulton v. City of Philadelphia,*
593 U.S. 522 (2021)................................................................................... *passim*

*Holt v. Hobbs,*
574 U.S. 352 (2015)............................................................................... 22, 25-26

*Hope v. Pelzer,*
536 U.S. 730 (2002)....................................................................................................7

*Janus v. AFSCME,*
585 U.S. 878 (2018)...................................................................................................26

*Jordan v. Rubio*,
  795 F. Supp. 3d 46 (D.D.C. 2025) ........................................................................22

*Kennedy v. Bremerton Sch. Dist.*,
  597 U.S. 507 (2022) ................................................................................18, 19

*Lowe v. Mills*,
  68 F.4th 706 (1st Cir. 2023) ..............................................................................12

*Mahmoud v. Taylor*,
  606 U.S. 522 (2025) ....................................................................22, 23, 24, 28

*Masterpiece Cakeshop v. Colo. C.R. Comm'n*,
  584 U.S. 617 (2018) ............................................................................... *passim*

*Mid Vermont Christian Sch. v. Saunders*,
  151 F.4th 86 (2nd Cir. 2025) ............................................................................20

*Motorists Com. Mutual Ins. Co. v. Hartwell*,
  53 F.4th 730 (1st Cir. 2022) ................................................................................7

*Pac. Indem. Co. v. Deming*,
  828 F.3d 19 (1st Cir. 2016) ..................................................................................7

*Pevia v. Green*,
  695 F. Supp. 3d 628 (D. Md. 2023) ..................................................................22

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*,
  547 U.S. 47 (2006) ............................................................................................27

*Sherbert v. Verner*,
  374 U.S. 398 (1963) ............................................................................................9

*Stamps v. Town of Framingham*,
  813 F.3d 27 (1st Cir. 2016) ..................................................................................7

*Taite v. Bridgewater State Univ., Bd. of Trs.*,
  999 F.3d 86 (1st Cir. 2021) ..................................................................................7

*Tandon v. Newsom*,
  593 U.S. 61 (2021) ..........................................................................8-9, 12, 15, 24

*Trinity Lutheran v. Comer*,
  582 U.S. 449 (2017) ....................................................................................15, 22

*W. Va. State Bd. of Educ. v. Barnette*,
  319 U.S. 624 (1943) ..........................................................................................27

*Wash. L. Found. v. Mass. Bar Found.*,
   993 F.2d 962 (1st Cir. 1993) .........................................................................26, 27

*Wilson v. Layne*,
   526 U.S. 603 (1999) ...............................................................................................7

**Statutes**

42 U.S.C. § 1988 ..........................................................................................................29

110 CMR 7.100 ...............................................................................................................3

110 CMR 7.104 .............................................................................................4, 9, 12, 26, 28

110 CMR 7.100 ...............................................................................................................4

110 CMR 7.107 ...............................................................................................................4

110 CMR 7.111 .............................................................................................................13

110 CMR 7.112 .............................................................................................................13

Ariz. Rev. Stat. § 8-921 ...............................................................................................25

Ark. Code Ann. § 9-28-417 ..........................................................................................25

Idaho Code § 16-1648 ...................................................................................................25

Kan. Stat. Ann. § 38-2293 ............................................................................................25

Miss. Code. Ann. § 11-62-3 ..........................................................................................25

Miss. Code. Ann. § 11-62-4 ..........................................................................................25

Miss. Code. Ann. § 11-62-5 ..........................................................................................25

Tenn. Code Ann. § 37-6-102 .........................................................................................25

Tex. Hum. Res. Code Ann. § 45.004 ............................................................................25

Wash. Admin. Code 110-148-1630 ...............................................................................25

**Other Authorities**

45 C.F.R. § 1355.22 (2024) ...........................................................................................25

Fed. R. Civ. P. 56 ...........................................................................................................7

## INTRODUCTION

Defendants denied a foster care license to the Burkes on the basis of their religious beliefs. Discovery proved that this was the only reason for that denial. Defendants now argue that the denial was justified, indeed necessary. But during the pendency of this case, they have amended their policies, claiming this will avoid such denials in the future. That is a textbook First Amendment violation. The evidence proves that Defendants violated the Free Exercise Clause in four different ways.

First, the Department of Children and Families (DCF) uses a discretionary, case-by-case system when licensing families. That discretion has led to contradictory results, with the Burkes being held to a higher standard than other families who have already been licensed. Indeed, the standard is so malleable that DCF personnel and contractors recommended the Burkes for approval *three times* before individual Defendants met as a team and overrode those recommendations. Second, DCF categorically prefers secular reasons for not meeting its licensing standards over religious reasons. DCF licenses families who feel they cannot care for children of a particular race, sex, or sexual orientation, so long as they give a secular reason for their refusal. But when it comes to religious belief, DCF claims that all families must be able to care for children of any sexual orientation or gender identity. Third, DCF's policy creates a religious gerrymander, approving religious groups who are willing to change their beliefs about sex and gender, while excluding those with beliefs similar to the Burkes'. And fourth, Defendants acted with overt hostility toward the Burkes' religion, privately criticizing their Catholic faith and then expressly denying the license "on the basis of this families [sic] beliefs."

Not stopping there, Defendants also violated the Free Speech Clause by conditioning licenses on the Burkes' willingness to speak the government's message, even when it conflicts with sincerely held religious beliefs. Then two Defendants tried to cover up the evidence, sending the Burkes an altered version of their file. That version omitted information about the Burkes' strengths and potential alternatives to denial of the Burkes' license, with after-the-fact revisions to make the recommendation "match up" with "the decision [we] arrived at." Given this record,

Defendants cannot hope to either establish qualified immunity or pass strict scrutiny. The law has been clear since long before 2023.

Subsequent events have only confirmed that Defendants lack any principled justification for their actions, much less any hope of overcoming strict scrutiny. In December 2025, DCF amended its policies on an emergency basis due to concerns expressed by DCF's federal regulator that DCF had violated constitutional rights. Under the new policy, the Burkes and others who share their beliefs would now be allowed to foster children without issue. Defendants ask this Court to close its eyes and agree that Defendants had a compelling interest in excluding the Burkes, for the good of children, in 2023, and not to question the fact that this interest evaporated in 2025. Then they ask this Court to rule that any other alternative would have been unworkable and harmful to children—including the alternative they have now adopted.

What changed from 2023 to 2025? The needs of children didn't change. DCF's policy documents do not even suggest this. The abilities of foster parents didn't change. DCF doesn't hint at that, either. The presidential administration changed. If their federal regulator's position is indeed harmful to the wellbeing of children, DCF can challenge that position. Defendants should not be permitted to ask for a court ruling holding that it is unworkable and harmful to the children in DCF's care to do the very thing that DCF had done openly for decades before 2023 and is doing openly today: licensing families with the Burkes' religious beliefs and placing foster children in their care.

DCF needs homes for children, and the Burkes were ready to welcome children into theirs. There was always a better alternative: welcoming families like the Burkes. Defendants considered that alternative, rejected it, and after three years of litigation, changed their mind. Accordingly, the Court should enter judgment for Michael and Catherine Burke on all counts.

STATEMENT OF FACTS

### A.  Michael and Catherine Burke.

Michael and Catherine Burke have wanted to become parents since their marriage in 2018. *See* ECF 6 ¶¶ 41-42 (Compl.). As faithful Catholics, both Michael and Catherine are deeply committed

to the Catholic Church and its teachings. *See id.* ¶¶ 36-39. Heartbroken after infertility, the Burkes decided to pursue adoption through a private agency, which assessed potential parents using "the regulations of the Massachusetts … Department of Children and Families," including asking the Burkes how they would respond to youth who came out as LGBTQ. SUMF ¶ 9-10. The agency approved the Burkes to become adoptive parents, but the cost of private adoption proved an insurmountable barrier. *Id.* ¶ 12. The Burkes then decided to apply to foster and adopt through DCF. Compl. ¶ 45.

**B.  DCF's need for foster families and process to become a foster parent.**

Massachusetts needs more foster homes to meet the needs of the children in its care. Due to the lack of available homes, DCF has had to house children in "hospital[s]" (even when the child was not sick) because DCF could offer those children no other place to go. SUMF ¶ 16. Foster children have even been housed in apartments rented by DCF, at considerable expense, due to a lack of family homes. Ex. I, Deposition of Sharon C. Silvia (Silvia 30(b)(6) Tr.) at 231:4-34:22. And foster children are sometimes transported to different towns to find a foster family. Silvia 30(b)(6) Tr. at 222:4-23:21.

When a family applies to become a foster, or "resource parent," with DCF, they undergo a lengthy training and screening process. The social worker assessing the family writes a caregiver training assessment and recommends whether DCF should approve or deny the family's license. *See* Ex. J, Licensing of Foster, Pre-Adoptive, and Kinship Families (Licensing Policy) at 17-26. After supervisor review of that assessment, Ex. F, Deposition of Dawn Sweetman (Sweetman Tr.) at 217:2-218:21, a Licensing Review Team (LRT) decides whether to approve the application. *See* Ex. J, Licensing Policy at 26-27. All members of an LRT are expected to actively participate, and all share equally in the LRT's final decision. *See* Silvia. 30(b)(6) Tr. at 60:5-17;165:2-14. It is rare for an LRT to deny a license that has been recommended for approval. SUMF ¶¶ 28-29.

**C.  DCF's policy is discretionary and applied inconsistently.**

To be licensed, applicants must demonstrate that they meet 17 different criteria "to the satisfaction of the Department." Ex. XX, Prior Version of 110 CMR 7.104; *see also* 110 CMR

7.100, 7.104, 7.107. At the time of the decision on the Burkes' license, these subjective criteria included "supporting and respecting a child's sexual orientation or gender identity," and to "respect and make efforts to support the integrity of a child's racial, ethnic, linguistic, cultural and religious background." Ex. XX, Prior Version of 110 CMR 7.104. DCF's "policy does provide for discretion" throughout the licensing and placement process. Ex. N, Deposition of Angel Emerson (Emerson Tr.) at 60:17-21. The personal capacity Defendants testified—and DCF's 30(b)(6) designees agreed—that the social worker and LRT assess each family's suitability for foster care "on a case-by-case basis," and that the decision requires a "judgment call." SUMF ¶¶ 30-33 (collecting deposition testimony).

This discretion has allowed DCF to approve families even when they specifically told DCF that they "do not feel equipped to support the needs of a LGBTQ child," Ex. T, Licensing Study at 17, or when they stated they were "concerned about [their] ability to raise a Black child," Ex. U, Licensing Study at 2. Licensed families can also refuse to accept a child for placement in their home for any reason—including their sexual orientation or gender identity—and DCF will not necessarily revoke their license. SUMF ¶ 57. In 2023, many DCF offices across the state set goals to increase the number of "LGBTQIA affirming homes" within their areas. SUMF ¶ 70. Although the CMR was amended in 2009 to require families to "support[ ] and respect[ ] a child's sexual orientation," Ex. XX, Prior Version of 110 CMR 7.104, DCF personnel complained in 2022 they were "currently aware of only **FIFTEEN** unrestricted homes in the state that are willing and able to take LGBTQ youth … ." Ex. Y, DCF LGBTQIA+ Liaisons Statewide Meeting Minutes (LGBTQIA+ Liaison Minutes) at 3 (emphasis in original).

**D.  The Burkes are denied a foster care license because of their religious beliefs.**

The Burkes applied to become foster parents with DCF in January 2022 and underwent an extensive screening and training process. SUMF ¶¶ 76-102. DCF contracted with Linda-Jeanne Mack at 18 Degrees, a private agency that supports foster families, to complete the Burkes' assessment. Sweetman Tr. at 68:6-71:18. Mack asked the Burkes "about their feelings regarding parenting children and youth who identify as LGBTQIA++." Ex. BB, Adoption Licensing Study

(Licensing Study) at 26. The Burkes responded that they adhere to the Catholic Church's teachings regarding gender, marriage, and sexuality. *See id.* They emphasized that they would love any child placed in their home, would never kick a child out of their home, and also would not change their own religious beliefs. *See id.* at 26-27; SUMF ¶¶ 90-91. After that interview, Mack wrote to DCF that the Burkes "have a lot of strengths … and really seem[ ] to understand adoption/foster care;" but on LGBTQ issues, "their faith is not supportive and neither are they." Ex. CC, DCF Internal Emails at 5.

Mack continued with further interviews. Her final written assessment of the Burkes discussed their "many strengths," including their ability "to truly connect and support a child in a meaningful way" and their openness "to a variety of children who have different levels of need, including children who are blind or deaf, have moderate medical needs, and have histories of mental health challenges." Ex. BB, Licensing Study at 31-32. She also noted her "apprehension about recommending them as a resource family due to the couple's views related to people who identify as LGBTQIA++. … They are heavily involved in their Catholic Church and cite their religious views as their primary reason for seeing LGBTQIA++ individuals in this way." *Id.* at 31.

Ultimately, however, the Burkes' "willingness to parent a child with" significant challenges "outweighed [Mack's] worry about their potential unwillingness to accept an LGBTQIA++ child in the future." *Id.* at 32. Consistent with DCF's practices, she recommended approval "with some conditions" around the types of children that would be best suited for placement in their home. *Id.*

This report was sent to DCF in January 2023. Both Jones and Sweetman recommended approval, then passed the Burkes' case to the LRT. SUMF ¶¶ 111-12. Mack—the only individual who had spoken with the Burkes regarding their beliefs and the individual who wrote the initial report recommending approval—was not invited to the LRT meeting. *See* Sweetman Tr. at 312:2-313:16; Ex. O, Deposition of Caitlyn Levine (Levine Tr.) at 103:21-104:4. This was "not the standard" operating procedure. Sweetman Tr. at 313:1. Each individual-capacity defendant participated in the meeting. *See* Ex. M, Deposition of Theresa Harris (Harris Tr.) at 76:17-77:16. All members were expected to be active participants and "were part of the panel that made the end

decision." *Id.* at 78:11-79:1. The decision was the decision of the entire team. *See* Silvia Tr. at 165:2-14.

The LRT denied the Burkes' application "[b]ased on this famil[y's] beliefs about children who identify as LGBTQIA+." Ex. AA, Burkes' DCF File at 60. This "reflects the official reasoning for the denial of the Burkes' license study." Ex. P, Deposition of Virginia Peel (Peel 30(b)(6) Tr.) at 74:2-16. Members of the LRT identified no other reason the Burkes should be denied. SUMF ¶ 121.

### E. DCF alters the Burkes' report.

When the Burkes were notified of the denial, they requested a fair hearing to challenge the LRT's discriminatory decision. Ex. A, Deposition of Michael Burke (M.Burke Tr.) at 155:7-11. Sweetman became concerned; and, against the explicit instructions of DCF's central office and regional legal counsel, she deleted portions of Mack's report discussing the Burkes' significant strengths, willingness to foster children with special needs, and conclusion that the Burkes' strengths outweighed concerns over LGBTQ issues and could be mitigated at the placement stage. Sweetman replaced this information with the LRT's negative assessment of the Burkes' "beliefs." SUMF ¶¶ 132-41; Sweetman Tr. at 336:6-10. She sent this altered version to the Burkes, who did not learn until discovery that they had been recommended for approval *three times* before they were denied. SUMF ¶¶ 32, 110-12, 138-142; Ex. C, Deposition of Catherine Burke (C.Burke Tr.) at 59:20-60:10.

### F. Procedural history.

In August 2023, the Burkes filed this lawsuit, claiming that the discriminatory denial violated the Free Speech and Free Exercise Clauses of the First Amendment. They named the LRT members as defendants in both their official and individual capacities, as well as two other officials in their official capacity only. *See* Compl. ¶¶ 21-32. They seek damages against individual capacity defendants and injunctive and declaratory relief against all defendants. The individual capacity defendants moved to dismiss based on qualified immunity. *See* ECF 59. This Court denied their motion, holding that "it was clearly established, in 2023, that DCF's individualized and

discretionary assessment of Plaintiffs' foster license application was not a 'generally applicable' policy and thus was subject to strict scrutiny." ECF 85 at 14. The Court dismissed the personal capacity claims against Sullivan without prejudice. *Id.* at 17. Official capacity defendants have moved to dismiss claims against them on grounds of mootness; that motion remains pending. ECF 110. After full discovery, including re-opened expert discovery, the Burkes now move for summary judgment on all counts. They seek declaratory and injunctive relief and further proceedings to assess damages.

## LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if the evidence is such that a reasonable jury could resolve the point in the favor of the non-moving party … and a fact is material if it has the potential of affecting the outcome of the case." *Taite v. Bridgewater State Univ., Bd. of Trs.*, 999 F.3d 86, 93 (1st Cir. 2021) (cleaned up). On cross-motions for summary judgment, the court "view[s] each motion separately and draw[s] all reasonable inferences in favor of the respective non-moving party." *Motorists Com. Mutual Ins. Co. v. Hartwell*, 53 F.4th 730, 734 (1st Cir. 2022) (quoting *Pac. Indem. Co. v. Deming*, 828 F.3d 19, 23 (1st Cir. 2016)).

Qualified immunity shields state officials "from liability for civil damages insofar as their conduct [did] not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Cintron v. Bibeault*, 148 F.4th 37, 47 (1st Cir. 2025); *see also Stamps v. Town of Framingham*, 813 F.3d 27, 34 (1st Cir. 2016) (a "clearly established" right is one that is "sufficiently clear" that "every reasonable official would have understood that what he is doing violates that right"). "'[A] consensus of cases of persuasive authority' can demonstrate 'that a reasonable officer could not have believed that his actions were lawful.'" *Cintron*, 148 F.4th 37, 52 (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)). Indeed, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). "[A] general constitutional rule already identified in the decisional law

may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful." *El Dia, Inc. v. Rossello*, 165 F.3d 106, 109 (1st Cir. 1999) (cleaned up); *accord French v. Merrill*, 15 F.4th 116, 126-27 (1st Cir. 2021) ("[G]eneral statements of the law may give fair and clear warning to officers so long as, in the light of the pre-existing law, the unlawfulness of their conduct is apparent." (cleaned up)).

## ARGUMENT

### I. Defendants violated the Burkes' free exercise rights.

DCF's policies are malleable, changeable, and riddled with exemptions. That was true in 2023, when the Burkes' license was denied, and it was confirmed in December 2025, when DCF changed the policies with the stroke of a pen after being warned that the policies "violate[ ] the constitutional rights of applicants." Ex. PP, DCF's Emergency Regulatory Change at 3. The pliable nature of the policies is established by the text of the policies, Defendants' testimony about how those policies are applied, and documents showing widespread departures from policy. These facts are undisputed, and they establish multiple violations of the Free Exercise Clause.

Because the Burkes would not agree to affirm relationships and gender expressions contrary to their religious beliefs, they were barred from being licensed as foster parents in Massachusetts. *See* Silvia 30(b)(6) Tr. at 158:5-159:20. Defendants' "actions have burdened [Plaintiffs'] religious exercise by putting [them] to the choice" of giving up foster care "or approving relationships inconsistent with [their] beliefs." *Fulton v. City of Philadelphia*, 593 U.S. 522, 532 (2021). Therefore, DCF's policies must satisfy strict scrutiny unless they are both neutral toward religion and generally applicable. *See id.* at 533.

DCF has failed the requirements of neutrality and general applicability in four distinct ways. As described by the en banc Ninth Circuit, "[f]irst, a purportedly neutral, 'generally applicable' policy may not have 'a mechanism for individualized exemptions.'" *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist.*, 82 F.4th 664, 686 (9th Cir. 2023) (*FCA*) (quoting *Fulton*, 593 U.S. at 533). This is Count I. "Second, the government may not 'treat ... comparable secular activity more favorably than religious exercise.'" *Id.* (quoting *Tandon v. Newsom*, 593 U.S. 61, 62

(2021)). This is Count II. *"*Third, the government may not act in a manner 'hostile to ... religious beliefs' or inconsistent with the Free Exercise Clause's bar on even 'subtle departures from neutrality.'" *Id.* (quoting *Masterpiece Cakeshop v. Colo. C.R. Comm'n*, 584 U.S. 617, 638 (2018)). This is Count III. Fourth, "[t]he design of these laws accomplishes instead a 'religious gerrymander,'" penalizing religious conduct and almost no other. *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 535 (1993). This is Count IV. Defendants violated the Free Exercise Clause in all four ways.

### A. DCF uses a system of individualized assessments (Count I).

DCF's policies "invite[ ] the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Fulton*, 593 U.S. at 533 (cleaned up). The policies apply open-ended, case-by-case standards based on judgment calls about the family's reasoning for a particular decision.

The First Amendment rule for individualized exceptions dates back at least to *Sherbert v. Verner*, where a state's unemployment compensation system excluded those who "failed, without good cause to accept available suitable work," and Adell Sherbert's Sabbath observance was not deemed "good cause." 374 U.S. 398, 401 (1963) (cleaned up). Similarly, in *Lukumi*, the city used individualized assessments when it permitted "necessary" animal slaughter like hunting and euthanasia, but not religious slaughter: this distinction "devalues religious reasons … by judging them to be of lesser import than nonreligious reasons." 508 U.S. at 537-38. And in *Fulton*, foster agencies were required to work with all foster parents, "unless an exception is granted by the Commissioner"—which she refused to do for Catholic Social Services. 593 U.S. at 535. Such "case-by-case analysis is antithetical to a generally applicable policy," *FCA*, 82 F.4th at 688, and just "the creation of" such a system requires strict scrutiny, *Fulton*, 593 U.S. at 537.

DCF created just such a system here. Its malleable "satisfaction of the department" standard, 110 CMR 7.104, permits DCF personnel to license families based upon value judgments about the family's beliefs. DCF's 30(b)(6) witness testified that whether a family meets the requirement to support and respect a child's identity is "a judgment call that DCF has to make," that "[a] lot of

factors go into that," and that DCF has to "apply their discretion on it based on the facts of the case." Ex. R, Deposition of Alisha Morrissey (Morrissey 30(b)(6) Tr.) at 194:10-22. Every individual capacity Defendant agreed, characterizing the determination as "not an exact science," one that "depends on each … person's and each family's circumstance," a "judgment call," or "case-by-case." SUMF ¶ 30-31. Repeatedly, Defendants testified that the policies were not always clear-cut and that people could disagree about whether a family should be licensed. SUMF ¶¶ 32-33. That's because "there's no clear checklist … [i]t's more an assessment." Emerson Tr. at 94:6-10.

Thus, on a case-by-case basis, DCF weighs a family's reasons for a particular action. DCF's standards at the time required families to "promote the physical … well-being" of a child, to "support[ ] and respect[ ] a child's sexual orientation or gender identity," and "to support the integrity of a child's racial, ethnic, linguistic, cultural and religious background." Ex. XX, Prior Version of 110 CMR 7.104. Yet, "DCF does license families who would say, we only feel prepared to take in a boy," so long as there is "reasoning to it," such as a foster parent who is "a single male, and that's what he's comfortable with." Silvia 30(b)(6) Tr. at 122:16-123:7. Or if a family expressed that they were unable to care for children with significant medical needs or certain disabilities, they could be licensed. *See, e.g.*, Peel 30(b)(6) Tr. at 122:21-123:12; Morrissey 30(b)(6) Tr. at 115-18. Or if a parent said she wasn't sure she could "support a child of a different racial background to help them be their truest self," such that she "would prefer a child of her own racial background, white," she could be licensed. Morrissey 30(b)(6) Tr. at 122:13-123:16. Or if a family would not accept a transgender child because "we don't think we could meet a child's needs because of the child's gender identity," they could be licensed. Ex. S, Deposition of Euphemia Molina (Molina Tr.) at 59:19-60:3. But if a family "said it was contrary to their religious beliefs to use a child's preferred pronouns that did not accord with the child's sex assigned at birth," then "they should not be licensed." Silvia 30(b)(6) Tr. at 94:5-19. DCF not only makes a case-by-case determination, but it also makes that determination based upon a value judgment about the family's beliefs.

That value judgment is evident in the Burkes' denial. Their license was denied based on fears about a hypothetical foster child's future identity: "[I]t is hard to predict the future and there is no way to guarantee the gender identity of a child over time." Ex. AA, Burkes' DCF File at 60. But that same hypothetical doesn't bother DCF at all in other circumstances. DCF will "allow a licensed family to say that they only want to take in boys or only want to take in girls," even though "DCF also knows that that child's gender identity might change while they're in placement." Silvia 30(b)(6) Tr. at 120:13-121:13. If that gender identity changes, DCF acknowledges that "yes, it's possible that the child might need to be placed in a different home." Peel 30(b)(6) Tr. at 119:22-122:22. The same is true of medical needs: DCF licenses families who cannot take on children with serious medical needs, and allows them to adopt, even though such needs might arise in the future. *See* SUMF ¶¶ 44-46. The Burkes, however, could not be licensed to care for *any* child. Why? "[T]his famil[y's] beliefs." Ex. AA, Burkes' DCF File at 60.[1]

In other cases, DCF simply deviated from its standard without explanation. DCF says its policies meant that "parents who were not willing to affirm same-sex relationships and transgender identities should not be resource parents." Silvia 30(b)(6) Tr. at 159:12-20. Yet, according to an internal DCF liaison group and Defendant Molina, in March of 2023 there was "[a] huge area of identified need [over] the lack of homes for LGBTQ youth." Ex. Y, LGBTQIA+ Liaison Minutes at 2; Molina Tr. at 78:14-17. DCF's recruitment plans confirm this need, as they sought to "increase the number of foster families that will consider children/youth who identify as LGBTQ+." Ex. Z, DCF Recruitment Plan at 4; *see also* SUMF ¶¶ 66-75. Indeed, in 2022, DCF was "aware of only **FIFTEEN** unrestricted homes in the state that are willing and able to take LGBTQ youth." Ex. Y, LGBTQIA+ Liaison Minutes at 3 (emphasis in original). While DCF says every family must be "affirming," the evidence shows that the standard was not applied in practice.

---

[1]    DCF has now changed its policies and "believe[s] that applicants with similar beliefs to Plaintiffs could be licensed under the revised DCF licensing regulations and policies." Opp. to Mot., ECF 151 at 2 & n.2. It appears that DCF proposes to do what it has done in the circumstances described above: license a family who might not be a good fit for all children and consider any limitation at the placement stage.

DCF's system thus "permit[s] the government to grant exemptions based on the circumstances underlying each application," *Fulton*, 593 U.S. at 534, but "devalues religious reasons … by judging them to be of lesser import than nonreligious reasons," *Lukumi*, 508 U.S. at 537-38. This law is clearly established, stemming back at least to *Sherbert* in 1963, and based upon *Fulton*, which applied the individualized exceptions rule to the foster care system in 2021. As this Court noted in its earlier ruling, even before *Fulton*, the *Blais* decision in Washington and the *Lasche* decision from the Third Circuit held that the Free Exercise standard applied to foster parents. ECF 85 at 13-17. The law is clearly established, then and now: when DCF burdens religious exercise through a discretionary system of exceptions, such action must face strict scrutiny.

**B.  DCF policies discriminate against religion as a category (Count II).**

DCF's policies not only allow individualized exceptions: they also make exceptions for conduct with secular motivations while penalizing comparable conduct when it is religiously motivated. "A law is not generally applicable if it 'treat[s] *any* comparable secular activity more favorably than religious exercise.'" *Lowe v. Mills*, 68 F.4th 706, 714 (1st Cir. 2023) (quoting *Tandon v. Newsom*, 593 U.S. 61, 62 (2021)) (emphasis in original). When the permissible "secular activities were comparable to the prohibited religious" ones, then strict scrutiny applies. *Lowe*, 68 F.4th at 714.

DCF's policies flunk this test in three ways. First, they allow families to be licensed if they have secular reasons for not being able to "support and respect" a particular type of child. Second, at the placement stage, DCF allows licensed foster families to exclude children from their home on the basis of protected characteristics. And third, DCF simply fails to apply its requirements to many families.

First, when granting licenses, "DCF may consider the preferences expressed by [foster care] applicants" regarding "the characteristics of children placed in their home." Ex. MM, Defs.' Interrogatory Responses at 6. As a result, DCF licenses foster families who state point-blank they cannot "respect and make efforts to support the integrity of a child's racial, ethnic, linguistic, cultural, and religious background," 110 CMR 7.104(e), or that they cannot "support[ ] and

respect[ ] a child's sexual orientation or gender identity," Ex. XX, Prior Version of 110 CMR 7.104; *see also* Ex. YY, Denial Letter (citing these provisions in the Burke's denial). DCF will approve licenses for foster families who "indicate a preference for children of their own race," Peel. Tr. at 48:17-50:8 ("Yes"), have sex-based preferences, *id.* at 46:16-47:16, have religion-based preferences, *id.* at 50:9-51:15, or "little tolerance for very Catholic churches," SUMF ¶ 49. DCF has licensed families who were unwilling or unable to accept children of a particular sex. SUMF ¶ 40. DCF approved a foster license to someone "concerned about her ability to raise a Black child," Ex. U, Licensing Study at 2, simply noting that "[r]ace & ethnicity will be discussed on a case by case [sic] basis to determine [the licensed foster parent's] level of confidence." Ex. W, Licensing Study at 11. DCF approved a foster home that "do[es] not feel equipped to support the needs of a LGBTQ child." Ex. T, Licensing Study at 3; *see also* SUMF ¶ 47 (home accepts some sexualities but not others). Thus, DCF licenses foster families who would exclude all kinds of foster children from their homes—while at the same time denying the Burkes a foster care license because of their religious "beliefs about children who identify as LGBTQIA+." Ex. AA, Burkes' DCF File at 60; *see also* Sweetman Tr. at 88:15-89:2, 186:18-22, 270:5-13 (confirming knowledge of these religious beliefs).

Second, the exceptions continue when placing children with licensed families. DCF officials agreed that it is not a violation of DCF policy for licensed foster families to "decline placements for all kinds of reasons, including LGBTQ youth." Molina Tr. at 55:6-11; *see also* SUMF ¶ 57. That is because DCF's policies allow foster families to "self-select:" foster families can determine the kind of children for whom they "can provide the best home." *Id.* at 54:20-55:1-4. This self-selection is authorized in multiple DCF regulations. For instance, DCF regulations allow foster families to identify "limitations on the identity or individual characteristics of children who may be placed in the foster/pre-adoptive home." *See* 110 CMR 7.111(4). And "[b]efore" a particular "child is placed in a foster/pre-adoptive home, [DCF] shall provide the prospective foster/pre-adoptive parent with sufficient information about the child to enable the foster/pre-adoptive parent to determine whether to accept placement of the child." 110 CMR 7.112(1). DCF will not

necessarily revoke their license for refusing any one child. *See* Morrissey 30(b)(6) Tr. at 116:10-117:2. So, "[i]f the family said they're safe and affirming and then declined placement of a youth based on not feeling they could meet that youth's needs, then no, it wouldn't necessitate a revocation of their license." Molina Tr. at 174:18-175:1. DCF says "a family has the right to say no to a placement" and a family need not give a reason for declining a placement. Silvia 30(b)(6) Tr. at 96:9-10; *see also id.* at 214:11-215:13.

Third, the exceptions are so sweeping that many licensed families do not meet DCF's definition of "affirming." As a state commission put it that same year, while "DCF may hope that all of its homes are affirming"—as DCF understands the term—"the agency has *not* taken steps to ensure that is the case." Ex. X, LGBTQ Youth in the Massachusetts Child Welfare System Report (LGBTQ Youth Report) at 32 (emphasis added). Rather, in the year the Burkes applied to be foster parents, "not all [foster] homes would necessarily accept every child with any particular sexual orientation or gender identity," or "any characteristic." Molina Tr. at 100:11-101:12. As described above, DCF's own documents and witnesses establish that despite DCF's assertion that all homes must be supportive and affirming, many—perhaps most—were not. *See also* SUMF ¶¶ 66-75.

"[I]n practice," DCF's actions "result[] in a pattern of selective enforcement favoring comparable secular activities." *FCA*, 82 F.4th at 689. If the Burkes say during a caregiver assessment that they would love and welcome any child in their home but cannot change their religious beliefs, C.Burke Tr. at 149:13-22, that is a reason to deny them a license. At the same time, it "wouldn't necessitate a revocation of [a] license" for a foster family to say they would also love and welcome any child in their home, but "then decline[] placement of a youth based on not feeling they could meet that youth's needs," including his or her sexual orientation or gender identity. Molina Tr. at 174:18-175:1. Similarly, licensed foster families can request, and have requested, that children not be placed in their home because they were not equipped to handle a child of a particular race, sex, or sexual orientation. SUMF ¶¶ 36-40. These secular justifications for not supporting a child were permitted. But the Burkes were denied because DCF concluded that the Burkes were not able to support LGBTQ children on the basis of their religious beliefs.

"Only by adjusting the dials just right … can you engineer" such arbitrary conclusions. *Masterpiece Cakeshop*, 584 U.S. at 652 (Gorsuch, J., concurring).

The undisputed facts show that Defendants "fail to prohibit" this "nonreligious conduct that endangers [its] interests in a similar or greater degree than" the Burkes' religious conduct supposedly does. *Lukumi*, 508 U.S. at 543. That triggers strict scrutiny.

Moreover, this rule was clearly established law in 2023. Indeed, it is a longstanding, "essential … protection of the rights guaranteed by the Free Exercise Clause." *Id.* at 543 (tracing this "principle" in cases going back to 1969). "This Court's decisions have made the following points clear. First, government regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise." *Tandon*, 593 U.S. at 62; *see also FCA*, 82 F.4th at 686 (holding *Tandon* "sets forth" one of the Free Exercise Clause's "three bedrock requirements"). Defendants treated comparable secular activities—being unable to support a child's race, sex, or sexual orientation—more favorably than the Burkes' religious activity. That was unconstitutional in 2023, and the individual capacity defendants broke the law.

### C. DCF used both a religious gerrymander and religious hostility (Counts III and IV).

#### 1. The policy operates as a religious gerrymander (Count IV).

DCF's policy is also a classic religious gerrymander: one that both "targets religious conduct for distinctive treatment," *Carson v. Makin*, 596 U.S. 767, 781 (2022), and imposes "special disabilities on the basis of religious views," *Trinity Lutheran v. Comer*, 582 U.S. 449, 460 (2017). Facially neutral government action still violates the First Amendment when it targets religious conduct through "subtle departures from neutrality" and "covert suppression of particular religious beliefs." *Lukumi*, 508 U.S. at 534. Such actions result in "religious gerrymanders." *Id.* In this case, DCF's policy bears all the hallmarks of a religious gerrymander: (1) the policy "burdens religious objectors yet almost no others;" (2) DCF's interpretation of the policy "favors secular conduct;" and (3) the policy bars "more religious conduct than is necessary to achieve [its] stated ends." *Blais v. Hunter*, 493 F. Supp. 3d 984, 995 (E.D. Wash. 2020) (quoting *Lukumi*, 508 U.S. at 536-38).

First, DCF is aware that its policy conflicts with certain religious beliefs generally and with the Burkes' religious beliefs specifically. *See* SUMF ¶¶ 122-23; *see also* Sweetman Tr. at 88:15-89:2, 186:18-22, 270:5-13 (discussing references to Burkes' religious beliefs). And it is undisputed that those "beliefs" on LGBTQ issues were the only reason the Burkes' application was denied. Ex. AA, Burkes' DCF File at 60; Ex. GG, Molina Messages at 2 ("The decision of the team was to deny the initial caregiver assessment based on [ ] the family's views about LGBTQIA+ youth."); SUMF ¶¶ 120-22. Courts have recognized that "foster care applicants who might object to supporting certain issues LGBTQ+ children might face will likely do so on religious grounds." *Blais*, 493 F. Supp. 3d at 996.

Next, DCF's interpretation of its policies favors secular views over certain religious ones. *Id.* Under the policy, DCF licenses foster parents who express a variety of secular limitations on or preferences for the child they could accept. SUMF ¶¶ 33-54; Morrissey 30(b)(6) Tr. at 125:3-126:19 (racial preferences), 179:9-181:15 (gender), 48:15-22 (age), 50:3-22 (medical conditions), 144:10-145:10 (wheelchair), 208:2-211:3 (certain behaviors). DCF further acknowledges that many of these characteristics can change unexpectedly during a placement. SUMF ¶¶ 39, 41, 46, 48, 51, 54. And after licensing, foster parents may freely refuse to accept (or continue) the placement of a child for a number of other secular reasons without jeopardizing their foster care license. Molina Tr. at 54:15-55:11 (not a violation of DCF policy to decline placements "for all kinds of reasons, including for LGBTQ youth"); Silvia 30(b)(6) Tr. at 95:16-96:10 ("A family has the right to say no to a placement."); SUMF ¶ 56-57. Yet, DCF treated the Burkes' "religious views" as fundamentally different than these permissible secular limitations. Ex. AA, Burkes' DCF File at 60.

Even more troubling, the discretion-laden policy allows DCF to call balls and strikes among religious views. For example, DCF approved the license of a woman who had "developed little tolerance for very Catholic Churches" and instead attended a Unitarian Universalist church as "[t]his church is very accepting of everyone." Ex. JJ, Licensing Study at 2. As the applicant's "church very open and progressive," the DCF recommendation ultimately concluded "their church community" was a positive network of "close supports." *Id.* at 3-4. Not so for the Burkes' Catholic beliefs. There, DCF's contractor decreed that their "faith is not supportive and neither are they" and, at Defendant Sweetman's behest, launched an inquiry into just "how significant … their religious beliefs" are. Sweetman Tr. at 87:5-89:2. In these cases, a family that disclaims the significance of non-supportive beliefs would be "on the right road." *Id.* at 99:2-100:15. But a family with "rigid or inflexible religious beliefs might warrant additional inquiry and explanation." Silvia 30(b)(6) Tr. at 190:17-191:3.[2] And the Burkes' initial home study recommended a license as the writer believed "there is some potential for the couple" to "come around" in changing its views "with education and ever-changing values in the church community." Ex. BB, Licensing Study at 32. In practice, DCF's gerrymandered decision tree looks like this:



Remarkably, DCF moves beyond this (already inappropriate) religious umpire role to become

---

[2]    Indeed, one of Defendants' experts testified that people with such beliefs might need to "negotiate those belief systems in a way that allows them to be affirming" by "engag[ing] in therapy" or "get[ting] counsel to address those beliefs" in order to become affirming. Ex. WW, Deposition of Dr. Abbie Goldberg (Goldberg Tr.) at 77:11-78:4. She further testified she could not think of "how somebody would retain their belief" and be affirming. *Id.* at 79:10-14. And she testified that families with such beliefs would need to stop attending a church that espouses such beliefs in order to be considered sufficiently affirming. *Id.* at 101:2-103:17.

an active player in reshaping the field of faith communities. DCF's training manual, for example, encourages foster applicants to: "Talk with your clergy and help your faith community to support LGBT people." Ex. KK, DCF Foster Training at 287. DCF's witnesses confirmed that "if they are very involved in their faith community, it would be very affirming for them to speak with the clergy and speak with the community and – not that they have to change their beliefs, but making it a[n] accepting and more affirming place." Silvia 30(b)(6) Tr. at 156:3-10. That is a distinction without a difference. DCF used its policy to favor and even advocate for certain religious views and practices over others.

Finally, the policy excludes more religious conduct than is necessary for its aims. *Blais*, 493 F. Supp. 3d at 996-97. Rather than completely denying the Burkes' license based on "phantom" hypotheticals, *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 543 (2022), DCF could address unlikely future conflict between the Burkes' faith and a child's views by thoughtful matching at the placement stage, followed by annual assessments to ensure ongoing best fit, *Blais*, 493 F. Supp. 3d at 997. DCF already employs this standard practice to protect foster children being placed and when circumstances change post-placement. SUMF ¶¶ 55, 58-59. DCF does not expect every foster placement to be permanent and regularly moves foster children where there is no longer the right fit. Morrissey 30(b)(6) Tr. at 108:1-109:9. Indeed, DCF exceeds the national average, with almost 40% of foster children having four or more different placements each time they are removed from their home. SUMF ¶ 65. And DCF allows a foster parent to maintain their license if a child requires re-placement to another home. SUMF ¶ 57. Applying this standard process to the Burkes would protect the state's interests without violating the Burkes' constitutional rights.

DCF has since recognized as much, changing its policies to allow families with the Burkes' beliefs to be licensed. It has changed its nondiscrimination policy to state that "placements," rather than "all placement settings" must be safe and affirming and that DCF "assesses," rather than "screens" families for support for LGBTQ youth. Ex. UU, 2025 LGBTQIA+ Nondiscrimination Policy at 2. DCF represented that the policy change allows it to "meet DCF's need for foster homes that support the identity and needs of the children in its custody." Ex. PP, DCF's Emergency

Regulatory Change at 3. If this was possible in 2025, it was possible in 2023, too.

The Supreme Court has recognized the First Amendment's prohibition on religious gerrymandering for decades, with yet another reemphasis the year before the Burkes' discriminatory denial. *See Lukumi*, 508 U.S. at 534; *Carson*, 596 U.S. at 784. And the message was clearly received by federal courts in the specific foster care context at issue here three years before DCF's discrimination occurred. *Blais*, 493 F. Supp. 3d at 1002 ("the Department must not discriminate against a foster care applicant based on their creed."); *cf. El Dia, Inc.*, 165 F.3d at 110 ("Clearly established law prohibits the government from conditioning the revocation of benefits on a basis that infringes constitutionally protected interests[.]"). Qualified immunity does not shield government officials who engage in religious gerrymandering.

### 2. Defendants acted with religious hostility (Count III).

For the counts above, strict scrutiny applies. But for Count III, the court does not even need to apply strict scrutiny when defendants acted with "official expressions of hostility" to religion: courts should "'set aside' such policies without further inquiry." *Kennedy*, 597 U.S. at 525 n.1 (quoting *Masterpiece*, 584 U.S. at 639). In this analysis, courts consider the historical background of the challenged decision, the series of events leading to the enactment, and any contemporaneous statements by members of the decision-making body. *Masterpiece*, 584 U.S. at 639.

Religious hostility permeated the official evaluation and rejection of the Burkes' foster care application. This began during the training where a presenter indicated that anyone who did not share DCF's views regarding LGBTQ youth had "no business working with the Department." C.Burke Tr. at 104:17-105:14. Rather than denounce this statement, DCF testified that this was "an accurate statement of DCF's policy." Silvia 30(b)(6) Tr.159:12-20.

The hostility became overtly anti-religious when DCF's contractor sounded an alarm that the Burkes "had the 'right answers'" but that "their faith is not supportive and neither are they." Ex. CC, DCF Internal Emails at 5. The contractor reiterated her "apprehension" because the Burkes "are heavily involved in their Catholic Church and cite their religious views as their primary reason for seeing LGBTQIA++ individuals in this way." Ex. AA, Burkes' DCF File at 60. DCF never

disavowed these comments. Indeed, the individual defendants denied the Burkes' license precisely because of their "beliefs." SUMF ¶ 120. A few days after the decision, LRT member Molina bragged on an internal chat:

> **Euphemia (DCF) Molina**
>
> Hey team, I met Caitlyn on 3/31 (TDOV by coincidence) as we were both members of a License Review Team. We discussed a caregiver assessment (in old language, license study) of a couple looking to adopt through DCF. They were transparent in not believing trans people exist, seeing it as chemical castration, etc. I was able to point to language in the new family resource policy regarding foster parents needing to "assure that a child placed in their care will experience a safe, supportive and stable family environment that is free from abuse and neglect; support connections to the child's racial, ethnic, linguistic, cultural and religious background, sexual orientation and gender identity, and community and family of origin". The LRT decided to deny the caregiver assessment based on their un-moveable stance regarding trans people and inability to support and affirm a child placed with them should they come out later in life (they were interested in littles).
>
> **when policy works to protect people**

Ex. HH, Molina Internal Messages at 2. As Molina's telling comments reveal, DCF equates traditional religious views about gender and sexuality with danger to children. This proves DCF's hostility to the Burkes' faith. *See Mid Vermont Christian Sch. v. Saunders*, 151 F.4th 86, 93-94 (2nd Cir. 2025).[3]

Finally, another "indication of hostility is the difference in treatment" between the Burkes' religious views and other approved faiths. *Masterpiece*, 584 U.S. at 636. In *Masterpiece*, the Court held that the state agency "reflected hostility" by treating plaintiffs' objections as illegitimate but others as permissible, "thus sitting in judgment of his religious beliefs themselves." *Id.* at 637. The same is true here: DCF approves foster care applicants from "open and progressive" churches, while rejecting the Burkes' "not supportive" Catholic beliefs. Ex. JJ, Licensing Study at 3-4; Ex. CC, DCF Internal Emails at 5.

It was clearly established in 2023 that Defendants could not act with overt hostility to religious

---

[3]    Rather than back away from this approach, Defendants offer expert testimony that parents should "engage in therapy or [ ] get counsel" regarding such religious beliefs "to, what's the right word, negotiate those belief systems in a way that allows them to be affirming." Goldberg Tr. at 77:11-78:4.

beliefs. The Supreme Court said in *Masterpiece* that "upon even slight suspicion" of "animosity to religion or distrust of its practices, all officials must pause to remember their own high duty to the Constitution and to the rights it secures." 584 U.S. at 638-39. That case involved a deliberative body charged with applying state law. But even if the state law was correctly applied in *Masterpiece*—a question the Supreme Court never reached—the result was still invalid. Why? "[T]he official expressions of hostility to religion in some of the commissioners' comments—comments that were not disavowed at the Commission or by the State at any point in the proceedings that led to affirmance of the order—were inconsistent with what the Free Exercise Clause requires." *Id*. at 639. The same is true here. At multiple points in the process, Defendants and their contractor made official expressions of hostility to religion, even denying the license "because of this famil[y's] beliefs." None of those comments have been disavowed by Defendants at any point in this process.

But Defendants did attempt to cover their tracks. When the Burkes invoked their right to a fair hearing because they suspected religious discrimination, Defendants Sweetman and Moynahan removed evidence from the file that emphasized the Burkes' strengths and showed they were initially recommended for approval.[4] They did so against the advice of DCF central office and legal. SUMF ¶ 131-42. The reason? "My worry is they are saying we are discriminating against their religious beliefs, and it feels messy to have one eval say it's sort of okay [to license] and then us say it's not." Sweetman. Tr. at 336:6-10.

It is no defense to claim Defendants were simply applying DCF policy. Even correct applications of the law must be free of religious hostility. In *Masterpiece*, the Supreme Court held the penalties invalid without regard to whether the cakeshop violated state law. *See Masterpiece*, 584 U.S. at 640. Justices Kagan and Breyer concurred to explain that the cakeshop likely *did* violate state law, but the state's actions still violated the First Amendment because "state actors

---

[4]    SUMF ¶¶ 126-42. "There are a couple of strengths that were removed to make the ending match up. Q. With the decision that you arrived at, right? A. Correct." Ex. F, Deposition of Dawn Sweetman (Sweetman Tr. at 332:2-6.

cannot show hostility to religious views; rather, they must give those views 'neutral and respectful consideration.'" *Id.* at 640, 642 (Kagan, J., concurring). It was clearly established at least since 2018 that Defendants' overt religious hostility was unconstitutional. Indeed, "the fundamentals of our free exercise jurisprudence" bar a State from "discriminat[ing] against 'some or all religious beliefs'" and from "regulat[ing] or outlaw[ing] conduct because it is religiously motivated." *Trinity Lutheran*, 582 U.S. at 461 (quoting *Lukumi*, 508 U.S. at 532).

### D. Defendants' actions fail strict scrutiny.

Defendants gave up any hope of passing strict scrutiny when they changed their policies in 2025 to again permit licensing of foster families with views similar to the Burkes. DCF has represented to the public and to its federal regulator that its new policies "meet DCF's need for foster homes that support the identity and needs of the children in its custody." Ex. PP, DCF's Emergency Regulatory Change at 3. If DCF can license families like the Burkes, then by definition it cannot have a compelling interest in their exclusion. If DCF can meet the needs of LGBTQ children while licensing families like the Burkes, then by definition a less restrictive alternative exists. *See, e.g.*, *Pevia v. Green*, 695 F. Supp. 3d 628, 635 (D. Md. 2023) ("In light of their current, less restrictive policy, the defendants have not shown that they had no 'other means of achieving [their] desired goal without imposing a substantial burden on the exercise of religion ….'" (quoting *Holt v. Hobbs*, 574 U.S. 352, 353 (2015))); *Jordan v. Rubio*, 795 F. Supp. 3d 46, 61 (D.D.C. 2025) (holding defendant's subsequent actions "reveal[ ] that requiring Jordan to obtain a Letter of No Record was not the least restrictive means of carrying out the Department's generalized interests"). The Court need look no further.

The further the Court looks, the worse the defense gets. "To survive strict scrutiny, a government must demonstrate that its policy 'advances "interests of the highest order" and is narrowly tailored to achieve those interests.'" *Mahmoud v. Taylor*, 606 U.S. 522, 526 (2025) (quoting *Fulton*, 593 U.S. at 541). It is insufficient to assert interests that might be compelling "as a general matter." *Id.* at 527; *see also Fulton*, 593 U.S. at 541 ("The First Amendment demands a more precise analysis."). Rather, "courts must scrutinize the asserted harm of granting specific

exemptions to particular religious claimants." *Fulton*, 593 U.S. at 541 (cleaned up). The government fails that standard when its "conduct undermines its assertion that its [religiously burdensome] policy is necessary to serve that interest." *Mahmoud*, 606 U.S. at 566.

Defendants meet no part of this demanding standard. For one, Defendants state none of their supposedly compelling interests with the "more precise analysis" that the "First Amendment demands," *Fulton*, 593 U.S. at 541. In their interrogatories, Defendants identified generalized interests in the wellbeing of children in their care, avoiding discrimination, promoting stability, and avoiding disrupted adoptive placements. Ex. II, Defs' Resp. to Pls' First Interrogatories at 11-12. Such "[w]eighty" interests stated "at a high level of generality" don't suffice for strict scrutiny. *Id.* at 541-42. "[A] state's general conception of the child's best interest does not create a force field against the valid operation of other constitutional rights." *Bates v. Pakseresht*, 146 F.4th 772, 783 (9th Cir. 2025), *reh'g denied*, 166 F.4th 1193 (9th Cir. 2026) (citing cases since 1972).

Every single one of these interests has been undermined by the record. Defendants' interest in the wellbeing of children is belied by their willingness to make exceptions for foster families who aren't prepared to take in children of a particular race, sex, sexual orientation, or disability. *See supra* I.B. Moreover, their actions are likely to adversely impact the wellbeing of children, given DCF's admitted need for more foster homes and its admitted use of hospitals, out-of-town placements, staffed apartments, and even office buildings due to a lack of available foster homes. *See* SUMF ¶¶ 14-17; *see also Fulton,* 593 U.S. at 542 (rejecting asserted interest because "[i]f anything, including CSS in the program seems likely to increase, not reduce, the number of available foster parents."). Their interest in the avoidance of discrimination is undermined by their willingness to let foster families discriminate in which children they will accept for placement. So are their concerns about stability and disrupted adoptions. That interest is also undermined by the record: regarding adoptions, the Burkes stated that they would never kick a child out, and DCF could not identify any action that would lead to a disrupted adoption. *See* Ex. P, Peel 30(b)(6) Tr. at 136:10-138:17. Regarding placement stability, Massachusetts already has a poor record on placement stability, *see* SUMF ¶¶ 64-65, and it knowingly tolerates potential placement instability

when it licenses parents who can only take in a child of one sex, knowing that child's gender identity might change, or who cannot care for children with certain medial conditions or mobility needs, knowing that those circumstances may arise at any time and may lead to placement disruption. *See* SUMF ¶¶ 34-54. Defendants' experts made much of the overrepresentation of LGBTQ children in foster care generally, but they admitted there was "very poor data" on those numbers in Massachusetts. Goldberg Tr. at 153:8-12.

Even if Defendants had identified an interest specific to the Burkes, "[t]he creation of a system of exceptions … undermines [Defendants'] contention that its non-discrimination policies can brook no departures." *Fulton*, 593 U.S. at 542 (citing *Lukumi*, 508 U.S. at 546-47); *see also Mahmoud*, 606 U.S. at 567 (a "robust system of exceptions undermines the Board's contention that the provision of opt outs to religious parents would be infeasible or unworkable.") (cleaned up). This rule is fatal to Defendants' compelling interest argument. DCF cannot claim it has a compelling interest in barring the Burkes from caring for *any* child when licensed foster families can "decline placements for all kinds of reasons, including for LGBTQ youth." SUMF ¶ 57.

Rather, "[w]here the government permits other activities to proceed with precautions, it must show that the religious exercise at issue is more dangerous than those activities even when the same precautions are applied." *Tandon*, 593 U.S. at 63; *see also Fulton*, 593 U.S. at 541 ("Put another way, so long as the government can achieve its interests in a manner that does not burden religion, it must do so."). Defendants have not and cannot make such a showing as to the Burkes. There is no dispute that the Burkes "have a lot of strengths and really seem[ ] to understand adoption/foster care," particularly in adopting older children or those with mental health challenges. *Supra* at 5. Nor is there any dispute that the Burkes would love any child in their care and would turn no child away. *Id.*

Given all this, Defendants had a less restrictive alternative, the very one recommended in the licensing study: license the Burkes, place children in their home who would be a good match, and address any concerns about placement fit the same way DCF already does: through regular check-ins, to make sure placements are successful. Federal law uses a similar approach, asking states to

have "[d]esignated [p]lacements" available who have the skills to care for children who identify as LGBTQ. 45 C.F.R. § 1355.22 (2024). A number of states have specific protections that prevent the wholesale exclusion of families with religious beliefs like the Burkes'.[5] Defendants have presented no evidence indicating that the needs of youth in their care are any different than the youth in these other states—much less the nation generally—or that youth in these other states fare worse than youth in Massachusetts because of other states' licensing policies. *See* Ex. WW, Goldberg Tr. at 141:5-12 ("I'm unaware of any research that has examined that.").

Despite all this, Defendants have claimed—contrary to their current public representations—that it is not possible to address concerns at the placement stage because LGBTQ identities may develop over time. *See* SUMF ¶¶ 41-43 (discussing expert reports). But Defendants' proffered expert, Christopher Bellonci, who testifies that this is "essential" for children, also "support[s]" the federal approach, which he concedes does not require all families to be affirming. Ex. ZZ, Deposition of Dr. Christopher Bellonci (Bellonci Tr.) at 88:1-15, 90:7-9, 146:9-147:6. Defendants cannot prove a less restrictive means is unavailable when multiple states and the federal government have found a workable solution—and Defendants themselves have since adopted one. The Supreme Court said as much in *Holt v. Hobbs*, where Arkansas rejected an alternative that was in use in the federal prisons and many states: "That so many other prisons allow" the religious exercise at issue "while ensuring prison safety and security suggests that the Department could

---

[5]    Ark. Code Ann. § 9-28-417(b)(2)(A)–(B) (protecting foster and adoptive parents' "sincerely held religious beliefs regarding sexual orientation or gender identity"); Ariz. Rev. Stat. § 8-921 (protecting foster or adoptive parents' right to raise child "consistent with the person's religious belief or exercise of religion"); *accord* Idaho Code § 16-1648; Kan. Stat. Ann. § 38-2293(a)(1) (state may not require foster parents "to affirm, accept or support any governmental policy regarding sexual orientation or gender identity that may conflict with the person's sincerely held religious or moral beliefs"); *accord* Tenn. Code Ann. § 37-6-102; Miss. Code. Ann. §§ 11-62-3 to -5 (protecting those who "instruct, or raise a child" consistent with religious beliefs that sex is "immutable"); Tex. Hum. Res. Code Ann. § 45.004 (prohibiting discrimination against foster-care providers who decline to provide services that conflict with their sincere religious beliefs); Wash. Admin. Code 110-148-1630 (will "make exceptions and license" families who "do not meet the minimum licensing requirements if we find that [they] can provide for the safety, health and well-being of children in [their] care.").

satisfy its security concerns through a means less restrictive than denying petitioner the exemption he seeks." 574 U.S. at 368-69. As the Ninth Circuit recently held when rejecting similar arguments from Oregon to deny a foster license in similar circumstances, "it is not narrowly tailored to deem [Plaintiff] categorically ineligible to adopt any child from foster care based on religious views that many Americans sincerely hold and the possibility of speculative harms to hypothetical children." *Bates*, 146 F.4th at 800.

Accordingly, Defendants fail their burden to satisfy strict scrutiny.

## II. Defendants violated the Burkes' free speech rights (Count V).

DCF's LGBTQIA+ Nondiscrimination Policy required that foster parents "be respectful of how individuals ask to be identified and use the terms an individual uses to describe themselves." Ex. LL, 2022 LGBTQIA+ Nondiscrimination Policy at 2.[6] At the time of the denial, DCF interpreted that policy to require foster parents to use a child's preferred pronouns. Silvia 30(b)(6) Tr. at 92:12-93:15. If doing so would violate foster parents' religious beliefs, "then, no, they should not be licensed" to foster *any* child. *Id.* at 94:18-19. Thus, DCF's prior pronoun policy would condition the Burkes' license on their willingness to say something contrary to their religious beliefs. *See* M.Burke Tr. at 69:13-17; C.Burke Tr. at 201:19-22. This is a classic case of compelled speech: "The most obvious infringement on First Amendment rights in the context of compelled speech occurs when individuals are forced to make a direct affirmation of belief." *Wash. L. Found. v. Mass. Bar Found.*, 993 F.2d 962, 977 (1st Cir. 1993); *accord Janus v. AFSCME*, 585 U.S. 878, 893, 913 (2018) ("When speech is compelled … individuals are coerced into betraying their convictions" "on controversial topics such as … sexual orientation and gender identity.").

DCF also requires foster parents to support and respect a child's sexuality and gender identity, 110 CMR 7.104—and treats hesitance to do so as another reason to disqualify parents completely. The Burkes believe that the way to support a child is to help them honor their body as a perfect gift from God, made in God's image, and either male or female. M.Burke Tr. at 69:13-17; C.Burke

---

[6]   DCF's policy has since been amended to omit "and use the terms an individual uses to describe themselves." *See* Ex. UU, 2025 LGBTQIA+ Nondiscrimination Policy, at 2.

Tr. at 181:2-10. DCF would require the Burkes to adopt its preferred message when speaking to a child, one that excludes their religiously informed beliefs. DCF denied the Burke's application for *one* reason: DCF believed they "would not be affirming to a child who identified LGBTQIA." Ex. AA, Burkes' DCF File at 67. Thus, DCF punished the Burkes both for what they did say in their hours-long conversations with DCF's contractor, and for what they did not say, as they would not commit to speak DCF's preferred message.

DCF's policies are a content-based speech restriction that can't pass strict scrutiny. *See supra* I.D. Worse still, Defendants should have known that. Here, the Burkes' right to speak *or not* could not have been clearer: DCF sought "a direct affirmation of belief." *Wash. L. Found.*, 993 F.2d at 977. And "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in … religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). "[T]he government may not deny a benefit to a person on a basis that infringes his constitutionally protected … freedom of speech even if he has no entitlement to that benefit." *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 59 (2006).

Despite these clear holdings, Defendants conditioned the Burkes' ability to foster *any* child upon the "direct affirmation of belief[s]" they do not hold. *Wash. L. Found.*, 993 F.2d at 977. They could say things they object to, and be mouthpieces for DCF's preferred messages about human sexuality, Ex. LL, 2025 LGBTQIA Nondiscrimination Policy at 2, or they could not foster any child. The choice itself was clearly unconstitutional in 2023. *See Rumsfeld*, 547 U.S. at 59. Massachusetts' interest in its foster system cannot override the First Amendment.

### III. The Burkes are entitled to injunctive, declaratory, and monetary relief.

The Burkes are entitled to three forms of injunctive relief to remedy the constitutional violations. *See* Compl. at 34. First, the Burkes seek an order enjoining Defendants from declining to issue a foster care license to them based on their religious beliefs, speech, or exercise. Second, the Burkes request the Court to prohibit Defendants from construing or applying their policies in a manner that discriminates against prospective foster parents on these grounds. Third, the Burkes

ask that Defendants be required to expunge or amend the Burkes' file to remove any record of the discriminatory statements, actions, and denial at issue, and to take further appropriate measures necessary to prevent additional harm resulting from the unconstitutional denial.

A party is entitled to a permanent injunction when it can show: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *CoxCom, Inc. v. Chaffee*, 536 F.3d 101, 112 (1st Cir. 2008) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

The Burkes suffered an irreparable injury because DCF violated their First Amendment rights. "[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Mahmoud*, 606 U.S. at 569. Second, the Burkes' rights cannot be protected going forward only with money damages; they need to be protected from further discrimination and the effects of the prior discriminatory denial. Third, the balance of hardships tips decidedly in the Burkes' favor. There is no hardship to DCF being enjoined from enforcing an unconstitutional decision. Given "the strong showing made by the [Burkes] here, and the lack of a compelling interest supporting [DCF's] policies" against them, "an injunction is both equitable and in the public interest." *Id.*

In addition, Plaintiffs seek declaratory relief to the effect that Defendants cannot engage in further discrimination against the Burkes and those who share their religious beliefs, and a declaration that 110 CMR 7.104(1)(d) and its supporting policies cannot be construed to exclude foster parents on religious grounds. *See* Compl. at 34. Although Defendants have amended those policies, declaratory judgment is necessary, given the vague language used and the highly discretionary nature of DCF's licensing process. The law and undisputed facts entitle the Burkes to this relief to vindicate their constitutional rights, to clear their names from an unconstitutionally motivated rejection, and to ensure their eligibility to foster a child in the future.

Finally, the factual record proves that Defendants violated the Burkes' clearly established First

Amendment rights, as detailed above. Accordingly, the Burkes are entitled to damages against Defendants in their personal capacities, recovery of all costs and expenses, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988, and such further relief as the Court deems just and proper. The Burkes request a hearing to determine the amount of damages.

## CONCLUSION

The Court should grant the Burkes' motion for partial summary judgment.

## REQUEST FOR ORAL ARGUMENT

Plaintiffs request oral argument on the dispositive motions.


Dated: March 13, 2026                          Respectfully submitted:

                                               /s/ Lori H. Windham
Michael Gilleran                               Lori H. Windham
 BBO No. 192210                                DC Bar No. 501838
Fisher Broyles, LLP                            Benjamin Fleshman
75 State Street                                DC Bar No. 1781280
Suite 100                                      Robert Ellis
Boston, MA 02109                               DC Bar No. 90035259
(781) 489-5680                                 Timothy P. Kowalczyk*
                                               DC Bar No. 90020181
                                               The Becket Fund for Religious Liberty
                                               1919 Pennsylvania Ave, N.W., Suite 400
                                               Washington, DC 20006
                                               (202) 955-0095
                                               *lwindham@becketfund.org*
                                               *pending admission pro hac vice

## CERTIFICATE OF COMPLIANCE

This memorandum complies with the word limit of Local Rule 7.1(b) because it exceeds 20 pages, double-spaced, but does not exceed 30 pages, double-spaced, by the leave of the Court. *See* ECF 167.

<u>/s/ Lori H. Windham</u>
Lori H. Windham

## CERTIFICATE OF SERVICE

I certify that this document, filed through the Court's ECF system on March 13, 2026, will be sent electronically to registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ Lori H. Windham
Lori H. Windham