# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

MICHAEL and CATHERINE BURKE,

    *Plaintiffs*,

    v.

KIAME MAHANIAH, in his official capacity as Secretary of the Massachusetts Executive Office of Health and Human Services, *et al*.

    *Defendants*.

Civil Action
No. 3:23-cv-11798-MGM

**PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS**

Plaintiffs submit the following Statement of Undisputed Material Facts pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1 in support of their motion for summary judgment.

| Exhibit | Document Name |
|---------|---------------|
| A | Deposition of Michael Burke (M.Burke Tr.) |
| B | Full Circle Home Study Support Documents |
| C | Deposition of Catherine Burke (C.Burke Tr.) |
| D | Full Circle Home Study |
| E | Plaintiff's Interrogatory Responses |
| F | Deposition of Dawn Sweetman (Sweetman Tr.) |
| G | Deposition of Tywanna Jones (Jones Tr.) |
| H | Massachusetts Department of Children & Families Quarterly Profile - FY2023 Q3 (DCF Quarterly Profile) |
| I | Deposition of Sharon C. Silvia (Silvia 30(b)(6) Tr.) |
| J | Licensing of Foster, Pre-Adoptive, and Kinship Families (Licensing Policy) |
| K | Deposition of Anna Moynahan (Moynahan Tr.) |
| L | Deposition of Luz Estrada (Estrada Tr.) |
| M | Deposition of Theresa Harris (Harris Tr.) |
| N | Deposition of Angel Emerson (Emerson Tr.) |
| O | Deposition of Caitlyn Levine (Levine Tr.) |
| P | Deposition of Virginia Peel (Peel 30(b)(6) Tr.) |
| Q | Deposition of Stacy Clark (Clark Tr.) |
| R | Deposition of Alisha Morrissey (Morrissey 30(b)(6) Tr.) |

| S | Deposition of Euphemia Molina (Molina Tr.) |
|---|---|
| T | Licensing Study |
| U | Licensing Study |
| V | Licensing Study |
| W | Licensing Study |
| X | LGBTQ Youth in the Massachusetts Child Welfare System Report (LGBTQ Youth Report) |
| Y | DCF LGBTQIA+ Liaisons Statewide Meeting Minutes (LGBTQIA+ Liaison Minutes) |
| Z | DCF Recruitment Plan |
| AA | Burkes' DCF File |
| BB | Adoption Licensing Study (Licensing Study) |
| CC | DCF Internal Emails |
| DD | DCF Internal Emails |
| EE | Dawn Sweetman Email Exchange |
| FF | Tywanna Jones Email Exchange |
| GG | Molina Messages |
| HH | Molina Internal Messages |
| II | Defs' Resp. to Pls' First Interrogatories |
| JJ | Licensing Study |
| KK | DCF Foster Training, |
| LL | 2022 LGBTQIA+ Nondiscrimination Policy |
| MM | Defs.' Interrogatory Responses |
| NN | Licensing Study |
| OO | [reserved from prior motion] |
| PP | DCF's Emergency Regulatory Filing |
| QQ | Amended 110 CMR 7.104 |
| RR | 2025 Licensing Policy |
| SS | Old Foster Parent Agreements |
| TT | New Foster Parent Agreement |
| UU | 2025 LGBTQIA Nondiscrimination Policy |
| VV | Expert Report of Thomas Charles Rawlings (Rawlings Report) |
| WW | Deposition of Dr. Abbie Goldberg (Goldberg Tr.) |
| XX | Prior Version of 110 CMR 7.104 |
| YY | Denial Letter |
| ZZ | Deposition of Dr. Christopher Bellonci (Bellonci Tr.) |
| AAA | Defs' Resp. to Pls' Requests for Admission |

## I.      Michael and Catherine Burke.

1.  Michael and Catherine Burke are the plaintiffs in this case. Since their marriage in 2018, the Burkes have wanted to become parents. *See* ECF 6 ¶¶ 41-42 (Compl.).

2.   Raised in the Catholic Church, both Michael and Catherine have found meaning in their shared faith. *See id.* ¶¶ 36-39.

3.  They remain deeply committed to the Catholic Church and its teachings, including those regarding marriage, human sexuality, and gender. *See id.* ¶¶ 36-39, 114-15.

4.  For years, Michael and Catherine provided music for multiple Masses and liturgies for the Diocese of Springfield, with Michael at the organ and Catherine as a cantor. *Id.* ¶¶ 36, 39.

5.  Catherine worked for many years as a substitute teacher and a paraprofessional helping children with special needs. *Id.* ¶ 34.

6.  Michael served for four years in the Marine Corps, including a deployment in Iraq that concluded in 2005 when he returned home and was honorably discharged from service. *Id.* ¶ 37.

7.  As a result of his experiences in Iraq, Michael has suffered from post-traumatic stress disorder (PTSD). *Id.* ¶ 38.

8.  Because Michael and Catherine were unable to have children after years of trying, they decided to pursue adoption through a private agency called Full Circle Adoption. *Id.* ¶¶ 42-43; Ex. A, Deposition of Michael Burke (M.Burke Tr.) at 28:20-29:6.

9.  Full Circle "bases its qualifications for prospective adoptive parents on the clinical assessment of factors enumerated in the regulations of the Massachusetts … Department of Children and Families." Ex. B, Full Circle Home Study Support Documents at 30.

10. Full Circle put the Burkes through a thorough assessment and home study that included, among many other things, asking the Burkes how they would respond to youth who came out as LGBTQ. *See* M.Burke Tr. at 30:16-31:14; Ex. C, Deposition of Catherine Burke (C.Burke Tr.) at 36:6-37:7; *see generally* Ex. D, Full Circle Home Study.

11. The Burkes informed Full Circle that they would love a child no matter their sexual orientation or gender identity. *See* C.Burke Tr. at 36:6-37:7; Ex. E, Plaintiffs' Interrogatory Responses at 4-5.

12. While Full Circle recommended the Burkes be approved to become adoptive parents, the cost of private adoption proved an insurmountable barrier for the Burkes. Ex. D, Full Circle Home Study at 3; Compl. ¶ 43-44.

13. The Burkes then began exploring the possibility of fostering or adopting through the Massachusetts Department of Children and Families (DCF). Compl. ¶ 45.

## II.    Massachusetts needs more foster homes.

14. Massachusetts needs more foster homes. Ex. F, Deposition of Dawn Sweetman (Sweetman Tr.) at 36:7-10; 39:14-16 (agreeing there is a "real need currently for more foster parents"); Ex. VV, Expert Report of Thomas Charles Rawlings (Rawlings Report) at 13-15 (describing loss of over 1,000 foster homes in Massachusetts between 2018 and 2023).

15. In particular, DCF needs more homes that are willing and able to take children with specific mental health challenges, children with moderate or severe medical conditions, and sibling sets. *See, e.g.*, Ex. G, Deposition of Tywanna Jones (Jones Tr.) at 181:18-183:6.

16. Due to the lack of available homes, DCF has had to house children in what it calls "[n]on-referral locations"—including "hospital[s]" (even when the child was not sick) or "other state agenc[ies]"—because they had no other place to go. Ex. H, Massachusetts Department of Children & Families Quarterly Profile - FY2023 Q3 (DCF Quarterly Profile) at 1; *see also* Ex. I, Deposition of Sharon Silvia (Silvia 30(b)(6) Tr.) at 223:13-225:3; Sweetman Tr. at 37:9-20; Ex. AAA, Def's Resp. to Pls' Requests for Admission at 3-4 (admitting the same). Foster children have even been housed in apartments rented by DCF, at considerable expense, due to lack of family homes. Silvia 30(b)(6) Tr. at 231:4-234:18. And foster children are sometimes transported to different towns to find a foster family. *Id.* at 222:4-7.

17. DCF admits that it "would not typically want a child to be in that type of situation." *See* Silvia 30(b)(6) Tr. at 221:5-17; *see also id.* at 219:11-225:3.

### III.    DCF's foster parent application process and policies.

18. When a family applies to become a foster parent, also called a resource parent, with DCF, they must demonstrate that they meet 17 different criteria "to the satisfaction of the Department." Ex. XX, Prior Version of 110 CMR 7.104; *see also* 110 CMR 7.100, 7.104, 7.107.

19. These criteria "can be subjective" and, at the time of the Burkes' application, included demonstrating their "ability" to "promote the physical, mental, and emotional well-being of a child … including supporting and respecting a child's sexual orientation or gender identity" and to "respect and make efforts to support the integrity of a child's racial, ethnic, linguistic, cultural and religious background." Ex. XX prior 110 CMR 7.104(1)(d)(e); Silvia 30(b)(6) Tr. at 55:8-56:13 (stating some of DCF's expectations for foster parents "can be subjective").

20. DCF interpreted the "support[ ]" and "respect[ ]" requirement to include following the then-current versions of DCF policies, including its LGBTQIA+ Nondiscrimination Policy and its Gender-Affirming Medication Consent Policy. Silvia 30(b)(6) Tr. at 92:20-93:15, 97:2-4, 107:3-108:2, 200:10-201:4. A family who would not agree to use a child's preferred pronouns "should not be licensed." *Id.* at 94:5-19.

21. To determine whether a family should be licensed, the social worker assessing the applicant family compiles all of the information gathered about the family, along with their own subjective analysis of the family's strengths, weaknesses, and fitness for fostering or adopting, into a caregiver training assessment, or home study. *See* Ex. J, Licensing of Foster, Pre-Adoptive, and Kinship Families (Licensing Policy) at 17-26.

22. This home study also contains the social worker's recommendation regarding whether to approve or deny the family's application. *See id.* at 25.

23. After the social worker makes a recommendation, that file may then be passed to the Adoption Development Licensing United (ADLU) Supervisor for review and recommendation. *See id.*

24. The family's full file is then passed to the Licensing Review Team (LRT), who is tasked with deciding whether to approve or deny the application. *See id.* at 25-27.

25. This team includes the social worker responsible for the family's application, their supervisor, and the regional program manager over that particular region. *See id.* at 26.

26. The LRT may also invite additional specialists—such as a mental health specialist or LGBTQ+ specialist—or senior staff to participate in its final review of the family's application if there are complex situations that require additional expertise. Ex. K, Deposition of Anna Moynahan (Moynahan Tr.) at 25:1-26:1.

27. All who are present are expected to participate, and they share equally in the LRT's final decision. *See* Silvia 30(b)(6) Tr. at 60:5-17, 165:2-14.

28. Though the LRT is not rubber-stamping the social worker's report, it is extremely rare for the LRT or, prior to that system, for DCF supervisors to decide not to license an individual or family that has been recommended for approval. *See, e.g.*, Ex. L, Deposition of Luz Estrada (Estrada Tr.) at 50:6-16 (can't recall a single instance in 23 years with DCF); Jones Tr. at 125:19-126:13 (of the families Jones has recommended to the LRTs, "only the Burkes … have been denied"); Sweetman Tr. at 315:1-316:6 (recalling only 2 incidents of reversal in 22 years with DCF).

29. This is particularly true when the reversal is based solely on information contained in the initial home study report. *See* Ex. M, Deposition of Theresa Harris (Harris Tr.) at 105:3-106:9, 109:9-15 (reversal "infrequent[ ]," and even then only with new information; unaware of any such incidents where no new information was presented).

**IV.    DCF's policy is discretionary, case-by-case, and exceptions have been made.**

30. Every applicant family is unique. Accordingly, the social worker and the LRT need to assess each family's suitability for foster care "on a case-by-case basis," Ex. N, Deposition of Angel Emerson (Emerson Tr.) at 78:16-82:14, using their best judgment about whether the family meets each licensing requirement "to the satisfaction of the Department," 110 CMR 7.104. *See, e.g.*, Ex. O, Deposition of Caitlyn Levine (Levine Tr.) at 128:10-129:9; Sweetman Tr. at 49:10-51:15; Ex. P, Deposition of Virginia Peel (Peel 30(b)(6) Tr.) at 142:15-20; Silvia 30(b)(6) Tr. at

30:15-31:12, 34:3-5; Ex. Q, Deposition of Stacy Clark (Clark Tr.) at 66:14-68:14; Ex. R, Deposition of Alisha Morrissey (Morrissey 30(b)(6) Tr.) at 194:6-22.

31. Every individual capacity Defendant agreed, characterizing the determination whether a family meets these standards as "not an exact science," Sweetman Tr. at 197:7-14; one that "depends on each … person's and each family's circumstance," Moynahan Tr. at 59:15-22; a "judgment call"; or "case-by-case." Estrada Tr. at 39:13-20 ("judgment call"); Levine Tr. at 128:20-129:9 (same); Clark Tr. at 68:7-22 ("case-by-case"); Emerson Tr. at 27:1-9 (same); Harris Tr. at 61:20-62:11 (same); Jones Tr. at 107:8-12 (same); Ex. S, Deposition of Euphemia Molina (Molina Tr.) at 169:17-170:2 (same); *see also* Emerson Tr. at 60:17-21 ("Our policy does provide for discretion, yes.").

32. Every individual Defendant testified either that the application of policies required judgment, that they could not say that the application of the policies was always clear, that DCF personnel sometimes disagreed about how to apply a policy, or that DCF personnel sometimes disagreed on whether a family could be licensed. *See, e.g.*, Clark Tr. at 86:20-87:1 (in some LRT meetings, "people expressed different views about whether a policy was met"); Emerson Tr. at 59:10-19 (noting "[d]isagreements about licensing a home" and that "experienced people could come to different conclusions about whether to license a family"); Estrada Tr. at 74:16-20 (agreeing "different people with DCF, reasonable people, could disagree about whether a family should be licensed"); Harris Tr. at 55:1-6 ("in the LRT, you need to take what you know about that family and use your best judgment to determine whether they would provide a safe and supportive home"); Jones Tr. at 151:16-18 ("I can't answer if it's clear-cut. I--I know that whenever we meet, if there are concerns, the policy's always applied."); Jones Tr. at 120:20-121:10 (noting two recommended approvals for the Burkes); Sweetman Tr. at 217:1-14 (noting one additional recommended approval for the Burkes); Levine Tr. at 129:3-12 (her "understanding having been trained recently on DCF's policies" is that you "ultimately make a judgment call about whether this is sufficiently affirming for DCF's policy,"); Molina Tr. at 113:15-19 (LRT members could "disagree about whether a potential foster care applicant meets the criteria at issue"); Moynahan

Tr. at 79:7-10 ("different people in the room might have different views on whether the family meets the policies"); Sweetman Tr. at 149:7-16 ("I was in agreement." Q: "That the Burkes should have a--should receive their license, right?" A: "Yes." Q: "And that's based on your decades of experience and your understanding of the policy. You agreed that in--under your judgment of things that they should receive--they should be approved for a license, correct?" A: "Yes.").

33. In other words, when it comes to the application of DCF's policies, "It's not always clear cut. Nope. Nope." Sweetman Tr. at 277:6-7.

34. DCF does not expect every licensed foster family to be a match for every child. *Id.* at 40:19-41:17; Ex. AAA at 4.

35. DCF will license a foster family even if they have limitations on what children they can accept or that would be the best fit for their home. Sweetman Tr. at 47:1-11.

36. DCF has approved a family that specifically told DCF that they "do not feel equipped to support the needs of a LGBTQ child." Ex. T, Licensing Study at 3; Morrissey 30(b)(6) Tr. at 211:20-212:6, 217:18-218:17 (confirming this family was licensed as resource parents).

37. DCF has licensed families that told DCF that they were "concerned about [their] ability to raise a Black child," Ex. U, Licensing Study at 2, or "would prefer a child of her own racial background, white," Morrissey 30(b)(6) Tr. at 122:1-123:16, 125:3-12; Ex. V, Licensing Study at 2.

38. DCF has licensed families who say that a child who is sexually active would not be a good fit for their family or that they would not feel comfortable taking sexually active teens. Morrissey 30(b)(6) Tr. at 145:11-17; 162:8-163:13; Ex. JJ, Licensing Study at 3.

39. DCF cannot predict which children would become sexually active as teenagers. Morrissey 30(b)(6) Tr. at 162:13-15.

40. DCF has licensed families who were unwilling or unable to accept children of a particular sex. *See* Silvia 30(b)(6) Tr. at 122:15-123:2; Peel 30(b)(6) Tr. at 119:10-120:13; Morrissey 30(b)(6) Tr. at 179:9-18.

41. DCF "knows that [a] child's gender identity might change while they're in placement." Silvia 30(b)(6) Tr. at 120:13-121:13; *see also* Peel 30(b)(6) Tr. at 119:15-120:5.

42. DCF does not have clear data on the number of children who come out as LGBTQ+ prior to, during, or after their time in foster care. *See* Ex. WW, Deposition of Dr. Abbie Goldberg (Goldberg Tr.) at 67:6-10.

43. DCF does not keep complete data on the number of LGBTQ+ youth in its care. *Id.* at 62:15-17; ECF 127-14 at 10 ("Due to poor data collection within DCF, the percentage of DCF-involved youth who identify as LGBTQ in Massachusetts is unknown.").

44. DCF has licensed families that say they would be unable to accept a child with certain medical conditions. Morrissey 30(b)(6) Tr. at 50:3-16.

45. DCF has licensed families that say they cannot take a child in a wheelchair or with other physical disabilities. *Id.* at 144:10-145:10.

46. DCF also knows that severe medical needs, and even disabilities, can arise unexpectedly in children while they are placed in a home. *See, e.g.*, Peel 30(b)(6) Tr. at 122:21-123:12; Morrissey 30(b)(6) Tr. at 144:10-145:6.

47. DCF has licensed a family that is only open to children with certain sexual attractions but not others. Morrissey 30(b)(6) Tr. at 199:10-200:3, 202:4-13; Ex. NN, Licensing Study at 2.

48. DCF knows that the sexual attraction and sexual orientation of a child can change during the placement. Morrissey 30(b)(6) Tr. at 204:17-205:22.

49. DCF has licensed a foster parent who expresses "little tolerance for very Catholic churches." *Id.* at 150:5-14; Ex. JJ at 2.

50. Some foster children can belong to "very Catholic churches." Morrissey 30(b)(6) Tr. at 151:11-19.

51. DCF knows that a foster child can change their religion during placement and could convert to a "very Catholic" church during the placement. *Id.* at 152:19-153:2.

52. DCF has licensed foster parents who say they cannot accept a child with substance abuse issues. *Id.* at 129:1-17.

53. DCF has continued approving a foster license with the comment that "[a] teenager with substance abuse issues should not be placed in his home." *Id.* at 136:6-21.

54. DCF knows that a child can develop issues with substance abuse after a placement and DCF does not know which children will develop those behaviors later on. *Id.* at 137:10-17.

**V.    DCF allows families to reject children at the placement stage and moves children when needed.**

55. "Before" a particular "child is placed in a foster/pre-adoptive home," DCF must "provide the prospective foster/pre-adoptive parent with sufficient information about the child to enable the foster/pre-adoptive parent to determine whether to accept placement of the child." 110 CMR 7.112(1).

56. According to DCF, "[a] family has the right to say no to a placement." Silvia 30(b)(6) Tr. at 96:9-10; *see also id.* at 214:11-215:13.

57. A family can refuse to accept a child for placement in their home for any reason—including the child's sexual orientation or gender identity—and DCF will not necessarily revoke their license. *See* Morrissey 30(b)(6) Tr. at 116:10-117:2; Molina Tr. at 55:6-11, 100:21-101:11, 174:18-175:1 ("If the family said they're safe and affirming and then declined placement of a youth based on not feeling they could meet that youth's needs, then no, it wouldn't necessitate a revocation of their license."); *accord id.* at 55:6-8 (foster parents can "decline placements for all kinds of reasons, including for LGBTQ youth.").

58. After placement, there is an ongoing assessment for the family to determine if the placement is still a best fit. Morrissey 30(b)(6) Tr. at 207:12-18; Sweetman Tr. at 110:11-20; Silvia 30(b)(6) Tr. at 181:14-184:21.

59. DCF acknowledges that sometimes the placement might no longer be a good fit and the child needs to be moved to another placement. Morrissey 30(b)(6) Tr. at 207:19-208:1, 106:21-107:3.

60. DCF acknowledges that sometimes placements fail, including if the foster parent no longer feels comfortable continuing to parent the child. *Id.* at 209:12-210:5.

61. DCF acknowledges that not every foster child placement is permanent. *Id.* at 108:6-13.

62. For example, if a female child is placed in home that can, or will, only accommodate female children, and that child later identifies as male, "it's possible that the child might need to be placed in a different home." Peel 30(b)(6) Tr. at 119:22-122:22.

63. DCF will continue to license families after disrupted placements, Morrissey 30(b)(6) Tr. at 209:17-21, even multiple disrupted placements, *id.* at 229:10-19, 230:19-231:1.

64. It has been more common for children in Massachusetts to have multiple placements than in the rest of the country. *Id.* at 143:6-15.

65. "Data from the federal Fiscal Year 2019 showed that 38 percent of foster youth [in Massachusetts] had four or more placements during a single episode of removal from the home, compared to the national average of 22 percent." *See* Ex. X, LGBTQ Youth in the Massachusetts Child Welfare System Report (LGBTQ Youth Report), at 16-17; Morrissey 30(b)(6) Tr. at 107:4-108:22, 143:6-15.

## VI.    Not all licensed families will accept LGBTQ children.

66. Between 2009 and 2025, DCF had a licensing requirement that families "support and respect" a child's "sexual orientation and gender identity." Ex. XX at 3 (110 CMR 7.104).

67. In 2022, the Massachusetts Commission on Lesbian, Gay, Bisexual, Transgender, Queer, and Questioning Youth issued a report on the safety and wellbeing of LGBTQ youth in DCF's care. *See* Ex. X, LGBTQ Youth Report at 1.

68. The Commission found that, "[w]hile DCF may hope that all of its homes are affirming, the agency has not taken steps to ensure that is the case." *Id.* at 32.

69. DCF's then-existing list of supportive homes "contained only sixteen affirming homes across the state." *Id.* at 19; *see also* Ex. Y, DCF LGBTQIA+ Liaisons Statewide Meeting Minutes (LGBTQIA+ Liaison Minutes), at 3 ("The DCF LGBTQ Liaisons are currently aware of only **FIFTEEN** unrestricted homes in the state that are willing and able to take LGBTQ youth…."); Molina Tr. at 100:11-101:12 (Q: "And not all homes would necessarily accept every child with any particular sexual orientation or gender identity?" A: "Correct, or any characteristic.").

70. In 2023, many DCF offices across the state set recruitment goals to increase the number of "LGBTQIA affirming homes" within their areas. Ex. Z, DCF Recruitment Plan at 2 ("Increase the number of foster homes serving the pre-teen youth including LGBTQIA affirming homes."); *Id.* at 3 ("Increase the amount of long-term placement homes … focusing on all age groups, LGBTQIA+ affirming homes…."); *Id.* at 7 ("Increase the number of sustainable pre-teen and teen home [sic] in the Metro North area including LGBTQIA affirming homes."); *Id.* at 8 ("Identify Affirming homes for LGBTQ+ Youth."); *Id.* at 9 ("Increase the number of LGBTQIA+ [sic] (Affirming Homes) for children in care."). *See also* Silvia 30(b)(6) Tr. at 251:7-8 ("To increase the number of affirming homes for the Harbor Area Office."); *Id.* at 249:17-19 ("Increase the amount of long-term placement homes focusing on all age groups, LGBTQIA-plus affirming homes."); *Id.* at 247:7-9 ("Increase the number of foster homes serving the pre-teen youth including LGBTQIA affirming homes.").

71. The Holyoke Area made the particular goal to "increase the number of Foster Families that will *consider* children/youth who identify as LGBTQ+." Ex. Z, DCF Recruitment Plan at 4 (emphasis added).

72. Later in the year, that region reported that it "has on boarded or will on-board approximately 9 new foster homes"—but reported only "one new family that will begin MAPP in July of 2023 that will consider children who identify as LGBTQ+." *Id.* at 5-6.

73. DCF admitted that this "would suggest" that not all of the recruited families in that region would consider children identifying as LGBTQ being placed in their homes. Silvia 30(b)(6) Tr. at 253:13-255:8; *see also* Moynahan Tr. at 226:11-17 (Q: "Do you believe this statement is consistent with your prior testimony that every family must be willing to consider children who identify as LGBTQ+?" A: "Yeah, so the way that this is written is not—does not appear to be consistent.").

74. DCF "can't say that we know for a fact that every single family is affirming." Silvia 30(b)(6) Tr. at 109:7-8.

75. DCF maintains a list of LGBT-affirming homes pursuant to its policies and not every foster family is on that list. Sweetman Tr. at 47:12-21.

## VII.    The Burkes are denied a foster care license because of their religion.

76. The Burkes applied to become foster parents with DCF in January 2022. Compl. ¶ 102.

77. Defendant Tywanna Jones was assigned to be their caseworker and acted as their primary point of contact with DCF. C.Burke Tr. at 38:8-15.

78. Working collaboratively with Jones, the Burkes submitted comprehensive documentation about themselves, underwent extensive interviews and examination of their home, and participated in several hours of training. *See generally* Ex. AA, Burkes' DCF File (detailing interactions between DCF and the Burkes).

79. That training included 30 collective hours spanning the months of May and June to participate in the Massachusetts Approach to Partnership in Parenting (MAPP) course. Compl. ¶ 103; C.Burke Tr. at 102:20-103:1.

80. David Connors, the DCF employee who conducted the training, said the Burkes were a "solid resource[ ]" that had "a solid understanding of how trauma can effect [sic] people." Ex. AA at 118. He further reported that the Burkes were "active participants throughout MAPP and their comments often helped to enrich the training" and "[i]t is anticipated that they will work cooperatively with DCF throughout their adoption journey." *Id.*

81. At one point during the training, another DCF employee gave a presentation about working with LGBTQ youth in DCF's system. C.Burke Tr. at 104:17-105:14. She indicated that anyone who did not share DCF's views regarding LGBTQ youth had "no business working with the Department." *Id.*

82. Connors then reassured the participants that this was not, in fact, DCF's position and that DCF would work with families of all backgrounds. *Id.*

83. In September 2022, Jones went on personal leave and Defendant Dawn Sweetman (Jones' supervisor) temporarily took over as the point of contact with the Burkes. *See* Sweetman Tr. at 68:6-71:18.

84. Sweetman engaged Linda-Jeanne Mack, who worked for the private agency 18 Degrees, to complete the Burkes' home study on DCF's behalf. *Id.* at 70:3-12.

13

85. Sweetman had worked with Mack before and considered her to be someone who does good work and is trustworthy, careful, and thorough. *Id.* at 70:13-71:2.

86. Mack had contracted with DCF before, did "great work," and was familiar with DCF policies. *See id.* at 72:1-11, 138:5-12, 256:6-19.

87. Mack spent several hours interviewing the Burkes to gather as complete a picture of them as possible. C.Burke Tr. at 136:22-137:1.

88. During the first interview, the Burkes shared the concerns that had surfaced during their MAPP training about the potential for their religious beliefs to become a hindrance to their application. *See* Ex. BB, Adoption Licensing Study (Licensing Study) at 26. Mack asked them "about their feelings regarding parenting children and youth who identify as LGBTQIA++." *Id.*

89. The Burkes explained their Catholic religious beliefs regarding marriage and sexuality. *See id.* at 26-28.

90. They emphasized that they would love and welcome any child placed in their home but would not change their religious beliefs. *See id.* at 26-27; C.Burke Tr. at 149:13-22.

91. When asked if they would kick a child out of their home if they identified as LGBTQ, the Burkes said they would not. *See* Ex. BB at 27; Ex. CC, DCF Internal Emails at 2.

92. Following that first interview, Mack wrote to Sweetman and her own supervisor at 18 Degrees to express that the Burkes were "lovely people," but she had some "concerns" about the Burkes' responses. *See* Ex. CC at 5.

93. She wrote that the Burkes "had the 'right answers' but they are not supportive of LGBTQIA+ youth." *Id.* While she reported that the Burkes "have a lot of strengths ... and really seem[ ] to understand adoption/foster care," "their faith is not supportive and neither are they." *Id.*

94. Sweetman responded by asking "how significant is [sic] their religious beliefs"? *Id.* at 2.

95. Sweetman testified that if a religious belief is not supportive but the family says the belief is not significant to them, then "we're on the right road." Sweetman Tr. at 98:17-100:15.

96. Sweetman encouraged Mack to gather more information and then join "a panel of folks from regional office" to discuss a licensing decision. Ex. CC at 2.

97. Mack returned to the Burkes for an additional round of interviews focused primarily on their willingness to parent LGBTQ youth. *See* Ex. AA at 55-56.

98. The Burkes, again, emphasized their religious beliefs and their willingness to love and support any child that came into their home. *See* Ex. BB at 27-28.

99. They also informed Mack that they would not attempt to have the child undergo what she described as conversion therapy. *See* Ex. AA at 56.

100. Mack then wrote to Sweetman, again, informing her of the Burkes' responses to her follow-up questions. *See* Ex. DD, DCF Internal Emails at 1-2.

101. Though Mack stated that she did "not agree" with everything the Burkes said, she said she was "less concerned about the LGBTQIA+ issue than before" and was "feeling a bit better" about the Burkes' application. *Id.*

102. Sweetman responded: "Ok, still don't love this, but I think it is workable as well." *Id.* at 1.

103. Mack prepared a report detailing her conversations with the Burkes and offering an ultimate licensing recommendation. *See* Ex. BB.

104. Mack wrote of the Burkes' "many strengths," including their ability "to truly connect and support a child in a meaningful way" and their openness "to a variety of children who have different levels of need, including children who are blind or deaf, have moderate medical needs, and have histories of mental health challenges." *Id.* at 31-32.

105. Mack added her own professional assessment that the Burkes "would be a great match for a child who is deaf." *Id.* at 32.

106. Mack also gave her judgment that "it would be ideal to consider them for a child who is waiting because of a medical need." *Id.*

107. Mack also noted her "apprehension about recommending them as a resource family due to the couple's views related to people who identify as LGBTQIA++. … They are heavily involved in their Catholic Church and cite their religious views as their primary reason for seeing LGBTQIA++ individuals in this way." *Id.* at 31.

108.  Mack wrote, "Unfortunately, it is hard to predict the future, but this writer believes there is some potential for the couple" to "come around" "with education and ever-changing values in the church community." *Id.* at 31-32.

109.  Ultimately, however, the Burkes' "willingness to parent a child with" significant challenges "outweighed [Mack's] worry about their potential unwillingness to accept an LGBTQIA++ child in the future." *Id.* at 32.

110.  Mack recommended "approval of Catherine and Michael Burke" as foster parents "with some conditions" around the types of children that would be best suited for their home. *Id.*

111.  This report was sent to Jones and Sweetman in January 2023. In an email to Mack's supervisor, Sweetman said, "I agree with [Mack]'s assessment, but we will see what management says here about licensing them." Ex. EE, Dawn Sweetman Email Exchange at 1.

112.  Ultimately, both Jones and Sweetman recommended approval of the Burkes and passed the licensing study to the next phase, the LRT. *See, e.g.*, Ex. FF, Tywanna Jones Email Exchange at 1 ("I confirmed with my supervisor yesterday, she approved your license study. … You are one step closer."); Sweetman Tr. at 217:2-14, 218:7-14.

113.  On March 31, 2023, the Burkes' LRT convened to decide whether to approve their license. Harris Tr. at 76:17-77:1.

114.  The Burkes' LRT meeting was the first such meeting that DCF had conducted in that region, pursuant to a newly implemented policy. *Id.* at 77:2-4. In addition to the required attendees, several others were invited to participate to experience the new process firsthand. *See id.* at 77:5-78:3.

115.  The participants included each of the individual-capacity defendants. *See id.*

116.  Although Emerson, Estrada, Molina, and Harris were not directly responsible for the Burkes' file, they were expected to be active participants and "were part of the panel that made the end decision." *Id.* at 78:11-79:1.

117. In the lead-up to the LRT, Molina "was pouring [sic] through and reviewing" DCF's license-in-training and safe-and-supportive "policies frequently to try to absorb and learn them," bringing this knowledge to the LRT. Molina Tr. at 188:8-191:20.

118. Mack—the only individual who had ever spoken with the Burkes regarding their beliefs and the individual who wrote the initial report recommending approval—was not included in the LRT. *See* Sweetman Tr. at 270:5-13, 312:2-313:16; Levine Tr. at 103:21-104:4.

119. As the author of the home study is usually there to help clarify anything in the report, this was "not the standard" operating procedure. Sweetman Tr. at 313:1.

120. The LRT denied the Burkes' application "[b]ased on this families [sic] beliefs about children who identify as LGBTQIA+." Ex. AA at 60; Peel 30(b)(6) Tr. at 74:2-16 (Q: "And this reflects the final decision of the [LRT]; is that correct?" A: "That is my understanding, yes." Q: "Okay. And this also reflects the official reasoning for the denial of the Burkes' license study; is that correct?" A: "That's correct."); Ex. GG, Molina Messages at 2 ("The decision of the team was to deny the initial caregiver assessment based on [ ] the family's views about LGBTQIA+ youth.").

121. Members of the LRT identified no other reason the Burkes should be denied. *See, e.g.*, Harris Tr. at 98:11-99:4; Emerson Tr. at 119:6-8; *see also* Molina Tr. at 192:7-9 (at the LRT, "I probably pointed out … here's where LGBTQ is mentioned in the new policies.").

122. Every member of the LRT knew these beliefs were rooted in the Burkes' Catholic faith. *See, e.g.*, Ex. BB at 31 ("They are heavily involved in their Catholic Church and cite their religious views as their primary reason for seeing LGBTQIA++ individuals in this way."); Levine Tr. at 93:20-94:4 (Q: "And you knew, having read this assessment, that the Burkes's beliefs on LGBTQIA individuals was tied to their religious beliefs, right?" A: "Yes."); Harris Tr. at 95:13-96:10 (Q: "… [Y]ou understood … that their beliefs stem from their Catholic faith?" … A: "Yes."); Molina Tr. at 171:2-4 ("The LRT acknowledged that the family attributed their beliefs to their faith."); Emerson Tr. at 122:18-124:4, 126:7-14 ("[I]t was mentioned in the CTA, so—so folks did know."); Sweetman Tr. at 191:6-15 (Q: "… [Y]ou understood that it was their religious views that was the primary reason for their views on the LGBT, right?" A: "I think so."); Clark Tr. at 113:2-

7, 116:3-19 (acknowledging reading the study before the LRT meeting and the study must have been discussed at the meeting); Jones Tr. at 84:8-14 (same); Moynahan Tr. at 155:11-21 (same); Peel 30(b)(6) Tr. at 92:15-22, 95:6-20 ("I think it's the Department's understanding that their beliefs are based in their religion—their beliefs, the Burkes' beliefs are based in their religion. Yes.").

123.   Sweetman testified that she was aware that members of other religions have beliefs about sex, gender, and marriage that are similar to the Burkes' beliefs. *See, e.g.*, Sweetman Tr. at 192:5-14.

124.   The LRT concluded it would not be possible to license the Burkes and simply limit the children placed in their home based on the child's age, gender identity, or sexual orientation. *See, e.g.*, Ex. AA at 60; Levine Tr. at 99:1-15; Harris Tr. at 91:7-16.

125.   All members of the LRT agreed to the decision to deny the Burkes because of their beliefs. *See, e.g.*, Sweetman Tr. at 275:8-276:2; Molina Tr. at 181:14-15 (there was "a group consensus that they just weren't licensable"); Levine Tr. at 104:14-18; Moynahan Tr. at 147:20-22; Clark Tr. at 122:2-12; Harris Tr. at 95:21-96:10; Jones Tr. at 247:2-12.

126.   The decision of the LRT is the decision of the entire team. Silvia 30(b)(6) Tr. at 165:5-14.

127.   No member of the LRT later attempted to raise any objection with management or others in DCF over the denial of the Burkes' application. *See, e.g.*, Clark Tr. at 122:15-124:17; Harris Tr. at 96:11-20.

128.   March 31, 2023, the date of the LRT meeting, was also Transgender Day of Visibility, which is commonly abbreviated "TDOV."

129.   On April 4th, 2023, Defendant Molina wrote to a group of LGBTQ Liaisons within DCF—a group that included Defendant Levine—stating: "Hey Team, I met [Levine] on 3/31 (TDOV by coincidence) as we were both members of a License Review Team. We discussed a caregiver assessment (in old language, license study) of a couple looking to adopt through DCF. They were transparent in not believing trans people exist, seeing it as chemical castration, etc. I

was able to point to language in the new family resource policy regarding foster parents needing to 'assure that a child placed in their care will experience a safe, supportive and stable family environment that is free from abuse and neglect; support connections to the child's racial, ethnic, linguistic, cultural and religious background, sexual orientation and gender identity, and community and family of origin'. The LRT decided to deny the caregiver assessment based on their un-moveable stance regarding trans people and inability to support and affirm a child placed with them should they come out later in life (they were interested in littles). **when policy works to protect people**" Ex. HH, Molina Internal Messages at 2; *see also* Molina Tr. at 205:18-206:8.

## VIII.  DCF alters the Burkes' home study.

130.  When the Burkes were notified of the denial, they were "devastated." Compl. ¶ 145; *see also* C.Burke Tr. at 92:1-95:9.

131.  They requested a fair hearing to challenge the LRT's discriminatory decision. M.Burke Tr. at 155:7-11.

132.  Hearing this and knowing the Burkes would be entitled to receive their records as part of the process, Sweetman became concerned: "My worry is that they are saying we are discriminating against their religious beliefs, and it feels messy to have one eval say it's sort of okay and then us say it's not." Sweetman Tr. at 336:6-10.

133.  Sweetman reached out to DCF's central office for guidance on whether the Burkes should receive the original home study that recommended approval as part of the fair hearing process. *Id.* at 313:17-314:22, 327:1-334:9.

134.  Central office instructed Sweetman not to make any changes to the home study but to maintain the original study as written and then add in the final decision as an addendum. *See id.* at 318:7-320:7.

135.  DCF's attorney also told Sweetman not to remove the initial recommendation in the home study and to provide all of that information to the Burkes. *Id.* at 355:16-357:6.

136.  Instead, Sweetman deleted the portions of Mack's report discussing her assessment of the Burkes' significant strengths and willingness to foster children with special needs (such as deaf

or blind children), her balancing of those issues, and recommending them for licensure; she replaced this with the LRT's decision to deny the license based upon the Burkes' "beliefs." *See id.* at 320:8-321:22, 348:20-349:6, 332:2-6, 350:7-11, 351:7-18; *see also* Ex. AA at 60-61. A redline of these changes is included as Exhibit OO.

137.  Sweetman deleted Mack's professional conclusion that the Burkes "would be a great match for a child who is deaf." *Compare* Ex. BB at 32, *with* Ex. AA at 60.

138.  Sweetman deleted Mack's assessment that "it would be ideal to consider them for a child who is waiting because of a medical need." *Compare* Ex. BB at 32, *with* Ex. AA at 60.

139.  Sweetman deleted Mack's belief that there is "potential" for the Burkes "to come around" to a child who identifies as LGBT in the future "with education and ever-changing values in the church community." *Compare* Ex. BB at 32, *with* Ex. AA at 60.

140.  Sweetman deleted Mack's professional judgment that "[a]fter very intense and careful consideration, this willingness to parent a child with these types of challenges has outweighed this writer's worry about their potential unwillingness to accept an LGBTQIA++ child in the future." *Compare* Ex. BB at 32, *with* Ex. AA at 60.

141.  Sweetman deleted the home study's recommendation "[o]n behalf of 18 Degrees and the Department of Children and Families, this writer recommends approval of Catherine and Michael Burke, with the conditions for placement outlined above." *Compare* Ex. BB at 32, *with* Ex. AA at 60.

142.  Moynahan instructed Sweetman to make these changes. Sweetman Tr. at 375:19-22.

143.  Moynahan added the notation in a comment to the report on DCF's internal management system that Sweetman inserted into the home study: "Based on this families [sic] beliefs about children who identify as LGBTQIA+ and after a careful review of this assessment by the regional DCF licensing and training review team, the Department is unable to issue a license for them to foster/adopt at this time." Ex. AA at 60; *see also* Moynahan Tr. at 163:18-164:17.

144.  Sweetman only sent to the Burkes the altered home study that had removed the original recommendation. Sweetman Tr. at 358:18-359:11.

145. Sweetman sent an email to the Burkes that was approved by Moynahan that told the Burkes that they had received the entire file and that their home study reflected the decision of the LRT to deny the license. *Id.* at 366:14-367:1, 368:3-369:19.

146. After telling the Burkes that they had the entire record, Sweetman continued to see the original home study in the file and asked Jones "to delete the upload" of that version. *Id.* at 371:2-9, 373:5-18.

147. Sweetman told Moynahan that the original license study recommending approval was still in their record and that "I hope and pray I did not send" that document to the Burkes. *Id.* at 374:1-377:13.

148. The Burkes received only the altered version of the licensing study from DCF and received the full version of the study only during discovery in this case. *See* C.Burke Tr. at 60:5-10.

149. Prior to the denial, the Burkes had prepared to welcome children into their home, gathering toys and children's books that they planned to read to their future foster and adoptive children. *See, e.g.*, *id.* at 92:1-93:5.

150. DCF's denial of the license has caused the Burkes significant mental anguish and distress. *See id.* at 83:10-85:8, 92:1-95:9; M.Burke Tr. at 94:17-95:10, 97:6-15.

151. DCF's denial of the license means that the Burkes did not become foster parents in Massachusetts.

152. The Burkes fear that the denial will impact their ability to obtain a foster license in Massachusetts or their new home of Florida in the future. *See* ECF 117-9 at 2-3.

**IX.    Massachusetts Changes Its Policies.**

153. On or about September 30, 2025, the federal Administration for Children and Families (ACF) informed DCF that, in its view, the then-current version "of 110 CMR7.104(1)(d) violates the constitutional rights of applicants." Ex. PP, DCF's Emergency Regulatory Change at 3.

154. On December 12, 2025, DCF promulgated an amendment to 110 CMR 7.104(1)(d) on an emergency basis in order to "preempt any potential escalation by ACF." *Id.*

155.  The new regulation replaces the requirement that foster care applicants demonstrate their ability to "support[ ] and respect[ ]" a child's "sexual orientation or gender identity," with a requirement that the applicant demonstrate their ability to "support[ ] and respect[ ] a child's individual identity." Ex. QQ, Amended 110 CMR 7.104(1)(d) at 1.

156.  DCF also changed the text of its Licensing of Foster, Pre-Adoptive, and Kinship Families Policy to require foster care applicants to "support connections to the child's individual background, [and] identity," Ex. RR, 2025 Licensing Policy at 20, rather than "support connections to the child's … sexual orientation and gender identity," ECF 127-3 at 20.

157.  DCF also changed the agreement that foster parents must sign to remove the requirement that foster parents "[s]upport, respect, and affirm the foster child's sexual orientation, gender identity, and gender expression." Ex. SS at 8. The agreement now requires foster parents to "support[ ] a child's individual identity and needs." Ex. TT, New Foster Parent Agreement at 3.

158.  The new foster parent agreement further states that DCF will make "[p]lacement decisions" that match a child to foster parents who can "care for the child's well-being." *Id.* at 1.

159.  This is the third version of the licensing agreement that DCF has used since the events that gave rise to this case. Between February 2006 and November 2023, including the time of the Burkes' license denial, DCF's foster parent agreement did not include any requirement that families "[s]upport, respect, and affirm the foster child's sexual orientation, gender identity, and gender expression." *See* Ex. SS, Old Foster Parent Agreement at 8.

160.  DCF also changed the text of its LGBTQIA+ Nondiscrimination Policy to remove the requirement that foster parents "use the terms an individual uses" as their pronouns. *Compare* ECF 127-9 at 2 *with* Ex. UU, 2025 LGBTQIA+ Nondiscrimination Policy at 2.

161.  DCF further changed the LGBTQIA+ Nondiscrimination Policy to indicate that it no longer "screens" families based on whether they are "affirming," but rather "recruits" on that basis. *Compare* ECF 127-9 at 3, *with* Ex. UU, 2025 LGBTQIA + Nondiscrimination Policy at 2. DCF further deleted language saying that children are "placed consistent with their gender identity,"

ECF 127-9 at 3, and replaced it with language stating that DCF commits to "recruiting" parents "to care for LGBTQIA+ children." Ex. UU at 2.

162. DCF further changed the LGBTQIA+ Nondiscrimination Policy to remove language indicating that DCF "ensure[d] that … foster parents … do not make attempts to convince LGBTQIA+ children/youth to reject or modify their sexual orientation, gender identity, or gender expression." ECF 127-9 at 5. The updated policy instead "ensures that … foster parents … are committed to providing … an environment where children's individual identities are supported and understood." Ex. UU at 4.

163. DCF interprets these regulatory and policy changes to mean that families with beliefs like the Burkes could be licensed under the revised DCF licensing regulations and policies. *See* ECF 151 at 2 & n.2.

164. DCF concluded that these amendments to DCF's regulations and policies "address ACF's concerns" about the constitutionality of DCF's regulations and policies, "while continuing to meet DCF's need for foster homes that support the identity and needs of the children in its custody." Ex. PP at 3.

165. In this regard, DCF's new policy now aligns with the policies and practices of the federal government and the vast majority of other states, all of which allow families with beliefs like the Burkes to become foster parents and address concerns about LGBTQ+ youth at the placement stage. *See* Rawlings Report at 25-27.

166. There is no study directly comparing outcomes for LGBTQ+ youth in states with policies similar to Massachusetts' prior regulations with LGBTQ+ youth in states with policies similar to their amended regulations. Goldberg Tr. at 141:5-12.

Dated: March 13, 2026                     Respectfully submitted,

Michael Gilleran                          /s/ Lori H. Windham
BBO No. 192210                            Lori H. Windham
Fisher Broyles, LLP                       DC Bar No. 501838
75 State Street                           Benjamin Fleshman

Suite 100                                  DC Bar No. 1781280
Boston, MA 02109                           Robert Ellis
(781) 489-5680                             DC Bar No. 90035259
                                           Timothy P. Kowalczyk*
                                           DC Bar No. 90020181
                                           The Becket Fund for Religious Liberty
                                           1919 Pennsylvania Ave, N.W. Suite 400
                                           Washington, DC 20006
                                           (202) 955-0095
                                           *lwindham@becketfund.org*
                                           *pending admission *pro hac vice*

**CERTIFICATE OF SERVICE**

I certify that this document, filed through the Court's ECF system on March 13, 2026, will be sent electronically to registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ Lori H. Windham
Lori H. Windham