# EXHIBIT C

# In the Matter of:

*Michael and Catherine Burke vs*

*Kate Walsh*

---

*Catherine Burke*

*May 29, 2025*

---

*68 Commercial Wharf • Boston, MA 02110*
*888.825.3376 - 617.399.0130*
*Global Coverage*
*Magnals.com*



O&L O'BRIEN & LEVINE COURT REPORTING SOLUTIONS

A MAGNA LEGAL SERVICES COMPANY

1            UNITED STATES DISTRICT COURT

2         FOR THE DISTRICT OF MASSACHUSETTS

3

4    ----------------------------x

5    MICHAEL and CATHERINE BURKE,

6                    Plaintiffs

7                                        Civil Action

8    v.                        No. 3:23-cv-11798-MGM

9

10   KATE WALSH, in her official
     capacity as Secretary of the
11   Massachusetts Executive Office
     of Health and Human Services,
12   et al.,
                     Defendants
13   ----------------------------x

14

15

16        VIDEOTAPED DEPOSITION OF CATHERINE BURKE, a

17    witness called by and on behalf of the Defendants,

18    taken pursuant to applicable provisions of the

19    Massachusetts Rules of Civil Procedure, before

20    Nicole E. Lavigne, a Registered Professional Reporter

21    and Notary Public in and for the Commonwealth of

22    Massachusetts, at Massachusetts Office of the Attorney

23    General, 1441 Main Street, Springfield, Massachusetts,

24    on Wednesday, May 29, 2025, commencing at 11:00 a.m.

Michael and Catherine Burke vs                                   Catherine Burke
Kate Walsh                                                         May 29, 2025

36

1  yes?

2      A.  Yes.  The answer is absolutely yes.

3      Q.  More generally, have your views on LGBTQIA+

4  issues evolved since summer 2021 or are they the same?

5      A.  I'm not sure which views you're asking about.

6      Q.  All right.  We can talk about that later with

7  more specificity.  I want to go back to the

8  interrogatory responses that we've marked as Exhibit 5.

9  If I refer you to Interrogatory Number 4.  The

10  interrogatory says "Identify any and all communications

11  you have had with any adoption agencies other than DCF

12  about the possibility of adopting a child who does or

13  may in the future identify as LGBTQIA+."  And the

14  response has objections and then it states, second

15  paragraph, "Plaintiffs further state that during their

16  home study with A Full Circle Adoptions, the social

17  worker asked plaintiffs how they would respond to an

18  adoptive child who came out to plaintiffs as LGBTQIA+.

19  Plaintiffs' response to that social worker was

20  materially identical to the response they gave to

21  Linda-Jeanne Mack during the home study she conducted

22  on behalf of DCF's behalf."

23         What does that mean "materially identical"?

24      A.  It means we gave Ms. Mack the same answer that

37

1  we gave our other social worker, I believe her name was

2  Hannah:  We're going to love our child no matter what.

3  That is not going to change.

4      Q.  A Full Circle left it at that and it didn't --

5      A.  Yes.

6      Q.  -- explore the subject further?

7      A.  Correct.

8      Q.  All right.  I want to refer you to what was

9  marked as Exhibit 1, which is plaintiffs' verified

10 complaint, which was previously marked and you have in

11 front of you.  Have you seen this document before?

12     A.  Yes, I have.

13     Q.  And this is the complaint that your attorneys

14 filed on your behalf?

15     A.  Correct.

16     Q.  I want to refer you to the last page, page 37.

17 It states "Verification" and then there's a paragraph

18 and then executed on August 7, 2023.  Is that your

19 signature?

20     A.  It is.

21     Q.  Okay.  What is your understanding what this

22 verification is?

23     A.  I'm sorry, what exactly do you mean by that?

24     Q.  What were you verifying when you signed here?

38

1    A.  I was verifying that this is the complaint that

2  my attorneys have filed on my behalf.  Everything in

3  this complaint is true and correct.

4    Q.  All right.  And to your knowledge, the factual

5  substance of the verified complaint is true and

6  correct --

7    A.  Yes.

8    Q.  -- to the best of your knowledge?  All right.  I

9  want to refer you to paragraph 130 of the fact section,

10  which is on page 23.  "The Burkes' caseworker at DCF

11  was their primary point of contact for the licensing

12  study."

13      Who was the Burkes' caseworker at DCF that

14  paragraph 130 refers to?

15    A.  Tywanna Jones.

16    Q.  At some point in 2022, Tywanna Jones goes out on

17  personal leave, correct?

18    A.  Correct.

19    Q.  Do you remember why she went out on personal

20  leave?

21    A.  I believe she had a death in her family.

22    Q.  While she was out, did you have a different

23  primary point of contact at DCF?

24    A.  During her leave, we were contacted a few times

Michael and Catherine Burke vs                                    Catherine Burke
Kate Walsh                                                         May 29, 2025

59

1      Q.   Two inches thick?

2      A.   At least.

3      Q.   Okay.

4      A.   That included the home study, and internal

5   communications, emails between DCF employees, including

6   Tywanna, Ms. Sweetman, Ms. Mack, and I believe one of

7   Ms. Mack's colleagues.

8      Q.   All right.  Do you still have this packet?

9      A.   I do.

10     Q.   Did you provide it to your attorneys?

11     A.   I did.

12     Q.   Okay.  Within that packet, was there some

13  version of what's been marked as Exhibits 3 and

14  Exhibits 9?

15     A.   No.

16     Q.   Before you withdrew your request for a fair

17  hearing, were you aware that Ms. Mack had recommended

18  you for licensure?

19     A.   No.

20     Q.   No.  When Ms. Jones emailed you, and we looked

21  at that email earlier, DCF-BURKE 4213, Exhibit 8 -- we

22  can take a look at that.  We looked at this before,

23  March 8, 2023, Tywanna Jones emailing you --

24     A.   Right.

60

1    Q.  -- "I confirmed with my supervisor yesterday,
2  she approved your license study."
3       You didn't understand that to mean that Ms. Mack
4  had recommended you for --
5    A.  I understand your question better now.  I'm
6  sorry.  Yes, so when I got this email, it was inferred
7  that Ms. Mack's home study, within it she would have
8  had to have approved us.  I did not -- I had never seen
9  this document.  The first time I saw this document was
10  fairly recently.
11    Q.  Oh, I understand.  We'll talk about that further
12  in a moment.
13    A.  Yeah.  But yes, at the time I received this
14  email, it was understood that if Tywanna had approved
15  it and Dawn had approved it, then Ms. Mack would -- had
16  said that she would have approved us as well.
17    Q.  Okay.  Did Ms. Mack ever tell you orally:  I
18  have recommended you for approval?
19    A.  No.
20    Q.  All right.  At the end of the second Zoom
21  meeting that you had with Ms. Mack in which your
22  husband was also a participant in December 2022, at the
23  end of the call, does Ms. Mack say:  Here's what
24  happens next?  Does she lay out a roadmap of further

83

1 ███████████████████████████

2 Q. ████████████████

3        MR. BRYANT:  That I'm sure you'll ask

4     for the spelling of later.

5 Q. (By Mr. Bryant) ███████████████████?

6 A. She is.

7 Q. Before March 2023, ████████████████████

8 ████████████████████████████████?

9 A. ████████████████████

10 Q. ████████████████████████████

11 ████████████████████████████████████

12 ████████████████████████

13 A. ████████████████████

14 ████████████████████████████████

15 ████████████████████████████████

16 ██████████████████████████████████████

17 ██████████████████████████████████████

18 ██████████████████████████████

19 Q. DCF's decision?

20 A. The denial.  -- pretty much ████████████████

21 ██████.

22 Q. DCF's decision hurt you?

23 A. Yes.

24 Q. Emotionally?

84

1    A.  Yes.

2    Q.  Okay.

3    A.  Very much so.

4    Q.  ████████████████████████████████████████████

5    ██████████████████████████████████████████████████

6    ███████████████████████████████████

7    A.  You're going to laugh, her actual name is

8    Catherine ██████  spelled the same way mine is.

9    Q.  Okay.  And do you know what her professional

10   bona fides are?

11   A.  I know she is ████████████████████████████.

12   Q.  How did you locate her?

13   A.  Google.

14   Q.  ████████████████████████████████████████████

15   ███████████████████████

16   A.  Insurance.

17   Q.  How often as of the summer of 2022 ███████████

18   ███████████████████████?

19   A.  Usually once every two weeks.

20   Q.  In person or remote?

21   A.  In person.

22   Q.  ████████████████████████████████████

23   ██████████████████████████████████████████████████

24   ████████████████

85

```
 1    A.  ████████████████████████████████████
 2    ████████████
 3    Q.  ██████████████████████████████████████
 4    A.  Not prior to summer -- not prior 2023.
 5    Q.  All right.  So when DCF denies you a license to
 6    adopt a foster child, ███████████████████████
 7    ██████████████████████████?
 8    A.  Yes.
 9    Q.  ███████████████████████████████████
10    A.  ██████████████████████
11    Q.  ████████████████
12    A.  ████████████████████████
13    Q.  ██████████████████
14    A.  ████
15    Q.  ████████████████████
16    A.  ██████████████████
17    Q.  ██████████████████████
18    A.  ████████████
19    Q.  ████████████
20    A.  Massachusetts.
21    Q.  Okay.  Since moving to Florida, ████████
22    ████████████████████████████████████
23    ██████████?
24    A.  ██████████████████████████████
```

92

1    Q.  All right.  Other than what you've testified to,
2   how else, if at all, has DCF's denial of a foster
3   license to you impacted your life?
4    A.  In so many ways.  It has been at the center of,
5   like, every decision that we have made, and I don't
6   know if there are words to, like, adequately explain,
7   like, how much it has impacted us or in all -- all the
8   little ways it has impacted us.  ███████████████
9   ██████████████████████████████, that was the house
10  that we -- we planned on raising a family in.
11    Q.  In Massachusetts?
12    A.  In Massachusetts, yeah.  ████████████████
13  ████████████      And that absolutely played a part in our
14  moving because the house itself just became, like, too
15  painful, you know, to walk by the bookcase full of
16  children's books that I had been collecting, you know,
17  some from my own childhood, some that, you know,
18  friends had handed down like:  Hey, we know that you
19  guys are going to be having foster kids soon or
20  adopting soon.  Here's the books that my kids are done
21  with.
22        You know, books that we -- kids books that we
23  had purchased on our honeymoon.  We had gone all the
24  way up to Alaska, and we met the husband of a woman who

93

1  had been an Iditarod winner, and she had written a

2  children's book about her lead sled dog.  She has since

3  passed away, but her husband was there.  He signed the

4  book for us, so we had that.  Like this is going to be

5  a great story to be able to tell our kids some day.

6          Now all that is gone, and I don't know if you

7  have children or have been around children or ever

8  wanted children, but when that is at the center of your

9  life for so long and then to suddenly have to let go,

10  and in letting go, not only is that gone, like,

11  everything that you've dreamed about since you were a

12  little kid to the point that when you auditioned for

13  the -- when you were in the Colleen contest in high

14  school and they're saying, you know:  Here's Catherine

15  ███████.  Her great-grandmother was of Irish descent.

16  She wants to be a veterinary and a wife and a mother in

17  that order, and everybody laughed because the wife and

18  the mother in that order was, like, a weird thing for

19  them to hear.

20          And then not only to let go of that but now to

21  suddenly have your life be center stage in newspapers

22  and on TV across the country and to have people say all

23  sorts of nasty things about you in internet forums and,

24  you know, nasty phone calls to your husband, there are

Michael and Catherine Burke vs                                    Catherine Burke
Kate Walsh                                                          May 29, 2025

94

1  no words to explain what that really feels like.  There

2  just aren't.

3     Q.  Okay.

4     A.  And there was really no reason to do what DCF

5  did.  There wasn't, especially now that I read all of

6  LJ's report.  To know that there are deaf kids out

7  there who are probably struggling to make those

8  language connections and to know that the whole reason

9  we ever even considered fostering in the first place

10 was because somebody at Willie Ross, which is the local

11 elementary school for deaf kids, asked us before we

12 were even married:  Hey, would you guys consider

13 fostering because there are not enough foster homes for

14 deaf children, and you guys know how to sign, you're

15 learning; and to know that we would have bent over

16 backwards to ensure that that child had access to

17 language in whatever way they needed, whether that was

18 ASL or a cochlear or Willie Ross or the American School

19 of the Deaf in Hartford, but DCF would rather put kids

20 in hospitals and in hallways because of some

21 preconceived notion they have about Catholics.

22              MS. WINDHAM:  Kitty, we can take a

23       minute.

24              THE COURT REPORTER:  Do you want to

95

1       go off the record?

2            MR. BRYANT:  That's up to them.  I'm

3       happy to.

4            THE WITNESS:  So that's what this

5       decision has done.  ████████████████

6  ████████████████████████████████████████

7  ██████████████████████████████████████

8  ██████████████████████████████████████

9  ████████████

10    Q.  (By Mr. Bryant)  Have you considered talking to

11  the Florida Department of Children and Families about

12  fostering a deaf child?

13    A.  I haven't even finished unpacking yet.

14    Q.  Okay.

15            MS. WINDHAM:  Let's go ahead and take

16       five minutes.

17            MR. BRYANT:  Please.

18            THE VIDEOGRAPHER:  Off record 1:15.

19            (A brief recess was taken.)

20            THE VIDEOGRAPHER:  We're back on

21       record 1:25.  This begins Media 3.

22    Q.  (By Mr. Bryant)  Okay.  We were talking about

23  how this has impacted your life, the denial of the

24  license.  I just have a few follow-up questions about

97

1    personally?

2        A.  I saw some of them, yes.

3        Q.  Okay.  What did you see?

4        A.  Just general comments about, you know, how

5    Catholicism is awful, how we're, you know, bigots, you

6    know, we shouldn't be allowed near a child, things like

7    that.

8        Q.  Were the people on the forum responding to your

9    appearance on Fox News?

10       A.  Fox News, any of the dozen or more articles that

11   cropped up right around the time the case was filed.

12       Q.  Did you speak to the press for any of those

13   dozen or more articles that were filed?

14       A.  I don't think so, only Fox.

15       Q.  Did you get any kind of negative response when

16   you appeared in a video that's on The Becket Fund for

17   Religious Liberties' website where you and your husband

18   speak?

19       A.  I don't believe so --

20       Q.  Okay.

21       A.  -- but I also learned not to go looking at the

22   comment sections.

23       Q.  When is the last time you saw any news coverage

24   of you or your husband?

102

1   it --
2       A.  Mm-hmm.
3       Q.  -- "Kitty and Mike"?  "Kitty and Mike also
4   shared that during their MAPP class, they mentioned
5   their feelings on 'hot topic political issues,' and
6   that one of their MAPP trainers suggested that they
7   should not be working with the Department."
8           Okay.  We talked about what the word -- the
9   acronym MAPP stands for --
10      A.  Mm-hmm.
11      Q.  -- Massachusetts Approach to Partnership and
12  Parenting.
13      A.  Yes.
14      Q.  Do you remember having this exchange with
15  Linda-Jeanne Mack?
16      A.  Yes.
17      Q.  Did you use the term "hot topic political
18  issues" when speaking to her?
19      A.  Probably, yes.
20      Q.  And the reference to "MAPP class," that's the
21  May, June remote set of trainings of approximately 30
22  hours that you and your husband underwent?
23      A.  Yes.
24      Q.  At the behest of DCF?

103

```
 1      A.  Yes.
 2      Q.  Okay.  Do you recall what the hot topic
 3  political issues were that were raised or discussed
 4  during the MAPP training?
 5      A.  Yes.
 6      Q.  Tell me.
 7      A.  Transgenderism.
 8      Q.  What does transgenderism mean?
 9      A.  Transgenderism is the belief that one can change
10  their sex from male to female or female to male.
11      Q.  And that was the hot topic political issue?
12      A.  Correct.
13      Q.  Were there any other hot topic political issues
14  other than transgenderism that you discussed during the
15  MAPP training?
16      A.  No.
17      Q.  What about homosexuality, was that discussed
18  during the MAPP training?
19      A.  It was.
20      Q.  You don't consider that to be a hot topic
21  political issue?
22      A.  No.
23      Q.  What about gay marriage?
24      A.  No.
```

Michael and Catherine Burke vs                    Catherine Burke
Kate Walsh                                          May 29, 2025

104

1    Q.  The sentence that I read before, it states "...

2  one of their MAPP trainers suggested they should not be

3  working with the Department."

4       Do you recall that conversation with the MAPP

5  trainer?

6    A.  It wasn't a conversation in that we were

7  communicating with the trainer, but the trainer did say

8  that.

9    Q.  Okay.  Was it part of a presentation to you and

10  the other two families?

11   A.  Yes.

12   Q.  Was it directed at you personally?

13   A.  No.

14   Q.  Was it on a PowerPoint slide?

15   A.  No.

16   Q.  Tell me about the context.

17   A.  It was one of a series of different -- back that

18  up.  Every session, there were different people from

19  DCF or people who work in conjunction with DCF, whether

20  that be doctors, nurses, other foster parents,

21  attorneys, and social workers who would do

22  presentations on certain topics.  For this particular

23  one, a woman, I think she was a social worker, I don't

24  know for sure, was speaking about LBGTQ [sic] youth in

1  the system, and at the very end of her presentation,

2  she said something to the effect of:  If you are not a

3  hundred percent on board with everything I just said,

4  meaning everything that she said during her

5  presentation, you have no business working with the

6  Department.

7        When -- and that was basically the very last

8  thing she said.  She signed out of the meeting.  David

9  Connors, who was the social worker running and

10  facilitating the overall training, got back on and

11  said:  No, that's not the Department's position.  We

12  work with families of all backgrounds.  So what the

13  woman just said is not actually the Department's

14  position, that's not what we believe.

15     Q.  The woman appears once during the entire

16  training sequence or more than once?

17     A.  I believe she was only there once.

18     Q.  And she was there to talk about LGBTQIA+ issues

19  and nothing else?

20     A.  Yes.

21     Q.  David Connors appeared at every weekend -- every

22  Saturday training you attended?

23     A.  Yes.

24     Q.  And what about a person by the name of Katie

Michael and Catherine Burke vs                                    Catherine Burke
Kate Walsh                                                          May 29, 2025

136

1      A.  I don't remember specifics.

2      Q.  Did she, the trainer described in paragraph 105,

3   talk about DCF's expectation that you affirm children

4   who have a transgender identity?

5      A.  That was the expectation, yes.

6      Q.  And that was an expectation that as of that

7   training, you were not prepared to meet?

8      A.  Correct.

9      Q.  I want to talk about Linda-Jeanne Mack again,

10  and we can go back to her home study that has the 18

11  Degrees logo on the top left, Exhibit 3.

12     A.  Mm-hmm.

13     Q.  In fact, forgive me, but we'll go back to the

14  complaint very briefly in paragraph 111.  It states in

15  paragraph 111, the complaint, Exhibit 1, "During the

16  home interviews, 'The Burkes were troubled that much of

17  the questioning centered around their views on

18  sexuality and their response if a child were in the

19  future to struggle with gender dysphoria or to identify

20  as gay or lesbian.  They estimate that a third of the

21  time in the interviews was spent on these questions."

22          How much time in total did you speak to Mack on

23  the Zoom -- three Zoom meetings that you had with her?

24     A.  I don't remember the exact amount of time.  It

137

1    was several hours.

2        Q.  Okay.  And we talked about the follow-up meeting

3    that you and your husband had in December 2022 with

4    Mack, and reading this, does it refresh your

5    recollection of whether that second meeting had any

6    specific focus?

7        A.  I don't remember.

8        Q.  Okay.  So just generally overall of those three

9    meetings that you had with her, two with your husband

10   and one by yourself, about a third of the time was

11   spent talking about gender dysphoria, gay and lesbian

12   issues, sexuality?

13       A.  Yes.

14       Q.  Okay.  What is gender dysphoria?

15       A.  Are you asking my definition or the scientific

16   def -- medical definition?

17       Q.  Well, I don't know what the scientific medical

18   definition is.  I'm just interested in your

19   understanding of what that term means --

20       A.  My --

21       Q.  -- as per the complaint?

22       A.  My understanding of gender dysphoria is the

23   feeling of being uncomfortable with the sex that you

24   are and wishing that you could change that, so a boy

149

1  but the sex is the immutable physical characteristics
2  and that cannot be changed.  So when someone feels that
3  they are -- they are transgender, it's their -- what
4  they're trying to change are those immutable
5  characteristics, and those cannot be changed.
6      Q.  And some of those immutable characteristics are
7  not physical.  They're also mental?
8      A.  I don't -- I don't know.
9      Q.  Okay.  When you said this to LJ Mack, did she
10  have any response?  According to what she wrote, she
11  moved on, but did she react in any way?
12      A.  I don't remember.
13      Q.  It goes on "This writer then asked about how
14  they'd feel if their child identified as lesbian, gay,
15  bisexual, queer, or any other sexuality.  Kitty shared
16  'There's nothing wrong with it.  I'm going to love you
17  the same, but I believe you would need to" -- lead a --
18  strike that, "leave a chaste life."  I believe that to
19  be a typo and the word to be "lead."
20          Do you remember saying to LJ Mack something to
21  that effect?
22      A.  Yes.
23      Q.  How does a person who is lesbian, gay, bisexual,
24  queer, or any other sexuality other than heterosexual

181

1           MS. WINDHAM:  Objection; vague.

2           THE WITNESS:  If a child came to me

3      and said, you know -- if my son came to me

4      and said:  Mom, I think I'm a girl, you

5      know, I'm going to look at that little boy

6      and say, you know:  Honey, I love you, but

7      you're a boy.  God made you to be a boy.

8      Your body is perfect the way it is.  And

9      then I'm going to find out -- you know, try

10      to figure out why he feels that way.

11  Q.  (By Mr. Bryant)  Okay.  And is it the same for a

12  child who tells you that they're attracted to the same

13  gender?

14  A.  Probably a slightly different conversation

15  because the way that -- I think that the way you feel,

16  and I'm just guessing because I'm not gay, that would

17  be more of a, you know, explaining how this is a really

18  difficult cross to bear, encouraging, you know,

19  frequent prayer, frequent confessions, you know, going

20  back to church teachings, you know, how I can best

21  support my kid, how my kid can find the support to, you

22  know, live this life the best way he can.

23           My main job as a wife, as a mother, as a sister,

24  as a friend, as a daughter is to make sure my loved

201

 1    A.  I understand gender dysphoria to be when someone
 2    is not comfortable with their -- their -- the body that
 3    they were born into and believe that changing from --
 4    changing their sex, that their outward sexual
 5    characteristics would be able to fix that.
 6    Q.  So would that be feelings of distress or stress?
 7    A.  Yes.
 8    Q.  And you would acknowledge that people can
 9    experience those feelings?
10    A.  Of course.
11    Q.  And the question is then how do you best help
12    someone in that position?
13    A.  Yes.
14        MR. BRYANT:  Objection; form.
15    Q.  (By Ms. Windham)  You also talked a lot today
16    about your religious beliefs, and you spoke a little
17    bit about honesty and your duty of honesty.  How is
18    that related to your religious beliefs?
19    A.  It's integral.  I think it's actually even in
20    the -- one of the commandments, basically telling the
21    truth is required.  I -- I don't lie.  I can't lie.
22    It's not in me to.
23    Q.  And what does the Catholic church teach briefly
24    about the dignity of the human person?

Michael and Catherine Burke vs
Kate Walsh

Catherine Burke
May 29, 2025

204

1    COMMONWEALTH OF MASSACHUSETTS           HAMPSHIRE, SS.

3        I, NICOLE E. LAVIGNE, a Registered Professional
Reporter and Notary Public duly commissioned and
qualified in and for the Commonwealth of Massachusetts,
do hereby certify that there came before me on the 29th
day of May, 2025, at 11:00 a.m., the person
hereinbefore named, CATHERINE BURKE, who provided
satisfactory evidence of identification as prescribed
by Executive Order 455 (03-13) issued by the Governor
of the Commonwealth of Massachusetts, was by me duly
sworn to testify to the truth and nothing but the truth
of her knowledge concerning the matters in controversy
in this cause; that she was thereupon examined upon her
oath, and her examination reduced to typewriting under
my direction; and that this is a true record of the
testimony given by the witness to the best of my
ability.
     I further certify that I am neither attorney
or counsel for, nor related to or employed by, any
of the parties to the action in which this
deposition is taken, and further, that I am not a
relative or employee of any attorney or counsel
employed by the parties hereto or financially
interested in the action.

     My Commission Expires:  April 3, 2031

*Nicole E. Lavigne*

         Nicole E. Lavigne, RPR
         Notary Public