# EXHIBIT F

Page 1

```
 1
 2        IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF MASSACHUSETTS
 3
 4   _____
                              )Civil Action No.
 5   MICHAEL and CATHERINE     )1:23-cv-11798-MGM
     BURKE,                    )
 6                            )
        Plaintiffs,           )
 7                            )
     v.                        )
 8                            )
     KATE WALSH, in her        )
 9   official capacity as      )
     Secretary of the         )
10   Massachusetts            )
     Executive Office of       )
11   Health and Human         )
     Services, et al.,         )
12                            )
        Defendants.           )
13   _____)
14
15
             VIDEOTAPED REMOTE DEPOSITION OF
16
                   DAWN SWEETMAN
17
                  May 15, 2025
18
                   8:34 a.m.
19
20
21
22   Reported by:  Lindsey Russo
     Job No. 7361105
```

Page 36

1   your roles, Ms. Sweetman?

2       A.    So, again, I oversee the unit.  I do

3   sometimes attend and participate in recruitment

4   events, but my particular unit at this time

5   does have a responsibility and a role in

6   recruitment of foster parents.

7       Q.    Okay.  And you would agree that

8   there is a need for DCF to have more foster

9   parents, right?

10      A.    Yes.

11      Q.    Do you sometimes make statements to

12  news media about the need for foster parents in

13  DCF -- at DCFS?

14      A.    Typically, no.

15      Q.    Okay.  Do you remember giving a

16  statement not to a news media but to a school,

17  the Minnechaug Regional High School -- are you

18  familiar with -- maybe I'm mispronouncing that.

19            Minnechaug, is that how you

20  pronounce it?

21      A.    Yes.

22      Q.    Do you remember making a statement

Page 37

1    to them, to their school newsletter about the

2    need for foster parents?

3        A.    Yes.

4        Q.    Okay.  And you would agree that

5    there -- that the -- that DCF always needs more

6    foster and adoptive families, right?

7        A.    We do.  We can't do our job without

8    qualified foster or adoptive families.

9        Q.    Are you aware of DCF ever housing

10   foster children in group homes?

11       A.    Yes.

12       Q.    Aware of DCF ever housing children

13   in office space?

14       A.    I'm -- I'm not personally aware of

15   that.

16       Q.    Have you ever heard of that before?

17       A.    I have heard of it, yes.

18       Q.    Have you heard of DCF ever housing

19   foster children in hospitals or hospital beds?

20       A.    Yes.

21       Q.    And you'd agree that that's --

22   that's a problem that needs to be addressed,

1    plan.

2        Q.    That's not good for the children,

3    right?

4        A.    Correct.

5        Q.    Okay.  How significant is the need

6    for DCF to recruit more foster parents?

7        A.    I'm not sure how to measure that.

8        Q.    Would you say it's very important?

9        A.    Yes, it is important that we

10   continue to recruit foster parents.  I would

11   agree with that.

12       Q.    Is there -- sorry.  I didn't mean to

13   interrupt you.

14            Is there a real need currently for

15   more foster parents?

16       A.    Yes.

17            MR. BRYANT:  Objection to form.

18            BY MR. ELLIS:

19       Q.    Are there children that do not have

20   a placement because of the lack of -- of

21   approved foster parents currently?

22       A.    I don't know the answer to that.

Page 40

1      Q.    Ms. Sweetman, are you involved in

2   the process of placing children with approved

3   foster families?

4      A.    Yes.

5      Q.    What is your involvement in that?

6      A.    So I oversee the unit that is

7   responsible for collaborating with the area

8   offices to work to identify appropriate matches

9   for youth experiencing foster care.

10          My particular unit focuses on, for

11   the most part, homes that say that they want to

12   adopt or be long-term permanent resources for

13   youth.

14      Q.    Okay.  You said appropriate matches.

15   That's finding an appropriate match between an

16   approved foster family or foster parents and

17   the foster child; is that correct?

18      A.    Correct.

19      Q.    Because not every approved foster

20   parent is a match for every child, is it?

21      A.    Correct.

22      Q.    That's not your expectation when you

Page 41

1    recommend licensing a foster family, right?

2         A.    Correct.

3         Q.    There can be restrictions or

4    preferences of the foster family, right?

5         A.    Yeah.

6         Q.    And there can be special needs for

7    the foster child, right?

8         A.    Yes.

9         Q.    And in your experience, those are

10   things that DCF takes into account when finding

11   the appropriate match, right?

12             MR. BRYANT:  Objection to form.

13             THE WITNESS:  (Nodding head yes.)

14             BY MR. ELLIS:

15        Q.    I'm sorry.  I missed that answer,

16   Ms. Sweetman.

17        A.    The answer is yes.

18        Q.    Okay.  Thank you.

19             For example, there could be

20   preferences on the gender of a child that's

21   placed, right?

22        A.    Yes.

Page 47

1      Q.    To enable there to be a right match

2   for every child, you want to have a wide

3   variety of foster families, true?

4      A.    Yes.

5      Q.    And in the licensing process, you

6   have experience of recommending approval for a

7   license for a foster family even if they have

8   limitations on what children they can accept or

9   that they would be the best fit to receive,

10  correct?

11     A.    Correct.

12     Q.    Ms. Sweetman, are you aware that DCF

13  has a list of LGBT-affirming homes?

14     A.    I am aware that there is a list of

15  LGBTQ-affirming homes.

16     Q.    And it's part of DCF's policy to

17  maintain that list, true?

18     A.    Yes.

19     Q.    And you're aware that not every

20  foster family is on that list, correct?

21     A.    Yes.

22     Q.    You're aware that DCF has approved

Page 49

1      Q.    And so DCF has not said that they

2    are LGBTQ affirming, correct?

3            MR. BRYANT:  Objection to form.

4            THE WITNESS:  Yeah, I don't think

5    that part is true.

6            BY MR. ELLIS:

7      Q.    Okay.  They're just not on the list

8    that DCF maintains as LGBTQ affirming, correct?

9      A.    Correct.  Yes.

10      Q.    In doing that analysis of whether a

11    family is LGBTQ affirming, that's going to be a

12    case-by-case review, correct?

13      A.    Correct.

14      Q.    It depends on each individual

15    family, right?

16      A.    Yes.

17      Q.    And are there -- is there a list of

18    right answers that a family needs to answer

19    correctly in order to be on that list?

20      A.    No.  I don't feel like there's a,

21    like, prescribed list of questions.  We do very

22    thorough assessments of families over time.

Page 50

1    We're asking hundreds of questions, so it's not

2    if you answer these five, then you get a

3    checkmark.  It doesn't work that way.

4         Q.    Yeah.  Sometimes you might answer

5    some correctly and some incorrectly, and then

6    there has to be a judgment call, right?

7              MR. BRYANT:  Objection to form.

8              THE WITNESS:  So I don't -- I don't

9    know that there's correct answers.  I feel like

10   when it -- when it comes to -- yeah, I don't

11   feel like there's correct answers, you know.  I

12   think that there --

13             BY MR. ELLIS:

14        Q.    Okay.

15        A.    Yeah.

16        Q.    But they might have different

17   responses, true?

18        A.    That's fair.

19        Q.    You said you might have a hundred

20   different questions.  People might not answer

21   the exact same way, right?

22        A.    Correct.

Page 51

1      Q.    And even if people answer questions
2  differently, they might both be seen as
3  affirming, correct?
4      A.    Correct.
5      Q.    And even if people answer questions
6  differently, they might both be seen as not
7  affirming, true?
8      A.    True.
9      Q.    So there needs to be a judgment call
10  made in that assessment, right?
11      A.    Yeah, I -- I would call that -- that
12  is the assessment, yes.
13      Q.    And that assessment would involve a
14  judgment call, correct?
15      A.    Yes.
16      Q.    I'd like to turn, Ms. Sweetman, to
17  the Burkes specifically.
18            In May of 2022, you became aware of
19  a potential foster family named Mike and Kitty
20  Burke, correct?
21      A.    Correct.
22      Q.    And DCF was initially impressed with

Page 52

1    this family, weren't they?

2        A.    I don't know.  I don't know about

3    that.

4        Q.    You would agree that at least

5    initially your -- your view was that the Burkes

6    were solid resources, right?

7            MR. BRYANT:  Objection to form.

8            THE WITNESS:  Yeah, in -- I think I

9    can only testify to my own -- my own take on

10   that, and I do think at least initially through

11   the prescreening and through the MAPP training

12   there were -- there was positive feedback for

13   sure about the family.

14           BY MR. ELLIS:

15       Q.    Yeah, and some of that positive

16   feedback -- that they really had a solid

17   understanding of how trauma can affect people,

18   right?

19       A.    (Nodding head yes.)

20       Q.    And that's important, isn't it?

21       A.    That is important.

22       Q.    Okay.  So from the initial training

Page 68

```
 1      Q.    Perfect.
 2      A.    Okay.  Okay.  I see that it's an
 3   email.
 4      Q.    Okay.  Do you recognize this email?
 5      A.    Yes.
 6      Q.    This is an email exchange between
 7   you and Ms. Burke?
 8      A.    Correct.
 9      Q.    If we can scroll to the bottom of
10   the -- it shows the first email in the chain,
11   so it starts in October, but it looks like your
12   first email was actually September 28th.  So
13   you were correct on September.  Good
14   recollection, Ms. Sweetman.  September 28, 2022
15   an email from you to Ms. Burke.
16            Do you see that?
17      A.    Yes.
18      Q.    And you respond:  "Hi, Kitty.  I'm
19   Tywanna's supervisor, Dawn Sweetman," and you
20   mention that she is going to be out of office
21   for an undetermined amount of time.
22            Do you see that?
```

Page 69

1       A.      (Nodding head yes.)

2       Q.      And you remember this, right,

3  Ms. Sweetman?

4       A.      Yes, I do.

5       Q.      And you say:  "I'm in the process of

6  reaching out to her families to see where

7  things are at and how we can keep things moving

8  during this time" --

9       A.      Yes.

10       Q.      -- you see that?

11              And then if we scroll up, you have

12  this interaction with the Burkes, and during

13  this process, Ms. Sweetman, you're interacting

14  with the family directly.  You were more

15  engaged with the Burkes than perhaps other

16  cases when you were just the supervisor and

17  that was handled by the team, correct?

18       A.      Correct.

19              MR. BRYANT:  Objection to form.

20              BY MR. ELLIS:

21       Q.      You became more familiar with the

22  Burkes at an earlier stage than you normally

Page 70

1  would, right?

2      A.    Yes.

3      Q.    And to complete this license home

4  study, you engaged someone named Linda-Jeanne

5  Mack, right?

6      A.    Correct.

7      Q.    Or LJ Mack.  Is that the same --

8  same person, correct?

9      A.    Same person, yes.

10     Q.    Who is Ms. Mack?

11     A.    Ms. Mack is a contracted employee of

12 18 Degrees.

13     Q.    Okay.  And she's someone that you've

14 done work with before, right?

15     A.    Yes, I have.

16     Q.    And someone that -- who does really

17 good work, right?

18     A.    Yes, she does.

19     Q.    All right.  And you have experience

20 with her as someone that you trust, right?

21     A.    Yes.

22     Q.    And she's very careful and thorough;

Page 71

```
 1   is that fair?
 2        A.    Yes.
 3        Q.    You enjoy working with her, right?
 4        A.    Yeah, I do.
 5        Q.    And so if we look here at the top
 6   email, this is an email from you to Ms. Burke,
 7   subject:  "License Study on October 3rd."
 8              You see that --
 9        A.    I do see it.
10        Q.    -- at the top?
11        A.    Yep.  Yes.
12        Q.    Okay.  And you're passing on some
13   information for the Burkes, and then you say:
14   "I just heard today that LJ Mack is the worker
15   from 18 Degrees who is going to complete your
16   licensing study."
17              Do you see that?
18        A.    Yes.
19        Q.    So as we discussed, you contracted
20   with Ms. Mack to make this licensing study on
21   behalf of DCF, right?
22        A.    Correct.
```

Page 72

```
 1      Q.     And she, you then say -- if you
 2  scroll down a couple of -- just a couple of
 3  sentences there, she says:  "Her" -- "her work
 4  is great, and she has a pretty quick turnaround
 5  time, so this is good news for us."
 6           Do you see that?
 7      A.     Yes.
 8      Q.     Consistent with what you just said
 9  about how you've -- have a history of Ms. Mack
10  doing great work for you, right?
11      A.     Yes.
12      Q.     How many times have you used
13  Ms. Mack before?
14      A.     A handful.
15      Q.     Okay.  Ten times?
16      A.     Maybe.  Maybe less than ten.
17      Q.     Okay.
18      A.     The --
19      Q.     Go ahead.  What were you going to
20  say?
21      A.     That's all I was going to say.
22  Thank you.
```

Page 87

1   to know was is this family a family that is
2   able to hold their religious beliefs and
3   welcome an LGBTQIA child into their home if
4   that were to present itself.
5        Q.    Okay.  So earlier we were just
6   talking about Ms. Mack telling you that their
7   faith is not supportive and neither are they.
8   Do you remember that, when Ms. Mack said that?
9        A.    Yes.
10       Q.    And this is your response to her,
11  true?
12       A.    Correct.
13       Q.    And your response in part is "how
14  significant is their religious beliefs?"
15  Right?
16       A.    Correct.
17       Q.    And so --
18       A.    Yes.
19       Q.    So the concern was of their faith
20  not being supportive, you then asked about
21  their religious beliefs as part of that -- as
22  part of your response, right?

Page 88

1      A.    I did.

2      Q.    Because it's important for you to

3  know how significant their religious beliefs

4  are, right?

5           MR. BRYANT:  Objection to form.

6           THE WITNESS:  It is important for us

7  to know that.

8           BY MR. ELLIS:

9      Q.    Okay.  Why is it important to know

10  how significant their beliefs are?

11      A.    We need to know if they are going to

12  be able to -- how their beliefs will impact

13  their ability to welcome and care for and

14  support any child that's placed in their home.

15      Q.    And you understood that it was the

16  significance of these religious beliefs that

17  impacted the Burkes' thoughts on the LGBTQ

18  questions at issue here, right?

19      A.    I do see that there's a connection

20  there.  That's -- that's what they've said,

21  yes.

22      Q.    And that was your understanding,

Page 89

```
 1   right?
 2        A.    Yes.
 3        Q.    The second half of that sentence
 4   after the dash, it says:  "Would they ask a
 5   kid" to leave -- "who came out to leave their
 6   home?  Would they consider conversion therapy?"
 7             Do you see that part?
 8        A.    Yes.
 9        Q.    The answer to those questions is no,
10   right?
11        A.    Yeah, I'm not so sure about that.
12   They're definitely --
13        Q.    You -- you learn from the Mack's --
14   or you learn from Ms. Mack that they responded
15   that they would not kick a child out, right?
16        A.    Correct.  They did respond that they
17   would not kick a child out.
18        Q.    And that they would not support
19   conversion therapy as defined, right?
20        A.    They would not support conversion
21   therapy as defined.
22        Q.    Okay.  So the answer to both of
```

1  there.

2      Q.    Okay.  So -- so you mentioned there

3  could be a religion that has a religious

4  teaching or a religious belief that impacts

5  their ability to be foster parents, true?

6      A.    Foster parents can come from any

7  religious background, every religious

8  background, or no religious background at all.

9  That doesn't -- that doesn't matter.  We're not

10  screening for religion.

11      Q.    Okay.  But some -- as we just saw

12  here in this email, it's possible that some

13  faiths might not be supportive, correct?

14      A.    I suppose.

15          MR. BRYANT:  Objection to form.

16          BY MR. ELLIS:

17      Q.    And in that case when you understand

18  a faith not being supportive, you want to know

19  how significant their religious beliefs are,

20  right?

21      A.    I would want to know more about

22  that, what does -- what does that mean, and

1  what does that look like for that family.

2      Q.     Mm-hmm.  In fact, here you wanted to

3  know how significant the Burkes' religious

4  beliefs are, right?

5      A.     Correct.  I wanted to know that --

6  what -- what their beliefs are with relation to

7  parenting LGBTQIA youth.

8      Q.     And how significant they are to

9  them, right?

10     A.     Yes.

11            MR. BRYANT:  Objection to form.

12            BY MR. ELLIS:

13     Q.     Because you want to know if they're

14  able to deal with it and find a way to be

15  supportive, true?

16     A.     Yeah, correct.

17     Q.     So if there's a religious belief

18  that's not supportive but the family says it's

19  not that significant to me, I don't really

20  follow that belief, that would give you

21  confidence that they can deal with it and find

22  a way to be supportive?

1    A.    I mean, it would -- we're on the

2   right road.  I'm not saying I'm, you know,

3   approving it at this point, but we're on the

4   right road.

5        Q.    Okay.  Whereas if their religious

6   belief that's not supportive, if that's very

7   significant to those individuals, that might

8   not be the right road is what you're saying?

9        A.    It's -- correct.  I have more

10  questions in that instance, for sure.

11       Q.    Okay.  So it can be relevant in your

12  analysis how much the foster parent actually

13  believes in the religious faith at issue?

14       A.    I think it's a -- it can be a

15  factor.

16       Q.    Yeah.  We can scroll up to the --

17  Ms. Mack's response to you, it looks like she

18  responds just about a half hour later to you.

19            Do you see that?

20       A.    Yes, I see that.

21       Q.    Okay.  And if you go to the second,

22  she says:  "Hi, Dawn."  She's responding

1      Q.    What would happen if a foster parent

2    adopts a religious belief that, in your mind,

3    is significant or not supportive?

4              MR. BRYANT:  Objection to form.

5              THE WITNESS:  I think families can

6    believe whatever they want to believe, but how

7    does that translate into your care of a child

8    in DCF foster care?  That's where I would --

9    that's where my questions would be.

10             BY MR. ELLIS:

11     Q.    Do you have a process of reviewing

12    with foster parents on an ongoing basis if

13    their religious views have changed?

14     A.    We do.  My -- my team does visits to

15    every single home, every single month where

16    they have discussion about a number of things.

17             We also do annual events every year,

18    relicensing events on homes that were licensed

19    beforehand.  So we do ask questions literally

20    all day, every day.

21     Q.    Okay.  If we could go to this email

22    following up with what Ms. Mack is telling you

1    Ms. Mack, right?

2         A.    Yes.

3         Q.    And you trust her judgment, right?

4         A.    Yes.

5         Q.    She's familiar with DCF policies as

6    well, right?

7         A.    Yeah, I think maybe not to the same

8    extent that probably the department is just

9    because they're contracted providers.  Every

10   time something changes or there's a new policy,

11   I don't know how they -- I'm just not familiar

12   with --

13        Q.    Yeah.  You --

14        A.    -- how that process work.

15        Q.    Good point.  You had even more --

16   you had even more expertise than she does,

17   right?

18             MR. BRYANT:  Objection to form.

19             THE WITNESS:  I think with regard to

20   the policy I probably do have more experience.

21             BY MR. ELLIS:

22        Q.    But she's -- she's done these

1      Q.    And here you're saying you agree

2   with her assessment, correct?

3      A.    Correct.

4      Q.    At this point, having read this long

5   and beautifully written assessment, you were in

6   agreement, weren't you?

7      A.    I was in agreement.

8      Q.    That the Burkes should have a --

9   should receive their license, right?

10      A.    Yes.

11      Q.    And that's based on your decades of

12   experience and your understanding of the

13   policy.  You agreed that in -- under your

14   judgment of things that they should receive --

15   they should be approved for a license, correct?

16      A.    Yes.

17      Q.    Yes?

18      A.    Yes.

19      Q.    Okay.  And that's having -- again,

20   having read through everything in this

21   comprehensive assessment, true?

22      A.    So I will tell you that I did not

Page 186

1      A.    Both are good there, yes.

2      Q.    Okay.  It says there in Paragraph

3   3 -- if we go up to the prior one, it says:

4   "This writer does have some apprehension about

5   recommending them as a resource family due to

6   the couple's views related to people who

7   identify as LGBTQIA plus, plus."

8            Do you see that?

9      A.    I do.

10     Q.    Okay.  It says:  "The couple

11  expressed that they are not open to

12  gender-affirming care and believe that

13  partnership outside of heterosexual

14  relationships is a sin."

15     A.    I see that.

16     Q.    Do you see that?

17     A.    Yes.

18     Q.    Okay.  It says:  "They are heavily

19  involved in their Catholic church and cite

20  their religious views as their primary reason

21  for seeing LGBTQIA-plus-plus individuals in

22  this way."

1  can certainly believe whatever they want to

2  about relationships, heterosexual, homosexual.

3  They're entitled to whatever beliefs they have.

4  The question that I keep coming back to is what

5  does that mean for our kid placed in your home.

6      Q.    Yeah.  And the next one where it

7  says:  "They're heavily involved in their

8  Catholic church, they cite their religious

9  views as their primary reason for seeing

10 LGBTQIA-plus-plus individuals in this way," you

11 understood that it was their religious views

12 that was the primary reason for their views on

13 the LGBT, right?

14              MR. BRYANT:  Objection to form.

15              THE WITNESS:  I think so.

16              BY MR. ELLIS:

17      Q.    Yeah.  And you know that, for

18 example, with gender-affirming care, that there

19 are people who have religious views that are

20 opposed to gender-affirming care, right?

21      A.    I'm -- I don't know every religion's

22 views on affirming care, so I don't -- I can't

Page 192

1    speak to that.

2        Q.    Yeah, and I -- I -- yeah, that

3    might've been a bad question.  I didn't mean to

4    ask you about every religion's views.

5            But you're aware that some religions

6    have a view -- religious views that oppose

7    gender-affirming care.  You're aware of that,

8    aren't you?

9        A.    I am.  Yes, I am aware of that.

10       Q.    Yeah.  That some peoples' religious

11   views are that we don't -- we don't have

12   gender-affirming care.  That's contrary to our

13   religious views, right?

14       A.    Yes.

15       Q.    Okay.  So you share -- you shared

16   Ms. Mack's apprehension because of those

17   beliefs.  I think you said a potential concern.

18   You said a discussion -- that was an

19   apprehension that you could have, right?

20       A.    Yes.

21       Q.    And then if we go to Paragraph 4

22   where we were, and we'll do this -- we'll pick

1     Q.    You see that Ms. Mack is saying that

2    she feels like there's a balancing and it's --

3    the concerns are being outweighed.  Do you see

4    how Ms. Mack is saying that?

5     A.    I do hear how she's saying that.  I

6    do see how she's saying that.

7     Q.    Okay.  That kind of weighing or

8    balancing of the strengths and the risks is

9    something that needs to happen when you're

10    reviewing an application, right?

11    A.    It does, yes.

12    Q.    Yeah.  And that's not an exact

13    science, is it?

14    A.    No, it is not.

15         MR. BRYANT:  Objection to form.

16         BY MR. ELLIS:

17    Q.    It's not like if you have X number

18    of strengths and Y number of concerns.  You

19    don't just count up a tally, and there's this

20    many here, and this many there, so this side

21    wins, right?

22    A.    Right.

Page 217

1      A.      Correct.

2      Q.      Okay.  Again, at this point, this is

3  a month and a half after y'all have had the

4  report or the assessment, right?

5      A.      About that.

6      Q.      And she's submitting a

7  recommendation, and the recommendation is that

8  they'd be approved as a resource, true?

9      A.      True.

10     Q.      Okay.  So fair to say Ms. Jones

11  agrees with Ms. Mack and Mr. Garrett and

12  yourself.  You-all agree with the assessment,

13  correct?

14     A.      At this point, yes.

15     Q.      Okay.  Next if you go back up to

16  that table, it looks like it shows review

17  recommendation -- first, it goes to you.  Is --

18  am I reading that correctly?  Is that how you

19  read that table?

20     A.      Yes.

21     Q.      And that your start date begins on

22  the date that Ms. Jones submitted her

Page 218

1  recommendation, right?

2       A.    Correct.

3       Q.    And you then review, and it looks

4  like you finished your review on March 7th

5  according to that table, correct?

6       A.    Yes.

7       Q.    And then you made a comment with

8  your recommendation, if you go down to the

9  comments, and your comment is "please approve."

10           Do you see that?

11      A.    Yes.

12      Q.    You're asking your supervisor to

13  approve the recommendation of the Burkes?

14      A.    Yes.  Technically, yes.

15      Q.    Okay.  Okay.  So you said:  "Please

16  approve" four days after receiving it, and this

17  then goes to your supervisor, Ms. Moynahan, for

18  her -- it says for her final review, review

19  recommendation final in the table.

20           Do you see that?

21      A.    Yes.

22      Q.    Okay.  Now, a week later, after

Page 256

1    would it have surprised you if they approved

2    it?

3                MR. BRYANT:  Objection to form.

4                THE WITNESS:  Yes, it would have.

5                BY MR. ELLIS:

6        Q.    Okay.  You would agree that at least

7    on the Burkes' application that reasonable

8    people could disagree about whether or not they

9    should be approved, right?

10                MR. BRYANT:  Objection to form.

11                THE WITNESS:  Potentially, yeah, I

12    could see that happening.

13                BY MR. ELLIS:

14        Q.    Because Ms. Mack is reasonable,

15    right?

16        A.    Yes, she is.

17        Q.    And she knows DCF's policies,

18    correct?

19        A.    As far as I know.

20        Q.    And Ms. Jones is reasonable and

21    you're reasonable as well, right?

22        A.    Yep.  Yes.

Page 270

1    various policies and seeing does it fit.  If it

2    does, great.  We have an approval.  If it

3    doesn't, then we have a denial, and if we're

4    not sure, we can defer.

5         Q.    Yeah.  My question is that none of

6    you on the LRT -- LRT team ever communicated

7    with the Burkes about LGBTQ issues or their

8    religious views, did they?

9         A.    No, we did not.

10        Q.    Everything that you were considering

11   relating to their religious views and LGBTQ

12   issues was from Ms. Mack's report, correct?

13        A.    Correct.

14        Q.    When you said that you need to know

15   if -- if everybody agrees with the -- the

16   decision that's being made, how did people

17   communicate their agreement?

18        A.    So I wish I could remember specifics

19   about that day.  I just -- I don't have it

20   anymore.  You know, I know we talked about the

21   policy.  We talked about direct quotes from the

22   assessment and how those two things were not

1          MR. BRYANT:  Objection to form.

2          THE WITNESS:  Yeah, I suppose so.

3          BY MR. ELLIS:

4     Q.    The decision was made here to deny

5     the application.  Is that your recollection?

6     A.    It was made to deny the license

7     assessment.

8     Q.    And everyone there agreed with that

9     decision?

10    A.    From the best of my recollection,

11    yes.  There was not anyone who voiced an

12    opinion saying I don't -- I don't think this is

13    the right thing to do.

14         There was discussion, for sure,

15    about it.  It's not a decision that was made

16    lightly.  There was definitely discussion about

17    it, but at the end of the meeting if we had

18    folks who were saying I don't think the policy

19    applies here or we need to look at something

20    else or consider something else, we had other

21    options.

22              So we did have consensus.  If

Page 276

1  everyone spoke up or not, I don't -- I don't
2  know how to answer that.
3      Q.    What do you mean by you had other
4  options?
5      A.    So the consensus was that this
6  assessment did not align with DCF policy and
7  regulations, and that's because we looked at
8  the regulations.
9           If there were folks in the room who
10 felt no, you know what, this -- this does meet
11 our regulations, I think you're wrong, we could
12 have deferred the decision and said we're not
13 agreeable.  We could've asked more folks to
14 join us.  Like, we had -- we had other options.
15 You don't have to approve or deny.  You can
16 defer.
17     Q.    There's a judgment call that's part
18 of that, right?
19     A.    Yeah, you keep saying judgment call.
20 I don't love that but --
21     Q.    Well, you -- you have to make a
22 decision --

Page 277

1    A.    Yeah.

2    Q.    -- based on the situation that

3  you're presented, right?

4    A.    Yes.  Yes.

5    Q.    It's not always clear cut?

6    A.    It's not always clear cut.  Nope.

7  Nope.

8    Q.    And, Ms. Sweetman, you said it was a

9  difficult conversation and there was a

10  discussion.  Who was advocating on behalf of

11  the Burkes receiving a foster care license?

12    A.    So the assessment itself was

13  recommended for approval.  So the assessment

14  stand alone.  That could've -- we have -- we

15  have assessments that come to licensing and

16  training with a recommendation of a denial.

17        So the assessment was -- was

18  recommending approval.  The report that every

19  person got was recommending approval.

20    Q.    And that -- that -- that was --

21  we've discussed this.  It was -- that was your

22  recommendation as well.

Page 282

1  she thinks this is how policy should be applied

2  and you disagreed with her?

3      A.    Not -- not that I can recall.

4      Q.    She -- she's your supervisor, right?

5      A.    Yes, she is.

6      Q.    And so when she's saying this is --

7  this is the -- how I see the policy, you can't

8  recall an instance where you've come back and

9  disagreed with her on that?

10      A.    If I didn't understand it or it

11  wasn't making sense to me, I would have no

12  problem saying help me understand or I'm not

13  seeing that connection.  If it's clear to me,

14  then there's nothing to discuss.

15      Q.    Now, you were aware that -- as we've

16  discussed through Mack's report, that the

17  Burkes' views on LGBTQIA issues were a part of

18  their religious beliefs, right?

19          MR. BRYANT:  Objection to form.

20          THE WITNESS:  Correct.

21          BY MR. ELLIS:

22      Q.    What -- did you raise a potential of

1      Q.    Big emailer.

2            And do you have any understanding of

3   why there's not an email about this invitation

4   going out to 18 Degrees?

5            MR. BRYANT:  Objection to form.

6            THE WITNESS:  I -- I don't know

7   that.  It's possible there was a conversation

8   with Nick.  We had other work that, you know,

9   their agency was doing for us, so maybe it was

10  mentioned in a call, but I'm not certain.

11           BY MR. ELLIS:

12     Q.    Okay.  The standard process is for

13  the contracting agency to be there as part of

14  the LRT, right?

15     A.    Yeah, ideally there would be at

16  least a representative from that agency in the

17  LRT.

18     Q.    In fact, that's something that made

19  this one an anomaly in your mind, right?

20           MR. BRYANT:  Objection to form.

21           THE WITNESS:  That is -- that is

22  true.  It's not -- I won't say it never

Page 313

1    happens, but it is not the standard.

2            BY MR. ELLIS:

3        Q.    Why not postpone the meeting until

4    18 Degrees could attend?

5        A.    We could've done that, for sure, but

6    we could've also reached out to them if we had

7    additional questions at the end, and folks were

8    pretty clear about the policy, again.

9        Q.    Okay.  Your testimony is that --

10   that you would've given an invitation, though,

11   to 18 Degrees and that would've been --

12       A.    Correct.

13       Q.    -- likely by email?

14       A.    I believe so.

15       Q.    Correct?

16       A.    Correct.

17       Q.    Okay.  Now, it says:  "The family

18   will be going to fair hearing, and they want a

19   copy of their assessment."

20            Do you see that?

21       A.    Yes.

22       Q.    And you're ask -- you're asking

Page 314

1  central office there in Boston:  "I need to

2  know if I, DCF, change the ending

3  recommendation on the 18 Degree assessment, and

4  that is the final copy, and if so, who signs

5  this, me and Nick?"

6            That's Nick Garrett, right?

7     A.    Yes.

8     Q.    "Or if the 18 Degrees approval

9  recommendation stands alone, and I, DCF, does

10  something different."

11            Do you see that?

12     A.    Correct.

13     Q.    So those are the two options that

14  you're considering here as far as the

15  assessment, right?

16     A.    Yes.

17     Q.    You said:  "You don't want people to

18  misrepresent at the fair hearing," and then you

19  say you have never been in this position

20  before.

21            Do you see that?

22     A.    I do.

Page 315

1      Q.    Is that -- does that change your

2  recollection of having done this before where

3  you've gone through and changed

4  recommendations?

5      A.    No, it doesn't.  I mean, I feel like

6  there were -- there were two instances

7  potentially in 20-something years.  Like, I

8  can't -- I didn't think through every

9  interaction, but the -- I was writing to Karen

10 saying this is not something I do every day,

11 and there's not --

12     Q.    Okay.

13     A.    -- clear protocol around how we do

14 this, what would you recommend.

15     Q.    Okay.  It's extremely rare, right?

16     A.    It is pretty rare, yes.

17     Q.    And -- and even in those other two

18 incidents that you remember where there had

19 been something that you had approved that then

20 got denied, do you recollect whether in those

21 two instances you had gone in and changed the

22 assessment?

Page 316

1     A.    Yes, I did.

2     Q.    Okay.  So in your 22 years of being

3   a supervisor, it's happened a couple of times,

4   but here you say you've never been in this

5   position before, right?

6     A.    Yes.

7     Q.    And you say:  "So what do we do,"

8   and you have three question marks, right?

9     A.    Correct.  So I'd like to clarify.

10    Q.    Sure.

11    A.    The other denials were -- one was a

12  unit I was covering, so it -- like, so I -- I

13  was the unapprover in the chain and was passing

14  along -- like, read it, passed it along.  The

15  director said no, it's not being approved.  So

16  I went in and made the change to that one.

17         The other one was from my unit, so

18  it was not a third-party contractor.  It was

19  from my unit where we made a recommendation up,

20  and again, the director at the time said no,

21  and we -- I went in and modified the ending

22  because that's how decisions were made at that

Page 318

1      Q.    But she is from DCF central office,
2   right?
3      A.    She is.
4      Q.    And she knows what she's talking
5   about, true?
6      A.    Most days.
7      Q.    Okay.  And let's see.  Her response
8   to your question is -- she tells you that she
9   spoke to Sharon about this.  Who is Sharon?
10      A.    Sharon Sylvia.
11      Q.    Who is Sharon Sylvia?
12      A.    So at the time, she was the director
13   of adoptions.  I think she was probably Karen's
14   boss.  There's been so many changes.  I can't
15   keep up, but she would've overseen Karen in
16   some fashion.
17      Q.    Okay.  So a director level there at
18   DCF?
19      A.    I think so.
20      Q.    Okay.  And so then it says:  "We" --
21   so she and this director -- "looked at what was
22   written in the event summary of the LS."

Page 319

1           That's the licensing study, right?

2      A.     Yes.

3      Q.     "Compared to what" -- "what is

4  uploaded into the electronic documents."

5           And then she says:  "Please have 18

6  Degrees/LJ sign the licensing study she

7  completed and send over as she wrote it."

8           Do you see that?

9      A.     Yes.

10     Q.     Okay.  She says -- meaning don't

11 make changes to the study that she wrote,

12 right?

13     A.     That's what she's suggesting.

14     Q.     Okay.  That she should sign her

15 own -- what we saw was officially complete and

16 finalized and send over as she wrote it, right?

17     A.     Yes.

18     Q.     And then she continues:  "Then,

19 adding to LJ's study, complete an addendum to

20 the LS," the licensing study, "identifying why

21 DCF does not support the approval

22 recommendation.  Then you sign."

1          Do you see that?

2     A.    Correct.

3     Q.    So she is saying for you to have the

4     licensing study as it was written and then to

5     separately have an addendum explaining why you

6     were doing something different; is that fair?

7     A.    It is what she was saying.  Correct.

8     Q.    Okay.  And that's not what you did,

9     is it?

10    A.    No, it is not what I did.

11    Q.    In fact, you went and edited the

12    actual report and removed Ms. Mack's

13    recommendation and added your language into the

14    body of Ms. Mack's report, right?

15    A.    Correct.

16    Q.    In fact, the edited version that you

17    did gave no indication that the assessment's

18    initial approval -- assessment's -- let me

19    scratch that.

20          Your -- the report that you edited

21    removed any of the references for the original

22    writer recommending approval, right?

Page 321

1      A.    I didn't remove references.    I
2   simply removed her final recommendation.
3      Q.    Okay.   And -- and removed several of
4   the family's strengths, right?
5      A.    In the summary, there were -- it was
6   probably a paragraph or two that were removed.
7   I had to make a conclusion that lined up with
8   the recommendation.
9      Q.    Okay.   And in order to -- to have a
10  conclusion that lines up with that
11  recommendation, you felt you needed to remove
12  some of the strengths of the Burkes; is that
13  fair?
14     A.    Well, it didn't feel like it would
15  flow properly to say -- like, I had to take out
16  some of what LJ was saying to -- to say this is
17  the denial.   Like, the decision that we've
18  reached as an agency is that we can't license
19  the home.
20     Q.    So you would need to remove parts of
21  it that would indicate the contrary, right?
22     A.    Correct.

1           BY MR. ELLIS:

2      Q.    Ms. Sweetman, your concern was that

3  at a hearing it could become messy if the

4  Burkes knew that you, having never assessed the

5  family or spoken with them about the issues,

6  read the evaluation and opted to deny them.

7  That was your concern, correct?

8      A.    Sure.   That's -- that could be, yes.

9      Q.    That could be, or that was your

10  concern?

11      A.    No.   That -- that -- that was

12  definitely a part of my concern.   The other

13  part was how am I documenting this in a record.

14  We don't have policy that dictates what this

15  should look like.

16      Q.    Okay.   I -- there's -- there's no

17  question here -- there's no -- nothing you

18  write here in this email that's saying this

19  could be a problem with our system.   Is it --

20  is that fair?

21      A.    No.   No, and Karen wouldn't -- she

22  doesn't understand -- remember, this was a new

Page 328

1  system.  So she has no idea how this works.

2  It's not -- she doesn't do that part of the

3  job.

4        So she's saying, from my perspective

5  at central office, this is the cleanest way to

6  do this.

7     Q.    Okay.  In fact, what you say is:

8  "Wondering what strategy approach I would take

9  at the fair hearing to explain this

10 discrepancy."

11        Do you see that?

12    A.    Yes.

13    Q.    And that discrepancy is the fact

14 that 18 Degrees recommended approval and DCF,

15 without having spoken with the family, denied

16 them.  That's the discrepancy you're concerned

17 about, right?

18    A.    That is one of them, yes.

19    Q.    Okay.  Do you think it's important

20 for the Burkes to know that that discrepancy

21 existed?

22        MR. BRYANT:  Objection.  Form.

Page 329

1          THE WITNESS:  Yes, I do think it is

2    important that the Burkes know there was an

3    initial recommendation for approval and the

4    agency, based on the LRT, did not support that

5    recommendation.

6          BY MR. ELLIS:

7     Q.    And you -- you felt that was

8    important for them to know that before the fair

9    hearing, correct?

10    A.    They did know that before the fair

11   hearing.

12    Q.    Okay.  That was -- you're saying --

13   your testimony now, Ms. Sweetman, is that your

14   desire was for them to know that there had been

15   an 18 Degrees assessment that recommended

16   approval and then DCF, without talking with the

17   family, denied their application.  Is that your

18   testimony that you wanted the Burkes to know

19   that?

20    A.    I don't know that I had a particular

21   want.  The family has a right to know that

22   their assessment was recommended for approval.

Page 330

1  They knew it was going to licensing and review.

2  Tywanna was in touch with them regularly.  LJ

3  was in touch with them regularly.  They knew

4  that there was a favorable recommendation.

5           At the end of the LRT, the decision

6  the agency made, which is the final decision,

7  was that that cannot happen.

8      Q.    What is your view of the discrepancy

9  that you're concerned about becoming messy,

10  Ms. Sweetman?

11     A.    That there are two assessments and

12  there's not a way to document that clearly and

13  cleanly in the record.

14     Q.    Is your concern that what could be

15  messy was it seems like 18 Degrees could be

16  pitted against DCF?

17     A.    Sure.  That's also a part of my

18  concern, yes.

19     Q.    Okay.  If that's the concern, you

20  didn't want the Burkes to know about the 18

21  Degrees having a different assessment than DCF,

22  did you?

```
 1            MR. BRYANT:  Objection to form.
 2            THE WITNESS:  It would've -- yeah,
 3    it would've come up in the -- the fair hearing.
 4    They didn't go that route, so this doesn't --
 5    you know what I mean?  Like, it's -- it
 6    would've come up.  It's the reason we would've
 7    been in the fair hearing.
 8            BY MR. ELLIS:
 9      Q.    It would have come up if you had
10    given them the full record, right?
11            MR. BRYANT:  Objection to form.
12            THE WITNESS:  It -- yeah, I don't --
13    they were given what we had in our records.
14            BY MR. ELLIS:
15      Q.    Okay.  They were given what you had
16    edited in your records, right?
17      A.    Correct.  That's the final copy of
18    their assessment.
19      Q.    And it doesn't include all of the
20    assessment that 18 Degrees authored, does it?
21      A.    It does not.
22      Q.    It removes some of their strengths,
```

Page 332

1   for example, doesn't it?

2       A.    There are a couple of strengths that

3   were removed to make the ending match up.

4       Q.    With the decision that you arrived

5   at, right?

6       A.    Correct.

7       Q.    And so you didn't provide that to

8   the Burkes, true?

9       A.    They did not get that draft of the

10  study, no.  They get a final copy.  We don't

11  send drafts out.

12      Q.    So they wouldn't have ever -- how

13  would it have come up in the fair hearing if

14  you didn't send them that report?

15           MR. BRYANT:  Objection to form.

16           THE WITNESS:  So the fair hearing

17  would've pulled both copies of this record.

18  Like, they -- they go in and pull the materials

19  for us.  That would've pulled their 18 Degrees

20  assessment, and then it would have pulled the

21  assessment that we modified the ending of.

22           BY MR. ELLIS:

1     Q.    Okay.  We'll get to more of these

2    emails, Ms. Sweetman.

3          But on this one, the approach --

4    you're asking Ms. Rossetti for a strategy

5    approach to take -- to explain the discrepancy

6    between 18 Degrees and DCF, right?

7     A.    I'm saying I wonder -- I wonder how

8    I'm going to manage this.  I'll be a person

9    that's at the fair hearing, and I wonder how

10   I'll manage this.

11    Q.    Okay.  It's messy in your mind,

12   right?

13    A.    It is messy.  There's no doubt about

14   it.

15    Q.    Okay.  Why is it messy to you that

16   18 Degrees recommended one thing and DCF,

17   without speaking with the family, denied their

18   application?

19          MR. BRYANT:  Objection to form.

20          THE WITNESS:  So part of it is we're

21   contracting with this agency that is supposed

22   to be going by the same rules and guidelines

Page 334

1  that we are.  We've got a different

2  recommendation.  We've got different people who

3  are going to be at the fair hearing.

4          This was a very difficult decision

5  to make.  This family does have a lot of

6  strengths.  We already talked about that, you

7  know.  It was a very difficult decision to

8  make, and it was going to be a difficult fair

9  hearing.

10          BY MR. ELLIS:

11     Q.    Okay.  We'll move -- move forward

12  here.

13          You had asked for a strategy, and

14  Ms. Rossetti responds to you:  "Does this

15  family align with DCF core values and the

16  protective factors framework?"

17          Do you see that?

18     A.    Yes.

19     Q.    And you respond:  "Well, the

20  protective framework does not mention LGBTQ

21  issues."  Let me stop there.

22          That's correct, right?  The

Page 336

 1   covered in the core values, right?

 2       A.    No.   I mean, at this point, it -- it

 3   is covered in the core values.   Cultural

 4   competency is a part of that, is a part of

 5   being welcoming and affirming.

 6       Q.    You say:  "My worry is they are

 7   saying we are discriminating against their

 8   religious beliefs, and it feels messy to have

 9   one eval say it's sort of okay and then us say

10   it's not."

11            Do you see that?

12       A.    I do.

13       Q.    You agree that it's messy, right?

14       A.    That, I do.

15       Q.    And you know that this was -- a

16   concern was about them -- DCF discriminating

17   against their religious beliefs, right?

18            MR. BRYANT:  Objection to form.

19            THE WITNESS:  At this point, the

20   family had expressed that concern directly.

21   That's where that came from.  This wasn't me

22   saying I'm concerned about this.  This was

Page 348

1    can't see what the number is, but I'm on Page
2    32.
3         Q.    Okay.  This is showing edits -- at
4    the bottom there, it says:  "Edits and final
5    recommendations completed by Dawn Sweetman and
6    Anna Moynahan."
7              Do you see that?
8         A.    Yes.
9         Q.    And this isn't the final version,
10   but on the changes here, it looks like this
11   assessment summary recommendation now only has
12   four paragraphs.
13             Do you see that?
14        A.    Yes.
15        Q.    And in this -- if you look at the
16   third paragraph, it still shows:  "This writer
17   does have some apprehension."
18             Do you see that?
19        A.    Yes.
20        Q.    There's no longer any information
21   here about the willingness of the Burkes to
22   foster children with medical needs or -- or

1    those who are deaf, is there?

2        A.    No, there is not in the final

3    recommendation.  No.

4        Q.    So that information was deleted,

5    true?

6        A.    Correct.  Yes, it was.

7        Q.    And also removed the

8    recommendation -- recommended approval of the

9    license, right?

10       A.    Yes.

11       Q.    Multiple places that -- that this

12   showed it before are now removed, correct?

13       A.    So it was -- it was in one place

14   before.  It was in the assessment, the

15   recommendation, and this is the assessment with

16   the final version.

17       Q.    Yeah, but within that -- within that

18   assessment, there were multiple places within

19   these paragraphs where the writer recommended

20   approval, including the very last sentence said

21   that they had balanced it and recommended

22   approval.  Do you remember that testimony --

Page 350

1      A.      Yes.

2      Q.      -- Ms. Sweetman?

3      A.      Yes, I do.  Yep.

4      Q.      Each of those have now been removed,

5  correct?

6      A.      Yes.

7      Q.      You removed the -- the balancing of

8  how those concerns of their religious views on

9  LGBT kids were outweighed, right?  That's

10 removed?

11     A.      Yes.

12     Q.      And did you remove those things,

13 Ms. Sweetman?

14     A.      Yes.

15     Q.      Why -- why delete that information?

16     A.      This was ultimately a denial.  The

17 agency had agreed that we would not be issuing

18 a license.  So the license isn't -- it's not

19 being sent out.  It's not going to folks to

20 consider placement, so it didn't feel

21 imperative.  No one was going to look at that

22 to say, let's put kids in this home.

Page 351

1          We've already made the decision that
2    there wouldn't be children placed in the home
3    based on the alignment with the -- with the
4    policy.  So --
5          Q.    So because of that decision -- oh,
6    sorry.  Continue, Ms. Sweetman.
7          A.    That's okay.  The bottom line is it
8    has -- it had to be a denial, and so that's --
9    that's -- that's what I opted to do.
10         Q.    So it had to be a denial, and so you
11   removed some of the strengths that were in
12   there in this -- in this closing assessment; is
13   that fair?
14         A.    That is fair.
15         Q.    Again, we had -- we've discussed how
16   this is, again, not what central office advised
17   you to do, is it?
18         A.    Correct.
19               MR. BRYANT:  Objection to form.
20               BY MR. ELLIS:
21         Q.    Now, fair hearings -- you haven't --
22   you had not attended a lot of fair hearings

Page 355

1      A.     No, not that I recall.

2      Q.     Okay.  You say:  "This is inherently

3  just a recommendation, but I wondered if these

4  should be in their record as well as my

5  supervision notes."

6             Do you see that?

7      A.     Yes.

8      Q.     Okay.  Ms. Moynahan responds:  "I'm

9  not sure when it comes to record requests."

10             Do you see that?

11      A.     Yes.

12      Q.     Okay.  Now, you respond, it looks

13  like, 12 minutes later to your supervisor,

14  right?

15      A.     Yes.

16      Q.     And you say:  "Aimee called me about

17  another matter, and I spoke to her about this.

18  She said that they have access to everything

19  and neither my supervision notes nor LJ's

20  recommendation would be redacted."

21             Do you see that?

22      A.     Yes.

Page 356

1      Q.    Okay.  And Aimee, is -- is that --
2   well, who is Aimee?
3      A.    She's an attorney for DCF.
4      Q.    Aimee Cameron-Browne?
5      A.    Correct.
6      Q.    What does it mean to not redact LJ's
7   recommendation?
8      A.    To not -- not block out her
9   recommendation.
10     Q.    Not block out, not remove it, for
11  example?
12     A.    Correct.
13     Q.    That the Burkes were to have access
14  to everything, true?
15     A.    Yes.
16     Q.    This is consistent with the advice
17  you had received from central office, right?
18     A.    Yes.
19     Q.    And here legal counsel is telling
20  you the same thing, correct?
21     A.    Yes.
22           MR. BRYANT:  Objection to form.

1          BY MR. ELLIS:

2      Q.    It would be inappropriate for you,

3  as a supervisor, to not give a family seeking a

4  fair hearing everything in their record, true?

5          MR. BRYANT:  Objection to form.

6          THE WITNESS:  Yes.

7          BY MR. ELLIS:

8      Q.    And you didn't want to share with

9  the Burkes about the 18 Degree recommendation,

10  did you?

11      A.    Yeah, I said before I thought that

12  they had that information, and I thought, with

13  having two different assessments -- you've got

14  one that is a draft and one that's a final

15  version.  That's -- that's really where I was

16  hung up with this --

17      Q.    When you say they had that

18  information, you mean that you -- that they

19  were aware that there had been a license study

20  recommending approval.  Is that what you mean?

21      A.    Correct.  That is my understanding,

22  that they were aware of that.

Page 358

1      Q.    Okay.  You -- you're not saying that

2  they were aware of the actual assessment by 18

3  Degrees listing out their strengths and all of

4  the recommendations that -- that Ms. Mack

5  actually gave.  They didn't have access to

6  that, right?

7      A.    Yes, as far as I know.  I -- I don't

8  know if LJ shared that with them before or not.

9  What I know is that when we went into the LRT,

10 the family was aware there was a favorable

11 recommendation.  When we came out of LRT, it

12 was not the same.

13     Q.    And they don't know the -- they

14 didn't know the substance of that

15 recommendation, did they, the details of it?

16     A.    I don't know if LJ shared that with

17 them beforehand or not.  I -- I don't know.

18     Q.    Okay.  And, well, here you're told

19 that those recommendations wouldn't be

20 redacted.  You had deleted those in the final

21 report, correct?

22            MR. BRYANT:  Objection to form.

Page 359

1           THE WITNESS:  So those were deleted

2    in the final report that was uploaded into our

3    system because we can only have one version in

4    the system.

5           BY MR. ELLIS:

6       Q.    And that's what you sent to the

7    Burkes for their fair hearing, correct?

8       A.    Our final version, correct.

9       Q.    That didn't have LJ's

10   recommendation?

11      A.    It did not.

12      Q.    True?

13           Okay.  And that was one way to solve

14   your -- the discrepancy, the worry you had

15   of -- of two different recommendations,

16   correct?

17           MR. BRYANT:  Objection to form.

18           THE WITNESS:  It felt like it was

19   part of a solution.

20           MR. ELLIS:  We can go briefly to

21   Exhibit 24.

22               (Exhibit 24 was marked for

Page 366

1        MR. ELLIS:  Okay.  If we can go to

2   Exhibit 27.

3        (Exhibit 27 was marked for

4   identification.)

5        BY MR. ELLIS:

6   Q.    Do you recognize this email between

7   you and your supervisor, Ms. Moynahan?

8   A.    Yes.

9   Q.    Okay.  Do you see you're sending

10  them a draft of this email to Michael and

11  Catherine?  Do you see yourself sending that at

12  4:31 p.m.?

13  A.    Yes.

14  Q.    Okay.  And then Ms. Moynahan

15  responds back saying:  "Looks good."

16        Do you see that?

17  A.    Yes.

18  Q.    Okay.  So Ms. Moynahan approved this

19  email going out, correct?

20  A.    Yes.

21  Q.    And this email tells the Burkes that

22  they have received the entire record, right?

Page 367

1      A.    Yes.

2      Q.    Okay.  And as we discussed, that's

3   not an accurate statement, is it?

4      A.    Yeah, that the draft piece is really

5   what is -- what's questionable, you know.  Like

6   I had said before, folks don't typically get

7   draft versions of their assessment with the

8   final recommendation.  So I just -- I don't --

9   you know, that --

10     Q.    If we can go back to the Exhibit 26,

11  Ms. Sweetman.

12     A.    Mm-hmm.

13     Q.    And the email says halfway down:

14  "The decision of the team was to deny the

15  license, which is reflected in the license

16  study assessment."

17           Do you see that?

18     A.    Correct.

19     Q.    Now, we've discussed that the

20  actual -- the official assessment from 18

21  Degrees was the opposite of that, right?

22     A.    I'm calling that the draft

Page 368

1  assessment because 18 Degrees does not issue a
2  license.  The department does.
3       Q.    Okay.  And you're saying that the
4  decision to deny is reflected in the license
5  study assessment, right?
6       A.    Correct.  That's the final version.
7       Q.    Okay.  It's -- it's not correct that
8  that would be reflected in the license study
9  assessment that was reviewed by the LRT,
10 correct?
11      A.    Correct.
12      Q.    Or the license study assessment that
13 was sent by 18 Degrees, right?
14      A.    Correct.
15      Q.    Which is the -- this 18 Degrees
16 assessment that central office and legal
17 counsel advised you to send to the Burkes,
18 right?
19      A.    I -- with -- with modification.  So
20 they suggested sending with the addendum, which
21 certainly would've made this cleaner.
22      Q.    Yeah, and that -- you -- you did not

1    do that, right, what you had been advised to

2    do, correct?

3        A.    Correct.

4              MR. BRYANT:  Objection.  Form.

5              BY MR. ELLIS:

6        Q.    And, instead -- and yet you're

7    telling the Burkes that you have received the

8    entire record, right?

9        A.    Yes.

10       Q.    And Ms. Moynahan approved that,

11   correct?

12       A.    Yes.

13       Q.    Okay.  I'd like to -- you then

14   became worried after sending this email that

15   the Burkes might have received the 18 Degrees

16   assessment, right?

17       A.    Correct.

18       Q.    Do you recall that feeling?

19       A.    Yes.

20             MR. ELLIS:  If we can go to Exhibit

21   29.

22             (Exhibit 29 was marked for

Page 371

1      A.    Yep.  Yes.

2      Q.    And you're telling Ms. Jones that in

3  the uploaded events, there is the approved 18

4  Degrees assessment.

5            Do you see that?

6      A.    Yes.

7      Q.    But you were looking for the Word

8  version of the denied assessment, right?

9      A.    Yes.

10     Q.    And so the approved 18 Degrees

11  assessment that you saw uploaded was the one

12  we've talked about before, right?  The one that

13  you -- that you ended up editing, correct?

14     A.    I -- I'm not sure what version.

15  When it says approved, the approved version

16  that was denied by us?  I -- that's what I'm

17  assuming is there.  I don't know.

18     Q.    Ms. Jones responds to you saying:

19  "I find the Word version of the Burke license

20  study attached."  She says:  "I'm certain you

21  did that, the edits, but if by chance you

22  hadn't, review, edit, and email me that version

```
                                              Page 373
 1   edited the assessment directly in iFNet."
 2   That's i-FamilyNet, right?
 3        A.     Right.
 4        Q.     "And printed that out to send them."
 5               Then you say:  "I am slightly
 6   worried that I sent the wrong version in the
 7   mail, but nothing I can do about it now."
 8               Do you see that?
 9        A.     Yes.
10        Q.     "I will submit the iFNet version for
11   our hearing."  That's the fair hearing that
12   you're talking about --
13        A.     Yes.
14        Q.     -- right?
15               And then you ask:  "Are you able to
16   delete the upload of the unapproved version?"
17               Do you see that?
18        A.     Yes.
19        Q.     Why are you asking to delete an
20   upload of an unapproved version?
21        A.     If it's not a fully approved event,
22   then it shouldn't be in our system.
```

1     Q.    Okay.  And, in fact, Ms. Jones is

2   saying -- in responding to you, it says:  "I

3   did not locate an updated Burke license study

4   with edits from you."

5              Do you see that?

6     A.    Yes.

7     Q.    So before all she was able to locate

8   in the record was the 18 Degrees version

9   recommending approval, correct?

10    A.    Seemingly.  I'm not certain.

11   This -- it doesn't -- yeah, I'm not certain.

12    Q.    Okay.  You see how she's saying she

13   couldn't locate an updated Burke license with

14   edits from you.  Do you see that?

15    A.    I do see that.

16    Q.    Okay.  And so you take that as she

17   wasn't able to find the version of the license

18   study that had your edits; is that fair?

19    A.    Yes.

20    Q.    Okay.  So she's looking in the

21   record, and all she finds is the prior

22   unapproved version, right?

Page 375

1      A.    That's what it seems like.

2      Q.    And yet two weeks ago before this

3    email, you told the Burkes that they had

4    everything that was in the record.  Do you

5    remember saying that?

6      A.    Yes.

7      Q.    So that wouldn't have been accurate,

8    would it?

9      A.    It does not seem so.

10           MR. ELLIS:  Okay.  If we could go to

11    Exhibit 30.

12           (Exhibit 30 was marked for

13    identification.)

14           BY MR. ELLIS:

15      Q.    You then talk about this worry you

16    have with your supervisor, Ms. Moynahan,

17    correct?

18      A.    Yes.

19      Q.    And we mentioned how Ms. Moynahan is

20    the one that instructed you to make these

21    changes, right?

22      A.    Yes.

1      Q.     Even though you had told her you had

2    received different guidance from central

3    office, true?

4      A.     Yes.  I shared some version of that

5    with her.  I don't remember specifically what.

6      Q.     Okay.  If we can -- do you recognize

7    this email chain that you sent with -- between

8    you and -- and your supervisor, Ms. Moynahan?

9      A.     Yes.

10     Q.     And this starts off with an email

11   that you send to Ms. Moynahan on June 15th,

12   11:46 a.m.

13           Are you with me?

14     A.     Yes.

15     Q.     Okay.  And the subject is just

16   "Burke," so we're talking about the Burkes,

17   right?

18     A.     Right.

19     Q.     And you say:  "Anna, I cannot recall

20   for the life of me which version of the license

21   study caregiver assessment was mailed to the

22   Burke family for the fair hearing."

Page 377

1              Do you see that?

2        A.    Yes.

3        Q.    And then you say:  "Tywanna has a

4   Word version of LJ's study on our letterhead

5   uploaded into the event recommending their

6   approval."

7              Do you see that?

8        A.    Yes.

9        Q.    And then you say:  "I hope and pray

10  I did not send them this copy, but at this

11  point, I can't be certain."

12             Do you see that, Ms. Sweetman?

13       A.    Yes.

14       Q.    Okay.  Then you say -- well, let me

15  just stop there.

16             Ms. Sweetman, are you -- this is the

17  -- the -- why would you be hoping and praying

18  that the Burkes did not receive this copy?

19       A.    Because it's not an official copy.

20  It's not a final copy.

21       Q.    It also makes the fair hearing messy

22  when they have two conflicting assessments,

Page 404

1        CERTIFICATE OF NOTARY PUBLIC

2      I, LINDSEY RUSSO, the officer before whom

3    the foregoing deposition was taken, do hereby

4    certify that the witness whose testimony

5    appears in the foregoing deposition was duly

6    sworn by me; that the testimony of said witness

7    was taken by me in shorthand and thereafter

8    reduced to computerized transcription under my

9    direction; that said deposition is a true

10   record of the testimony given by said witness;

11   that I am neither counsel for, related to, nor

12   employed by any of the parties to the action in

13   which this deposition was taken; and further,

14   that I am not a relative or employee of any

15   attorney or counsel employed by the parties

16   hereto, nor financially or otherwise interested

17   in the outcome of the action.

18

19               _____.

20               Notary Public in and for

21                the District of Columbia

22   My Commission expires:  February 28, 2029