# EXHIBIT I

Page 1

```
1           IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS
2

     ------------------------------:
3    MICHAEL AND CATHERINE BURKE,    :
                                     :
4                 Plaintiffs,        :
                                     : Civil Action No.
5          vs.                       : 1:23-cv-11798-MGM
                                     :
6    KATE WALSH, in her official     :
     capacity as Secretary of the    :
7    Massachusetts Executive Office  :
     of Health and Human Services,   :
8    et al.,                         :
                                     :
9                 Defendants.        :
     ------------------------------:
10

11

12         REMOTE DEPOSITION OF SHARON C. SILVIA

13

14   DATE:              Tuesday, June 24, 2025

15   TIME:              9:12 a.m.

16   LOCATION:          Remote Proceedings

17

18   REPORTED BY:       Erick M. Thacker
                        Reporter, Notary

19

20

21              Veritext Legal Solutions
            1250 Eye Street, NW, Suite 901
22              Washington, D.C. 20005
```

Page 20

1      exhibit now?

2           A    I am.

3           Q    Okay.  And you see -- have you seen

4      this exhibit before or this document before?

5           A    Yes.

6           Q    Okay.  And you understand that you are

7      here today to testify as a 30(b)(6) witness?

8           A    Yeah.

9           Q    Okay.  And if you go through that

10     document to page 3, you will see Exhibit A,

11     Schedule of Topics.

12               Can you see that?

13          A    Yes.

14          Q    And, also, up there on the left, there

15     is a very helpful zoom feature.  I cannot read

16     tiny print, and so that comes in handy.

17          A    Yes.  I've used it already.

18          Q    Okay.  Great.  All right.  And I know

19     this is where your lawyer may have -- may have an

20     objection, but my understanding is that you are

21     here today to testify as to Topics 1, 2, 3, 4, 5,

22     7, 8 -- continuing on the next page -- 10, 14 and

Page 30

1         So, when the family first comes to us
2    and inquires, they may say this is what they're
3    interested in.  They then go through -- they
4    submit an application.  They then go through MAPP
5    training.  And during that process as well, they
6    learn more about the children, and we learn more
7    about them.
8            During the -- the assessment process,
9    when the LTSW is meeting with the family,
10   these -- these issues are discussed.  Okay.  We
11   explore what their -- what they identify as their
12   abilities.  We also assess.  We also discuss with
13   them and reflect back things that we're saying --
14   seeing, rather.
15           It's really a mutual selection process
16   that occurs, but it's -- it's -- it's a process.
17   It's not just that a family says this or we say
18   that.  It's a process.  It's a clinical
19   formulation given everything that we have learned
20   about the family and there -- but that's --
21   that's how we come to it.
22       Q    It would include a holistic assessment

Page 31

```
 1    of the family?
 2             MR. SHIPOSH:  Objection.  Vague.
 3    BY MS. WINDHAM
 4        Q     You can answer.
 5             MR. SHIPOSH:  Yeah.
 6             THE WITNESS:  Okay.  I think you said
 7    holistic.  Is that what you said?
 8    BY MS. WINDHAM
 9        Q     I said, is it a --
10        A     Okay.  Yes.
11        Q     -- holistic assessment of the family?
12        A     Yes.
13        Q     And I know that's assessed at the time
14    of a licensing decision.
15             Is best fit capacity something that
16    will also change over time?
17        A     Yes.  It can.
18        Q     And when is it reassessed?
19        A     It can be reassessed at any time, but,
20    officially and formally, it is reassessed at
21    least at any -- at the annual events or any
22    interim event that -- or any kind of update that
```

Page 34

1    happen?

2        A    Correct.

3        Q    And it's going to be very individual

4    specific to that family and their capacity?

5        A    Yes.

6        Q    I know we're -- we've already talked

7    about this a little bit, but I will just ask, on

8    the next definition, you have a definition for

9    foster family?

10       A    Yes.

11       Q    And it says, "An individual who does

12   not meet the definition of kinship and who is

13   licensed to provide 24-hour out-of-home care for

14   the children in the custody of the Department."

15            And so, you know, I'm going to

16   assume -- my questions here -- please assume my

17   questions here are going to be about these

18   families who are non-kinship families.  I'll ask

19   you about -- about kinship and be specific if

20   that's needed.

21            When you're issuing a license, is there

22   a different license for foster family as defined

Page 55

1    BY MS. WINDHAM

2        Q    Got it.  Thank you.  Let's go down to

3    DCF-BURKE 286.  And I'm looking at No. 18 there.

4        A    Got it.

5        Q    Fair to say that this is -- I'm sorry?

6    Thought I heard something.

7        A    No.

8        Q    Is it fair to say that No. 18 on page

9    286 lists some of DCF's expectations of foster

10   parents?

11       A    Yes, it lists them.

12       Q    And is it part of the caregiver

13   assessment to educate foster parents on these

14   expectations?

15       A    Yes.

16       Q    And the social worker is going to

17   assess if foster parents can meet these

18   expectations?

19           MR. SHIPOSH:  Objection to the form.

20           THE WITNESS:  They're going to gather

21   information to better assess whether they can

22   meet those expectations and to report back and to

Page 56

1    document what they have found.

2    BY MS. WINDHAM

3        Q    And when a social worker is making

4    these assessments, is it fair to say that some of

5    these requirements are objective and some of them

6    are subjective?

7            MR. SHIPOSH:  Objection to the form.

8            THE WITNESS:  It's fair to say that

9    these are guiding and that, yes, some of them can

10   be subjective, which is also -- which is also why

11   they -- why we have the process that we have in

12   place to help assist with eliminating any kind of

13   bias or inexperience or -- so --

14   BY MS. WINDHAM

15       Q    And you say process, process you have.

16   Which process are you referring to?

17       A    The license review team.

18       Q    And the process, would that also

19   include meeting with the supervisor or the

20   specialists to discuss these concerns?

21       A    Definitely the supervisor and at times

22   the specialists, depending on any kind of

Page 60

1    that it's really not a matter of -- it's -- it's

2    really a discussion and -- it's really a

3    discussion and a -- it's -- I'm trying to

4    summarize in a short way, but I won't do that.

5            So it's really a discussion with

6    anyone, everyone in there.  Okay.  So different

7    people may have different viewpoints, may have

8    different expertise.  And so what I would say is

9    that the -- the -- in an LRT, they -- it is

10   expected that everyone coming in has an open mind

11   to hear everything, okay, and to engage in --

12   engage in not only curiosity and -- and healthy

13   discussion of what's in the study, things that

14   have been considered.  They will ask whether or

15   not the worker had asked this or that.  And so,

16   yes, someone may disagree in the end, but it is

17   really a collective decision.

18           What I would say to that as well is, if

19   there is enough concern or doubt, okay, it

20   doesn't have to end there.  Okay.  So they can

21   defer and gather more information and pull in

22   more people for a later date.  Okay.  They can

Page 92

1   non-discrimination policy.

2       Q    And how does DCF use this document?

3       A    We use it to guide our practice.  We

4   use it to inform our practice.  We use it to

5   inform our families as well.  Okay.  We use it --

6   we use it to also inform anyone that contracts

7   with us, okay, so -- we use it for reference as

8   well.

9       Q    So let's take a look at page DCF-BURKE

10  163.

11      A    Okay.

12      Q    And I'm looking at the second paragraph

13  of that.  It says, "Employees, foster parents,

14  interns, volunteers, and others who interact with

15  children and families must be respectful of how

16  individuals ask to be identified and use the

17  terms an individual uses to describe themselves."

18           Did I read that correctly?

19      A    I believe you did.

20      Q    And what does that mean for DCF?

21      A    So what that means is really exactly

22  what it says, that through our interactions with

Page 93

1    children and families, we are bound to be

2    respectful of who they are, how they identify.

3    And if -- if they -- well, for some staff,

4    they'll -- they will flat out ask, you know, what

5    the pronouns are or what the -- you know, and

6    be -- and for some families and children, they

7    inform you right away, but to use those, okay,

8    and to -- that's really what it is.

9        Q    And so DCF staff would be making sure

10   they use the child's preferred pronouns would be

11   part of that?

12       A    Yes.  Correct.

13       Q    And are foster parents also expected to

14   use a child's preferred pronouns?

15       A    Yes.

16       Q    If a foster family said it was contrary

17   to their religious beliefs to use a child's

18   preferred pronouns that were different than sex

19   identified at birth, would a foster family be

20   able to do that?

21            MR. SHIPOSH:  Objection.  Calls for

22   speculation.  Calls for legal conclusion.  Go

Page 94

1     ahead.
2                THE WITNESS:  The question, they would
3     be allowed not to use it?  Is that what the
4     question is?
5     BY MS. WINDHAM
6         Q     If a foster family said it was contrary
7     to their religious beliefs to use a child's
8     preferred pronouns that did not accord with the
9     child's sex assigned at birth, could that family
10    be licensed?
11               MR. SHIPOSH:  Objection.  Calls for
12    speculation.  Compound.  Go ahead.
13               THE WITNESS:  So this is not about the
14    foster family.  It's about the child, so, no
15    matter what their religion or beliefs are, it's a
16    matter of being affirming and supporting the
17    child.  So, if they cannot be affirming and
18    supportive to the child, then, no, they should
19    not be licensed.
20    BY MS. WINDHAM
21        Q     Could a family in that circumstance be
22    licensed and simply decline a placement for a

1    child who uses pronouns that don't align with

2    their sex assigned at birth?

3                MR. SHIPOSH:  Objection.  Compound.

4    Calls for speculation.

5                THE WITNESS:  So that would be making

6    an assumption that they did not disclose that to

7    us, and that's how they got licensed.  Okay.  So,

8    if that were the case and they were denying

9    placement with no other factors, okay, with no

10   other factors except for that fact, then we would

11   be exploring that in conversation with the family

12   and foster family, social worker, supervisor.  It

13   would be a discussion, okay, most definitely, and

14   to see where we go from here.

15   BY MS. WINDHAM

16      Q    Is a foster family required to disclose

17   any reason why they don't accept a placement?

18                MR. SHIPOSH:  Objection.  Calls for

19   speculation.  Go ahead.

20                THE WITNESS:  I wouldn't use the word

21   "required."  Okay.  So what typically happens is,

22   they will be contacted around a particular child

1    or children, and we'll give them what we know at

2    the moment, okay, what we know.  And if they were

3    to say, no, I can't take this placement, they

4    would typically say, because of A, B and C.

5    Okay.  It is not typical for just a flat-out no

6    without a -- without the family saying something,

7    because they have a relationship with us.  Okay.

8    So we wouldn't say, well, why not?  We wouldn't

9    say that.  Okay.  A family has the right to say

10   no to a placement.

11   BY MS. WINDHAM

12        Q    Skipping down to the last paragraph in

13   this section, it says, "The Department ensures

14   that all placement settings for children, youth,

15   and young adults are safe and affirming.  The

16   Department actively recruits, screens, and

17   assesses foster families for their ability and

18   willingness to support and affirm LGBTQIA-plus

19   children placed in their care, including

20   recruiting foster families that identify as

21   LGBTQIA-plus."

22             Did I read that correctly?

Page 97

1          A    You did.

2          Q    Is it correct to say that DCF requires

3     all placements to be safe and affirming?

4          A    Yes.

5          Q    Does that include kinship placements,

6     too?

7          A    Yes.  If -- yes.

8          Q    In kinship placements, would it be

9     specific to the particular child they're taking?

10              MR. SHIPOSH:  Objection to the form.

11              THE WITNESS:  So, in kinship

12     placements, they are being -- they are being

13     contacted for a specific child, okay, and they

14     are being approved for a specific child.

15              So if we know -- and kinship is very

16     different, because if we know that the child

17     identifies as LGBTQIA-plus, many times, so does

18     the kin.  Okay.  They may not, but many times,

19     they do, too, and so -- and with kinship

20     placements, we are also talking to the family and

21     talking to the child if they are of, you know,

22     developmental age to be able to answer these

1          THE WITNESS:  So DCF acknowledges that

2     some families have special skills around this

3     because of possibly their experience, but we do

4     expect all families to be affirming, and so we

5     wouldn't just look at somebody that -- at that

6     designation, okay, but that designation tells us

7     that there is something about this family that

8     especially -- would have some sort of special

9     skill around this.  Okay.

10          So whether or not they themselves are

11     part of the community -- it might be one of their

12     children that's part of the community.  It might

13     be part of their work, okay, their employment,

14     that -- that gives them a special expertise and

15     understanding.  And, at times, it's really just a

16     special place in their heart.  Okay.

17          It could be that given their medical

18     background and for -- we may have a child that is

19     participating in some sort of medication, whether

20     it be puberty blockers or whatever, that they may

21     have that special skill.  Okay.  So the

22     designation does not mean that everybody else is

1    not affirming.  It just means that this is -- for
2    some reason, this is a special skill.
3    BY MS. WINDHAM
4         Q    Does DCF have licensed families who are
5    not equipped to serve LGBTQIA-plus children?
6              MR. SHIPOSH:  Objection to the form.
7              THE WITNESS:  So, at any point in time,
8    I'd have to say yes, because it's not -- it may
9    not be that they're not affirming, but it may be
10   that because of who they have in their home at
11   this point in time or a particular circumstance
12   that they're going through right now that they're
13   not best equipped.
14              So, at any given time, we could have
15   families that are not best equipped at that
16   moment.
17   BY MS. WINDHAM
18        Q    Does DCF have licensed families who are
19   not affirming of LGBTQIA-plus children?
20              MR. SHIPOSH:  Objection to form.
21   Outside the scope.  Calls for speculation.
22              THE WITNESS:  I could never say that

 1    every single family is affirming.  What I can say

 2    is that if we become aware because of

 3    circumstances, experiences that we have with them

 4    that they're not affirming, then that will be

 5    addressed, and there would be an update, and

 6    depending on the situation could lead to closing

 7    the home.  So I -- but I can't say that we know

 8    for a fact that every single family is affirming.

 9    BY MS. WINDHAM

10        Q    So this paragraph mentions an

11    electronic record of affirming placements.

12             Where is that electronic record kept?

13             MR. SHIPOSH:  Objection.  Beyond the

14    scope.

15             THE WITNESS:  So what I believe this

16    refers to is just our i-FamilyNet, okay, so in

17    those demographics, recording that, and in those

18    special needs and fits and just recording that.

19    So it's not a different record, but we can search

20    for some best fit and special need -- special

21    skills, okay, so that is in the electronic

22    record, which means i-FamilyNet.

Page 120

1      Calls for speculation.  Vague.

2             THE WITNESS:  So we might, but, again,

3      that's not the only consideration.  It's really

4      looking at the dynamics of the family, the

5      information about the youth that they would be

6      sharing a room with.

7             So it's more than just looking at birth

8      sex versus gender identity, and so, therefore,

9      they can share a room with a male because their

10     gender identity is male, even though they are

11     physically female.  So it's more than that.

12     BY MS. WINDHAM

13         Q    When DCF is making placement decisions,

14     does it allow a licensed family to say that they

15     only want to take in boys or only want to take in

16     girls?

17         A    I think --

18             MR. SHIPOSH:  Objection.  Vague.  Calls

19     for speculation.  Go ahead.

20             THE WITNESS:  Yes.  We do allow for

21     that, and it's typically because of the makeup of

22     the home.  So it might be that they know that a

Page 121

1  child is going to be sharing a room or -- with a

2  child already there, maybe their own birth child,

3  or it could be that there -- it could be that

4  they have, say, capacity for two and want to

5  foster two, so, therefore, they want same sex.

6  It might be boy.  It might be girl, but -- yeah,

7  so depending on many factors.

8  BY MS. WINDHAM

9      Q    But DCF also knows that that child's

10  gender identity might change while they're in

11  placement, right?

12          MR. SHIPOSH:  Objection to the form.

13          THE WITNESS:  Correct.

14  BY MS. WINDHAM

15      Q    Could that possibly cause a disrupted

16  placement if a child --

17          MR. SHIPOSH:  Object to form.

18  BY MS. WINDHAM

19      Q    -- sharing a bedroom, if a child's

20  gender identity changes?  Could that lead to a

21  disruptive placement?

22          MR. SHIPOSH:  Objection.  Outside the

Page 122

1    scope.  Calls for speculation and compound.

2            THE WITNESS:  So, yes, but not -- yes,

3    it could, because if the family -- if their setup

4    is such that the child has to share a room and is

5    no longer comfortable, either child is no longer

6    comfortable with the situation of sharing a room,

7    we would actually first try to look for some --

8    alternative accommodations.  Okay.

9            And I use that word loosely and not in

10   the official accommodations, but more in the fact

11   of:  Could we set something up differently?

12   Could they set something up differently?  So, if

13   it's just a space situation, then we would look

14   to mitigate the issue and make it work.

15   BY MS. WINDHAM

16     Q    But DCF does license families who would

17   say, we only feel prepared to take in a boy?

18            MR. SHIPOSH:  Objection.  Vague.

19            THE WITNESS:  Yes.

20            MR. SHIPOSH:  And hold on a second.

21   Objection as outside the scope as well.  Go

22   ahead.

```
 1              THE WITNESS:  Yes, but there would be
 2      reasoning to it.
 3      BY MS. WINDHAM
 4          Q    What do you mean by reasoning?
 5          A    So it could be a single parent.  It
 6      could be a single male, and that's what he's
 7      comfortable with.  And, you know, he may be
 8      interested in teen boys, which we definitely need
 9      homes for, but not teen girls, because that could
10      put him at risk as well because of accusations
11      or -- or the teen girl could possibly not feel
12      comfortable.  So, yes, we do do that.
13          Q    Let's go down to -- this is on page
14      165.  Let me just find which paragraph this is
15      in.
16          A    Excuse me.
17          Q    This is paragraph 10.  It says, "The
18      Department, foster parents, and contracted
19      service providers do not make attempts to
20      convince LGBTQIA-plus children/youth to reject or
21      modify their sexual orientation, gender identity,
22      or gender expression."
```

1    forget it, I'm just going to, you know -- but

2    preparing them.  Okay.

3              So, by the same token, if they are very

4    involved in their faith community, it would be

5    very affirming for them to speak with the clergy

6    and speak with the community and -- not that they

7    have to change their beliefs, but making it a

8    accepting and more affirming place for that

9    youth.  The youth may choose not to go, okay, and

10   that's okay, but -- that's my answer to that.

11   BY MS. WINDHAM

12        Q    Can we go down to the next page, 1268?

13        A    Uh-huh.

14        Q    And there's a bullet point -- it's

15   actually the top of -- bottom of 1267, it says

16   "Other Tips," and then you see a bullet pointed

17   list under that.

18        A    Yes.

19        Q    In the second bullet point there:

20   "Household rules should be consistent for all

21   teens in the home.  For example, if heterosexual

22   teens are permitted to hold hands while watching

```
                                              Page 158
 1    BY MS. WINDHAM
 2         Q    Okay.  Do you know what this is?
 3         A    So it's the filing of the lawsuit that
 4    we are discussing at this point.
 5         Q    Right.  And there's a reference to MAPP
 6    training on here, and so I'm going to ask you
 7    about that.  It's in paragraphs 105 to 107 of
 8    this document.  I'll tell you when I figure out
 9    which page it is.
10             Okay.  It's on page 19 of the document,
11    paragraphs 105 to 107.
12             And I presume you were not present when
13    the Burkes took their MAPP training?
14         A    Oh, absolutely not.
15         Q    So I'm not asking you to opine on what
16    happened or what was said.
17         A    Okay.
18         Q    I am just asking you about DCF's
19    policies here.  And what it says in paragraph 105
20    is, "An instructor stated that parents who were
21    not willing to affirm same-sex relationships and
22    transgender identities should not be resource
```

1    parents."

2              Next paragraph says, "After the class,

3    a DCF employee expressed a somewhat more moderate

4    tone, essentially stating that this wasn't the

5    case and that DCF understood that there were

6    people of different backgrounds there."

7              Do you see that?

8        A    I do.

9        Q    My question -- and, again, I know --

10   I'm not asking you to opine on, you know, whether

11   or not this is an accurate statement.

12             My question is simply:  That first

13   statement that parents who were not willing to

14   affirm same-sex relationships and transgender

15   identities should not be resource parents, is

16   that an accurate statement of DCF's policy?

17             MR. SHIPOSH:  Objection.  Outside the

18   scope.

19             THE WITNESS:  It is accurate.  It is

20   accurate.

21             MS. WINDHAM:  We'll go ahead and move

22   on to the next exhibit.  This should be 12.

Page 165

1        A    I do.

2        Q    And it says, "At the conclusion of the

3    meeting, the LRT makes a decision to approve,

4    deny, or defer a decision about the family."

5             Is the decision that is made the

6    decision of the entire licensing review team?

7             MR. SHIPOSH:  Objection.  Vague.

8             THE WITNESS:  So the decision is

9    made -- the decision that is made is the decision

10    of the -- essentially, the entire licensing

11    review team.  However, there may be some that are

12    not sure of the decision or may be on the fence,

13    but it is the decision of the licensing review

14    team.

15    BY MS. WINDHAM

16        Q    And the -- then a couple of lines below

17    that, it talks about the LRT makes modifications

18    to the prospective placement family's

19    recommendation -- recommendations or training and

20    support plan.

21             Do you see that?

22        A    I do.

Page 181

1        Q    And if a family had limitations on the

2    sex of the child that they could take in due to

3    bedroom capacity, that sort of thing, would that

4    be noted in i-Family?

5        A    Typically, yes.

6        Q    And if the family had special language

7    capabilities, would that be noted in i-Family?

8            MR. SHIPOSH:  Objection.  Vague.

9            THE WITNESS:  Typically, it would.

10   BY MS. WINDHAM

11       Q    I'm just going to scroll down in this

12   policy here.  Please bear with me for just a

13   moment.  Okay.

14            So, in this policy, it looks like it

15   goes on to talk about annual assessments.  I'm

16   going to scroll down to DCF-BURKE 294.

17       A    Yes.

18       Q    And then fourth paragraph there says,

19   "At the end of an annual or interim assessment,

20   foster parents indicate that they wish to

21   continue in their role, and the Department

22   determines if the licensing standards continue to

```
 1    be met."

 2                Do you see that?

 3                MR. SHIPOSH:  What paragraph?  Yeah,

 4    can you -- I didn't see that, either.  Can you --

 5                MS. WINDHAM:  Page 294, fourth

 6    paragraph.

 7                THE WITNESS:  One, two, three, four.

 8    Yeah.  Oh, yes, I see it.  "At the end of an

 9    annual or interim assessment," yes.

10                So the question?  I'm sorry.

11    BY MS. WINDHAM

12         Q    And the licensing standards for that

13    reassessment are the same as the licensing

14    standards for the original assessment, right?

15                MR. SHIPOSH:  Objection.  Outside the

16    scope.  Go ahead.

17                THE WITNESS:  The standards are the

18    same, but we don't do a whole other study.  We do

19    a lookback and update.

20    BY MS. WINDHAM

21         Q    And so what are you looking at in

22    the -- in the lookback?
```

Page 183

1              MR. SHIPOSH:   Objection.   Outside the

2      scope.

3              THE WITNESS:   In the lookback, we

4      review with the family how things went this year.

5      We also want to hear about any positive, negative

6      experiences.   We look at where they were at the

7      beginning of the year and where they're at now,

8      and what I mean by that is in many different

9      ways.   So it could be maybe their family

10     composition has changed, so we make note of that.

11     We make those changes.

12              It could be that, you know what, I said

13     that I don't know how I would do with a kiddo

14     with ADHD, and I had a kiddo placed with me with

15     ADHD, and I feel good about this, you know, so --

16     and I learned so much.   I -- I feel like I

17     could -- this is a special skill that I have,

18     okay, and we would make note of that change.

19              Unfortunately, it could be something

20     negative.   It could be, you know, that -- that

21     there was some change in family circumstance

22     around the relationship, around health, around

                                                    Page 184

1    whatever it may be, although it would be -- the

2    support worker would most likely know that

3    information along the way, okay, and would

4    provide that information to the LTSW doing the

5    annual.

6            It is not formally noted as it's coming

7    up other than in dictation, so that would be

8    pulled together in that annual to -- to basically

9    present how it's gone and also looking at

10   training plans, okay, if they've completed their

11   training and what -- and discussion around what

12   types of issues they may benefit from that, you

13   know, they feel that they may benefit from, and

14   updating that training plan, so, you know, in the

15   training that they did take, how they felt about

16   that and -- so it's a lookback.

17   BY MS. WINDHAM

18       Q    And when that assessment is done, would

19   DCF then update the placement recommendations as

20   needed?

21       A    As needed.

22            MR. SHIPOSH:  Objection.  Outside the

Page 190

1      Q    Okay.  And it says "Safety and Clinical

2   Concerns"?

3      A    Yes.

4      Q    And it lists a number of different

5   things, domestic violence, physical abuse, sexual

6   abuse, substance abuse or misuse, and then it

7   includes rigid or inflexible beliefs.

8           What does rigid or inflexible beliefs

9   mean?

10     A    So it can mean a lot of different

11  things.  Okay.  So rigid or inflexible beliefs

12  could be, all black people are bad, all black

13  people are criminals.  It could be around

14  religion.  It can be around drugs.  It could be

15  once a drug user, always a drug user, and nothing

16  you can say.

17          And it can be anything that is --

18  anything that the person is not open to -- not

19  open to other viewpoints, not that you have to

20  accept the other beliefs, but open to other

21  viewpoints and cannot go beyond that.

22     Q    So rigid or inflexible religious

Page 191

1    beliefs might warrant additional inquiry and

2    explanation?

3        A    Yes.

4        Q    Scrolling down to page -- next page,

5    311, it talks about writing the caregiver

6    assessment and the recommendation.  I think we've

7    already covered that a good bit.

8        A    I've got it.

9        Q    So, partway through that paragraph, it

10   talks about placement recommendations.

11            "Placement recommendations take into

12   account any wishes of the foster/pre-adoptive

13   parents about the type of child they want to

14   foster and the capacities of the foster parent."

15            Is that correct?

16       A    Oh, I see it.  Okay.  I wasn't seeing

17   that.  Foster parent, family's preference in the

18   type of child they are -- yes, I see that.

19       Q    So it's a normal part of the assessment

20   to consider a foster parent's wishes about the

21   kind of children they would like to foster; is

22   that fair?

1    has a cold and you're taking them to the doctors,

2    you're taking them for their routine annual,

3    their -- you know, you're bringing them to the

4    emergency room because they fell, you don't need

5    DCF to do that.  So, routine medical care, the

6    foster parent can do that.  Anything beyond just

7    routine, emergency or emergency medical care,

8    it's DCF.

9    BY MS. WINDHAM

10        Q    So gender-affirming medication would be

11   DCF's decision to make, right?

12            MR. SHIPOSH:  Objection.  Outside the

13   scope.  Calls for speculation and vague.

14            THE WITNESS:  So it would be DCF's

15   decision to make in certain circumstances.

16   There's also family, so first family, birth

17   family, involvement in some of the

18   decision-making.

19   BY MS. WINDHAM

20        Q    But it would not be the foster family's

21   decision to make?

22            MR. SHIPOSH:  Objection.  Outside the

Page 201

1    scope of the testimony.  Calls for speculation

2    and vague.

3              THE WITNESS:  They could not make this

4    decision on their own.

5    BY MS. WINDHAM

6        Q    Is this policy reviewed with

7    prospective foster parents as part of the

8    licensing process?

9              MR. SHIPOSH:  Objection to the form.

10             THE WITNESS:  Our -- well, a couple of

11   things.  In -- I know in our current MAPP

12   training, we have the policy included, as far as

13   links to the policy, okay, so those are included.

14             The families are made aware, but

15   whether or not it's -- and we also have our

16   foster care portal, so -- it's called FosterMA

17   Connect.  So families have access to all our

18   policies on FosterMA Connect that pertain to

19   children in care.

20   BY MS. WINDHAM

21       Q    If a foster family disagreed with

22   providing hormone therapy to treat gender

Page 214

1    here to No. 9.  This is on page 335, "Prepare the

2    Foster Parent for Placement."

3                Do you see that?

4        A    I do.

5        Q    And so this indicates the FFSW contacts

6    the foster home, explains why they think the

7    foster family is a good match for the child and

8    provides information about the child and goes on.

9                Do you see that?

10       A    I do.

11       Q    Is a foster family ever required to

12   accept a particular placement?

13       A    No.

14       Q    And so a foster family could decline

15   the placement for a variety of different reasons,

16   right?

17       A    Yes.

18       Q    And we've talked about some of those

19   today, like if they had a medical crisis and they

20   couldn't care for that child, right?

21       A    Yes.

22       Q    Or if they didn't -- if they had work

Page 215

1    hours that would not allow them to make all the

2    child's medical appointments, that might be a

3    reason as well, right?

4        A    Yes.

5        Q    Or if they had never parented a

6    teenager before and they did not feel equipped to

7    care for a teenager, that might be a reason,

8    right?

9        A    Yes.

10       Q    And I think you said before, a foster

11   parent could decline without giving a reason,

12   although that would be unusual, right?

13       A    Yes.

14       Q    Scrolling down to 340.

15       A    I've got it.

16       Q    All right.  Actually, I'm going to

17   skip -- skip over that one.  Let's go down to

18   345, talking about out of state placements.

19       A    Got it.

20       Q    This is placing children outside of

21   Massachusetts.  Do you see that?

22       A    I do.

Page 219

1      Do you have that up?

2          A      Fourteen.

3                 MR. SHIPOSH:  Just while she's doing

4      that, Lori, one of the documents we sent

5      yesterday might be of relevance in terms of the

6      placement type inquiries of 2 and 3, I think, the

7      topics you mentioned.

8                 MS. WINDHAM:  Thank you.

9                 THE WITNESS:  I've got that.

10     BY MS. WINDHAM

11         Q      Okay.  And this is a Boston Globe

12     article, correct?

13         A      Yes.

14         Q      Could you read the article headline and

15     subheading for me?

16         A      Sure.  "A 15-year-old stayed in a

17     hospital for 40 days.  The reason?  The state

18     child welfare agency had no place to put him.

19     Massachusetts' child welfare agency has been

20     stranding healthy kids in hospitals due to a lack

21     of options."

22         Q      And I understand from our discussions

```
                                                  Page 220

 1     through your counsel, you're not going to be

 2     testifying about this particular child today,

 3     who's identified as James.  We don't know his

 4     name.  But I'm going to ask you about a couple of

 5     other things that are stated in this article.

 6          A    Sure.

 7          Q    And so this article alleges that this

 8     boy was in the hospital for 40 days because DCF

 9     did not have a placement for him.

10               I'm not asking you if that's true.  I'm

11     asking if that's a fair -- is that a fair summary

12     of what the article is saying?

13               MR. SHIPOSH:  Objection.  Vague.

14               THE WITNESS:  Go ahead?

15               MR. SHIPOSH:  No, you can go ahead and

16     answer.

17               THE WITNESS:  Okay.  As far as what the

18     article is saying, yes.

19     BY MS. WINDHAM

20          Q    And it says, the second paragraph on

21     page 2 here, "The 15-year-old lived in a

22     windowless room, ate hospital meals, wore thin
```

Page 221

1    papery scrubs, and was allowed to leave only to

2    use the bathroom or shower down the hall."

3            Did I read that correctly?

4        A    You did.

5        Q    And would you agree with me, if that

6    statement is true, that's a situation that DCF

7    would not want for a child in its care?

8            MR. SHIPOSH:  Objection.  Calls for

9    speculation.  Vague.

10           THE WITNESS:  So --

11           MR. SHIPOSH:  Lacks foundation.

12           THE WITNESS:  So, absent of any

13   details, yes, we -- we would not typically want a

14   child to be in that type of situation.

15   Unfortunately, sometimes -- well, in those

16   situations, there are always other circumstances,

17   so...

18   BY MS. WINDHAM

19       Q    A couple of paragraphs down, the

20   article says -- references "kids shuttled around

21   the state in the back seat of workers' cars or

22   sleeping on couches and bean bags in agency

Page 222

1    offices."

2              Do you see that?

3        A    I do.

4        Q    Are there sometimes situations where

5    DCF workers have to drive kids to another town

6    for the right placement?

7        A    Yes.

8        Q    And it also has reference to kids

9    sleeping on couches and bean bags in agency

10   offices.

11             Are there sometimes situations where

12   kids have to spend the night in a DCF office?

13       A    Typically, that is not -- well, they

14   may come in in the middle of the night, so, yes,

15   they may indeed be there during the night as

16   we're locating a placement for them, but as far

17   as this is where you're sleeping tonight, no.

18   Okay.  But they -- we try and make them as

19   comfortable as possible when we are bringing --

20   we may be getting them out of bed at 2:00 in the

21   morning and literally carrying a child, a

22   sleeping child, out of a home.  So, yes, they

1      might be on a couch or a bean bag when they come

2      into care, and it might be the middle of the

3      night.

4          Q    But your goal is to be able to move

5      them out of that situation as quickly as you can,

6      right?

7          A    Into -- yes.  Into an appropriate

8      placement, yes.

9          Q    Okay.  And the article then goes on to

10     refer to kids -- apparently other kids as being

11     housed in hospitals when DCF does not have an

12     appropriate placement for them.

13              Is it sometimes the case that children

14     in DCF's care have to remain in hospitals while

15     an appropriate placement is found?

16         A    Yes, but we are -- we -- some of the

17     things are -- most of them are beyond our control

18     because those kids are there because of the fact

19     that there are some complex needs, and we have

20     children that are in these settings that needed

21     to be there initially, okay, and based on -- you

22     know, they needed to be medically cleared and --

Page 224

1    and stabilized.  And we immediately -- because

2    some kids, it's -- they need psychiatric

3    hospitalization.  They need to move from that

4    hospital to elsewhere, and there may not be a bed

5    available for that.

6            For other kids, we need a higher level

7    of care, so a congregate care bed.  Okay.  And

8    for some of our kids, they may have gone to the

9    hospital because of assaultive behaviors, because

10   of -- most of the time, it's because of severe

11   behavioral challenges that they may have been

12   sectioned by the police and got there, okay, and

13   then it falls to us to try and find something for

14   them.

15           Depending on the child's history, they

16   may be stuck there, because we will send out

17   information to congregate care providers, and we

18   have to disclose what we know about the child.

19   They may have come from another congregate care

20   setting and was assaultive to staff and ended up

21   being evaluated -- a crisis evaluation, so they

22   ended up in the hospital, but we have to disclose

Page 225

1    that to the next congregate care, and so some

2    just refuse them.  And we have to find some place

3    safe for them.

4         Q    So, going down to page 4, they refer to

5    a statement from a DCF spokesperson.  This is the

6    third full paragraph on page 4.

7              Do you see that?

8         A    The statement?

9         Q    Yes.

10        A    Yes.

11        Q    So it said, "She said the state has

12   started making several changes to help reduce the

13   number of children boarding in emergency

14   departments."

15             What does boarding in emergency

16   departments mean?

17        A    So what that means is that we're trying

18   to -- that they ended up in the emergency

19   department because of a need.  They stabilize

20   there, and we're trying to find a placement that

21   can meet their needs.  So they call it boarding

22   in an emergency department.

Page 231

```
1    apartments as short-term housing for children,"
2    correct?
3         A    Correct.
4         Q    The article says that DCF uses
5    apartments at three locations as emergency
6    overnight shelters for youths in need.
7              Is that fact correct?
8         A    Yes.
9         Q    Does DCF still use apartments as
10   emergency shelters?
11        A    We do have them available to us.  They
12   are not as much in use at this point.  A lot of
13   this was with timing of what was going on
14   around -- it was just coming -- not really out of
15   the pandemic, but our congregate care, we all had
16   a -- you know, the great resignation, and our
17   congregate care, although they may have had some
18   beds, they may not have had the staffing for
19   them.
20              So we -- and these children are not --
21   they are not easy as far as -- they have some
22   complex needs.  Some of them may be -- there may
```

Page 232

1    be aggression.  They may be on the autism

2    spectrum.  Some may be nonverbal.  Some may be a

3    combination of all those things.

4              Also, some kids that have been either

5    on the run or exploited, and we have now gotten

6    them back into our care.  We've -- we've got

7    them, but need to keep them safe, and so it's

8    not -- and these were for -- are for, typically,

9    12 to 18, youth 12 to 18.

10        Q    Are there circumstances where they

11   would be used for a child who is younger than 12?

12        A    The contract that we have with these

13   two providers allows for a discussion around

14   that.  I am not aware of any child that was below

15   that age.  It doesn't mean it didn't happen, but

16   it may be a special -- maybe there was an

17   11-year-old.

18              And these apartments, the kiddos are

19   not just put in the apartment.  They're staffed.

20   Okay.  We have staff, either our staff, or one

21   provider that we have a contract with, they staff

22   it, and one, we staff it.

1        Q    And this refers to a -- it quotes a

2    union representative saying that "Though the

3    apartments were intended for youths with complex

4    needs, they have also housed recent runaways and

5    kids in transition from one placement to

6    another."

7              Do you know whether that's accurate

8    that they have sometimes housed kids who are in

9    transition from one place to another?

10       A    Yes.  Yes.  So we may have, as I

11   mentioned, a child, a youth, come in on an

12   emergency basis and not have a hotline bed for

13   them, okay, and given -- not have a hotline bed.

14   And, also, given other behaviors that they are

15   presenting with, it's not just that they're

16   transitioning from one spot to another.  They're

17   transitioning for a reason.  It may have been and

18   typically is that their behavior has been such

19   that they couldn't be maintained in that previous

20   placement.

21             Okay.  So, rather than -- especially if

22   it's been during the night.  This is a

Page 234

1    comfortable place.  They can shower.  They can --

2    there's a stocked refrigerator.  There's -- and

3    we have one-on-one staff with them.  So it's a

4    more comfortable alternative.

5         Q    The article estimates that "The three

6    apartments cost the department almost

7    $380,000 through June," and says, "DCF budgeted

8    close to 1 million to cover the anticipated need

9    for the New Bedford unit."

10             Are those numbers accurate?

11             MR. SHIPOSH:  Objection.  Outside the

12   scope.

13             THE WITNESS:  I'm just looking for the

14   numbers.  Okay.  I -- I know that -- I know --

15   there we go.  The three apartments cost the

16   Department almost 38,000 [sic] through June.

17             It's my understanding that that is

18   accurate.  The -- the apartments by one provider,

19   which we were staffing, had a very low cost, but

20   the five beds with the other provider that they

21   were staffing, that's the staff costs as well.

22   Okay.  So that is accurate.

Page 247

1          A    Goal number --

2          Q    3.

3          A    -- 3.  Page 265?

4          Q    2265.  It's page 37 of the document.

5          A    Goal No. 3, I have.  Oh, I'm sorry.  I

6     was looking at the activity step.  That's what my

7     issue was.  Okay.  Yes.  "Increase the number of

8     foster homes serving the pre-teen youth including

9     LGBTQIA affirming homes."  Yes.

10         Q    So does this indicate that not all

11    homes are LGBTQIA affirming homes?

12         A    No.

13              MR. SHIPOSH:  Objection to form.

14    BY MS. WINDHAM

15         Q    You can --

16         A    No.

17         Q    -- answer.

18         A    No.  That doesn't -- one doesn't equal

19    the other.

20         Q    Why is there a need to recruit more

21    LGBTQIA affirming homes if all homes are LGBTQIA

22    affirming?

1   although all homes are expected to be

2   affirming -- excuse me.  Let me just hang up on

3   this spam.  Although all homes are expected to be

4   affirming and they may not have openings at this

5   point because they're not -- all homes are not

6   specific to, in any, way shape or form, LGBTQIA,

7   so we may not have the capacity because of other

8   placements in that home that it's not a good

9   match.

10          Q    Let's scroll down to page 2303.  This

11   is page 75 of the document.

12          A    Got it.

13          Q    And it looks like this is the Western

14   Region/Greenfield Area Office Recruitment Plan

15   for 2023; is that right?

16          A    Yes.

17          Q    And Goal No. 1 says, "Increase the

18   amount of long-term placement homes focusing on

19   all age groups, LGBTQIA-plus affirming homes."

20               Do you see that?

21          A    I do.

22          Q    So the Greenfield office is also in

Page 251

1          A     Correct.

2          Q     Okay.  And I'm going to scroll down to

3     page 2314 within this.

4          A     We'll see.

5          Q     Do you see Goal No. 4 there?

6          A     Yes.

7          Q     And this says, "To increase the number

8     of affirming homes for the Harbor Area Office"?

9          A     Yes, it does.

10          Q     And so this would indicate the Harbor

11     Area Office did not have enough affirming homes?

12          MR. SHIPOSH:  Objection.  Outside the

13     scope.

14          THE WITNESS:  So I go back to using

15     affirming and special skills, unfortunately,

16     interchangeably when they shouldn't be.

17     BY MS. WINDHAM

18          Q     But it doesn't say special skills on

19     here, correct?

20          A     No, it does not.

21          MR. SHIPOSH:  Objection.  Outside the

22     scope.

Page 253

1           MR. SHIPOSH:  Objection.  Outside the
2      scope and also objection to form.
3      BY MS. WINDHAM
4           Q    All right.  Let's go down to 2317, just
5      a couple more pages down.
6           A    2317.  Got it.
7           Q    All right.  And this is the
8      Western/Holyoke Recruitment Plan for 2023, right?
9           A    Yes.
10          Q    All right.  And go down to 2319 at Goal
11     No. 2.
12          A    Yes.
13          Q    And Goal No. 2 says, "Increase the
14     number of foster families that will consider
15     children/youth who identify as LGBTQIA-plus,"
16     correct?
17          A    Yes.
18          MR. SHIPOSH:  Objection.  This is
19     outside the scope of the notice.  Go ahead.
20     BY MS. WINDHAM
21          Q    And this would indicate that not all
22     foster families would consider children -- youth

Page 254

 1    who agree -- who identify as LGBTQIA-plus,

 2    correct?

 3              MR. SHIPOSH:  Objection to the form of

 4    the question.  Outside the scope.

 5              THE WITNESS:  The way this is worded,

 6    it could suggest that.

 7    BY MS. WINDHAM

 8         Q    And I'm going to scroll down to page

 9    2320, just the next page.

10         A    Got it.

11         Q    And you see, "Outcome: Update 2023.

12    There are more affirming families within the

13    foster care ranks due to the media exposure and a

14    shift in the general population's view on this

15    community.  There's more work to be done for

16    recruitment efforts for those populations.  There

17    is one new family that will begin MAPP in 2023

18    who will consider children that identify as

19    LGBTQ-plus."

20              Do you see that?

21         A    I do.

22         Q    Does this also indicate that not all

1      the families would consider children who identify

2      as LGBTQ-plus?

3                MR. SHIPOSH:  Objection to the --

4      objection to the form.  It's outside the scope of

5      the notice.  It's vague and calls for

6      speculation.

7                THE WITNESS:  Would it suggest that?

8      Yes, it would suggest that.

9      BY MS. WINDHAM

10          Q     And let's go ahead and scroll down to

11     page 2393.  That's page 165 of the document.

12          A     Thank you.  I've got it.

13          Q     And this is the Western Region

14     Springfield Area Office Recruitment Plan for

15     2023, correct?

16          A     Correct.

17          Q     And Goal No. 1 is, "Identify

18     community-based churches that align with the

19     Department's mission of inclusivity."

20                What is the Department's mission of

21     inclusivity?

22                MR. SHIPOSH:  Objection to form.

Page 267

1          CERTIFICATE OF NOTARY PUBLIC

2          I, ERICK M. THACKER, the officer before whom

3     the foregoing deposition was taken, do hereby

4     certify that the witness whose testimony appears

5     in the foregoing deposition was duly sworn by me;

6     that the testimony of said witness was taken by

7     me in stenotype and thereafter reduced to

8     typewriting under my direction; that said

9     deposition is a true record of the testimony

10    given by said witness; that I am neither counsel

11    for, related to, nor employed by any of the

12    parties to the action in which this deposition

13    was taken; and, further, that I am not a relative

14    or employee of any counsel or attorney employed

15    by the parties hereto, nor financially or

16    otherwise interested in the outcome of this

17    action.

18                    ERICK M. THACKER
                  Notary Public in and for the
19                Commonwealth of Virginia

20

      My commission expires:

21    August 31, 2028

22    Notary Registration No.: 7184488