# EXHIBIT K

```
                                                        Page 1
 1            IN THE UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF MASSACHUSETTS
 3   _____
 4   MICHAEL BURKE and CATHERINE
 5   BURKE,
 6          Plaintiffs,
 7      v.                              Civil Action No.
 8   KATE WALSH, in her official        1:23-cv-11798-MGM
 9   capacity as Secretary of the
10   Massachusetts Executive Office
11   of Health and Human Services, et
12   al.,
13          Defendants.
14   _____
15
16
17
18
19
20
21
22
```

```
                                                    Page 2
 1           VIDEOTAPED DEPOSITION OF ANNA MOYNAHAN
 2    DATE:            Tuesday, May 13, 2025
 3    TIME:            9:04 a.m.
 4    LOCATION:        Remote Proceeding
 5                     DCF Western Regional Office
 6                     1350 Main Street
 7                     Springfield, MA 02108
 8    REPORTED BY:     Richard Livengood
 9    JOB NO.:         7361093
10
11
12
13
14
15
16
17
18
19
20
21
22
```

Page 25

1    Q    And so talking a little bit more about the
2    process for licensing foster parents, what role do you
3    currently play in that process?
4    A    Currently, I am not a part of the LRT on a
5    regular basis.  I am part of an expanded team, if
6    additional support is needed.
7    Q    So in what kind of circumstances would
8    additional support be needed?
9    A    If there are complex situations that need
10   further discussion, if there's questions about whether
11   something meets policy in order to be licensed.
12   Q    And who else is on that expanded team along
13   with you?
14   A    It really depends on each circumstance.
15   Q    Who are some other people who have, at some
16   point, played a role on that expanded team?
17   A    Some of our agency's specialists, depending
18   on the circumstances of each family's situation.
19   Q    And what are those specialties in?
20   A    The department has specialists for domestic
21   violence, substance abuse, mental health, permanency,
22   education, LGBTQIA+, legal.  There may be others that

Page 26

1    I'm just -- childcare.  There's a number of them.
2         Q    And about how often do you need to pull in
3    somebody from the expanded team as part of the
4    process?
5              MR. BRYANT:  Objection to form.
6              You can answer.
7              THE WITNESS:  Yeah, I -- I'm not sure.
8    I'm -- I don't know how often, in comparison, because
9    I don't join every LRT.
10   BY MS. WINDHAM:
11        Q    In the past, did you join LRTs regularly?
12        A    When -- LRTs refer -- when -- when we were
13   trying to implement the new policy, I was part of
14   those meetings on a more regular basis.
15        Q    And when did you stop attending on a regular
16   basis?
17        A    I don't recall exactly when.
18        Q    Was it in 2025?
19        A    No.
20        Q    Was it in 2024?
21        A    I don't -- I honestly do not recall exactly
22   when.

Page 59

1    gender identity in that circumstance?
2                    MR. BRYANT:  Objection to form.
3                    THE WITNESS:  Supporting a child's
4    identity would be to be affirming in the ways that
5    were described earlier.
6    BY MS. WINDHAM:
7         Q    And how would DCF determine whether that
8    family was affirming?
9                    MR. BRYANT:  Objection to form.
10                   THE WITNESS:  Again, through the
11   interview process and the statements and reflections
12   from the foster -- potential foster family if they are
13   able to be affirming.
14   BY MS. WINDHAM:
15        Q    And what sorts of things would the family
16   have to commit to saying in order to be affirming?
17                   MR. BRYANT:  Objection to form.
18                   THE WITNESS:  I can't say specifically.
19   It really depends on each person's -- in the -- each
20   person's and each family's circumstance, and what
21   comes up during an interview with regard to what is
22   said and how it's said.

Page 79

1   family is to be approved and assigned at the area
2   office.  And then you have supervisors and managers in
3   the room who are also able to review the information
4   that's discussed and ensure that it's consistent with
5   our policies.
6   BY MS. WINDHAM:
7       Q   So different people in the room might have
8   different views on whether the family meets the
9   policies?
10      A   Correct.
11      Q   Are there any drawbacks to proceeding via
12  licensing review team?
13              MR. BRYANT:  Objection to form.
14              THE WITNESS:  I don't believe so.
15  BY MS. WINDHAM:
16      Q   In your role, can you invite or add more
17  people to a particular LRT?
18      A   Yes.
19      Q   What would be the reasons why you would do
20  that?
21              MR. BRYANT:  Objection to form.
22              THE WITNESS:  To invite people outside

Page 147

1                MR. BRYANT:  Objection to form.
2                THE WITNESS:  Did you -- could you
3     repeat that?  It -- there are parts that just kind of
4     go out a little, and I couldn't hear everything you
5     said.
6     BY MS. WINDHAM:
7        Q    Sure.  What views or opinions did she
8     express to you during that call?
9        A    I don't recall the specifics of what was
10    said, but she did agree with the decision that was
11    made at the LRT, in terms of the family not being
12    affirming, and that they did not meet the licensing
13    requirements, based on that.
14       Q    What views or opinions did you express to
15    her on that call?
16               MR. BRYANT:  Objection to form.
17               THE WITNESS:  Views or opinions?  I
18    discussed the outcome of the LRT.
19    BY MS. WINDHAM:
20       Q    And you agreed with that outcome?
21       A    With the outcome of the LRT that was
22    finalized?  Yes.

Page 155

1    Q    It's going to be -- actually, hang on just a
2    second.  It'll be Exhibit 7.  Sorry about that.  But I
3    need to figure out what has gone wrong here with
4    exhibit share.  Give me just a moment.
5    A    Okay.
6    Q    It is the time of day when I have to
7    reauthenticate and get back into everything.  Give me
8    just a second for that.  Okay.  Great.  I've got that.
9         And we are back in Exhibit 7.  We're going
10   to be turning -- actually, before we jump to any page
11   yet, let me ask you.  You testified this morning, I
12   believe, that you reviewed the Burkes' licensing study
13   prior to the LRT meeting?
14   A    Yes.
15   Q    And was it that that caused you to have
16   concerns about whether they should be licensed?
17   A    No, I reviewed it because I'm the manager.
18   Q    And when you reviewed it, was it that review
19   that caused you to have concerns about whether they
20   should be licensed?
21   A    Yes.
22   Q    Do you recall which part of the licensing

Page 163

1   A   To review the final recommendation.
2   Q   Who's supposed to review it?
3   A   Me.
4   Q   Okay. So that was a comment to you?
5   A   Correct.
6   Q   Okay. And would that indicate that
7   Ms. Sweetman had edited the licensing study?
8           MR. BRYANT: Objection to form.
9           THE WITNESS: Yeah, it could. I -- I
10  don't know.
11  BY MS. WINDHAM:
12  Q   Do you recall who edited the licensing
13  study?
14  A   Excuse me.
15          MR. BRYANT: Objection to form.
16          THE WITNESS: I don't know.
17  BY MS. WINDHAM:
18  Q   And then there's a comment, next, from you.
19  Is that the formal decision of the LRT?
20  A   Yes.
21  Q   And that is the decision of DCF on the
22  Burkes' license?

Page 164

1     A     Yes.
2                MR. BRYANT:  Objection to form.
3     BY MS. WINDHAM:
4     Q     This says, "Based on this family's beliefs
5     about children who identify as LGBTQIA+, and after a
6     careful review of this assessment by the regional DCF
7     licensing and training review team, the department is
8     unable to issue a license for them to foster or adopt
9     at this time."  What beliefs were you referring to
10    there?
11    A     I'd have to go back and take a look at that
12    assessment and the -- there were several areas of
13    quoted discussion during the interview between 18
14    Degrees and the family which was an indication that
15    the family was not affirming of LGBTQIA children or
16    children who may identify as such, if they were to be
17    placed in their home.
18    Q     And the Burkes were seeking to adopt young
19    children.  Correct?
20    A     I believe their age range was from 4 to 12,
21    that they had identified.
22    Q     And the LRT's determination was that no

Page 226

1    work to do."  I'm sorry, I just need to make it
2    bigger.
3              "There is more work to do regarding
4    recruitment efforts for this population.  There is one
5    new family that will begin MAPP in July of 2023 that
6    will consider children who identify as LGBTQ+.  The
7    Holyoke -- the HAO catchment area will participate in
8    two community events that focus on this population in
9    the hopes that it enhances our recruitment efforts
10   with onboarding more homes."
11        Q    Do you believe this statement is consistent
12   with your prior testimony that every family must be
13   willing to consider children who identify as LGBTQ+?
14              MR. BRYANT:  Objection to form.
15              THE WITNESS:  Yeah, so the way that
16   this is written is not -- does not appear to be
17   consistent.
18   BY MS. WINDHAM:
19        Q    We're going to scroll down to page 2391.
20        A    Okay.  I found it.
21        Q    I'm still getting there.  Actually, just to
22   make sure we know which part of the document this is,

Page 246

1              CERTIFICATE OF DEPOSITION OFFICER
2              I, RICHARD LIVENGOOD, the officer before
3     whom the foregoing proceedings were taken, do hereby
4     certify that any witness(es) in the foregoing
5     proceedings, prior to testifying, were duly sworn;
6     that the proceedings were recorded by me and
7     thereafter reduced to typewriting by a qualified
8     transcriptionist; that said digital audio recording of
9     said proceedings are a true and accurate record to the
10    best of my knowledge, skills, and ability; that I am
11    neither counsel for, related to, nor employed by any
12    of the parties to the action in which this was taken;
13    and, further, that I am not a relative or employee of
14    any counsel or attorney employed by the parties
15    hereto, nor financially or otherwise interested in the
16    outcome of this action.

                                        *Richard Livengood*

17                                      RICHARD LIVENGOOD
18                                      Notary Public in and for the
19                                      State of Maryland
20
21    [X] Review of the transcript was requested.
22

Page 247

1                CERTIFICATE OF TRANSCRIBER

2         I, SARAH JOHNSON, do hereby certify that

3    this transcript was prepared from the digital audio

4    recording of the foregoing proceeding, that said

5    transcript is a true and accurate record of the

6    proceedings to the best of my knowledge, skills, and

7    ability; that I am neither counsel for, related to,

8    nor employed by any of the parties to the action in

9    which this was taken; and, further, that I am not a

10   relative or employee of any counsel or attorney

11   employed by the parties hereto, nor financially or

12   otherwise interested in the outcome of this action.

15                                    SARAH JOHNSON