# EXHIBIT M

```
                                                    Page 1
 1
 2       IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF MASSACHUSETTS
 3
 4    _____
                                  )Civil Action No.
 5    MICHAEL and CATHERINE       )1:23-cv-11798-MGM
      BURKE,                      )
 6                                )
         Plaintiffs,              )
 7                                )
      v.                          )
 8                                )
      KATE WALSH, in her          )
 9    official capacity as        )
      Secretary of the            )
10    Massachusetts               )
      Executive Office of         )
11    Health and Human            )
      Services, et al.,           )
12                                )
         Defendants.              )
13    _____)
14
15
              VIDEOTAPED REMOTE DEPOSITION OF
16
                    THERESA HARRIS
17
                    May 20, 2025
18
                     1:03 p.m.
19
20
21
22    Reported by:  Lindsey Russo
      Job No. 7362938
```

Page 55

1      Q.    And in the LRT, you need to take
2  what you know about that family and use your
3  best judgment to determine whether they would
4  provide a safe and supportive home, correct?
5           MR. SHIPOSH:  Objection to the form.
6           THE WITNESS:  Correct.
7           BY MR. FLESHMAN:
8      Q.    And that's done on a case-by-case,
9  family-by-family basis, correct?
10     A.    That's correct.
11     Q.    Under Subsection B, do you see where
12 it says that the -- the applicant family needs
13 to show -- to demonstrate to the satisfaction
14 of the department that they're able to assure
15 that the child placed in his or her care will
16 be provided with adequate food, clothing,
17 shelter, supervision, and other essential care
18 at all times?
19     A.    Yes.
20     Q.    How do you determine whether a
21 family is able to provide adequate supervision?
22          MR. SHIPOSH:  Objection to form.

Page 61

```
 1   are -- there's discussions in regards to that,
 2   and that carries over when we talk about the
 3   cultural competency of a home.  We also include
 4   the LGBQ-plus piece in that conversation as
 5   well.
 6            So we're having conversations with
 7   foster parents to ensure that they are -- would
 8   be supportive and affirming of our youth.
 9        Q.   Okay.  And when you say supportive
10   and affirming, what do you mean?
11        A.   Again, able to provide them with an
12   environment that the youth feels comfortable
13   in, that the youth is able to feel valued in,
14   and the youth is able to be him or herself in.
15        Q.   Okay.  And if -- is it fair to say
16   that there are a variety of ways that a family
17   could provide the kind of environment you've
18   described?
19        A.   It's fair to say, yes.
20        Q.   So what -- and during the licensing
21   and review team meeting, you would need to take
22   everything -- that the team would need to take
```

Page 62

1   everything that you've gathered about that
2   family and use your best judgment to determine
3   whether they're able to adequately support and
4   affirm the child's sexual orientation and
5   gender identity; is that correct?
6           MR. SHIPOSH:  Objection to the form.
7           THE WITNESS:  Yes, that's correct.
8           BY MR. FLESHMAN:
9       Q.   Okay.  And that determination is
10  made on a case-by-case basis, correct?
11      A.   That is correct.
12      Q.   What kinds of information are you
13  looking for to determine whether a family is
14  able to -- to be sufficiently supportive and
15  affirming?
16          MR. SHIPOSH:  Objection to the
17  question -- to the form.
18          THE WITNESS:  Again, they go through
19  the training.  They have the conversation with
20  the LT.  We're looking to -- to make sure that
21  they're in agreement with the -- the policy and
22  with the department's position.

Page 76

1  a variety of things a family might do to
2  demonstrate its ability to manage stressful
3  situations?
4      A.    Yes.
5      Q.    And the licensing review team needs
6  to take the information that's been gathered
7  about the family and use its best judgement to
8  determine whether that family is sufficiently
9  able to manage stressful situations; is that
10 correct?
11     A.    Yes.
12           MR. SHIPOSH:  Objection to the form.
13           BY MR. FLESHMAN:
14     Q.    And that assessment is done on a
15 case-by-case basis, correct?
16     A.    Correct.
17     Q.    Okay.  In March of 2023, there was a
18 license review team meeting held to discuss the
19 application of Michael and Catherine Burke to
20 be licensed as a foster family.
21           Do you remember participating in
22 that meeting?

Page 77

1    A.    I do.
2    Q.    Was that the first licensing review
3    team meeting held in the Western region?
4    A.    It was.
5    Q.    Do you remember who else was in
6    attendance at that meeting?
7    A.    Yes.
8    Q.    Who else was there?
9    A.    Anna Moynahan was there, Dawn
10   Sweetman, Tywanna -- her last name is escaping
11   me right now because the pressure.
12   Q.    Fair enough.
13   A.    My -- my three supervisors, again
14   Effie, Luz, and Angel.  There was our mental
15   health specialist, Caitlin Leonard.  There was
16   a quality assurance supervisor, Stacy Clark.
17   Q.    Okay.  And why were you and your
18   three supervisors at that meeting?
19   A.    It was the first LRT that we were
20   convening with the new policy, and I think my
21   supervisors were all a little curious how the
22   meeting was going to be run.  So I think it was

Page 78

1  used as an opportunity for all of us to kind of
2  get together and review this one as the first
3  one together.
4      Q.   Okay.  And did you expect that --
5  sorry.  Was it -- was it -- you weren't there
6  to just be a fly on the wall, correct?
7           MR. SHIPOSH:  Objection to the form.
8           THE WITNESS:  No.  I was -- I was
9  part of the panel, part of the team.
10          BY MR. FLESHMAN:
11     Q.   Okay.  And did you expect your
12 supervisors to be there just to watch, or did
13 you expect them to participate as well?
14          MR. SHIPOSH:  Objection to the form.
15          THE WITNESS:  I expected them to --
16 to read the report and discuss any concerns or
17 observations that they -- they had.
18          BY MR. FLESHMAN:
19     Q.   And were the four of you involved in
20 the decision that that licensing review team
21 came to?
22     A.   We were part of the panel that made

Page 79

1  the end decision, yes.
2      Q.    Okay.  And so you said before the
3  meeting you -- you expected them to review the
4  licensing study --
5      A.    Yes.
6      Q.    -- for the family?
7            Okay.  Let's open up Exhibit 4.
8  There will -- there's not a 2 or 3.  We're just
9  going to do 4.
10     A.    Okay.
11     Q.    Let me know once you've got that up.
12           (Exhibit 4 was marked for
13  identification.)
14           THE WITNESS:  I see it.
15           BY MR. FLESHMAN:
16     Q.    Okay.  Do you recognize this
17  document?
18     A.    I do.
19     Q.    Okay.  What is it?
20     A.    This was the CTA that was presented
21  to the team to review.
22     Q.    Okay.  It's the -- the CTA for the

Page 91

1  that the department might be able to work with
2  the Burkes if they were to be licensed?
3              MR. SHIPOSH:  Objection to the form
4  of the question.
5              THE WITNESS:  I don't recall that.
6              BY MR. FLESHMAN:
7      Q.     For example, did the -- did the team
8  discuss the possibility of placing infants or
9  young children with the Burkes?
10             MR. SHIPOSH:  Objection to the form.
11             THE WITNESS:  So we did discuss
12  that.  However, that infant would grow up to be
13  a toddler, latency age and then adolescent age,
14  and again, if that youth then identified in the
15  LGB community, we were concerned that the
16  Burkes would not be affirming to that youth.
17             BY MR. FLESHMAN:
18      Q.     Was there any concern that a child
19  placed in the Burkes' home might change their
20  religion at any time?
21             MR. SHIPOSH:  Objection to the form.
22             THE WITNESS:  I don't think there

Page 95

1  at this time."
2      A.   Yes.
3      Q.   Is that correct?
4      A.   Yes.
5      Q.   And would you agree that their
6  reported beliefs are connected here to their
7  Catholic faith?
8           MR. SHIPOSH:  Objection to the form.
9           THE WITNESS:  I believe that these
10 are their beliefs.  They connected it to
11 their -- their faith.
12          BY MR. FLESHMAN:
13     Q.   Okay.  And you understood kind of
14 during the time -- in the licensing review team
15 meeting, everyone understood that -- or you
16 understood that their beliefs stem from their
17 Catholic faith?
18          MR. SHIPOSH:  Objection to the form.
19          THE WITNESS:  Yes.
20          BY MR. FLESHMAN:
21     Q.   Okay.  And do you agree with this
22 final decision not to license the Burkes?

Page 96

1  A. I do.
2  Q. Okay. And do you agree with this
3  statement as it's written here?
4          MR. SHIPOSH: Objection.
5          THE WITNESS: I do, yes.
6          BY MR. FLESHMAN:
7  Q. Okay. And did you agree with it at
8  the -- at the time of the licensing review team
9  meeting?
10 A. Yes.
11 Q. Did you ever express any
12 disagreement with the decision to deny the
13 Burkes a license?
14 A. No.
15 Q. Did you ever advocate to have that
16 decision changed after the fact?
17 A. No.
18 Q. Did you ever advocate to have any of
19 the language in this final report changed?
20 A. No.
21 Q. If you had -- strike that.
22          MR. FLESHMAN: Let's go to Exhibit

Page 98

1  first page?  Are those related to the Burkes in
2  any way?
3      A.    No.  Those were other activities or
4  items that I had going on that day.
5      Q.    Okay.  So back on the second page,
6  it says here at the top there are two concerns:
7  "Parents openness around LGBTQ youth are of
8  concerned and parents' past mental health."
9            Did I read that correctly?
10     A.    Yes.
11     Q.    Okay.  But as we discussed before,
12 the team did not ultimately have any concerns
13 about their past mental health; is that
14 correct?
15           MR. SHIPOSH:  Objection to form.
16           THE WITNESS:  Right.
17           BY MR. FLESHMAN:
18     Q.    So the team's decision was focused
19 on this openness around LGBTQ youth concern,
20 correct?
21     A.    Correct.
22     Q.    Okay.  And you understood that

Page 99

1  those -- that their statements were informed by
2  their religious belief, correct?
3             MR. SHIPOSH:  Objection to the form.
4             THE WITNESS:  Correct.
5             BY MR. FLESHMAN:
6     Q.    Okay.  And then the next bullet
7  point down, it says:  "Foster parents.  They
8  aren't okay with pronouns/they are saying."
9             Did the team discuss whether the
10 Burkes were okay with using preferred pronouns?
11    A.    I don't recall that conversation.
12    Q.    Okay.  Do you know why you would
13 write that down here?
14    A.    My guess is that it was in the
15 conversation, but I don't recall.  I don't
16 recall that -- those specifics.
17    Q.    Do you know what you almost finished
18 writing there when it says:  "They are saying"?
19 Was there something -- do you know what that
20 means?
21    A.    I do not know what that means.
22    Q.    Okay.  And then the next one down,

Page 105

1  about two years; is that right?
2      A.   Yes.
3      Q.   Okay.  So you've sat on a couple
4  hundred of these licensing review teams; is
5  that right?
6      A.   Yes.
7      Q.   And you testified earlier that for
8  each meeting you review the license --
9  licensing study that's been conducted; is that
10 correct?
11     A.   Yes.
12     Q.   And each of those licensing studies,
13 the -- the person who drafted the initial
14 license -- the initial draft of the licensing
15 study makes a recommendation about whether to
16 approve or deny the family; is that correct?
17     A.   Yes.
18     Q.   Other than the Burkes, have you --
19 have you ever seen -- sat on a licensing review
20 team where the initial recommendation was to
21 approve the family but the licensing review
22 team decided to deny their application instead?

Page 106

1      A.     Yes.
2      Q.     Okay.  About how many times?
3      A.     I don't know if I have a number.
4      Q.     Would you say it happens frequently
5   or infrequently?
6      A.     I would say infrequently.
7      Q.     So a handful of times that you've
8   seen over the past two years?
9      A.     Yes.
10            MR. SHIPOSH:  Objection to the form.
11            BY MR. FLESHMAN:
12     Q.     Okay.  Do you recall any of the
13  circumstances that -- that -- any particular
14  cases that you're thinking of?
15     A.     I think what happens is it's
16  additional information that we're learning
17  during the review, so as I spoke about earlier
18  during the license review team, the clinical
19  team has an opportunity to speak about -- speak
20  about a home or -- so if there's additional
21  concerns that we were just made aware of and
22  it's not in the report, that would cause us to

Page 109

1  decision was based on the information that was
2  already in the licensing study is different
3  from the situations where the licensing review
4  team learned new information at the meeting
5  that then caused it to change its decision?
6           MR. SHIPOSH:  Objection to the form.
7           THE WITNESS:  Yes.
8           BY MR. FLESHMAN:
9      Q.   Are you aware of any other
10 situations where the licensing review team
11 changed its mind based on information solely --
12 that was solely on information that was already
13 in the -- the CTA?
14          MR. SHIPOSH:  Objection to the form.
15          THE WITNESS:  Not that I'm aware of.
16          MR. FLESHMAN:  Thank you.  We have
17 no further questions at this time.
18          MR. SHIPOSH:  Okay.  No further --
19 no questions from me today.
20          THE VIDEOGRAPHER:  This now ends the
21 deposition of Theresa Harris.  We're off the
22 record at 3:04 p.m.

```
 1          CERTIFICATE OF NOTARY PUBLIC
 2      I, LINDSEY RUSSO, the officer before whom
 3   the foregoing deposition was taken, do hereby
 4   certify that the witness whose testimony
 5   appears in the foregoing deposition was duly
 6   sworn by me; that the testimony of said witness
 7   was taken by me in shorthand and thereafter
 8   reduced to computerized transcription under my
 9   direction; that said deposition is a true
10   record of the testimony given by said witness;
11   that I am neither counsel for, related to, nor
12   employed by any of the parties to the action in
13   which this deposition was taken; and further,
14   that I am not a relative or employee of any
15   attorney or counsel employed by the parties
16   hereto, nor financially or otherwise interested
17   in the outcome of the action.
18                               Lindsey Russo
19                      _____.
20                      Notary Public in and for
21                         the District of Columbia
22   My Commission expires:  February 28, 2029
```