# EXHIBIT N

Page 1

1    MICHAEL and CATHERINE BURKE        IN THE UNITED STATES

                                        DISTRICT COURT

2                                       FOR THE DISTRICT OF

                                        MASSACHUSETTS

3             Plaintiffs

4    vs.                                Civil Action

                                        No. 1:23-cv-11798-MGM

5

6    KATE WALSH, in her official

     capacity as Secretary of the

7    Massachusetts Executive Office

     of Health and Human Services,

8    et al.

9             Defendants

10   _____/

11

12

13            The deposition of ANGEL EMERSON was held on

14   Monday, May 19, 2025 commencing at 8:32 a.m. Via Zoom

15   before Eric Leichter, Notary Public.

16

17

18

19

20

21   REPORTED BY:  Eric Leichter

Page 26

1    looks for to determine whether a family would be

2    sufficiently affirming?

3         A      So, you know, to respect and support a

4    youth however they might identify, which can sometimes

5    be different than, you know, you liking that.  But, so

6    validate, support, be open to getting them the support

7    services that -- that might best support them.  Use of

8    pronouns is a big one, you know, for kids who may

9    identify as trans.

10        Q      And fair to say that every family has a

11   different degree of comfort with each of those types of

12   conduct?

13        A      Yes.

14               MR. SHIPOSH:  Objection to form.

15        Q      And fair to say that some of those actions

16   that a family might take would be informed by their

17   religious beliefs?

18        A      I -- I'm assuming that could be, yes.

19        Q      And, again, there's a lot of variability in

20   how families answer those questions.  Is that right?

21        A      Yes.

Page 27

1       Q       So you need to determine whether a family

2    would be sufficiently supportive of an LGBT youth on a

3    case-by-case basis.  Is that right?

4       A       Yes.

5       Q       And because those answers are different for

6    each family, you need to kind of weigh and use your best

7    judgment about whether a family would be sufficiently

8    affirming.  Is that correct?

9       A       Yes.

10       Q       Were you taught how to determine whether a

11    family would be able to respect a child's racial

12    background?

13       A       Yes.

14       Q       Okay.  And what were you taught in that

15    regard?

16       A       You know, the importance of embracing a

17    child's cultural traditions, their you know, ethnic

18    background which may include incorporating food into

19    their home, learning how to do different textured hair,

20    you know, creating opportunities for kids to, you know,

21    be in touch with their -- with their culture if that

Page 59

```
 1   advise?
 2              MR. SHIPOSH:  Objection to form.
 3        A     You want -- are you wanting my impression?
 4   Or my understanding of that?
 5        Q     Yes.  What's your understanding?
 6        A     I mean, yes.  I think that they'd be --
 7              MR. SHIPOSH:  Same objection.  Go ahead.
 8        A     I think that they would primarily be there
 9   to advise.
10        Q     In your experience, do some team members
11   sometimes disagree about a decision?
12        A     Yes.
13        Q     Okay.  And what kind of disagreements have
14   you seen?
15        A     Disagreements about licensing a home.
16        Q     Mm-hmm.  So it's fair to say that
17   experienced people could come to different conclusions
18   about whether to license a family?
19        A     Yes.
20              MR. SHIPOSH:  Objection to form.
21        Q     And about whether a family meets particular
```

Page 60

1   policy requirements.

2               MR. SHIPOSH:  Objection to form.

3       A       In my experience, it really hasn't been

4   related to policy.  It's been more just general

5   discomfort with the facts.  So if someone had, you know,

6   a significant quarry, we might have folks who -- who

7   just don't feel comfortable with that.

8       Q       So with a significant quarry, that would

9   mean that there's some criminal background that's not

10  automatically disqualifying.  Is that right?

11      A       Correct.

12      Q       Okay.  And so then it's a judgment call

13  about whether that -- that family's substantial quarry

14  would be disqualifying in practice even if it's not

15  strictly forbidden by policy.  Is that right?

16              MR. SHIPOSH:  Objection to form.

17      Q       So you have a little bit of discretion

18  there in deciding whether to license a family.

19              MR. SHIPOSH:  Objection to form.

20      A       Our policy does provide for discretion,

21  yes.

Page 78

1    identity.  Maybe --

2         Q     What -- go ahead.

3         A     I was just going to say, you know, really

4    to respect and support.

5         Q     Respect and support.  And you mentioned --

6    well let's start with those two.  What -- what does it

7    mean to you to respect the child's -- in that

8    circumstance?

9         A     It means to listen to them without your

10   judgment hear what they're saying, you know, without --

11   again, without asserting your judgment.  Being an open

12   space for them and -- which isn't to say that you like

13   what is being said, but you're -- you're being open to

14   that child.  You're giving them space to -- to express

15   themselves.

16        Q     And how would a family demonstrate that

17   they are sufficiently respectful?  That they're open to

18   those conversations even if they don't like the things

19   that the child is saying?

20              MR. SHIPOSH:  Objection to form.

21        A     That's, again, kind of assessed on a

Page 79

1    case-by-case basis depending on -- you know, really

2    looking at the actions or inactions that they'd be

3    willing to take.

4         Q      Because some actions might be more or less

5    respectful in DCF's view.  Is that right?

6              MR. SHIPOSH:  Objection to form.

7         A      Correct.

8         Q      And each family has a different approach

9    that they would take when confronted with difficult

10   questions.  Is that right?

11        A      That would be fair to say.

12             MR. SHIPOSH:  Objection to form.

13        Q      And you said you're -- you're assessing

14   whether a family can respect that -- that child on a

15   case-by-case basis.  Correct?

16             MR. SHIPOSH:  Objection to form.

17        A      No. No. That's not what they're saying.

18   The expectation is not -- that they're respecting a

19   child period.  Not on a case-by-case basis.

20        Q      All right.  My question was you're

21   assessing whether a family would be able to respect

Page 80

1    children on a case-by-case basis pertaining to the

2    family?

3              MR. SHIPOSH:  Objection to form.

4        Q    Whether that family is able to meet it on a

5    case -- you're assessing on a case-by-case basis whether

6    each family is able to meet that requirement.

7              MR. SHIPOSH:  Objection to form.

8        A    I think it's better to say it can look

9    different in each family.

10       Q    Okay.

11             MR. SHIPOSH:  And hey.  Hey, Ben?

12             MR. FLESHMAN:  Yes?

13             MR. SHIPOSH:  I just got the -- the link

14   for the exhibit share.  So maybe if you're just --

15   whenever you're going to move on, I can put that link

16   into the chat or whatever you want to do to get that to

17   Angel.

18             MR. FLESHMAN:  Okay.  Okay.  I think --

19   let's -- let's carry on with this as we've got it and

20   then maybe we can take a break and get that set up after

21   we're finished with this exhibit.

Page 81

1              MR. SHIPOSH:  Okay.  That sounds good.

2              MR. FLESHMAN:  Cool.

3       Q      So that's respect.  When you -- you

4   mentioned that the family needs to be able to

5   sufficiently support the child, what did you mean by

6   that?

7       A      You know, emotional support.  And so that

8   doesn't look like, you know, invalidating their

9   feelings.  It's supporting their feelings, respecting

10  what they're, you know, saying, giving them space,

11  giving them emotional outlet, again withholding your

12  judgment.

13      Q      And fair that family support can look a

14  little bit different in each case.  Correct?

15             MR. SHIPOSH:  Objection to form.

16      A      Family support can look different, yes.

17      Q      And a family might be able to demonstrate

18  that they're sufficiently supportive in family specific

19  ways and unique ways.  Is that correct?

20             MR. SHIPOSH:  Objection to form.

21      A      I'm sure.

Page 82

1      Q      So you would need to assess each family's

2   specific responses on a case-by-case basis to determine

3   whether they are sufficiently supportive of an LGBTQ

4   youth.  Correct?

5      A      Not even of an LGBTQIA youth, but just of

6   youth.  And --

7      Q      Of youth in general.

8      A      Yes.

9      Q      Okay.  And because there are different

10  answers, you are using your best judgment about whether

11  that family's responses meet the policy.  Is that

12  correct?

13             MR. SHIPOSH:  Objection to form.

14      A      Find with the totality of information, yes.

15      Q      Okay.  So let's talk about a couple of

16  hypothetical questions, situations that -- that might

17  come up.  So let's say a prospective family has only one

18  bedroom that they can have a -- a youth be housed in and

19  they have a son in there.  And so under normal

20  circumstances, would DCF place only male children in

21  that home because they'd have to align with the gender

Page 93

1         Q        So would they be required to use the

2     child's preferred pronouns to be sufficiently affirming?

3                  MR. SHIPOSH:   Objection to form.

4         A        It's -- it would be an area that we would

5     look at for licensing and determining if they're

6     affirming.  And it would be a concern if they are -- if

7     they're not willing to -- or not being open to this may

8     happen.  This may be a possibility.

9         Q        And when you say open, what do you mean?

10        A        That they may get a child who, regardless

11    of how they feel about it, at some point in their

12    lifetime says I'm transgendered.  I identify as this.

13    That may -- that may happen.  So I would -- we'd like

14    folks to have that flexibility that this may -- this

15    potentially exists.  And along those lines, that's why

16    we -- our policy requires folks to have an affirming

17    home for all children.

18        Q        And is there a set list of requirements

19    that DCF has that a family needs to meet in order to

20    show that they're affirming?  That they -- is there a

21    checklist that can be followed for a family?

Page 94

1              MR. SHIPOSH:  Objection to the form.

2        A      There's actions that -- that families can

3    take that are affirming and then there's inactions that

4    they can take that -- that show that they're not

5    affirming.

6        Q      So there's no clear checklist of actions or

7    inactions that a family can take or not take to be

8    considered sufficiently affirming.

9              MR. SHIPOSH:  Objection to form.

10       A      It's more an assessment.  Correct.

11       Q      It's more an assessment.  Based on the

12   families individual responses.  Correct?

13       A      Based on all the information gathered I

14   would say.

15       Q      Okay.  Gathered about that particular

16   family.  Right?

17       A      Yes.

18       Q      In the next subsection in this -- we're

19   still on Exhibit 1.  If you look at the next subsection,

20   subsection E, where a family -- it says a family is

21   required to demonstrate that they are -- to the

Page 119

1        A        I don't recall.

2        Q        Do you recall what the response was once

3    that was raised?

4        A        I felt like everybody agreed that that was

5    a concern.

6        Q        Okay.  Do you recall any concerns being

7    raised besides the concern with the LGBTQIA issue?

8        A        No.

9        Q        Okay.  Let's go down to page 32 of the

10   exhibit.  If you look in the bottom righthand corner,

11   there'll be a Bates stamp, which is a fancy lawyer page

12   number.  It should say DCF-Burke-004000 in the bottom

13   right-hand corner?

14       A        You said page 30?

15       Q        32 of the PDF. Yeah.  But --

16       A        Okay.

17       Q        Can you just confirm that it's page 4,000

18   on the -- in the bottom righthand corner?

19       A        Yes.

20       Q        Okay.  Do you see this under assessment

21   summary and recommendation, the second paragraph

Page 122

1    particular?

2         A      I don't.  I -- I'm -- I remember one -- you

3    know, one voice in particular, but I think everybody was

4    having a discussion.  But the --

5         Q      Okay.  Do you recall any -- anyone voicing

6    an opposing opinion?  You said there were concerns.  Do

7    you recall anybody saying I think that's probably

8    workable or something along those lines?

9         A      I don't recall that, no.

10        Q      Did the LRT discuss the Burke's reported

11   view that partnership outside of a heterosexual

12   relationship is a sin?

13        A      We discussed their responses.  I -- I

14   believe there was discussion about that.

15        Q      Do you recall what anybody said about that?

16        A      Not specifically but again, just the -- the

17   concern about their ability to be an affirming home.

18        Q      And did anybody raise the fact that this

19   was based on their catholic religious beliefs?

20              MR. SHIPOSH:  Objection to the form.

21        A      There -- it was mentioned in the CTA, so --

Page 123

```
 1   so folks did know.
 2        Q      Okay.  Did anybody suggest that holding
 3   that view would still be workable?
 4                MR. SHIPOSH:  Objection to the form.
 5        A      Not in accordance with our policy.
 6        Q      So the consensus was that the Burkes belief
 7   that partnership outside of heterosexual relationships
 8   is a sin does not align with DCF policy.
 9                MR. SHIPOSH:  Objection to the form.
10        A      The piece that I -- that stands out more
11   was the piece about the gender affirming care, the
12   gender identity piece.  That -- you know, I'm not saying
13   that the other response wasn't -- you know, that there
14   wasn't concern there, but it was really kind of the
15   definitive response about gender identity and gender
16   affirming care that, that I think folks were concerned
17   about primarily in terms of denial.
18        Q      Did the LRT discuss the report that the
19   Burkes held these views about gender affirming care and
20   the concerns you just identified -- did the LRT discuss
21   the report that the Burkes held these views because of
```

Page 124

```
 1   their Catholic faith?

 2              MR. SHIPOSH:  Objection to the form.

 3        A     Their beliefs that were reported were

 4   discussed.

 5        Q     Did anyone raise any concerns about

 6   religious discrimination against the Burkes?

 7              MR. SHIPOSH:  Objection to the form.  Go

 8   ahead.

 9        A     You know, I think that we were wanting to

10   be respectful but focused on our policy and approving a

11   home in accordance with -- with our policy.

12        Q     So nobody raised any concerns about

13   religious discrimination against the Burkes.

14              MR. SHIPOSH:  Objection to the form.

15        A     We spoke about their religious beliefs and

16   -- and feeling that our -- this was kind of related to

17   our policy that our decision -- you know, we're looking

18   for homes for our kids not kids for homes.  So you know,

19   it was really kind of geared towards policy and what our

20   policy says, which felt pretty clear in that discussion.

21   And it felt hard though.  It didn't feel easy because,
```

Page 126

1    religion but more of an action or inaction related to

2    our kids.  And so a statement about not being willing to

3    do gender affirming care or, again, take the T out of

4    it, not even a discussion about transgendered felt

5    something, you know, that's really in contrast to our

6    policy.  So that felt really difficult.

7         Q     And you were aware that the Burkes cited

8    their religious beliefs as their reasons for -- for the

9    responses they gave in the licensing assessment.

10              MR. SHIPOSH:  Objection to form.

11        A     Yes.  That's my understanding.

12        Q     Okay.  And the licensing review team was

13   aware of that at the time to the best of your --

14        A     Yes.

15        Q     Can you please read the first two sentences

16   in the next paragraph?  Oh, sorry.  You already did.

17   This Mike and Kitty are open to -- no, sorry.  Yes, the

18   next one.  Despite -- despite some hesitation.  Can you

19   read that?  That paragraph.  And let me know when you

20   finish reading that paragraph.

21        A     All set.

Page 141

1   State of Maryland

2   City of Baltimore, to wit:

3        I, Eric Leichter, a Notary Public of the State of

4   Maryland, Baltimore City, do hereby certify that the

5   within-named witness personally appeared before me at

6   the time and place herein set out, according to law, was

7   examined by counsel.

8        I further certify that the examination was recorded

9   stenographically by me and this transcript is a true

10  record of the proceedings.

11       I further certify that I am not of counsel to any

12  of the parties, nor in any way interested in the outcome

13  of this action.

14       As witness my hand this 19th day of March 2025.

15

16                              Eric Leichter

17                              Notary Public

18  My Commission Expires:

19  January  13, 2028

20

21