# EXHIBIT O

Page 1

```
 1
 2        IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF MASSACHUSETTS
 3
 4   _____
                              )Civil Action No.
 5   MICHAEL and CATHERINE     )1:23-cv-11798-MGM
     BURKE,                    )
 6                             )
        Plaintiffs,            )
 7                             )
     v.                        )
 8                             )
     KATE WALSH, in her        )
 9   official capacity as      )
     Secretary of the          )
10   Massachusetts             )
     Executive Office of       )
11   Health and Human          )
     Services, et al.,         )
12                             )
        Defendants.            )
13   _____)
14
15
             VIDEOTAPED REMOTE DEPOSITION OF
16
                   CAITLYN LEVINE
17
                   May 21, 2025
18
                    1:02 p.m.
19
20
21
22   Reported by:  Lindsey Russo
     Job No. 7362939
```

Page 87

1  related to LGBTQIA.

2          Do you see that in Paragraph 3?

3      A.    Yes.

4      Q.    And it says:  "The couple expressed

5  that they are not open to gender-affirming care

6  and believe that partnership outside of

7  heterosexual relationships is a sin."

8          Do you recall reading that when you

9  were reviewing the license review study?

10     A.    Yes.

11     Q.    And it says:  "They are heavily

12  involved in their Catholic church and cite

13  their religious views as their primary reason

14  for seeing LGBTQIA-plus-plus individuals in

15  this way."

16          Do you see that?

17     A.    Mm-hmm.  Yes.

18     Q.    And that -- their Catholic religion

19  is cited several times throughout the report.

20  Your understanding at this time was it was --

21  their religious views were their primary reason

22  for their -- for seeing LGBTQ issues this way,

Page 88

1  right?

2          MR. SHIPOSH:  Objection to the form.

3          THE WITNESS:  Yes.

4          BY MR. ELLIS:

5      Q.    Back to the -- that fourth paragraph

6  where we left off, it says:  "After very

7  intense and careful consideration, this

8  willingness to parent a child with these types

9  of challenges has outweighed this writer's

10 worry about their potential unwillingness to

11 accept an LGBTQIA-plus-plus child in the

12 future."

13         Do you see that?

14     A.    Yes.

15     Q.    Do you feel like that was a

16 reasonable judgment call?

17         MR. SHIPOSH:  Objection to the form.

18         THE WITNESS:  I'm not -- I'm not

19 sure that my understanding of the

20 reasonableness is -- my understanding of that

21 what's reasonable might be different than this

22 person's judgment call.

Page 93

1      Q.    But there can be room for a judgment
2  call on whether or not this family should be
3  licensed or not, fair?
4            MR. SHIPOSH:  Objection to the form
5  of the question.
6            THE WITNESS:  Yes, that's why we
7  have the LRT to discuss that further.
8            BY MR. ELLIS:
9      Q.    It's not a clear-cut decision in
10  your mind?
11           MR. SHIPOSH:  Objection to the form
12  of the question.
13           THE WITNESS:  No.
14           BY MR. ELLIS:
15     Q.    No, it's not a clear-cut decision in
16  your mind?
17           MR. SHIPOSH:  Objection to the form.
18           THE WITNESS:  Correct.
19           BY MR. ELLIS:
20     Q.    And you knew, having read this
21  assessment, that the Burkes's beliefs on
22  LGBTQIA individuals was tied to their religious

Page 94

1  beliefs, right?

2          MR. SHIPOSH:  Objection to the form

3  of the question.

4          THE WITNESS:  Yes.

5          BY MR. ELLIS:

6     Q.    Ultimately, the LRT disagreed with

7  the license study, true?

8     A.    Yes.

9     Q.    The license study recommended

10  approval, but the LRT denied the approval,

11  true?

12     A.    Correct.

13     Q.    I'd like to talk with you about the

14  details of that LRT discussion.  Do you

15  remember we saw that it was a 30-minute meeting

16  roughly, correct?

17     A.    Yes.  Yes.

18     Q.    What all did you say at the LRT?

19     A.    I don't recall the specifics of

20  that -- of what I said at that conversation.

21     Q.    I think you testified recalling

22  discussing their strengths; is that correct?

Page 99

```
 1      Q.    Okay.  What accommodations did you
 2   consider for the Burkes's beliefs?
 3      A.    We had --
 4            MR. SHIPOSH:  Objection to the form
 5   of the question.
 6            Go ahead.
 7            THE WITNESS:  Sorry.
 8            MR. SHIPOSH:  No.  Go ahead.
 9            THE WITNESS:  We had considered
10   placing older children who were not LGBTQ.
11   However, the issue was raised that this is a --
12   identity is fluid, and allowing children the
13   space to explore in a safe and affirming
14   environment is necessary and part of our
15   policy.
16            BY MR. ELLIS:
17      Q.    Okay.
18      A.    So that was not really an option at
19   the time.
20      Q.    Who raised that about gender and
21   identity being fluid?  Who raised that?
22      A.    I don't recall exactly who.
```

Page 103

1      A.    I don't recall if we had discussed

2    that.

3      Q.    But you have experience of LRTs

4    being deferred to get more information, right?

5      A.    Correct.

6      Q.    In this case, the meeting that was

7    scheduled for an hour was finished in just

8    under 30 minutes, right?

9              MR. SHIPOSH:  Objection to the form.

10             THE WITNESS:  Yes.

11             BY MR. ELLIS:

12     Q.    Correct?

13             And nobody that was there had

14   actually talked with the Burkes themselves, had

15   they?

16             MR. SHIPOSH:  Objection to the form.

17             THE WITNESS:  I believe Tywanna had

18   spoken to them previously, and she was involved

19   in the LRT.

20             BY MR. ELLIS:

21     Q.    Okay.  I should've been clear.

22             Nobody had talked with them about

Page 104

1    the -- the LGBT issues that were the concern

2    for the LRT, correct?

3            MR. SHIPOSH:  Objection to the form.

4            THE WITNESS:  As far as I know, yes.

5            BY MR. ELLIS:

6        Q.    You mentioned before that this is

7    the only license review team that you've been a

8    part of that ended in a denial of the foster

9    family, correct?

10           MR. SHIPOSH:  Objection to the form.

11           THE WITNESS:  Yes, as far as I can

12   recall.

13           BY MR. ELLIS:

14       Q.    And you, Ms. Levine, agree with the

15   final decision of denying their foster

16   application?

17       A.    I -- yes, I agree that per policy

18   that was the right decision to make.

19       Q.    And you agree that this was the

20   opposite of what the license study assessment

21   recommended, right?

22           MR. SHIPOSH:  Objection to the form.

Page 128

1  not be affirming of their religious views.

2          BY MR. ELLIS:

3      Q.    So would that foster parent need to

4  have their license revoked?

5          MR. SHIPOSH:  Objection to the form.

6          THE WITNESS:  I don't make the

7  decisions about revoking a license or not, so

8  I'm not sure -- well, it's not really my realm.

9          BY MR. ELLIS:

10     Q.    If a foster parent can't affirm a

11 child's religious views, that violates DCF's

12 policy, right?

13         MR. SHIPOSH:  Objection to the form.

14         THE WITNESS:  I think specific --

15 like case-specific children, I think it depends

16 on -- I think the generality of being an open

17 and affirming placement is different than the

18 case-specific religious views of one child.

19         BY MR. ELLIS:

20     Q.    All of these decisions need to be

21 assessed on a case-by-case basis, fair?

22         MR. SHIPOSH:  Objection to the form.

Page 129

```
 1              THE WITNESS:  Fair.

 2              BY MR. ELLIS:

 3       Q.    And have -- ultimately make a

 4   judgment call about whether this is

 5   sufficiently affirming for DCF's policy,

 6   correct?

 7              MR. SHIPOSH:  Objection to the --

 8   objection to the form.

 9              THE WITNESS:  Correct.

10              BY MR. ELLIS:

11       Q.    And that's your understanding having

12   been trained recently on DCF's policies, right?

13       A.    Yes.

14       Q.    As a mental health specialist, you

15   know that not every foster parent in DCF's

16   system is equipped to support foster children

17   with mental health needs, right?

18       A.    Correct.

19       Q.    And you know that it's important to

20   be encouraging and supporting those that have

21   mental health challenges, right?

22       A.    Yes.
```

Page 160

1          CERTIFICATE OF NOTARY PUBLIC

2      I, LINDSEY RUSSO, the officer before whom

3    the foregoing deposition was taken, do hereby

4    certify that the witness whose testimony

5    appears in the foregoing deposition was duly

6    sworn by me; that the testimony of said witness

7    was taken by me in shorthand and thereafter

8    reduced to computerized transcription under my

9    direction; that said deposition is a true

10    record of the testimony given by said witness;

11    that I am neither counsel for, related to, nor

12    employed by any of the parties to the action in

13    which this deposition was taken; and further,

14    that I am not a relative or employee of any

15    attorney or counsel employed by the parties

16    hereto, nor financially or otherwise interested

17    in the outcome of the action.

18

19          _____.

20              Notary Public in and for

21               the District of Columbia

22    My Commission expires:  February 28, 2029