# EXHIBIT P

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF MASSACHUSETTS

3    _____

4    MICHAEL and CATHERINE BURKE,

5              Plaintiffs,

6         v.                          Civil Action No.

7    KATE WALSH, in her official      1:23-cv-11798-MGM

8    capacity as Secretary of the

9    Massachusetts Executive Office

10   of Health and Human Services, et

11   al.,

12             Defendants.

13   _____

14         DEPOSITION OF VIRGINIA PEEL AS 30(B)(6)

15               CORPORATE REPRESENTATIVE FOR

16     MASSACHUSETTS DEPARTMENT OF CHILDREN AND FAMILIES

17   DATE:          Thursday, June 26, 2025

18   TIME:          9:10 a.m.

19   LOCATION:      Remote Proceeding

20                  Norton, MA 02766

21   REPORTED BY:   Samuel Pachon

22   JOB NO.:       7436421

Page 46

1      Q    Okay.  Would DCF consider it sex

2   discrimination for a foster family to indicate a

3   preference for female placements?

4                MR. SHIPOSH:  Objection to the form.

5                THE WITNESS:  -- necessarily.  I mean,

6   a preference might have to do with what the physical

7   layout of their home is.  Or maybe they have more

8   experience, you know, parenting boys versus girls.

9   Maybe the bedroom setup only allows them if they're

10  going to have a foster child to have a child of the

11  same sex or same -- or a transgender child who

12  identifies with that sex, that kind of thing.  So no,

13  it's not discrimination to -- to indicate a

14  preference.  No.

15  BY MR. FLESHMAN:

16     Q    Would it be discrimination for a foster

17  family to decline a placement because of the child's

18  sex?

19                MR. SHIPOSH:  Objection to the form.

20  Vague.

21                THE WITNESS:  Not necessarily.  I mean,

22  a question -- it -- it -- you have to go sort of

Page 47

1    behind that.  Like, why are they, you know, if -- if

2    initially they say -- and their -- and their house is

3    set up to take a male or female child.  So, you know,

4    you sort of start off neutral, and they're saying,

5    "No, I don't want to take a boy ever," you know, "Now

6    I don't want to take a boy," I think there'd need to

7    be discussion about why.  Why now?  Why don't -- why

8    don't you want a boy or a girl?

9    BY MR. FLESHMAN:

10        Q    So fair to say there could be a variety of

11   factors that go into that --

12        A    Yes.

13        Q    -- conversation, and it requires DCF to make

14   a judgment call about whether the family's still in

15   compliance with policy?

16        A    Yes.

17             MR. SHIPOSH:  Objection to the form.

18             THE WITNESS:  Oh, sorry.

19             MR. SHIPOSH:  No, no, go ahead.

20   BY MR. FLESHMAN:

21        Q    And you said "yes"; is that right?

22        A    Yes.

Page 48

1          Q    Okay.  Just confirming.  Would DCF consider

2    it race discrimination for a foster family to indicate

3    a preference for a child of their own race?

4                    MR. SHIPOSH:  Objection to the form.

5                    But you can go ahead and answer.

6    BY MR. FLESHMAN:

7          Q    Couldn't quite hear.

8          A    Sorry.  Is there a question?

9          Q    What was your answer to my question about

10   the family expressing a preference based on race?

11                   MR. SHIPOSH:  Hold on.  Ben, can you

12   just ask it again just 'cause I'm not sure that I want

13   to make the objection.

14                   MR. FLESHMAN:  Okay --

15                   MR. SHIPOSH:  -- yep.

16   BY MR. FLESHMAN:

17         Q    Would DCF consider it race discrimination

18   for a foster family to indicate a preference for

19   children of their own race?

20                   MR. SHIPOSH:  Objection to the form.

21   Vague.  Calls for speculation.

22                   You may answer.

Page 49

1              THE WITNESS:  No.

2     BY MR. FLESHMAN:

3         Q    And what about if a family declined the

4     placement of a child because they were of a different

5     race?

6                   MR. SHIPOSH:  Objection to the form.

7                   THE WITNESS:  Again, I think that's the

8     discussion that goes on when the worker who's

9     licensing talks to them about what their preference is

10    for placements in their home.  And they have that

11    discussion.  And certainly the -- the workers who do

12    the placements, the foster family, social workers who

13    do the placements, if a -- if a family was

14    consistently declining a particular race, there would

15    be a discussion about that.

16                   There may be a reason.  There may be a

17    good reason that that match isn't, you know, that that

18    matches isn't good.  But there'd need to be a

19    discussion about that.

20    BY MR. FLESHMAN:

21        Q    But fair to say there could be a variety of

22    reasons that that might be acceptable to the

```
                                                        Page 50
 1    Department?
 2         A    Yes.
 3         Q    And that requires the Department to make a
 4    judgment call about which of those reasons are
 5    acceptable reasons and which ones are not?
 6                   MR. SHIPOSH:  Objection to the form.
 7                   THE WITNESS:  Yes.
 8    BY MR. FLESHMAN:
 9         Q    Okay.  Would DCF consider it religious
10    discrimination for a foster family to indicate a
11    preference for children of their own religious
12    background?
13                   MR. SHIPOSH:  Objection to the form.
14    Vague.  Calls for speculation.
15                   THE WITNESS:  No.
16    BY MR. FLESHMAN:
17         Q    And would the Department consider it
18    religious discrimination if a foster family declined a
19    placement of a child because they were of a different
20    religion?
21                   MR. SHIPOSH:  Objection to the form.
22                   THE WITNESS:  Not necessarily.  Again,
```

Page 51

1    it would be a discussion with a foster family about

2    why.

3    BY MR. FLESHMAN:

4        Q    So again, there might be a variety of

5    reasons that would be acceptable to DCF; right?

6        A    Yes.

7        Q    And a variety of reasons that would not be

8    acceptable; right?

9        A    Yes.

10       Q    And DCF has to take the information to

11   account that they've gathered about the family, the

12   situation, and then make a judgment call about whether

13   those reasons are acceptable or not; correct?

14               MR. SHIPOSH:  Objection to the form.

15               THE WITNESS:  Yes.

16   BY MR. FLESHMAN:

17       Q    What does DCF do to prevent discrimination

18   against the children in its care based on these

19   protected attributes?

20               MR. SHIPOSH:  Objection to the form of

21   the question.

22               THE WITNESS:  I think there's a variety

Page 74

1          A     Sorry, I thought --

2          Q     That's all right.  And then the next

3     sentence says "Based on this family's beliefs about

4     children who identify as LGBTQIA+, and after a careful

5     review of this assessment by the regional DCF

6     licensing and training review team, the Department is

7     unable to issue a license for them to foster/adopt at

8     this time."  Do you see that?

9          A     I do.  Yes, I do.

10          Q     And this reflects the final decision of the

11     licensing review team; is that correct?

12          A     That is my understanding, yes.

13          Q     Okay.  And this also reflects the official

14     reasoning for the denial of the Burkes' license study;

15     is that correct?

16          A     That's correct.

17                    MR. SHIPOSH:  Objection to the form.

18                    THE WITNESS:  That's correct.

19     BY MR. FLESHMAN:

20          Q     All right.  And the licensing review team

21     had authority to make this decision on behalf of the

22     Department; is that correct?

Page 92

1              MR. SHIPOSH:  Objection to the form.

2              THE WITNESS:  It's not -- it's not

3     their beliefs.  It's the way in which the beliefs

4     would manifest themselves in their actions towards or

5     inactions towards children placed in their home.

6     BY MR. FLESHMAN:

7          Q    Okay.  So the conduct that they take based

8     on their religious beliefs?

9              MR. SHIPOSH:  Objection to the form.

10             THE WITNESS:  Not just the -- I mean,

11    towards the children placed in their home.  It's

12    not -- it's not their -- it's the conduct towards the

13    children placed in the --

14    BY MR. FLESHMAN:

15         Q    Okay.  And the Department acknowledges that

16    that conduct is related to their religious beliefs

17    about gender, marriage, and sexuality?

18             MR. SHIPOSH:  Objection to the form.

19             THE WITNESS:  I think it's the

20    Department's understanding that their beliefs are

21    based in their religion -- their beliefs, the Burkes'

22    beliefs are based in their religion.  Yes.

Page 95

1     official reasoning and decision of the Department; is

2     that correct?

3                   THE WITNESS:  Correct.

4                   MR. SHIPOSH:  Objection to the form.

5     BY MR. FLESHMAN:

6         Q    And the Department understood that the

7     Burkes cited their religion as the motivating factor

8     for their views and any conduct that results from

9     those views regarding LGBTQIA people; is that correct?

10                  MR. SHIPOSH:  Objection to the form.

11                  THE WITNESS:  That's correct.

12    BY MR. FLESHMAN:

13        Q    Okay.  And so when you're saying that

14    there's concern that they would not be able to respect

15    the cultural background of a child placed in foster

16    care, it's based on this?  This is the reasoning for

17    that, is that correct, that's summarized here in this

18    last paragraph?

19                  MR. SHIPOSH:  Objection to the form.

20                  THE WITNESS:  Correct.

21    BY MR. FLESHMAN:

22        Q    Okay.  Let's go back to Exhibit 4, back down

Page 119

1       want teenagers, but after the assessment, teenagers

2       are not the best decision, at least in the first year.

3       Or people want infants, and maybe infants aren't the

4       best decision in the first year.  So there's always a

5       discussion of -- with the foster family around their

6       preferences.  So --

7       BY MR. FLESHMAN:

8           Q    And one of those preferences.  Sorry.  I

9       didn't mean to cut you off.  I thought you were done.

10          A    Oh, I was going to say, so yes, there's a

11      discussion around the preferences, and a foster family

12      could indicate that they only want girls, or they only

13      want boys, but there's -- usually it's more of a

14      discussion around their preferences and why.

15          Q    Okay.  And in fact, there might be

16      circumstances where they could really only take a boy

17      or a girl depending on their housing situation.  Is

18      that fair?

19                    MR. SHIPOSH:  Objection.  Scope.

20                    THE WITNESS:  Oh, sorry.  That's fair.

21      BY MR. FLESHMAN:

22          Q    But the Department doesn't always know when

Page 120

1       they place a child in a home that has a gender

2       restriction, whether that child will come out later as

3       transgender, does it?

4                       MR. SHIPOSH:  Objection.  Scope.

5                       THE WITNESS:  No, it doesn't.

6       BY MR. FLESHMAN:

7           Q    Okay.  And yet the Department continues to

8       allow families to have limitations on the types of --

9       the gender of children that they'll take into their

10      care despite that uncertainty.  Isn't that correct?

11                      MR. SHIPOSH:  Objection.  Scope and

12      form.

13                      THE WITNESS:  Yes, that's correct.

14      BY MR. FLESHMAN:

15          Q    Okay.  And if a child came out -- so say a

16      family can only take boys in their home, a boy is

17      initially placed in that home, and that boy later

18      comes out as a transgender girl, that boy may need to

19      be removed from that home and placed into a home -- a

20      different home.  Is that correct?

21                      MR. SHIPOSH:  Objection.  Outside the

22      scope.  Calls for speculation.  Vague.

1           THE WITNESS:  I think there's steps

2    that would be taken before that happened, and it would

3    also depend on the configuration of the home.  I mean,

4    there may be steps that can happen.  What's important

5    is that -- that child's in a home that supports their

6    gender identity.

7                That's -- that's the piece that's

8    important is, even if that happens, and maybe they

9    can't share the same bedroom any longer that they were

10   sharing with a girl -- they might be able to, but they

11   might not be able to -- it's important that they're in

12   a home where they're affirmed, and then there's a

13   discussion about whether or not it's possible to do

14   something else with the home so that the child can

15   stay there if they can't continue to share the same

16   bedroom -- that's what they're doing.  You know, they

17   might have their own bedroom.  So --

18   BY MR. FLESHMAN:

19       Q    And if it's not possible for the child to

20   remain in that home, then that child would need to go

21   to a different home; is that correct?

22                MR. SHIPOSH:  Objection.  Outside the

1    scope, calls for speculation, and vague.

2                    THE WITNESS:  -- that the child might

3    need to go to a different home.  But again, it's --

4    it's how that's explained, what support there is, how

5    the transition's done.  All of that would be taken

6    in -- you know, it's not simply just taking the child

7    out of the home and placing them in a different --

8    like that wouldn't be the -- the best alternative.

9    But yes, it's possible that the child might need to be

10    placed in a different home.

11    BY MR. FLESHMAN:

12        Q    Okay.  And DCF allows foster families who

13    are unable to care for -- or licenses foster families

14    that are unable to care for children with severe

15    physical disabilities.  Is that correct?

16                    MR. SHIPOSH:  Objection.  Outside the

17    scope.

18                    THE WITNESS:  Can you ask that again?

19    Sorry.

20    BY MR. FLESHMAN:

21        Q    Yeah.  Does DCF license foster families who

22    are not able to care for children with severe physical

```
                                             Page 123
 1     disabilities, for example, a child in a wheelchair?
 2                    MR. SHIPOSH:  Objection.  Outside the
 3     scope.
 4                    THE WITNESS:  Yes, they do.
 5     BY MR. FLESHMAN:
 6         Q    Does DCF know, when it places a child in
 7     that home, if that child will eventually develop a
 8     disability that the family's unable to care for?
 9                    MR. SHIPOSH:  Objection.  Outside the
10     scope of the deposition, calls for speculation, and
11     vague.
12                    THE WITNESS:  No, it doesn't.
13     BY MR. FLESHMAN:
14         Q    We've been going for about an hour.  Would
15     you like to take maybe a five-minute break and then
16     come back?  I think we're just about done.
17         A    Sure.
18         Q    Okay.
19                    MR. SHIPOSH:  So --
20                    MR. FLESHMAN:  Let's go ahead and go
21     off the record and then at --
22                    MR. SHIPOSH:  11:40, is that okay?
```

Page 136

 1     Ms. Peel.  Nothing further.

 2                         EXAMINATION

 3     BY MR. FLESHMAN:

 4          Q    We do have a few redirect questions about

 5     the questions you were just asked by your counsel.  So

 6     your counsel first asked you about -- or not first,

 7     but you were asked about disrupted adoption

 8     placements.  Do you recall that?

 9          A    [No audible response.]

10          Q    And that was one of the interests that was

11     stated in DCF's interrogatory responses was minimizing

12     disrupted adoption?

13          A    Yes.

14          Q    Okay.  Do you recall seeing in the Burkes'

15     home study that they would not take out a child who

16     identified as LGBTQ or not ask for them to leave their

17     home?

18                    MR. SHIPOSH:  Objection to the form.

19                    THE WITNESS:  I -- it would be best if

20     I reread the home study to see if it was specifically

21     there or not.  Do you want me to do that?

22     //

Page 137

```
 1    BY MR. FLESHMAN:

 2         Q    Yes.  I'm finding the citation here for you.

 3    Just a moment.  In Exhibit 3 on page 56 it looks like.

 4    Let me know once you make it to page 56.

 5         A    Page 56.

 6         Q    All right.  And then the second paragraph,

 7    the last sentence of that paragraph, it says "Kitty

 8    said she would never throw out a child who was LGBTQIA

 9    and would not use what this writer described

10    conversion therapy to be."  Did I read that correctly?

11         A    Yes.

12         Q    Okay.  And so the Department was aware that

13    the Burkes had stated that they would not send a child

14    back to the Department if it -- if the child

15    identified as LGBTQIA; correct?

16         A    It's in the home study.  Correct.

17         Q    Is there any reason to suspect that the

18    Burkes would do that contrary to their statements to

19    the Department?

20              MR. SHIPOSH:  Objection to the form of

21    the question.

22              THE WITNESS:  I don't think there was
```

Page 138

1    any reason to assume that they would do that.

2    BY MR. FLESHMAN:

3        Q    And you testified earlier that DCF might

4    become involved with an adoptive family if there were

5    concerns about them abusing or neglecting the child;

6    is that correct?

7        A    That's correct.

8        Q    Okay.  Was there anything in the Burkes'

9    license study that indicated that the Burkes would

10   neglect or abuse a child who came out as LGBTQIA?

11              MR. SHIPOSH:  Objection to the form of

12   the question.

13              THE WITNESS:  There wasn't anything

14   specific in the study, but I don't think you can

15   necessarily know until that occurs.  So -- but there

16   wasn't anything in the study that would've indicated

17   that.

18   BY MR. FLESHMAN:

19       Q    All right.  Now, you testified also about a

20   letter that the Burkes received identifying the policy

21   or the regulations that the DCF relied on; is that

22   correct?

Page 142

1                   MR. SHIPOSH:  Objection to the form.

2       Outside the scope.

3                   THE WITNESS:  Yes, although there's a

4       couple of -- so -- so the -- the worker has a

5       supervisor.  Supervisor has a manager.  They all see

6       the study before it goes to the LRT, but yes.

7       BY MR. FLESHMAN:

8            Q    And then the LRT makes the ultimate

9       determination of whether this family, given the

10      information that they have, meets the standards laid

11      out in the regulation.  Is that correct?

12                  MR. SHIPOSH:  Objection.  Scope.

13                  THE WITNESS:  Sorry.  Correct.

14      BY MR. FLESHMAN:

15           Q    And the LRT has to use the information it's

16      gathered and its professional judgment to determine

17      whether a family meets the criteria laid out in the

18      policy; correct?

19                  MR. SHIPOSH:  Objection.  Scope.

20                  THE WITNESS:  Correct.

21      BY MR. FLESHMAN:

22           Q    Okay.  And regarding the letter that was

Page 150

CERTIFICATE OF TRANSCRIBER

1

2          I, KATHLEEN ALCORN, do hereby certify that

3    this transcript was prepared from the digital audio

4    recording of the foregoing proceeding, that said

5    transcript is a true and accurate record of the

6    proceedings to the best of my knowledge, skills, and

7    ability; that I am neither counsel for, related to,

8    nor employed by any of the parties to the action in

9    which this was taken; and, further, that I am not a

10   relative or employee of any counsel or attorney

11   employed by the parties hereto, nor financially or

12   otherwise interested in the outcome of this action.

13

14

15                              KATHLEEN ALCORN

16

17

18

19

20

21

22