# EXHIBIT Q

```
 1
 2        IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF MASSACHUSETTS
 3
 4      _____
                                    )Civil Action No.
 5     MICHAEL and CATHERINE        )1:23-cv-11798-MGM
       BURKE,                       )
 6                                  )
          Plaintiffs,               )
 7                                  )
       v.                           )
 8                                  )
       KATE WALSH, in her           )
 9     official capacity as         )
       Secretary of the             )
10     Massachusetts                )
       Executive Office of          )
11     Health and Human             )
       Services, et al.,            )
12                                  )
          Defendants.               )
13     _____)
14
15
               VIDEOTAPED REMOTE DEPOSITION OF
16
                      STACY CLARK
17
                     May 20, 2025
18
                      8:30 a.m.
19
20
21
22     Reported by:  Lindsey Russo
       Job No. 7362938
```

Page 66

1  foster parents can't be inclusive and
2  respectful, providing our kids a safe place to
3  explore their own identities.
4    Q.    And what kind of statements would
5  require a closer look to see if a family could
6  meet the criteria?
7           MS. GOHLKE:  Objection to form.
8           THE WITNESS:  I think if a family
9  said that they're going to use corporal
10 punishment with our kids, that they don't
11 understand -- or they understand our policy but
12 aren't willing to -- to abide by it.
13          BY MS. WINDHAM:
14   Q.    Skipping down to D, this is
15 highlighted.  It says:  "To promote the
16 physical, mental, and emotional well-being of a
17 child placed in his or her care, including
18 supporting and respecting a child's sexual
19 orientation and gender identity."
20          What kinds of things do you look at
21 to determine whether a family meets this
22 criteria?

Page 67

1            MS. GOHLKE:  Objection to form.
2            THE WITNESS:  I think that we ask
3    questions to promote a conversation, hopefully
4    understand if folks feel like they can be
5    inclusive and respectful of a child's sexual
6    orientation or gender identity.
7            BY MS. WINDHAM:
8      Q.    And how do you define "inclusive and
9    respectful"?
10           MS. GOHLKE:  Objection to form.
11           THE WITNESS:  I think we -- as we
12   understand, this is using inclusive terminology
13   or -- or language, openly accepting a child for
14   where -- who they are and where they're at and
15   maybe their emerging identity.
16           BY MS. WINDHAM:
17     Q.    What about providing
18   gender-affirming care?  Would that be included
19   in this?
20     A.    Yes.
21     Q.    Would there be anything that would
22   automatically disqualify a family from being

Page 68

1  able to meet this criteria, looking at 1D?
2           MS. GOHLKE:  Objection to form.
3           THE WITNESS:  I don't -- I don't
4  think so.  We look at the whole picture, the
5  full assessment.
6           BY MS. WINDHAM:
7      Q.   So you have to take each -- each CTA
8  on a case-by-case basis to see if it meets the
9  criteria?
10     A.   Yes.
11     Q.   And -- and you have to make a
12 determination based on the whole picture of
13 what you're seeing about the family?
14     A.   Yes.
15     Q.   How do you determine whether a
16 family can support and respect a child's sexual
17 orientation?
18          MS. GOHLKE:  Objection to form.
19          THE WITNESS:  So I am -- I think
20 it's part of the assessment, asking questions,
21 understanding if they are able to be affirming
22 and discrimination-free.

Page 86

1  they bring to the table?
2       A.    Yes.
3       Q.    And different people might have
4  different views on what's important in that
5  CTA?
6            MS. GOHLKE:  Objection to form.
7            THE WITNESS:  I think that everyone
8  that comes to an LRT is -- is familiar with our
9  policies and understands that it's important
10 that we find safe and nurturing homes.
11           BY MS. WINDHAM:
12      Q.    And among the people who are
13 familiar with your policies and believe it's
14 important to find safe and nurturing homes, do
15 they sometimes have different views about
16 whether those policies are met?
17           MS. GOHLKE:  Objection to form.
18           THE WITNESS:  I'm not sure.
19           BY MS. WINDHAM:
20      Q.    Can you recall a time in an LRT
21 meeting where people expressed different views
22 about whether a policy was met?

Page 87

1    A.    Yeah.
2    Q.    About how often has that happened?
3    A.    I'm not sure.
4    Q.    Would you say it's been more than
5  ten times?
6    A.    I'm not sure.
7    Q.    More than a hundred times?
8    A.    No.
9    Q.    Would you say that it is common for
10  people to come into the room and have different
11  views about whether the family meets the
12  policies?
13         MS. GOHLKE:  Objection to form.
14         THE WITNESS:  I think when this --
15  this many people come together, there's always
16  going to be different views, and we use that
17  time to talk about the whole assessment.
18         BY MS. WINDHAM:
19    Q.    And when you're -- when you're
20  having those discussions, how do those
21  discussions generally go?
22         MS. GOHLKE:  Objection to form.

Page 113

1           BY MS. WINDHAM:
2       Q.    After you read this assessment and
3    before the LRT meeting, what was your view of
4    the Burkes's application?
5       A.    I would think that I -- it felt like
6    the Burkes had some strengths, some skills,
7    and -- but I had some questions and concerns.
8       Q.    And what were your questions and
9    concerns about?
10      A.    I had questions about their beliefs
11   regarding LGBTQIA and if it would match our
12   policy.
13      Q.    Did you share those views with
14   anyone before the LRT meeting?
15      A.    No.
16      Q.    Did you make any notes on this
17   application?
18      A.    Not that I recall.
19      Q.    When you went into the LRT meeting
20   on the Burkes's application, did anyone lead
21   the meeting?
22      A.    I don't recall.

Page 116

1  the meeting?
2      A.    I don't recall.
3      Q.    Did you discuss their religious
4  views on LGBTQIA-plus individuals in the
5  meeting?
6      A.    I have to assume that -- that we
7  discussed their -- their beliefs regarding
8  LGBTQIA.
9      Q.    Did anyone in the meeting raise the
10 question of religious discrimination?
11     A.    No.  I -- I don't believe our
12 discussion was about religion.  It was about
13 the beliefs that they expressed to the -- to
14 the CTA worker.
15     Q.    And the CTA worker said that their
16 beliefs were based on their religious views and
17 heavy involvement in the Catholic church,
18 right?
19     A.    That's what's written, yes.
20     Q.    Did you discuss the Burkes's views
21 on providing gender-affirming care?
22     A.    I don't recall.

```
                                            Page 122
 1      A.    That's what it appears to be.
 2      Q.    Do you agree with this
 3  recommendation?
 4      A.    This was a team decision, and the
 5  team, we -- we made this decision together,
 6  yes.
 7      Q.    And you agreed with what the team
 8  decided?
 9      A.    Yes.
10      Q.    And the entire team agreed on this
11  decision?
12      A.    That's what I recall.
13            MS. GOHLKE:  Object to form.
14            BY MS. WINDHAM:
15      Q.    If anyone disagreed, would you
16  expect them to speak up?
17            MS. GOHLKE:  Objection to form.
18            THE WITNESS:  Yes.
19            BY MS. WINDHAM:
20      Q.    Did you, during the LRT meeting,
21  raise any concerns about this decision?
22      A.    I did not.
```

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 123

1     Q.    And after the LRT meeting did you
2  raise concerns with anyone else about this
3  decision?
4     A.    No.
5     Q.    You felt that it met DCF's quality
6  assurance standards?
7     A.    I felt like --
8           MS. GOHLKE:  Objection to form.
9           THE WITNESS:  I felt like after our
10 meeting hearing all the information and
11 understanding the policy, this was the right
12 decision.
13          BY MS. WINDHAM:
14    Q.    And you never did anything to try
15 and revisit that decision or have that decision
16 changed after the fact?
17    A.    I did not.
18    Q.    Did you raise any concerns over the
19 language tying this decision to the Burkes's
20 beliefs?
21          MS. GOHLKE:  Objection to form.
22          THE WITNESS:  I'm sorry.  Could you

Page 124

1  clarify.
2           BY MS. WINDHAM:
3      Q.    Did you raise any concerns over this
4  paragraph which ties this decision to the
5  Burkes's beliefs?
6           MS. GOHLKE:  Objection to form.
7           THE WITNESS:  Not that I recall.
8           BY MS. WINDHAM:
9      Q.    Did anyone else raise concerns over
10 this paragraph tying the decision to the
11 Burkes's beliefs?
12          MS. GOHLKE:  Objection to form.
13          THE WITNESS:  Not that I recall.
14          BY MS. WINDHAM:
15     Q.    Did you advocate changing or
16 removing any language from the CTA?
17     A.    I don't recall.
18          MS. WINDHAM:  Let's go ahead and go
19 to the next exhibit.  This is Exhibit 10.
20          (Exhibit 10 was marked for
21 identification.)
22          BY MS. WINDHAM:

Page 130

```
 1            CERTIFICATE OF NOTARY PUBLIC
 2       I, LINDSEY RUSSO, the officer before whom
 3   the foregoing deposition was taken, do hereby
 4   certify that the witness whose testimony
 5   appears in the foregoing deposition was duly
 6   sworn by me; that the testimony of said witness
 7   was taken by me in shorthand and thereafter
 8   reduced to computerized transcription under my
 9   direction; that said deposition is a true
10   record of the testimony given by said witness;
11   that I am neither counsel for, related to, nor
12   employed by any of the parties to the action in
13   which this deposition was taken; and further,
14   that I am not a relative or employee of any
15   attorney or counsel employed by the parties
16   hereto, nor financially or otherwise interested
17   in the outcome of the action.
18                          [Signature: Lindsey Russo]
19                      _____.
20                       Notary Public in and for
21                         the District of Columbia
22   My Commission expires:  February 28, 2029
```