# EXHIBIT R

Page 1

```
 1
 2
        IN THE UNITED STATES DISTRICT COURT
 3       FOR THE DISTRICT OF MASSACHUSETTS
 4
    _____
 5                         )Civil Action No.
    MICHAEL and CATHERINE  )1:23-cv-11798-MGM
 6  BURKE,                 )
                           )
 7     Plaintiffs,         )
                           )
 8  v.                     )
                           )
 9  KATE WALSH, in her     )
    official capacity as   )
10  Secretary of the       )
    Massachusetts          )
11  Executive Office of    )
    Health and Human       )
12  Services, et al.,      )
                           )
13     Defendants.         )
    _____)
14
15
16   Remote 30(b)(6) deposition of Department of
17  Children and Families through the testimony of
18               ALISHA MORRISSEY
19             June 25, 2025
20              9:01 a.m.
21
22  Reported by:  Lindsey Russo
    Job No. 7436420
```

Page 12

```
 1        A.     Good morning.
 2        Q.     Would you please introduce yourself
 3   to the Court.
 4        A.     My name is Alisha Morrissey, and I
 5   am employed at the Department of Children and
 6   Families.
 7        Q.     Okay.  And what is your -- your
 8   title there with the Department of Children and
 9   Families?
10        A.     I'm a regional program manager for
11   the southern regional office.
12        Q.     And do you understand that you're
13   here to give testimony under oath in a lawsuit?
14        A.     Yes.
15        Q.     And that the testimony that you're
16   giving is to give, you know, not just your own
17   personal understanding, but the DCF's position
18   on behalf of DCF?
19        A.     Yes.
20        Q.     Okay.  Have you ever given a
21   deposition before?
22        A.     No.
```

1      Q.     Have you ever testified in court

2   before?

3      A.     Yes.

4      Q.     Okay.  How many times have you done

5   that?

6      A.     I've been employed for over 17

7   years, so I've been in court previously.  I --

8   I'm not sure the exact amount, but I've

9   testified before.

10      Q.     A number of times.

11             Were those all -- all the times

12   you've testified in court, Ms. Morrissey -- I

13   take it from your answer -- did all those times

14   relate to your employment with DCF?

15      A.     I -- no.

16      Q.     Okay.  Let me -- I guess so -- so

17   you said you've testified many times in court

18   before.  Is that a dozen times?  Two dozen

19   times?  Just ballpark your -- your experience

20   testifying.

21      A.     More than two dozen times as an

22   employee of the Department of Children and

Page 14

1  Families.

2      Q.    Okay.  And -- and have you testified

3  in court outside of your employment

4  responsibilities with DCF?

5      A.    Yes.  Once prior to my employment in

6  the Department of Children and Families.

7      Q.    Okay.  And what did that involve?

8      A.    I was a witness.

9      Q.    In what case?

10      A.    When I was in college, I witnessed

11  a -- the aftereffect of an assault and called

12  the police, and I was asked to testify as to

13  what I saw.

14      Q.    Okay.  So have you ever been a party

15  in a lawsuit not as a witness but either the

16  plaintiff or defendant in a lawsuit?

17      A.    Yes.  I was in a car accident and

18  personal injury.

19      Q.    Okay.  What -- and just ballpark.

20  Was that recently, or when was that -- that

21  lawsuit?

22      A.    That was more than 15 years ago.

1       Q.    Okay.  And that was -- you were --
2    you were the plaintiff in that lawsuit?  Or I
3    guess --
4       A.    Can you clarify that, please?
5       Q.    Yeah, sure.  And that's a great
6    point.  If there's anything I say that's --
7    that is kind of a lawyerly term or something
8    that you're not familiar with, please ask for
9    clarification, like you're doing now is -- is
10   great.
11            You said that there you were
12   involved in a lawsuit after a car accident.
13   Were you the one that brought the lawsuit?
14      A.    Yes.
15      Q.    Okay.  And what was the result of
16   that lawsuit?
17      A.    I was awarded damages for the -- the
18   personal injury and to the damage to my car.
19      Q.    Okay.  Going back to the testimony
20   that you've given on behalf of DCF in court,
21   you said that's been over a couple of -- over
22   two dozen instances.  What was the role of that

Page 16

1    testimony that you were providing just

2    generally, general topics that you would be

3    asked to testify about?

4         A.    Typically I was called to court to

5    testify in care and protection proceedings and

6    probate custody proceedings or in

7    child-requiring-assistance proceedings.

8               MR. BRYANT:  Rob, before we proceed

9    the -- the --

10              MR. ELLIS:  Yeah.

11              MR. BRYANT:  -- standard

12   stipulations, so we preserve everything until

13   the time of trial except as to form and

14   privilege for future questions.  Can we agree

15   to that?

16              MR. ELLIS:  Perfect.  Yep.  No

17   problem.

18              MR. BRYANT:  Thank you.

19              BY MR. ELLIS:

20        Q.    Okay.  You said this is your first

21   deposition, Ms. Morrissey.  You're doing a

22   great job now.  Just one request for the court

Page 17

```
 1   reporter.  As this is all being transcribed,
 2   it's important that we don't talk at the same
 3   time.  That makes it hard for her to -- to make
 4   an accurate record of -- of everything that's
 5   said.
 6             So if you can wait till I'm done
 7   asking the question before answering, and then
 8   I'll make sure to wait till you're done with
 9   your answer before asking the next question; is
10   that fair?
11        A.    Yes.
12        Q.    Okay.  And we definitely want to
13   respect your time, so I'll do my best to keep
14   this deposition moving, but as we -- we've said
15   before, this isn't a sprint, and -- and if you
16   ever need a break, please just let me know, and
17   we can -- we can accommodate that.  Okay?
18        A.    Okay.  Thank you.
19        Q.    We'll try and take regular breaks
20   throughout the deposition.
21             Ms. Morrissey, is there any reason
22   you would be unable to give full and complete
```

Page 18

1    testimony today?

2        A.    No.

3        Q.    What did you do to prepare for the

4    deposition today?

5        A.    I reviewed the documents provided to

6    me, and I had discussions with Kim Occhiuti

7    from OMPA with a social worker from -- that

8    wrote an event as well as preparation with my

9    attorneys.

10       Q.    Okay.  We'll just break those down

11   if we could.

12             So you said you reviewed documents.

13   What documents did you review?

14       A.    Departmental policy as well as the

15   case files of the 35 identified families.

16       Q.    Okay.  And you mentioned a Kim

17   Occhiuti?

18       A.    Occhiuti.

19       Q.    Is that the -- Occhiuti?

20       A.    Correct.

21       Q.    Okay.  Do you know how to spell

22   that?

Page 22

1    prepare or work on in the 35?

2        A.    The family identified in Row 34.

3        Q.    Row 34 -- when you say Row 34, is

4    that of the spreadsheet that's the best fit and

5    special skills spreadsheet?

6        A.    Yes.

7        Q.    Okay.  And did you reach out to Ms.

8    Boenitz or -- or -- or strike that.

9            Why did you reach out to Ms.

10   Boenitz?

11       A.    After reviewing the special skills

12   and best fit documentation, there were just

13   some clarifying questions that I had for her.

14       Q.    Okay.  What were those questions?

15       A.    I wanted more information regarding

16   her clinical formulation for the family.

17       Q.    Okay.  We'll get into -- we'll be

18   able to ask more about that when -- when we get

19   there.

20            Did you reach out -- did you speak

21   to anyone else about the deposition?

22       A.    I spoke to one other manager.

Page 48

1    conditions on the age of a child that they

2    would accept, right?

3        A.    In relation to other parts of the

4    policy, yes.

5        Q.    Ms. Morrissey, you have seen foster

6    parents express limitations of the age of a

7    child that they could accept, correct?

8        A.    Based on the other housing standards

9    not being met.  It's based upon the housing

10   standards, not on a preference or a

11   self-imposed limitation.

12           MR. ELLIS:  Okay.  I'm going to

13   object as nonresponsive.

14           BY MR. ELLIS:

15       Q.    So my question, Ms. Morrissey, is:

16   You have seen in your experience families who

17   have expressed preference on what ages of a

18   child that they can accept, true?

19       A.    Preference, yes.

20       Q.    And DCF will still issue a license

21   to a family with those limitations, correct?

22       A.    Yes.

Page 50

```
 1   support.
 2              BY MR. ELLIS:
 3      Q.    They are allowed to say, we would be
 4   unable to accept a child with certain medical
 5   conditions, correct?
 6      A.    Yes.
 7      Q.    You've seen that before, haven't
 8   you, Ms. Morrissey?
 9      A.    Yes.
10      Q.    And DCF will still issue a license
11   to those families, true?
12      A.    Yes.
13      Q.    And then at the placement stage, a
14   family doesn't need to accept a child that has
15   those medical conditions, correct?
16      A.    Correct.
17      Q.    DCF has the ability to issue a
18   license even if there are families that have
19   limitations on what kind -- on what children
20   they can accept as foster children, true?
21              MR. BRYANT:  Objection to form.
22              THE WITNESS:  Yes.
```

1  snapshot, you're aware of that happening,

2  right?

3           MR. BRYANT:  Objection to form.

4           THE WITNESS:  May I ask what family

5  directly you're referencing on the spreadsheet?

6           BY MR. ELLIS:

7      Q.    I believe you said that -- we'll

8  talk about the specific family.  I think you

9  talked about following up with this family in

10  your preparation for the deposition.

11      A.    Yes, I did.

12      Q.    One of the purposes of this list of

13  affirming homes is to enable better matches and

14  longer placement for the foster children,

15  correct?

16      A.    Yes.

17      Q.    If we can stay on that -- well,

18  let's see.  If we can go back to Exhibit 35.

19  Let me know when you have that.

20      A.    It's up.

21      Q.    And you would agree that

22  Massachusetts DCF at times has to move

1   placements or replace children in foster care,

2   right?

3       A.    Yes.

4       Q.    And do you agree that Massachusetts

5   moves children or it has children with multiple

6   placements at a higher rate than the national

7   average?

8       A.    I'm not aware of that.

9       Q.    Okay.  If we can go to Page 17 of

10  this PDF, which is Bates 245.  Let me know when

11  you're there.

12      A.    I'm there.

13      Q.    Looking at the bottom where it says:

14  "Barriers to Permanency," if you see that

15  section at the bottom.

16      A.    I see that.

17      Q.    Okay.  Second sentence says that

18  Massachusetts struggles to secure permanency

19  for youth in DCF custody.

20            Do you see that?

21      A.    Yes.

22      Q.    And then last sentence on that page:

1    "Data from the Federal Fiscal Year 2019 showed

2    that 38 percent of foster youth had four or

3    more placements during a single episode of

4    removal from the home, compared to the national

5    average of 22 percent."

6              Ms. Morrissey, you agree that in

7    practice not every placement that DCF makes is

8    permanent, right?

9        A.    Yes.

10       Q.    And that there are situations where

11   DCF moves children in between placements,

12   right?

13       A.    Yes.

14       Q.    What this data is showing is that

15   foster youth had four or more placements during

16   a single episode of removal.  That would mean

17   from one time being away from their birth

18   family, they had four or more separate foster

19   homes where they were placed; is that correct?

20             MR. BRYANT:  Objection.  Scope.

21             THE WITNESS:  That's how I read that

22   sentence, yes.

1           BY MR. ELLIS:

2      Q.    That's fair.

3           So the way you read that is almost

4  40 percent would have four or more placements

5  each time they're removed from their home.  Is

6  that how you read that?

7           MR. BRYANT:  Objection to form.

8           THE WITNESS:  That's my

9  understanding of that sentence, yes.

10          BY MR. ELLIS:

11     Q.    Okay.  I'd like to -- we'll be going

12  back to that Exhibit 1, the best fit and

13  special skills.  So this pulled 162 families

14  from that two-year period that met the -- the

15  different requirements of the search that DCF

16  made, right?

17     A.    Yes.

18     Q.    I'd like to ask about a few of these

19  license studies from some of these families.

20  Okay?

21     A.    Yes.

22     Q.    And you talked, Ms. Morrissey, about

Page 115

1    raise a Black child."

2              Do you see that?

3        A.    I see that sentence.

4        Q.    And this foster parent expresses

5    worry about her ability to create psychological

6    safety --

7        A.    I see that.

8        Q.    -- for a child that's Black.

9              Do you see that?

10       A.    I do.

11       Q.    And with this worry of the parents,

12   DCF still approved the license, right?

13       A.    Yes.

14       Q.    There are other topics in addition

15   to race.  If we go to -- keep going down, it

16   says in the next paragraph:  "She does not

17   believe she would be a good match for a child

18   who has significant medical needs."

19              Do you see that?

20       A.    Yes.

21       Q.    And that she does not feel she'd be

22   a good match for a child who utilizes a

1    wheelchair for mobility, right?

2        A.    I see that, yes.

3        Q.    DCF licenses families who say they

4    would not be a good match for foster kids with

5    these type of conditions, right?

6        A.    This is a preference in a best

7    match, not her inability to meet the licensing

8    standards of welcoming a child into her home,

9    so yes.

10       Q.    And this parent could -- at the

11   placement stage after a license, she -- they --

12   this parent could decline to accept a child who

13   has special needs at the placement stage,

14   right?

15       A.    Yes.  Foster families can decline

16   placements.

17       Q.    They can decline placement for any

18   reason, can't they?

19            MR. BRYANT:  Objection to form.

20            THE WITNESS:  They can decline, but

21   it would -- there -- it would be the

22   expectation there'd be further conversation

Page 117

1    with the family about them declining the

2    placement.

3              BY MR. ELLIS:

4        Q.    Okay.  So they could say, this child

5    is in a wheelchair and I'm not a good match for

6    a child with a wheelchair, for example, right?

7              MR. BRYANT:  Objection to form.

8              THE WITNESS:  It's possible they

9    could say that, yes.

10              BY MR. ELLIS:

11        Q.    And -- and DCF would allow them to

12    continue having a licensure to foster, true?

13              MR. BRYANT:  Objection to form.

14              THE WITNESS:  Yes.

15              BY MR. ELLIS:

16        Q.    It goes back to what you said about

17    matching.  They might not be the right match

18    for some children but could be for other

19    children, correct?

20              MR. BRYANT:  Objection to form.

21              THE WITNESS:  Yes.  The department

22    does -- attempts to match children with the

Page 118

1   best fit placement, yes.

2           BY MR. ELLIS:

3       Q.    And it's a -- that -- that attempt

4   to match is -- there's a judgment made by DCF's

5   side of what's a good fit, and there's a

6   judgment made by the foster family as well

7   about what's a good fit, fair?

8       A.    Yes.

9       Q.    And one of the considerations that's

10  fair game for a foster family to consider is

11  whether or not the child has significant

12  medical needs, right?

13      A.    And there's a multitude of factors

14  taken into consideration during the matching --

15  matching process, yes.

16      Q.    Right.  And that's one of the things

17  a foster family could consider when they're

18  deciding whether or not to accept a placement,

19  true?

20      A.    True.

21      Q.    Also there on Page 15, next

22  paragraph down:  "She does not feel that she

Page 122

1      A.    It's open.

2      Q.    Okay.  And you recognize this as

3  another license study, right?

4      A.    Yes.

5      Q.    And one that, if we see there on

6  Page 1, the outcome is to issue the license,

7  right?

8      A.    Yes.

9      Q.    Okay.  Foster home ID is 4999275.

10  You see that there at the bottom of the

11  document; is that correct?

12      A.    Yes.

13      Q.    Okay.  If we can scroll down to Page

14  23 of this PDF, please.  We see this section

15  called:  "Child Interest Characteristics."

16      A.    Yes.

17      Q.    Okay.  And there's another family

18  that is stating a preference of zero to five

19  age.  You see that?

20      A.    Yes.

21      Q.    And no preference on gender.  And

22  then the next paragraph, it says:  "She

Page 123

```
 1   explained that she would prefer a child of her
 2   own racial background, white.  As a single
 3   parent, she does not view she would have the
 4   ability to provide a child with the racial
 5   development that should be offered to them so
 6   they can grow and learn their racial identity."
 7              Do you see that?
 8       A.    I see that sentence.
 9       Q.    Okay.  And then halfway through the
10   paragraph, she says:  "Again, as a single
11   parent, she does not feel like she would best
12   be able to teach and support a child of a
13   different racial background to help them be
14   their truest self."
15              Do you see that?
16       A.    I see that sentence.
17       Q.    Okay.  And so it's important for DCF
18   that each child, regardless of their racial
19   background, is affirmed, correct?
20       A.    Yes.
21       Q.    And help to be their truest self,
22   right?
```

Page 125

1    limitation that she cannot -- that she cannot

2    accept placement of a youth of another race.

3         Q.    Okay.  Well, DCF is aware that she's

4    saying she has a preference for only a certain

5    race and not others, right?

6         A.    That's what the record indicates.

7         Q.    And DCF approves the license for

8    families who express those racial preferences,

9    right?

10              MR. BRYANT:  Objection to form.

11              THE WITNESS:  As part of helping to

12   make the best fit matches, yes.

13              BY MR. ELLIS:

14        Q.    And DCF approves the license for

15   families when they say that they would not be

16   best able to teach or support a child of a

17   different race, right?

18        A.    In order to answer that question

19   more fully, I'd have to have a conversation

20   with the writer of this license event and --

21   and have further conversations.

22              But in my review, the family has

Page 126

1  expressed a preference for the best fit in

2  their home.

3      Q.    Ms. Morrissey, the document here

4  shows that she -- this parent is saying that

5  she would not be best able to teach and support

6  the child of a different race, correct?

7      A.    Yes.

8      Q.    This is part of the license study,

9  right?

10     A.    Yes.

11     Q.    Which you reviewed, right?

12     A.    Yes.

13     Q.    And the recommendation is to approve

14 this child, approve this foster family,

15 correct?

16     A.    Yes.

17     Q.    And DCF, as we saw in Page 1, did

18 issue the license, correct?

19     A.    Correct.

20     Q.    Okay.  If you go -- let's see.  Let

21 me just pull up this.  If you can back to

22 Exhibit 1 and see how this shows up on DCF's

Page 129

1          Q.     Okay.  DCF also licenses foster

2     families who say they are not suitable for a

3     child with substance abuse issues, correct?

4          A.     Yes, that's possible.

5          Q.     And you're aware of that happening

6     in your own experience, right?

7          A.     As part of the assessment process,

8     you're asking about what the best -- the

9     family's ability -- their best fit, and that

10    may include not accepting placement of a youth

11    that has a substance use disorder based on

12    their own family situation, yes.

13         Q.     And a parent can say, I can't accept

14    a child who has substance abuse issues in my

15    home, and still DCF could give them a license,

16    correct?

17         A.     It's possible, yes.

18         Q.     Well, let's look at an example.  If

19    we can go to Exhibit 5.  Let me know when you

20    have that one.

21              (Exhibit 5 was marked for

22    identification.)

Page 136

1   fit placement for this home.

2           BY MR. ELLIS:

3       Q.    It's saying he would not be suitable

4   for that, right?

5       A.    That he would not be the best fit.

6       Q.    Well, in DCF's view, that someone

7   with substance abuse should not be placed

8   there, right?

9       A.    I -- yeah, so that would not be the

10  best fit placement for that youth.

11      Q.    Okay.  Let's go to just the next

12  page if you look at the recommendation.  You

13  see how it's shown there the comments:  "DCF,"

14  at the bottom, "recommends continuance

15  approval."

16          You see that?

17      A.    Yes.

18      Q.    And it says:  "A teenager with

19  substance abuse issues should not be placed in

20  his home," right?

21      A.    I see that, yes.

22      Q.    That's the recommended approval is

Page 137

1  to have no teenagers with substance abuse
2  issues placed in his home, fair?
3      A.    That's what's written in the
4  document, yes.
5      Q.    That's what the recommendation was,
6  correct?
7      A.    Yes.
8      Q.    And DCF approved the license, right?
9      A.    Yes.
10      Q.    And you would agree, Ms. Morrissey,
11  that a child can develop issues with substance
12  abuse after a placement, right?
13      A.    Yes.
14      Q.    And you don't know at the time of
15  placement if a child or youth will develop
16  substance abuse behaviors later on, right?
17      A.    Correct.
18      Q.    If that happens, placement with this
19  particular parent could no longer be
20  appropriate, right?
21      A.    In order to have that, in order to
22  have a fuller discussion on that, you would --

Page 143

1    replacement of that child in the future,

2    correct?

3        A.    That can't be answered with the

4    information I have available through this

5    reassessment.

6        Q.    Okay.  We've talked about how

7    replacements sometimes are required, right?

8        A.    Yes.

9        Q.    And that that's something that DCF

10   does more than the national average, right?

11           MR. BRYANT:  Objection.

12   Mischaracterizes the record.  Asked and

13   answered.

14           THE WITNESS:  At the time that that

15   report was generated, that was true, yes.

16           MR. ELLIS:  Okay.  You know, we've

17   been going for a good clip, and it's noon your

18   time.  Maybe we should stop for lunch.  Do you

19   want to -- would 45 minutes be enough for

20   lunch?

21           THE WITNESS:  Yes, that's fine.

22           MR. ELLIS:  Circle back up at 12:45.

```
                                              Page 144

 1             MR. BRYANT:  Okay.

 2             MR. ELLIS:  Okay.  Why don't we go

 3     off the record.

 4             THE COURT REPORTER:  We're now off

 5     the record.

 6             (A short recess was taken.)

 7             THE COURT REPORTER:  We're now back

 8     on the record.

 9             BY MR. ELLIS:

10       Q.    Ms. Morrissey, before the break, we

11     had discussed how DCF can license families that

12     say that a child with a severe physical

13     disability would not be a good fit for their

14     family.  We've seen examples of that already.

15             Do you recall that?

16       A.    I do.

17       Q.    That a family can say, for example,

18     they cannot take a child in a wheelchair,

19     right?

20       A.    Yes, we saw that.

21       Q.    Now, whether or not a child requires

22     a wheelchair, that's something that could
```

Page 145

1   change in the future, right?

2        A.    Yes.

3        Q.    And a physical disability requiring

4   a wheelchair is not always something that can

5   be predicted in advance, right?

6        A.    Correct.

7        Q.    And DCF can still issue a license to

8   families who say they would not be a good fit

9   for a child in a wheelchair, right?

10       A.    Yes.

11       Q.    Now, DCF also licenses families that

12  say that a child who is sexually active would

13  not be a good fit for their family, right?

14       A.    Yes.

15       Q.    You're aware of that happening in

16  your experience, true?

17       A.    Yes.

18       Q.    And also in preparation for this

19  deposition, you reviewed files to that effect,

20  right?

21       A.    Yes.

22       Q.    If we could go to Exhibit 6, please.

Page 150

1    placement, not that they would limit -- that

2    they wouldn't accept placement of a youth in a

3    wheelchair but that the best fit would be of a

4    child of certain characteristics.

5        Q.    DCF still issues the license to this

6    family, right?

7        A.    This family has a license, yes.

8        Q.    Right.  I'll note here that on the

9    next paragraph this foster parent applicant

10   says in the middle of that paragraph that the

11   church is Unitarian Universalist and that the

12   foster parent says that she developed little

13   tolerance for very Catholic churches.

14       A.    I see that, yes.

15       Q.    Okay.  Does that give you concern if

16   a foster parent expresses little tolerance for

17   certain churches?

18            MR. BRYANT:  Objection to form.

19            THE WITNESS:  Foster families are

20   allowed to have their own belief systems, as

21   long as it doesn't interfere with their ability

22   to meet the licensing standards of meeting the

1    needs of a child based in their home.

2              BY MR. ELLIS:

3        Q.    Okay.  Is there any discussion, as

4    you reviewed this or see it, of protecting

5    Catholic children that could be placed in this

6    home?

7              MR. BRYANT:  Objection to form.

8              THE WITNESS:  Can you please

9    rephrase that?

10             BY MR. ELLIS:

11       Q.    Yeah.  So here the foster parent

12   applicant is saying that she has little -- has

13   developed little tolerance for very Catholic

14   churches.

15             Do you see that?

16       A.    I see that sentence, yes.

17       Q.    Some foster children can belong to

18   very Catholic churches, right?

19       A.    It's possible, yes.

20       Q.    And it would be important to be

21   affirming to those children in their religious

22   views, right?

1      A.    In my review, there's -- there is
2  not information that states she wouldn't be
3  affirming to a child who identified as
4  Catholic.  She expressed a lack of -- of
5  developing little tolerance for the Catholic
6  church.
7            So I would need more information
8  regarding -- regarding her ability to be
9  affirming to a foster youth, but the statement
10 is about the Catholic Church.
11     Q.    And, in fact, it doesn't mention
12 anything at all about follow-up questions or
13 anything about religious children being placed
14 in her care, does it?
15     A.    That's -- that's not to say that it
16 didn't occur.
17     Q.    It's not noted, right?
18     A.    It's not noted.
19     Q.    And -- and children can change their
20 religion during a placement, right?
21     A.    Yes.
22     Q.    A child could be converted to a very

1   Catholic church during the placement, right?

2       A.    Correct.

3       Q.    And a parent that has little

4   tolerance for those churches might not be the

5   right fit, right?

6       A.    That would be one factor in

7   determining whether that placement continues to

8   be the best fit for that child.

9       Q.    It would be a factor, wouldn't it?

10      A.    It could be a factor, yes.

11      Q.    And could be that if this parent has

12  little tolerance for the church that the child

13  was converted to, that she would not be the

14  right fit for that -- that child, true?

15      A.    I'm not reading anywhere in this

16  document that says she wouldn't be an affirming

17  placement for a child.  It speaks, again, about

18  her tolerance to the church.

19          So I would need more information

20  when -- about the youth in the placement and

21  about this family in order to make a more

22  informed decision about whether or not that was

1      A.    Yes.

2      Q.    This family, it says:  "Attended and

3  participated in MAPP, but there were some

4  reported concerns about her thoughts about

5  sexually active teens."

6            Do you see that?

7      A.    I see that comment, yes.

8      Q.    Okay.  And then you go back to 25,

9  and we see that they do not feel comfortable

10  taking in a child who is sexually active,

11  right?

12      A.    Yes.

13      Q.    Now, DCF doesn't know who is going

14  to become sexually active as a teenager, right?

15      A.    Correct.

16      Q.    And DCF will license a family even

17  if they're not comfortable with sexual activity

18  for a child, right?

19      A.    That is their preference, that they

20  would prefer a child that did not have sexual

21  activity, yes.

22      Q.    And even with that preference, DCF

1  will issue them a license, right?

2      A.    It's a preference for placement,

3  yes.

4      Q.    And with that -- with that

5  preference, DCF will issue a license, right?

6      A.    Yes.

7      Q.    And then that is the consideration

8  that the family can use when deciding whether

9  or not to accept a placement, correct?

10      A.    Yes.

11      Q.    And to continue a placement,

12  correct?

13      A.    Yes.

14      Q.    The next paragraph -- we had seen

15  how their church is on that -- earlier in the

16  section, it says their church is mainly a

17  Caucasian population.  It talks about their

18  church again in the following paragraph when it

19  says:  "The family is LGBTQIA affirming."

20  There's a following sentence.

21          Do you see that?

22      A.    Yes.

1  foster child will need to share a room with

2  another girl -- with a girl, then the gender

3  limitation can be that there's only a girl

4  placed at that -- at that home --

5       A.    The --

6       Q.    -- is that correct?

7       A.    That's possible, yes.  That's

8  possible, yes.

9       Q.    Okay.  And also there's lots of

10 examples of people having preferences of what

11 gender they're going to have -- that they would

12 accept, right?

13      A.    Yes.

14      Q.    And it sounds like there are

15 sometimes where that preference might become a

16 requirement based on -- on sleeping

17 arrangements, right?

18      A.    Yes, that's possible.

19      Q.    Okay.  Your testimony yesterday,

20 that a single man, for example, might only be

21 interested in teenage boys and not teenage

22 girls, is that something that you've seen

1   before?

2            MR. BRYANT:  Objection.  Form.

3            THE WITNESS:  In my -- in my

4   professional experience, yes, I've seen that.

5            BY MR. ELLIS:

6       Q.    Okay.  A reason that was given

7   yesterday was that having teenage girls could

8   put him, the single parent, at risk of

9   accusations?

10           MR. BRYANT:  Objection to form.

11           BY MR. ELLIS:

12      Q.    Is that something you've heard of

13   before?

14      A.    There could be a multitude of

15   reasons why that the best fit for that home

16   would be -- for a single man would be an

17   adolescent male.  Every family has their unique

18   circumstances when making their best fit

19   determinations.

20      Q.    Okay.  And then if the -- DCF's

21   position is that gender identity can change for

22   the child, right?

Page 181

1      A.    Yes.

2      Q.    And that that is something that

3  can't be predicted at the time of placement,

4  true?

5      A.    Yes.

6      Q.    And so if the gender identity

7  changes, that might make a placement no longer

8  the right fit, correct?

9           MR. BRYANT:  Objection to form.

10          THE WITNESS:  If there were changes

11  in either the youth or the foster family's

12  characteristics, then it's -- that's part of

13  the ongoing conversations about whether this is

14  a best fit.  So yes, it'd be part of the

15  ongoing conversations about best fit.

16          BY MR. ELLIS:

17      Q.    Yeah, and that -- that could require

18  a replacement in the ongoing conversations

19  about best fit, true?

20      A.    It's possible, yes.

21      Q.    Yeah.  Now, DCF will issue a

22  license -- well, let's -- let's look at Exhibit

Page 194

1    you're referencing a particular --

2        Q.    Yeah.  If a family says that they're

3    only open to children that have certain sexual

4    attractions, that family can still be licensed

5    by DCF, right?

6        A.    Families have to demonstrate to the

7    satisfaction of the department at the time of

8    licensure and licensing event that they're able

9    to support and affirm a child's identities.

10        Q.    You said to the satisfaction of DCF.

11    That's a judgment call that DCF has to make,

12    right?

13        A.    Yes.

14        Q.    A lot of factors go into that, true?

15            MR. BRYANT:  Objection to form.

16            THE WITNESS:  Yes.  Yes.

17            BY MR. ELLIS:

18        Q.    And -- and they have to apply their

19    discretion on it based on the facts of the

20    case, right?

21            MR. BRYANT:  Objection to form.

22            THE WITNESS:  Yes.

Page 199

1    of the prior regime where they couldn't take a

2    child that was younger than 12 because of the

3    dog.  You remember that?

4         A.    Yes.

5         Q.    Okay.  And so they're saying for

6    ages 12 through 21 -- so those would be the

7    ages that this person believed they could

8    accept a child.  Are you with me?

9         A.    Yes.

10        Q.    Okay.  So for ages 12 through 21,

11   she is open to parenting females, gay males, or

12   transgender males or females who are attracted

13   to males.

14            Do you see that?

15        A.    I see that sentence, yes.

16        Q.    She goes on that this is based on

17   youth bedrooms being on a second floor that

18   would have a more intimate experience with her

19   niece that lives there on that -- that stays on

20   that floor.

21            For those ages, this foster parent

22   is not open to a lesbian, for example, though,

1  she would be open to a gay male; is that fair?

2      A.    She's made a preference for one --

3  for a preference, yes.

4      Q.    Well, she said she's open to

5  parenting females, gay males, females attracted

6  to males.  Okay.  You say a preference.  She's

7  not open to a lesbian in this situation.  She's

8  open to a gay male or to females attracted to

9  males, right?

10     A.    Without speaking to her about her --

11 all of her openness, this -- this indicates her

12 preferences of what she's -- her preference for

13 a placement based on her house characteristics.

14 So in order to have a conversation about

15 particulars, I'd have to have -- you'd have to

16 have more information.

17     Q.    Okay.  And DCF can still issue a

18 license to a foster parent if they say that

19 they would not be open to taking certain

20 children based on their sexual orientation?

21     A.    She's -- she's made a preference.

22 She didn't say she would not.  She's made a

1  youth beyond this floor -- it would be an

2  intimate experience for her niece, right?

3      A.    That's what's stated, yes.

4      Q.    And so she's saying she's open to

5  people who are not attracted to women.  Only

6  those who are attracted to men, whether they're

7  gay males or whether they're females attracted

8  to males, correct?

9      A.    That's what it states, yes.

10     Q.    Okay.  And that's a reasonable

11 position for a parent to have, right?

12     A.    Families are allowed to express

13 their preferences on -- on -- on placements.

14     Q.    It's not unreasonable for someone to

15 say that they would not be open to somebody

16 that's attracted to the same gender as another

17 youth that's in the same living area, right?

18     A.    Families are allowed to have their

19 belief system and -- and partner with the

20 department to ensure that standards are met and

21 that we're collaborating on the best fit for

22 their home, ensuring that it's safe,

Page 204

1  include being able to say I'm open to some and

2  not open to others, right?

3           MR. BRYANT:  Objection to form.

4           THE WITNESS:  I didn't speak to the

5  writer of this -- this license event to say why

6  they used the word "open" versus "a

7  preference."

8           The way that I'm interpreting it is

9  that it's a preference for a placement and that

10  there's nothing else indicated that says they

11  would be -- they would not be able to meet the

12  licensing standards of being safe and affirming

13  for another youth but that the best fit based

14  on the characteristics of her home would be for

15  these youth.

16           BY MR. ELLIS:

17      Q.    Okay.  Ms. Morrissey, sexual

18  attraction can change during a placement,

19  right?

20      A.    Yes.

21      Q.    Okay.  So if this family is saying

22  I'm open to accepting certain people based on

1  their sexual orientation, that might change,

2  true?

3       A.    Yes.

4       Q.    And the sexual orientation of the

5  child placed could initially have been

6  attracted to men, but then later that changes

7  and that -- that placement is now attracted to

8  women, right?

9       A.    That's possible, yes.

10       Q.    DCF doesn't know when that might

11  happen, right?

12       A.    And that's why we -- we -- the

13  licensing standards at all homes are supportive

14  and affirming of a child's identity, as things

15  can change over the -- over a child's lifetime.

16       Q.    And here's an example of somebody

17  saying that I'm open to some but, because of

18  our living situation with another niece that's

19  in my care, that I am not open to certain

20  children based on their sexual orientation,

21  right?  That's their preference?

22       A.    That is her preference, yes.

1          BY MR. ELLIS:

2     Q.    Oh, sorry.  Keep going.  I didn't

3  mean to interrupt.  I thought you were

4  finished.  Please continue.

5     A.    Sorry.  Some homes are best fits,

6  but all homes have to meet the standards of

7  being safe, supportive, and affirming.

8          MR. ELLIS:  I'm going to object to

9  partially nonresponsive.

10         BY MR. ELLIS:

11    Q.    So, Ms. Morrissey, the -- the

12 question is you understand that -- I think you

13 were just testifying that there's going to be

14 an ongoing assessment for that family, right?

15    A.    Yes.

16    Q.    To determine if it's still a best

17 fit, correct?

18    A.    Yes.

19    Q.    And you recognize that sometimes the

20 placement might no longer be a good fit and

21 that child needs to be placed somewhere else,

22 right?

Page 208

1      A.      That is possible.

2      Q.      Okay.  This same foster family says

3  they can't take someone with substance use.

4  We've seen examples of that before in the

5  deposition, right?

6      A.      Yes.

7      Q.      If you look at the bottom of that

8  same page.

9      A.      Yes.

10     Q.      It says that the niece experienced

11  parental substance use.  A child or youth who's

12  actively engaging in substance use would not be

13  an appropriate placement in this home as this

14  can be triggering for that person.

15              Do you see that?

16     A.      I do.

17  ████  ███  ██  ███  █  ██  ███  ███  ██

██  ████  ███  ██  ███  ████  ███  ██  ███  █

██  █████  ███  ██  ███  ████  ███  ████  ███

██  ████  ██  ███  █████  ██████  █  ████

██  ███

██       ██  ███  ██  ████

17      Q.      And DCF allows foster parents to

18  continue to be licensed even if they've had

19  prior placements that were disrupted, true?

20      A.      Yeah, sometimes placements fail.

21  Yes.

1  ████ ████ ████ ████ ████ █ █ ████ ████

█ ████ ████ ████ ████ ████ ████ ████

█ ████ ████ ████ ████

█ ██ ████ ████ ████ ████ ████

█ ████ ████ ████

6       Q.    Okay.  And this is another example

7  of -- if you just scroll up a few paragraphs

8  before that on Page 21 where it says that this

9  parent is open to parenting a child or youth

10  who is a member of the LGBTQ-plus community.

11  Do you see that paragraph?

12       A.    Yes.

13       Q.    And in the middle of the next

14  paragraph, it says:  "However, a child or youth

15  whose behaviors include sexually acting out

16  would not be an appropriate match."

17            Do you see that?

18       A.    I see that sentence, yes.

19       Q.    And so it's possible, from DCF's

20  point of view, to allow a parent to be open to

21  taking LGBTQ children, at the same time, not

22  feeling appropriate about behaviors that

Page 211

1    include sexually acting out.  Those things

2    aren't mutually exclusive, right?

3         A.    Correct.

4         Q.    Okay.  We've talked about how you're

5    aware of DCF licensing families who do not feel

6    equipped to support the needs of an LGBTQ

7    child.  Do you remember that?

8         A.    Yes.

9         Q.    I'd like to look at Exhibit 22.  If

10   we could jump to that.  It might take a second

11   to pull that up.

12             (Exhibit 22 was marked for

13   identification.)

14             THE WITNESS:  I have it open.

15             BY MR. ELLIS:

16        Q.    Okay.  So this is -- I just lost it.

17   Sorry.  Let me -- sorry.  Give me one moment.

18   Some technical issues here.  Okay.  I think we

19   have it.

20             All right.  Ms. Morrissey, do you

21   see Exhibit 22 is an annual assessment for

22   Family 3717296?

Page 212

1          A.    Yes.

2          Q.    And that this is one that -- on Page

3     1, it shows the annual assessment status

4     approved and the recommendation of continued

5     license.

6          A.    Yes.

7          Q.    You see that?

8                The submitting supervisor is

9     Euphemia Molina.  Do you know Ms. Molina?

10          A.    I don't work in the same region as

11     her, but I do know Ms. Molina, yes.

12          Q.    Okay.  If we can go to Page 17.

13          A.    Yes.

14          Q.    The last paragraph there, it says:

15     "It is recommended this family continue to have

16     their home licensed as an unrelated placement

17     provider."

18                Do you see that?

19          A.    Yes.

20          Q.    And the last sentence says:  "To

21     note, they do not feel equipped to support the

22     needs of an LGBTQ child.  They state they would

Page 217

1    better fit, and part of -- part of the matching

2    process is if that there's information obtained

3    during placement, that you share that in order

4    for it -- to make the -- an informed next

5    placement if a child needs to move.

6              But she did not disclose --

7        Q.     Did the writer say -- sorry.

8    Continue.  I thought you were finished.  Please

9    continue.

10       A.     Sorry.  She disclosed in the

11   conversation that the family would act

12   appropriately in the moment.

13       Q.     Okay.  DCF feels that people,

14   whether they're short term or long term, they

15   would need to act similarly in both situations,

16   right?

17       A.     Yes.

18       Q.     It's the same license they're being

19   approved for, true?

20       A.     Yes.

21       Q.     And here DCF is granting a license

22   for people who are saying they don't feel

1    equipped to support the needs of an LGBTQ

2    child, right?

3        A.    That's what's stated, yes.

4        Q.    Okay.  And it's possible that a

5    family that's making a -- an application for a

6    license -- you're saying that they -- they

7    could be -- they get the same license, but some

8    of them might be open to long-term placements

9    and some might be open to short-term

10   placements, right?

11       A.    Yes.  All families have to be

12   licensed to provide care, but some can express

13   preference for the length of placement, yes.

14       Q.    All right.  But the license that

15   they have to do would be the same for both,

16   right?

17       A.    Yes.

18       Q.    And if -- if -- does DCF make

19   distinctions between them?  So if a family

20   would not be approved for a long-term but would

21   for a short-term placement, that they let the

22   family know that?

1    one.  But this first disrupted placement goes

2    to the point you've testified before, that DCF

3    knows that some placements are disrupted,

4    right?

5        A.    Yes.

6        Q.    And it doesn't require -- DCF

7    doesn't require foster parents to keep

8    placements at all costs, do they?

9        A.    No.

10       Q.    Okay.  And you can still be a

11   licensed parent even after a disrupted

12   placement, right?

13       A.    Yes, you can be still licensed after

14   disrupted placement.

15       Q.    In fact, here they went from being

16   kinship to then, after one disrupted placement,

17   they went into becoming an unrestricted

18   resource, right?

19       A.    Yes.

20   ███   █████   ████  ████  ████  ████  ██  ██  ████

█   █████  █████  ██  ████  ████  █  █████████  ██  █████

█   █████  ████  ████  ████  ████  ███████  ██  ██  █████

Page 230

19          Q.    So even after disrupted placements,

20    DCF still will not only approve a license but

21    recommend placements of other children moving

22    forward, right?

Page 231

1    A.    Yes.



Page 265

1           CERTIFICATE OF NOTARY PUBLIC

2        I, LINDSEY RUSSO, the officer before whom

3     the foregoing deposition was taken, do hereby

4     certify that the witness whose testimony

5     appears in the foregoing deposition was duly

6     sworn by me; that the testimony of said witness

7     was taken by me in shorthand and thereafter

8     reduced to computerized transcription under my

9     direction; that said deposition is a true

10    record of the testimony given by said witness;

11    that I am neither counsel for, related to, nor

12    employed by any of the parties to the action in

13    which this deposition was taken; and further,

14    that I am not a relative or employee of any

15    attorney or counsel employed by the parties

16    hereto, nor financially or otherwise interested

17    in the outcome of the action.

18

19    _____.

20               Notary Public in and for

21                 the District of Columbia

22    My Commission expires:  February 28, 2029