# EXHIBIT S

Page 1

1
        IN THE UNITED STATES DISTRICT COURT
2          FOR THE DISTRICT OF MASSACHUSETTS
3
4    _____
                                )Civil Action No.
5    MICHAEL and CATHERINE       )1:23-cv-11798-MGM
     BURKE,                      )
6                                )
        Plaintiffs,              )
7                                )
     v.                          )
8                                )
     KATE WALSH, in her          )
9    official capacity as        )
     Secretary of the           )
10   Massachusetts               )
     Executive Office of         )
11   Health and Human            )
     Services, et al.,           )
12                               )
        Defendants.              )
13   _____)
14
15
            VIDEOTAPED REMOTE DEPOSITION OF
16
                EUPHEMIA MOLINA
17
               May 21, 2025
18
                8:35 a.m.
19
20
21
22   Reported by:  Lindsey Russo
     Job No. 7362939

Page 54

```
 1              And then I had asked whether that
 2      was also hypothetically true about a child's
 3      sexual orientation.  Is -- is that a
 4      hypothetical possibility?
 5              MR. BRYANT:  Objection to form.
 6              THE WITNESS:  Yes.
 7              BY MR. HAUN:
 8          Q.    That was a yes?  I'm sorry.  You cut
 9      out.
10          A.    Yes, it was a yes.  Yep.
11          Q.    Okay.  Okay.
12              And could you recall any specific
13      instances of that?
14          A.    So I can't recall necessarily, you
15      know, a family declining a -- so -- okay.  In
16      general, I'm working with unrelated foster
17      parents.  They choose their best fits
18      consideration, so we license them for like 0 to
19      18, 1 to 18.
20              But then they choose best fits
21      considerations, and not everybody chooses to
22      want to take placement of an older child or a
```

Page 55

1   child who is transgender or a child who is gay

2   or lesbian or a child who has asthma.

3   People -- people self-select kind of what they

4   feel like they can provide the best home for.

5        Q.    Okay.

6        A.    So in that context, people might

7   decline placements for all kinds of reasons,

8   including for LGBTQ youth.

9        Q.    And -- and that's not a violation of

10  DCF policy?

11       A.    No.

12       Q.    Okay.  So if during the course of,

13  let's say, a caregiver assessment, for example,

14  foster family says I -- I'm very eager to be a

15  foster parent.  I want to bring children into

16  my home and -- and help improve the care for

17  children in Massachusetts.  I'm not sure that

18  our family is a best fit for a Jewish child

19  because we work on Saturdays, and we couldn't

20  observe the Jewish Sabbath with the child.

21  Would that be a barrier to them being foster

22  parents?

Page 59

1    safe and affirming means, and then at the --

2    they get licensed, and then at the placement

3    stage, they get asked about having, like the

4    example you mentioned, like a 15-year-old

5    transgender youth coming into their home and

6    they say we don't think we could meet that --

7    that child's needs because of their gender

8    identity, that would not be a barrier to them

9    still being foster parents?

10                MR. BRYANT:  Objection to form.

11                THE WITNESS:  I would have to know

12   more context, but we encourage people in making

13   decisions around placements to be taking

14   placements that they feel that they're equipped

15   and ready and capable and able to meet the

16   kid's needs that we're presenting.

17                BY MR. HAUN:

18        Q.    So it's at least possible that a

19   parent could -- a foster parent could say we

20   don't think we could meet a child's needs

21   because of the child's gender identity?

22                MR. BRYANT:  Objection to form.

Page 60

1          BY MR. HAUN:

2      Q.    Is that a yes?

3      A.    Yes, it's possible.

4      Q.    Okay.  Okay.

5           Let's look back at that document we

6  were discussing.

7           MR. BRYANT:  Counsel.

8           MR. HAUN:  Yes.

9           MR. BRYANT:  Would it be okay if we

10  take a brief break at 9:30?  It doesn't have to

11  be a full ten-minute break if you don't want.

12           MR. HAUN:  Yeah, we can do a

13  five-minute break because we just had one over

14  the technical issue.

15           MR. BRYANT:  Okay.

16           BY MR. HAUN:

17      Q.    And let's -- back at this document

18  here, it also says -- this is in the same

19  paragraph discussing the changes to the FRU.

20  It also says that when searching for a home,

21  it's now possible to search by LGBTQIA

22  placements but, to be effective, family

Page 78

1  description -- it's a huge area of identified

2  need -- was accurate?

3       A.    Yes.

4       Q.    And why is that?

5       A.    Because the liaisons -- that was the

6  understanding of that group, right, that that

7  was -- there are two main, big areas of need

8  that we were hoping to address.  One was

9  training across the board, and the other was

10  making sure we had safe and affirming homes for

11  our youth.

12       Q.    Okay.  Is -- so is it fair to say

13  then that at the time of this document, which

14  is March of 2023, according at least to the

15  LGBTQIA-plus liaisons, which includes you, that

16  there was a huge area of identified need over

17  the lack of homes for LGBTQ youth?

18       A.    Yes.

19       Q.    Okay.  What would you attribute that

20  lack of homes to?

21            MR. BRYANT:  Objection to form.

22            THE WITNESS:  So, in general, I

Page 100

1            And what would they be asking the
2   family resource workers?
3        A.    They would be asking how many homes
4   do we have in the area office that are
5   accepting of placements of LGBTQ youth.
6        Q.    Okay.  And then do you know how the
7   family resource workers would determine that
8   information?
9        A.    From -- from their personal
10  knowledge of the homes that they work with.
11       Q.    Okay.  So does that mean then that
12  you -- just because you have a foster care
13  license with DCF, it doesn't mean that you're
14  necessarily willing and able to have an
15  LGBTQ-identifying child in your home?
16            MR. BRYANT:  Objection to form.
17            THE WITNESS:  We were looking for
18  homes that were self-identified as wanting
19  LGBTQ placements.
20            BY MR. HAUN:
21       Q.    Okay.  Why would that be necessary
22  if everyone in the foster care system has to be

Page 101

```
 1   open to having an LGBTQ child in their home?
 2              MR. BRYANT:  Objection to form.
 3              THE WITNESS:  Because logistically
 4   even though we license 0 to 18, not all homes
 5   accept kids of all age ranges, for example.
 6              BY MR. HAUN:
 7       Q.    And not all homes would necessarily
 8   accept every child with any particular sexual
 9   orientation or gender identity?
10              MR. BRYANT:  Form.
11              THE WITNESS:  Correct, or any
12   characteristic.
13              BY MR. HAUN:
14       Q.    So it varies based on the family?
15              MR. BRYANT:  Objection to form.
16              THE WITNESS:  It varies based on the
17   foster family's interest.
18              BY MR. HAUN:
19       Q.    And that by itself -- that interest
20   by itself doesn't stop the foster family from
21   having a foster license, right?
22              MR. BRYANT:  Objection to form.
```

Page 112

1  but it wasn't always the case that there was a

2  license review team when it came to reviewing

3  foster care applicants; is that correct?

4        A.    Yeah, that's correct.  It's new with

5  the new policy.

6        Q.    Okay.  Were you involved in the

7  implementation of this new policy?

8              MR. BRYANT:  Objection to form.

9              THE WITNESS:  I was not.

10             BY MR. HAUN:

11       Q.    Okay.  And does the LRT help assure

12  the quality of DCF licensing decisions?

13       A.    Yes.

14       Q.    Okay.  How so?

15       A.    So I think having a team of folks

16  who are considering the report and the

17  different factors in it strengthens the quality

18  of our work.

19       Q.    Is that because it's important to

20  have different people involved?

21       A.    I think the -- the range of

22  expertise and voices and minds in the room

Page 113

1   toward any given issue is helpful.

2        Q.    So there's a range of expertise,

3   experiences, perspectives?

4        A.    Correct.

5        Q.    Okay.  And does that mean that the

6   different people, they -- because they didn't

7   bring different things to the discussion, could

8   they disagree about what to do in a given

9   situation?

10       A.    They could.

11             MR. BRYANT:  Objection to form.

12             BY MR. HAUN:

13       Q.    I'm sorry.  Did you say they could?

14       A.    They could.

15       Q.    Okay.  Might they disagree about

16  whether a potential foster care applicant meets

17  the criteria at issue?

18             MR. BRYANT:  Objection to form.

19             THE WITNESS:  Yes.

20             BY MR. HAUN:

21       Q.    Okay.  Have you ever served on an

22  LRT?

Page 122

1            Is that what your question was?

2            BY MR. HAUN:

3       Q.    But you understood yourself as a

4    subject matter expert, and that's why you

5    offered your services regarding the new MAPP

6    curriculum; is that correct?

7            MR. BRYANT:  Objection to form.

8            THE WITNESS:  Yes.

9            BY MR. HAUN:

10      Q.    Yes.  Okay.

11           And that curriculum was implemented

12   in the fall of 2023; that's right?

13      A.    No.

14      Q.    When was it implemented?

15      A.    It has not been implemented.

16      Q.    It has not been implemented.  Okay.

17           Okay.  So if you went to an LRT

18   meeting in 2023 when the liaisons were still

19   meeting, you would still consider yourself a

20   subject matter expert in this area, right?

21      A.    -- in that meeting.

22      Q.    But if it was about things related

Page 123

1  to the training of foster parents?

2      A.    No.  That's not my personal --

3      Q.    Then why --

4      A.    -- understanding of SME.

5      Q.    Sure.  How -- how would you then

6  describe yourself as a subject matter expert

7  regarding the MAPP curriculum?

8      A.    I would not.  I mean -- so, again,

9  my understanding of SME, subject matter expert,

10 is back in the day when there were liaisons if

11 we were considered subject matter experts, we

12 could be invited or maybe should've -- should

13 be invited to policy development.

14     Q.    And you understood yourself as one,

15 correct?

16          MR. BRYANT:  Objection to form.

17          THE WITNESS:  Then my understanding

18 was by definition, as a part of that group, we

19 were considered as such.

20          BY MR. HAUN:

21     Q.    So yes?

22     A.    Actually --

Page 124

1    MR. BRYANT:  Objection to form.

2    THE WITNESS:  -- I'm -- I'm

3  remembering the diversity plan.  That's --

4  that's -- that's where we understood we were

5  subject matter experts.

6    BY MR. HAUN:

7    Q.    But you offered your subject matter

8  expertise regarding the new MAPP curriculum,

9  correct?

10    MR. BRYANT:  Objection to form.

11    THE WITNESS:  (No audible response.)

12    BY MR. HAUN:

13    Q.    Yes?

14    A.    I don't know the intention of -- of

15  Jen Pudder, if she wanted Shavon and I to

16  participate as liaisons or just as people in

17  the department or people that have done the

18  work.  I -- I don't know if -- if we were

19  lifted as subject matter experts to do that.

20  Lots of people were being asked to meet with

21  the consultants at the beginning of the MAPP

22  curriculum development.

Page 126

1  team operate?

2      A.    In terms of the structure of the

3  meeting?  In terms of --

4      Q.    Right.  In terms of the structure of

5  the meeting.

6      A.    So currently the structure of the

7  meeting is -- some of us will do introductions.

8  My manager generally begins the meeting, asks

9  the licensed-in-training social worker to

10  review the housing standards of the proposed

11  home, who is in the family, a little bit about

12  their background.  We go through their

13  references, any BRC findings.

14          The -- the manager will then ask for

15  any type of observations or opinions from other

16  teams in the room that have had -- had contact

17  with that resource.  So, for example, if it's a

18  kinship family, she's going to ask the social

19  worker that provides support to that kinship

20  family as well as the child's social worker if

21  it's a -- a provisional placement prior to the

22  CTA to -- to talk about what their observations

Page 169

```
 1            THE WITNESS:  So family resource
 2   work asks for people to constantly be
 3   self-reflecting on their capacity to provide
 4   care, safe care.
 5            BY MR. HAUN:
 6      Q.   And if they don't think -- and if a
 7   foster parent doesn't think they can meet the
 8   needs of a child because of that child's sexual
 9   orientation and gender identity, they can say
10   that to DCF and that's not violating DCF
11   policy?
12            MR. BRYANT:  Objection.  Form.
13            THE WITNESS:  It would really depend
14   on their actions towards that youth in the home
15   and their reaction to any child.
16            BY MR. HAUN:
17      Q.   If they -- if the foster parent
18   didn't say at the meeting I can't meet your
19   needs to the child, they just relayed that to
20   DCF, is that okay?
21            MR. BRYANT:  Objection to form.
22            THE WITNESS:  It's such a
```

```
                                                    Page 170

 1   case-by-case situation.  We would have to look

 2   at how they're managing those situations.

 3             BY MR. HAUN:

 4       Q.    Okay.  And did the -- the Burkes say

 5   in here that they would say to the child that

 6   they thought what you were doing is sinful?

 7             MR. BRYANT:  Objection to form.

 8             THE WITNESS:  I would have to review

 9   the whole license study to -- to answer that

10   question.

11             BY MR. HAUN:

12       Q.    Okay.  Do you recall having that

13   impression when you went to the LRT?

14             MR. BRYANT:  Objection to form.

15             THE WITNESS:  What I'm recalling is

16   some specific mentions in the license study

17   that gave pause to their ability to be safe and

18   affirming.

19             BY MR. HAUN:

20       Q.    Okay.  Did the LRT discuss that the

21   Burkes held these views because of their

22   Catholic faith?
```

Page 171

1          MR. BRYANT:  Objection to form.

2          THE WITNESS:  The LRT acknowledged

3     that the family attributed their beliefs to

4     their faith.

5          BY MR. HAUN:

6     Q.    And who acknowledged that?

7     A.    The foster -- the prospective

8     resource.

9     Q.    Right.  But in the course of the LRT

10    discussion, who acknowledged that?

11    A.    I don't remember specifically.

12    Q.    Okay.  Did you have any reaction to

13    when you saw that this was a -- when you --

14    strike that.

15          When you read their -- this draft

16    report in preparation for the LRT and you saw

17    that the Burkes attributed their beliefs to

18    their Catholic faith, did you have any reaction

19    to that?

20    A.    No.

21    Q.    Okay.  That wasn't a problem for

22    you?

Page 174

1          BY MR. HAUN:

2      Q.    And that --

3      A.    -- and they identify the

4  characteristics of the kids they believe would

5  thrive in their home --

6      Q.    Okay.

7      A.    -- and that they could meet the

8  needs for.

9      Q.    So if the Burkes raised -- if the

10  Burkes said we can be safe and affirming as

11  foster parents and then, after they received a

12  license, they said we would -- we don't think

13  we can meet the needs of a child due to this

14  child's sexual orientation or gender identity,

15  that would not be a basis to remove their

16  foster license; is that right?

17          MR. BRYANT:  Objection to form.

18          THE WITNESS:  If the family said

19  they're safe and affirming and then declined

20  placement of a youth based on not feeling they

21  could meet that youth's needs, then no, it

22  wouldn't necessitate a revocation of their

Page 175

1    license.

2            MR. HAUN:  Okay.  Let's look at

3    another document then.  This is Exhibit 7 for

4    identification.

5            (Exhibit 7 was marked for

6    identification.)

7            THE WITNESS:  Okay.  I can see it.

8            BY MR. HAUN:

9        Q.    Okay.  Do you recognize this

10    document?

11        A.    I do not.  I mean, I recognize what

12    it is, but I haven't seen it before.

13        Q.    Okay.  Would you agree with me that

14    on the title page it says:  "Family Resource

15    Application Section A, Initial Eligibility

16    Screening"?

17        A.    Yes.

18        Q.    Okay.  Have you seen a cover page

19    like this before?

20        A.    I have seen application -- yes, at

21    bays before.

22        Q.    Okay.  What -- what is -- what is an

Page 181

1   decision to not license the Burkes?

2       A.    Yes.

3       Q.    Okay.  Did you agree with it at the

4   time?

5       A.    Yes.

6       Q.    Was there a vote about whether to

7   license the Burkes?

8       A.    No.

9       Q.    Okay.  How was the outcome

10  determined?

11      A.    What I recall is that we reviewed

12  policy.  I didn't feel like they met standards

13  for licensing, and the team came to a -- kind

14  of a group consensus that they just weren't

15  licensable.

16      Q.    Is that recorded somewhere?

17      A.    So it might be recorded in the

18  license review team notes that are added after

19  the license review team meeting.

20      Q.    Did anyone express any disagreement

21  with the decision to deny the Burkes a license?

22      A.    I don't recall, like, a dissenting

Page 188

1              BY MR. HAUN:

2      Q.    Okay.  So your insight is well known

3  and valued by your colleagues?

4              MR. BRYANT:  Objection to form.

5              THE WITNESS:  I would like to think

6  so.

7              BY MR. HAUN:

8      Q.    Okay.  Do you recall bringing up

9  specific policies at the LRT?

10     A.    So -- okay.  I don't recall directly

11  the meeting, but my assumption is that the same

12  policies that I just quoted to Dawn in that

13  email is the policies I was aware of at that

14  license review team.

15     Q.    And Dawn would know to call you

16  about those policies.  Is that because you

17  brought them up at the meeting?

18              MR. BRYANT:  Objection to form.

19              THE WITNESS:  It could be.

20              BY MR. HAUN:

21     Q.    It could be.  Okay.

22              Now, let's look at the policies you

Page 189

1    mentioned.  So you respond to Ms. Sweetman

2    later that day; is that correct?  That's an

3    email from you to Ms. Sweetman?

4         A.    Yes.

5         Q.    Okay.  And this email response

6    begins with "Sounds good.  The places in policy

7    are Page 20 of the licensing policy, third

8    stanza up from the bottom."

9              And then the next line says:  "And

10   in safe and supportive policy Page 16, I would

11   assume this refers to kin families as well as

12   unrelated.  They are all foster families."

13             Do you see those lines?

14        A.    I do.

15        Q.    Okay.  Why did you respond this way?

16        A.    To be helpful.

17        Q.    Okay.  So what is the -- you -- you

18   seem to know exactly where to go on, giving

19   page numbers and, in the case of the licensing

20   policy, even the -- how many stanzas up from

21   the bottom.

22             Are you very familiar with these

Page 190

1    policies?

2              MR. BRYANT:  Objection to form.

3              THE WITNESS:  The policy was like

4    weeks old at that point, so I was pouring

5    through and reviewing those policies frequently

6    to try to absorb and learn them.

7              BY MR. HAUN:

8         Q.   Okay.  And you had that knowledge

9    when you went to the LRT?

10        A.   Yes.

11        Q.   Okay.  And the policies that are

12   mentioned here, what is the licensing policy

13   you're referring to?

14        A.   The license and in training policy.

15        Q.   Okay.  And do you recall what

16   specifically on Page 20, third stanza up from

17   the bottom you're referring to?

18        A.   No.

19        Q.   Okay.  And in safe and supportive

20   policy, Page 16, do you know what -- do you

21   recall what you're referring to there?

22        A.   So in -- in the safe and supportive

Page 191

1    policy, there's an LGBTQIA section that kind of

2    talks about the role of the support workers and

3    educating foster parents.

4         Q.    And that's what you were referring

5    to here?

6         A.    Yes.

7              MR. BRYANT:  Objection to form.

8              THE WITNESS:  And there may be more

9    in that policy too but...

10             BY MR. HAUN:

11        Q.    And did you bring these policies up

12   particularly at this LRT?

13             MR. BRYANT:  Objection to form.

14             THE WITNESS:  I do not remember

15   specifically what I brought up.

16             BY MR. HAUN:

17        Q.    Okay.  But you knew that they were

18   relevant?

19             MR. BRYANT:  Objection to form.

20             THE WITNESS:  Yes.

21             BY MR. HAUN:

22        Q.    Okay.  Did you give any further

1  direction on these policies to Ms. Sweetman at

2  the meeting?

3     A.    I do not recall at the meeting

4  whether I lifted and discussed each of those

5  policies.

6     Q.    Do -- do you recall --

7     A.    But my assumption is that I probably

8  pointed out here -- here -- here's where LGBTQ

9  is mentioned in the new policies.

10    Q.    Okay.

11    A.    I don't know if I was the one to

12 lift it because I don't think I was the only

13 one aware of the new policies.

14    Q.    Okay.  So you do recall referencing

15 the policies at the meeting?

16          MR. BRYANT:  Objection to form.

17          THE WITNESS:  Yes, I do believe our

18 conversation at that meeting included relevant

19 policies.

20          BY MR. HAUN:

21    Q.    And -- and you referenced them?

22    A.    I do not remember --

Page 205

1    hurt as foster parents?

2         A.    The risk would be if they're caring

3    for a child who had an LGBTQIA identity and

4    their approach in parenting that child and some

5    of the actions they stated they may try to take

6    on behalf of that child.

7         Q.    What were those actions?

8         A.    For example, any type of

9    intervention that would ask the child to modify

10   or reject their identity.

11        Q.    And it's your view that the Burkes

12   were going to ask a child to modify or reject

13   their identity?

14        A.    Yes.

15        Q.    Okay.  And you got that view from

16   what was said in the caregiver assessment?

17        A.    Yes.

18        Q.    Okay.  And from your point of view,

19   that made the Burkes harmful to children?

20        A.    From my point of view, that was not

21   in alignment with our policy.

22        Q.    Right.  And you're saying protect

Page 206

1    people here.  What are -- protecting people

2    from harm?

3        A.    Yes.

4        Q.    So you were concerned that the

5    Burkes would harm a child because of their

6    views on sexual orientation and gender

7    identity?

8        A.    That's correct.

9            MR. HAUN:  Okay.  I'm just going to

10   take a couple-minute break here, and we'll come

11   right back.

12            THE VIDEOGRAPHER:  We're going off

13   the record.  The time on the video is

14   p.m.

15            (A short recess was taken.)

16            THE VIDEOGRAPHER:  We're back on the

17   record.  The time on the video is 12:16 p.m.

18            MR. HAUN:  Thank you.

19            BY MR. HAUN:

20       Q.    Ms. Molina, when you were describing

21   the LRT attendance, you mentioned a 120 person

22   who takes notes.  Do you recall that?

Page 210

1          CERTIFICATE OF NOTARY PUBLIC

2      I, LINDSEY RUSSO, the officer before whom

3  the foregoing deposition was taken, do hereby

4  certify that the witness whose testimony

5  appears in the foregoing deposition was duly

6  sworn by me; that the testimony of said witness

7  was taken by me in shorthand and thereafter

8  reduced to computerized transcription under my

9  direction; that said deposition is a true

10  record of the testimony given by said witness;

11  that I am neither counsel for, related to, nor

12  employed by any of the parties to the action in

13  which this deposition was taken; and further,

14  that I am not a relative or employee of any

15  attorney or counsel employed by the parties

16  hereto, nor financially or otherwise interested

17  in the outcome of the action.

18

19          _____.

20          Notary Public in and for

21          the District of Columbia

22  My Commission expires:  February 28, 2029