UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MICHAEL and CATHERINE BURKE,<br><br>Plaintiffs,<br><br>v.<br><br>KIAME MAHANIAH, in his official capacity as Secretary of the Massachusetts Executive Office of Health and Human Services, *et al*.<br><br>Defendants. | C.A. No. 3:23-cv-11798-MGM<br><br>**ORAL ARGUMENT REQUESTED** |

**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**


TABLE OF AUTHORITIES ........ ii

ARGUMENT ........ 1

I. Qualified Immunity Applies Because the Burkes Failed to Carry Their Burden of Proving a Violation of a "Clearly Established" Constitutional Right. ........ 1

A. Defendants Did Not Waive Qualified Immunity Under Any Theory. ........ 1

B. *Magazu* Clearly Established that Denying the Burkes a Foster License Did Not Constitute a Constitutional Violation. ........ 2

C. The Burkes Fail to Show a Clearly Established Violation as of March 31, 2023... 3

1. No Case Cited as to Count I Clearly Established a Violation ........ 4

2. No Case Cited as to Count II Clearly Established a Violation ........ 8

3. No Case Cited as to Count III Clearly Established a Violation ........ 11

4. No Case Cited as to Count IV Clearly Established a Violation ........ 13

5. No Case Cited as to Count V Clearly Established a Violation ........ 16

II. The Burkes Failed to Prove DCF Violated the Constitution. ........ 19

A. DCF's Interest in Protecting LGBTQ+ Foster Children is Compelling ........ 19

B. The LGBTQ+ Requirements Were Narrowly Tailored to That Interest ........ 20

CONCLUSION ........ 20

## TABLE OF AUTHORITIES

**Rules:**

Fed. R. Civ. P. 8(d)(2) .......... 1

**Cases:**

*303 Creative LLC v. Elenis*, 600 U.S. 570 (2023) .......... 4
*Agency for Int'l Dev. v. AOSI*, 570 U.S. 205 (2013) .......... 18
*Alfano v. Lynch*, 847 F.3d 71 (1st Cir. 2017) .......... 2
*Antonucci v. Winters*, No. 2:24-CV-783, 2025 WL 569928 (D. Vt. Feb. 20, 2025) .......... 4
*Axson-Flynn v. Johnson*, 356 F.3d 1277 (10th Cir. 2004) .......... 5
*Bates v. Pakseresht*, No. 2:23-CV-00474-AN, 2023 WL 7546002
(D. Or. Nov. 14, 2023) .......... 4, 8
*Bates v. Pakseresht*, 146 F.4th 772 (9th Cir. 2025) .......... 3, 5
*Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675 (1986) .......... 16
*Blais v. Hunter*, 493 F. Supp. 3d 984 (E.D. Wash. 2020) .......... 3
*Brox v. Woods Hole*, 164 F.4th 37 (1st Cir. 2026) .......... 10
*Cantwell v. Connecticut,* 310 U.S. 296 (1940) .......... 5
*Care & Prot. of Eve*, 258 N.E.3d 329, 343 (Mass. 2025) .......... 4
*Carson as next friend of O.C. v. Makin*, 596 U.S. 767 (2022) .......... 13-15
*Chiles v. Salazar*, No. 24-539, 2026 WL 872307 (U.S. Mar. 31, 2026) .......... 15
*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993) .......... 11, 13-15
*Doe No.1 v. Bethel Loc. Sch. Dist. Bd. of Educ.*,
No. 23-3740, 2025 WL 2453836 (6th Cir. Aug. 26, 2025) .......... 14
*District of Columbia v. Wesby*, 583 U.S. 48 (2018) .......... 5
*Employment Division v. Smith*, 494 U.S. 872 (1990) .......... 5, 6
*F.C.C. v. Pacifica Found.*, 438 U.S. 726 (1978) .......... 16, 17
*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist.*,
82 F.4th 664 (9th Cir. 2023) .......... 4
*Free Speech Coalition, Inc. v. Paxton*, 606 U.S. 461 (2025) .......... 17
*Fulton v. City of Philadelphia*, 593 U.S. 522 (2021) .......... 4-6, 7, 18, 19
*Garcetti v. Ceballos,* 547 U.S. 410 (2006) .......... 17-18
*Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988) .......... 17
*Johnson v. California,* 543 U.S. 499, 515 (2005) .......... 5
*Jones v. Mahaniah*, No. 4:25-cv-12449-MGM (D. Mass. Nov. 3, 2025) .......... 4
*L.M. v. Town of Middleborough*, 103 F.4th 854 (1st Cir. 2024) .......... 17
*L.W. by & through Williams v. Skrmetti*, 83 F.4th 460 (6th Cir. 2023) .......... 4
*Lasche v. New Jersey*, No. CV 18-17552 (FLW),
2022 WL 17250731, (D.N.J. Nov. 28, 2022) .......... 3
*Lowe v. Mills*, 68 F.4th 706 (1st Cir. 2023) .......... 4
*MacRae v. Mattos*, 106 F.4th 122 (1st Cir. 2024) .......... 17
*Magazu v. Dep't of Child. & Families*, 473 Mass. 430 (2016) .......... 2-3
*Mahanoy Area Sch. Dist. v. B. L.*, 594 U.S. 180 (2021) .......... 16
*Mahmoud v. Taylor*, 606 U.S. 522 (2025) .......... 4

*Maldonado v. Fontanes*, 568 F.3d 263, 269 (1st Cir. 2009)....................................................4, 12
*Manchester v. Town of Ludlow*, 780 F. Supp. 3d 296 (D. Mass. 2025) ......................................17
*Masterpiece Cakeshop v. Colorado Civil Rights Commission*, 584 U.S. 617 (2018).................11
*Meriwether v. Hartop*, 992 F.3d 492 (2021) .................................................................................17
*New Hope Fam. Servs., Inc. v. Poole*, 966 F.3d 145 (2d Cir. 2020) ...........................................11
*Pearson v. Callahan*, 555 U.S. 223 (2009)......................................................................................3-4
*Perry v. Marteney*, No. 24-2132, 2026 WL 946152 (4th Cir. Apr. 8, 2026).................................6
*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47 (2006) ................18
*Schwartz v. Booker*, 702 F.3d 573 (10th Cir. 2012) .....................................................................19
*Stanton v. Sims*, 571 U.S. 3, 9-10 (2013). .........................................................................................2
*Swartz v. Sylvester*, 53 F.4th 693 (1st Cir. 2022) ....................................................................5, 12
*Tandon v. Newsom*, 593 U.S. 61 (2021)...................................................................................8, 10-11
*Tingley v. Ferguson*, 47 F.4th 1055 (9th Cir. 2022) ...............................................................14-15
*Tinker v. Des Moines Indep. Comm. Sch. Dist.*, 393 U.S. 503 (1969)........................................16
*Thomas v. Rev. Bd.*, 450 U.S. 707 (1981) .........................................................................................5
*United States v. Skrmetti*, 605 U.S. 495 (2025)...................................................................................4
*Wuoti v. Winters*, No. 2:24-CV-614,
2025 WL 569909 (D. Vt. Feb. 20, 2025) ..................................................................................4, 7, 8

## ARGUMENT

### I. Qualified Immunity Applies Because the Burkes Failed to Carry Their Burden of Proving a Violation of a "Clearly Established" Constitutional Right.

For purposes of qualified immunity, the only question is what a reasonable social worker participating in the LRT knew on March 31, 2023, when the Burkes' application was denied. All subsequent information—whether factual or legal—is irrelevant. An objectively reasonable social worker would not believe the LGBTQ+ Requirements were unconstitutional on that date.

#### A. Defendants Did Not Waive Qualified Immunity Under Any Theory.

The Burkes argue qualified immunity is "waived" because Defendants' brief "do[es] not argue qualified immunity claim-by-claim." P.Opp. 3-4. This is both factually and legally baseless. Counts I, II, IV merely state different paths to strict scrutiny, not distinct theories of liability. Defendants' motion addressed all avenues to strict scrutiny. D.Br. 22-23. Count III alleges "overt religious hostility," which Defendants also addressed. D.Br. 15, 21-22. Defendants also addressed Count V's Free Speech claim. D.Br. 26-30. Further, Defendants analyzed all controlling cases in the Complaint from all five counts and demonstrated that it was not clearly established on March 31, 2023, that the constitutionality of the LGBTQ+ Requirements was beyond debate, under any case or theory. D.Br. 12-17.[1] Moreover, the Burkes' decision to style their alternative theories as separate *counts*, *see* Fed. R. Civ. P. 8(d)(2), makes no difference to the qualified immunity analysis, because the relevant facts are identical: the LRT convened on March 31, 2023, and determined the Burkes could not meet the LGBTQ+ Requirements. No court had ever struck down similar requirements, and there is no evidence of hostility towards the Burkes' religion. Regardless of the theory, these operative facts remain the same. Qualified immunity applies and was not waived.

---

[1] Defendants' Opposition also assesses each Count separately. D.Opp. 2-14.

### B. *Magazu* Clearly Established that Denying the Burkes a Foster License Did Not Constitute a Constitutional Violation.

The Burkes argue that *Magazu v. Department of Children & Families*, 473 Mass. 430 (2016) is "not a proper source of precedent for a qualified immunity argument" because it applied the supposedly "less restrictive" Massachusetts Constitution, did not involve a discovery record, and is "irrelevant." P.Opp. 4-5. But the SJC stated in *Magazu*: "[T]he scope of protection afforded the right to freely exercise one's religion under the Massachusetts Constitution is greater than that afforded by the United States Constitution," and relied on First Amendment cases. 473 Mass. at 442-44 (citation omitted). The LRT members were not required to second-guess the SJC's description of its own jurisprudence. And courts may look to "the highest court of the state in which a case arises" to determine what is clearly established. *Alfano v. Lynch*, 847 F.3d 71, 78 (1st Cir. 2017); *see also Stanton v. Sims*, 571 U.S. 3, 9-10 (2013) (cautioning against "subject[ing] [workers] to personal liability for damages[ ]based on actions that were lawful according to courts in the jurisdiction where [they] acted"). If state law can clearly establish a right, then it can also establish potential limitations on that right. And differences in the "record" cannot place the individual Defendants—who necessarily had no access to a discovery record prior to litigation, and had never before participated in an LRT meeting—on notice. *Magazu* is binding precedent that was directly relevant to what a reasonable social worker would understand in March 2023.

The Burkes also cite *Magazu* and argue that Defendants were "on notice" they could not deny the Burkes a license "because of this family's beliefs." P.Opp. 5-6. But the LRT could reasonably conclude it was not regulating the Burkes' beliefs "as such," or at all—it regulated their expected conduct toward children, just like in *Magazu.* 473 Mass. at 443. Massachusetts' greater free exercise right did not prevent DCF "'as parens patriae'" from exercising its core purpose of protecting foster children "'from serious physical *or emotional harm*,'" even when the applicant

was motivated by "sincerely held Christian beliefs." *Id.* at 442, 445 (citation omitted; emphasis added). *Magazu* also stated that "*every other* public and private consideration must yield" to "the welfare of the child" and that it "'cannot be disputed that the State has a compelling interest to protect children from actual or potential harm.'" *Id.* (citations omitted; emphasis added). A reasonable social worker in March 2023 would believe that they could deny a foster license to applicants who were unable to support and respect an LGBTQ+ child, even if the inability was based on religion.

**C. The Burkes Fail to Show a Clearly Established Violation as of March 31, 2023.**

Separate from *Magazu,* neither controlling authority nor a robust consensus of persuasive authority clearly established under any of the Burkes' theories that applying the LGBTQ+ Requirements to deny the Burkes' application would violate the Constitution on March 31, 2023. As the Burkes admit, DCF's LGBTQIA+ Nondiscrimination Policy took effect on June 30, 2022, the March 31, 2023 LRT "was the first [LRT] meeting convened in the region," and "none of the members had ever previously participated in" an LRT. P.Res. ¶ 5, 157. At least three other states had imposed similar licensing requirements (Oregon, Washington, and Vermont), and at the time of the meeting, no circuit court had ruled on their constitutionality.[2, 3] D.Br. 17-19.

The Burkes rely on *Bates v. Pakseresht*, 146 F.4th 772, 799 (9th Cir. 2025) and other post-March 2023 cases, but those cases cannot clearly establish *anything* as of March 31, 2023. *Pearson*

---

2 As previously explained, *Blais v. Hunter*, 493 F. Supp. 3d 984 (E.D. Wash. 2020), in which a district court entered a preliminary injunction, does not clearly establish law for qualified immunity. D.Br. 18-19; D.Opp. 8.

3 Further, the Burkes cannot identify any case that imposed personal liability on a social worker for following such a policy. In *Blais* and *Bates,* the plaintiffs did not assert individual claims for money damages. In *Lasche*, qualified immunity was *granted* just four months before the Burke LRT convened. *Lasche v. New Jersey*, No. CV 18-17552 (FLW), 2022 WL 17250731 at *5, (D.N.J. Nov. 28, 2022).

*v. Callahan*, 555 U.S. 223, 230 (2009) (right must be clearly established "at the time of the events in question").[4] The debate over the constitutionality of such policies continues to this day—years after the March 2023 LRT meeting. *See* D.Br. 17-19. In 2025, a federal district court upheld Vermont's analogous policy. *Wuoti v. Winters*, No. 2:24-CV-614, 2025 WL 569909 (D. Vt. Feb. 20, 2025); *Antonucci v. Winters*, 767 F. Supp. 3d 122 (D. Vt. 2025). While these opinions are "now vacated" following a settlement, P.Opp. 8, that is beside the point—Vermont's policy has never been struck down, and a federal district court upheld it years after the LRT's March 2023 decision. Thus, if the nine LRT members were mistaken about the lawfulness of the LGBTQ+ Requirements, so were the social workers, officials, and child welfare attorneys in a number of other states—and even district court judges.[5] As of March 2023, no case provided "fair warning" to the LRT that they could not follow the LGBTQ+ Requirements without violating the First Amendment. *Maldonado v. Fontanes*, 568 F.3d 263, 269 (1st Cir. 2009).

**1. No Case Cited as to Count I Clearly Established a Violation.**

The Burkes argue that *Fulton v. City of Philadelphia*, 593 U.S. 522 (2021) "clearly established" their claim under Count I. P.Opp. 6. As Defendants demonstrated at length, *Fulton* is inapposite. D.Br. 12-14, 16; D.Opp. 6, 7, 14-15. Contrary to the Burkes' claim that *Fulton* "clearly" applies to all cases involving "foster care," P.Opp. 7, three Supreme Court Justices understood *Fulton* to "hang[]" narrowly on a "glitch" in "Philadelphia['s] contractual provision."

---

[4] E.g., *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist.*, 82 F.4th 664 (9th Cir. 2023) [Sept. 13, 2023] ("FCA"); *Lowe v. Mills*, 68 F.4th 706 (1st Cir. 2023) [May 25, 2023]; *303 Creative LLC v. Elenis*, 600 U.S. 570 (2023) [June 30, 2023]; *L.W. by & through Williams v. Skrmetti*, 83 F.4th 460 (6th Cir. 2023) [Sept. 28, 2023], *aff'd sub nom. United States v. Skrmetti*, 605 U.S. 495 (2025); *Mahmoud v. Taylor*, 606 U.S. 522 (2025); *Care & Protection of Eve*, 258 N.E.3d 329 (Mass. 2025); *Jones v. Mahaniah*, No. 4:25-cv-12449-MGM (D. Mass. Nov. 3, 2025).

[5] Likewise, in November 2023, Oregon argued, and the district court agreed, that its analogous policy was "neutral, both facially and as applied." *Bates v. Pakseresht*, No. 2:23-CV-00474-AN, 2023 WL 7546002 at *10 (D. Or. Nov. 14, 2023).

*Fulton,* 593 U.S. at 552-53 (Alito, J., concurring). They observed that the case would not "help" even "in other cases involving the exclusion of faith-based foster care and adoption agencies," let alone "other important religious liberty cases," where it would be "even less significant." *Id.* Because it turned on a specific contractual exemption, *Fulton's* holding was narrow and "provides *no guidance* regarding similar controversies in other jurisdictions." *Id.* (emphasis added). [6]

Subsequent cases confirm that, at most, *Fulton* merely provided a "framework" for deciding the level of scrutiny for potential free exercise violations. *Bates*, 146 F.4th at 798.[7] But that determination "'says nothing about the ultimate validity of any particular law[.]'" *Johnson v. California*, 543 U.S. 499, 515 (2005) (citation omitted). And the LRT members were not expected to identify the level of scrutiny to apply and then guess at the outcome of such an analysis; their duty was to not "knowingly violate" "clearly established" law. *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018). Here, "under the Free Exercise Clause, the contours of those rights were not sufficiently clear such that a reasonable official would have understood that what [she] was doing was a violation." *Swartz v. Sylvester*, 53 F.4th 693, 699 (1st Cir. 2022) (cleaned up).

The Burkes argue that an "applicant-specific assessment" is the same as a "system of exceptions," P.Opp. 6-7, but circuit courts have not read *Fulton* so expansively. For example, in

---

6 Nor do the additional cases cited by the Burkes as to Count I clearly establish a violation. In addition to cases previously discussed, *Thomas v. Review Board*, 450 U.S. 707 (1981) pre-dated the "neutral and generally applicable" standard from *Employment Division v. Smith*, 494 U.S. 872 (1990), and involved an explicit "good cause" provision. *Thomas*, 450 U.S. at 717. *Cantwell v. Connecticut*, 310 U.S. 296 (1940) also pre-dated the modern tiered-scrutiny approach, and involved a state law that explicitly empowered a state official "to withhold his approval" for solicitation "if he determine[d] that the cause *is not* a religious one." *Id.* at 305. *Axson-Flynn v. Johnson*, 356 F.3d 1277 (10th Cir. 2004) is out-of-circuit and factually dissimilar, involving a college curricular requirement, a material fact issue about whether the defendants had previously made exceptions for the plaintiff herself, and no written policy expressly disclaiming any exceptions. *Id.* at 1282, 1299.

7 *See also FCA*, 82 F.4th at 687 (*Fulton* "provided a framework" for determining whether policy was "not subject to strict scrutiny"). *FCA* was decided well after March 31, 2023.

*Perry v. Marteney*, No. 24-2132, 2026 WL 946152 (4th Cir. Apr. 8, 2026), the Fourth Circuit upheld a West Virginia vaccination requirement that provided for no religious exemption, but did allow for a medical exemption if a child's "physical condition" might result in an adverse reaction or compromise the vaccine's effectiveness. *Id.* at *1-2. While state officials had to use "discretion and judgment" to determine whether a child was eligible for a medical exemption, the "mandatory" vaccination requirement was nothing like the "sole discretion standard" in *Fulton*, because officials were not given "any discretion 'to decide which reasons' for refusing vaccination 'are worthy of solicitude.'" *Id.* at *5-6 (quoting *Fulton*, 593 U.S. at 537). Striking the vaccine law down would mean that "[e]very legal standard or criterion that required some degree of professional judgment in its application would suddenly run afoul of the Free Exercise Clause. This cannot be." *Id.* at *6. The Fourth Circuit did not apply heightened scrutiny, and further noted the state's interest in "protecting its . . . children has long been recognized as of the utmost importance." *Id.* at *3-4.[8]

This case is far closer to *Perry* than *Fulton*. While DCF officials must also exercise "some degree of professional judgment," *Perry* at *5, this does not mean the LRT members had the power to grant exemptions. Professional judgment in deciding whether a requirement—or, in *Perry*, an exemption—is met does not constitute "a system of individualized exemptions" such that *Fulton* "clearly" applies. P.Opp. 6. The fact that courts differ on *Fulton's* application means the nine LRT members could not have been on notice in March 2023 that applying DCF's LGTBQ+ Requirements would be unlawful just because some degree of "judgment" and "case-by-case"

---

8 The Fourth Circuit also noted that in *Smith*, the Supreme Court did *not* hold "that an individual's right of free exercise is violated whenever a generally applicable law requires him to perform an act that his religious beliefs forbid." *Perry,* 2026 WL 946152 at *3.

assessment was required to determine whether a family meets the minimum standard.[9]

The Burkes argue that the record shows "unexplained and pervasive deviations from DCF's policy" that are supposedly "exceptions" to the LGBTQ+ Requirements. P.Opp. 7. But to support this claim, the Burkes repeatedly cite to a single license renewal in the record (P.Ex. T, *see* P.Opp. 9, 10, 15, 25) that (1) post-dated the March 31, 2023 LRT, D.Opp. 3, n.3, (2) did not involve a "secular" applicant, D.Opp. 19; D.Ex. 40, and (3) involved an applicant who *met* the LGBTQ+ Requirements, D.Res. ¶ 36. A single decision in September 2023 to renew the license of a Baptist foster parent is not a "system of exemptions" or favoring "comparable secular activity," nor could it possibly have provided any notice to the LRT members months earlier.

The Burkes also point to recruitment materials identifying a goal to expand the pool of foster parents actively seeking to care for "out" LGBTQ+ youth and informal lists of "affirming families" that predated the LGBTQ+ Requirements. P.Opp. 9, 14-15. None of this evidence—even if known to the LRT members—shows that the LGBTQ+ Requirements allow for exceptions. The 2022 and 2023 policies were intended to address prior deficits by imposing across-the-board requirements and, consistent with this ongoing effort, where DCF identified a home that did not meet the baseline requirements, that home's license was reviewed. *See* D.Res. ¶ 68, 74. Further, DCF used the term "affirming" to refer to homes that already met and exceeded DCF's baseline LGBTQ+ Requirements, whether through "special skills" or an expressed desire to foster LGBTQ+ youth. D.Res. ¶ 69-75. One obstacle to placing youth who have disclosed an LGBTQ+ identity is that those youth are often teenagers and can be difficult to place for that independent

---

[9] Similarly, in 2025, the *Wuoti* district court concluded *Fulton* did not preclude rational basis review as to Vermont's similar requirements, even where Vermont "provide[d] an exception for parents who are unable to foster children of a particular age or with special needs," 2025 WL 569909, at *3, and, indeed, would have upheld the requirements under strict scrutiny in any case, *id.* at *9. *See* D.Br. 17-18.

reason. D.Res. ¶ 69. But a licensed foster home who is unwilling to accept placement of an out LGBTQ+ teenager has not thereby been granted an exception to the LGBTQ+ Requirements; that placement decision does not indicate that the family is unable to support and respect a child who comes out as LGBTQ+ while in their care. The law did not clearly establish that every reasonable social worker had to view this situation as an "exception" to a generally applicable requirement.

**2. No Case Cited as to Count II Clearly Established a Violation.**

On Count II, the Burkes rely primarily on *Tandon v. Newsom*, 593 U.S. 61 (2021), to "establish" that where the state "treat[s] any comparable secular activity more favorably than religious exercise," strict scrutiny is triggered. P.Opp. 8-11. This general principle of Free Exercise law fails to overcome qualified immunity for numerous reasons.

First, this Free Exercise "rule" says nothing about whether the LGBTQ+ Requirements would survive strict scrutiny, a fact-intensive inquiry the outcome of which social workers are not expected to correctly predict absent much closer authority. In any event, in the years after the LRT's decision, at least two federal courts concluded that similar requirements *would* survive strict scrutiny. *Bates*, 2023 WL 7546002, at *29; *Wuoti*, 2025 WL 569909, at *9. Whether those decisions remain good law *today* is, again, beside the point—social workers who reach the same conclusion later reached by two federal district court judges are entitled to qualified immunity.

Second, the Burkes repeatedly and improperly attempt to compare apples (licensing requirements) to oranges (preferences and limitations regarding placement).[10] The "comparable" activities in *Tandon* were far closer to one another than what the Burkes claim are "comparable" activities here, such that a reasonable social worker would not consider DCF's system-wide

10 As discussed *supra* § IC1, the Burkes' mining of discovery for purported "exceptions" to the LGBTQ+ Requirements does not, factually, support that exceptions are granted, and, legally, cannot be imputed to the individual Defendants at the time they made their decision.

placement decisions as dispositive of the lawfulness of the LGBTQ+ Requirements. DCF's "licensure" decisions (as relevant here) ensure that applicants can promote the physical and psychological well-being of a foster child. D.Res. ¶ 35. Its "placement" decisions, by contrast, ensure that placements are stable and lasting by accounting for licensed foster families' strengths, limitations, and preferences when evaluating their fit with a foster child. D.Res. ¶ 34-35. The fact that foster families have a say in who will live under their roof does not make placement considerations comparable to licensing standards. Indeed, the record shows that DCF would not tolerate a refusal to accept a placement on a basis that violates its licensure requirements.[11]

Focusing on foster families' limitations and preferences, the Burkes argue DCF "allows families to discriminate based upon sex, gender identity, race, disability, and other characteristics." P.Opp. 7. But the Burkes' application process itself shows that their claims of discrimination amount to nothing more than a diversion. During their caregiver assessment, the Burkes expressed their preference to care for a child aged 4-12, and to *not* care for a child with autism or "extreme physical needs." D.Ex. 1 at DCF-BURKE-000058-59. But these limitations or preferences do not evince an inability to meet a DCF licensing requirement. In contrast to their treatment of an LGBTQ+ child, the Burkes did not show that they could not "support or respect" a teenager, or that they would oppose medical care for a disabled child. The Burkes' statements do not show that they would treat older (or younger) children, children with autism, or children with disabilities in a way that research shows would cause harm to those children. The inability to satisfy the LGBTQ+ Requirements is entirely different from their recognition of their caregiving limitations.

The LGBTQ+ Requirements are not "comparable" to the preferences the Burkes describe

[11] *E.g.,* D.Res. ¶ 57 ("Foster parents may decline placement of a foster child, though that may cause DCF to reevaluate whether the family continues to meet DCF's licensing requirements.")

as "discriminatory." LGBTQ+ status, *by definition*, is self-disclosed and cannot be definitively ascertained by DCF ahead of a placement, making it impossible for DCF or a foster parent to "condition" a license on non-placement of an LGBTQ+ child. D.SOF ¶ 61-64. This is unlike, for example, an age preference or a statement that the home would be the best fit for a child of a certain race. Moreover, there are unique harms to an LGBTQ+ child who has not developed or disclosed that identity living in an unsupportive home, and that very fact can dissuade disclosure, such that DCF will not be aware of the mismatch while the child is suffering harm. D.SOF ¶ 74, 80-82. This is unlike, for example, a child who develops a medical issue that a family is not equipped to handle, but where DCF can identify that changing need and address it—sometimes through increased support for the family, rather than changing the placement. D.Ex. 39, Silvia 30(b)(6) Depo. 209:14-22. Of course, for qualified immunity, such detailed analysis of comparability only underscores that no case was adequately on point—these types of legal arguments are appropriate for lawyers to make to the Court, but they are not expected of social workers carrying out the day-to-day functions of child welfare work.[12]

Just this year, the First Circuit applied *Tandon* and concluded a medical exemption and religious exemption to a vaccination requirement were not "comparable" for Free Exercise purposes. *Brox v. Woods Hole*, 164 F.4th 37, 47-50 (1st Cir. 2026). Those two exemptions bear far greater superficial similarity than DCF's licensing requirements bear to its placement considerations, and yet *Tandon* did not require the First Circuit to treat the two exemptions as "comparable." Where the First Circuit must apply *Tandon* with fact-sensitivity even today, it is

---

12 For the same reason, any factual disputes about the research showing the harms that result from unsupportive homes are entirely immaterial for qualified immunity—a social worker is not expected to parse the relative strength of different studies underlying their employer's policies and then side with the Burkes' preferred view of the literature.

inconceivable that the nine LRT members were on notice that not only did they have to treat placement considerations as "secular activity" that is "comparable" to an inability to meet the LGBTQ+ Requirements based on a religious objection, thus triggering strict scrutiny, but also that the licensing requirement thereby failed strict scrutiny.

In sum, it was not "apparent" on March 31, 2023 that the existence of alleged defects in DCF's *placement* system meant that its LGBTQ+ *licensing* requirement was unenforceable. *See, e.g., Alfano*, 847 F.3d at 76 (requiring that "existing precedents establish the applicable legal rule with *sufficient clarity and specificity* to put the official on notice that his contemplated course of conduct will violate that rule") (emphasis added).

**3. No Case Cited as to Count III Clearly Established a Violation.**

The only case the Burkes cite with factual context for a claim of "religious hostility" is *Masterpiece Cakeshop v. Colorado Civil Rights Commission*, 584 U.S. 617 (2018), which bears no resemblance to the alleged "hostility" here. D.Br. 15-16, 21-22; D.Opp. 10, 24-25. Nor does *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993). D.Opp. 10. As previously discussed, none of the Burkes' alleged instances of "hostility" comport with the plain meaning of that term, or how it has been used in the caselaw. *See* D.Opp. 10, 24-27. There is no evidence the LGBTQ+ Requirements were *designed* to target Catholics, or that any of the LRT members *understood them* to be so designed. *New Hope Fam. Servs., Inc. v. Poole*, 966 F.3d 145, 166 (2d Cir. 2020) ("[A] generally applicable anti-discrimination regulation will usually be understood to indicate neutrality rather than religious animosity.")

Nothing in the record suggests that the individual Defendants denied the Burkes' application because of any personal dislike or disapproval of their beliefs. Given that there is no competent evidence of hostility, the Burkes are forced to rely on documents having little or nothing

to do with the individual Defendants. *E.g.,* P Ex. JJ; D.Res. ¶ 49. *See Maldonado*, 568 F.3d at 273 (qualified immunity analysis must "rest on [defendant's] personal conduct"). The Burkes splice Mack's recommendations—which were not adopted by the LRT—to accuse DCF of considering their "involve[ment] in their Catholic Church" to be a "cause for apprehension." P.Opp. 12. But Mack's "apprehension" was about whether the Burkes met the LGBTQ+ Requirements, which the LRT determined they did not. *See* P.Ex. BB at 31. The mere lack of religious (or secular) exemption does not amount to hostility. *See also* D.Opp. 25 (discussing *Swartz*, 53 F.4th 693).

The Burkes also argue it was "clearly established" the individual Defendants were acting with "religious hostility" because "Sweetman and Moynahan knew the record looked bad and tried to cover it up." P.Opp. at 13. This misstates both the facts and the law. D.Opp. 26-27. The then-new Licensing Policy "authorizes the [LRT] to modify the licensing recommendation," P.Res. ¶ 137, and that is what occurred here. This was the first LRT in the region, P.Res. ¶ 157, the license study was prepared by a third-party contractor, P.Res. ¶ 98, and there was no established precedent for incorporating edits after an LRT decision that differed from a contractor's recommendation, for reasons entirely unrelated to the basis for the Burkes' denial. The Burkes incorrectly argue that the policy provision cited above "does not extend beyond the specific recommendation to license or not to license a family and does not confer authority to modify the other contents of the study," P.Res. ¶ 137; D.Res. ¶ 133-135. But the only material modifications to the study *were* within the section labeled "K. Recommendations." *Compare* D.Ex. 20 (18 Degrees); D.Ex. 1 (DCF); *see also* D.Opp. 26 n.15. Thus, this issue is a distraction that has nothing to do with the LRT's licensing decision. The Burkes have no competent evidence of religious hostility.

The modifications to the license study are also immaterial to the legal claims in this case. The LRT made its decision on March 31, 2023, all LRT members agreed with that decision at the

conclusion of the meeting, and then the decision was conveyed by letter to the Burkes, dated the same day. P.Res. ¶ 161, 163. The Burkes' quibbles about whether they later received the "entire file" (and whether that included a draft by a third-party contractor) has no bearing on the constitutionality of the LGBTQ+ Requirements. The Burkes withdrew their request for an administrative hearing, so the documentation they would or would not have received ahead of that hearing has become a moot point. Compl. ¶ 147, 150.[13] Their claims in this case focus entirely on the March 31, 2023 decision, and its First Amendment implications. *E.g., id.* at ¶ 164, 187, 200, 209. How the LRT's decision was *documented* has no bearing on the *earlier*, unanimous decision of the nine LRT members—especially when seven out of nine members had no involvement whatsoever in that documentation. The LRT's decision was disclosed to the Burkes, not "covered up," and there is no competent evidence of "religious hostility" by any Defendant.

Finally, it should be obvious that expert opinion in 2025 and 2026 about the state of scientific research on LGBTQ+ children's needs could not possibly have placed the individual Defendants on notice in 2023 that they were impermissibly acting with "religious hostility," regardless of how the Burkes style those expert opinions. P.Opp. 13-14; *see also* D.Opp. 22 n.12. If anything, the expert opinions underline the reasonableness of the LRT members in believing that applying the LGTBQ+ Requirements in March 2023 served to protect child welfare.

### 4. No Case Cited as to Count IV Clearly Established a Violation.

As to Count IV, the Burkes rely on *Lukumi* and *Carson as next friend of O.C. v. Makin*, 596 U.S. 767 (2022), but neither supports the argument that the LGBTQ+ Requirements are a

---

[13] There is no evidence of what the DCF lawyer meant that the Burkes "have access to everything." P.Ex. RRR. The Burkes never determined whether this meant they would have received the "original" Mack recommendation—perhaps from DCF Legal. Nor did they establish this was "legal advice," as they now characterize it, P.Opp. 1, which would have been privileged. Regardless, this is not a material fact for any of the Burkes' First Amendment claims.

"religious gerrymander." D.Br. 15; D.Opp. 20-24. The Burkes misstate the law, claiming that a religious gerrymander is any law that "favor[s] secular views over disfavored religious beliefs." P.Opp. 14. But, per *Lukumi*, a "religious gerrymander" is a law whose "object" is to "target[] . . . religious practices" in a way that is "remote" from any "legitimate concerns." 508 U.S. at 535.

Nothing in the record indicates that DCF's "object" or intent was to target Catholics, or that DCF's interest in protecting LGBTQ+ youth in DCF custody was pretextual. While the Burkes may disagree about the importance of protecting LGBTQ+ children at the licensing stage, they cannot reasonably dispute that this was indeed DCF's goal. Nor does the record support that "almost the only conduct subject to" the LGBTQ+ Requirements is "religious exercise." *Lukumi*, 508 U.S. at 535. *See* D.Opp. 11 (citing D.Ex. 44, Rawlings Depo. 183:19-184:14, 185:17-18; D.SOF ¶ 123).[14]

And, again, for qualified immunity, the question is whether *Lukumi* and *Carson* were so obviously applicable that every reasonable social worker would have understood the LGBTQ+ Requirements to be an unlawful religious gerrymander. Given the distinct differences between the LGBTQ+ Requirements and the ordinances at issue in *Lukumi*, whose goal was the "improper targeting of Santeria sacrifice," 508 U.S. at 538, and the law in *Carson* excluding "otherwise eligible schools *on the basis of* their religious exercise," 596 U.S. at 789, that high bar is not met. *See also Tingley v. Ferguson*, 47 F.4th 1055, 1087 (9th Cir. 2022) (no "religious gerrymander" from ban on "conversion therapy" where people seek it "for religious *and* secular reasons, such as 'social stigma, family rejection, and societal intolerance for sexual minorities'" (citation omitted)),

[14] *See also Doe No.1 v. Bethel Loc. Sch. Dist. Bd. of Educ.*, No. 23-3740, 2025 WL 2453836, at *1, 8 (6th Cir. Aug. 26, 2025) (holding school policy related to trans students' use of bathrooms that treated "[a]ll hardships . . . the same, regardless of whether a student was secular or religious" was "neutral").

*abrogated on other grounds*, *Chiles v. Salazar*, 146 S. Ct. 1010 (2026). Although later abrogated on other grounds, *Tingley* was persuasive authority in March 2023, when the LRT convened.

Second, the Burkes' misconceived idea of a "religious gerrymander" is also duplicative of their claim under Count II and fails for the same reasons. They confuse the issues by pointing to evidence about "LGBTQ affirming placements." P.Opp. 14-15. As explained, this term was used within DCF to describe families who had "special skills" to foster LGBTQ+ children, or were willing to take placement of an openly LGBTQ+ youth, who might be older. D.Res. ¶ 69-75. The Burkes have not demonstrated that every reasonable social worker would have understood recruitment documents or a list of "affirming" placements to mean that they were constitutionally prohibited from denying the Burkes' a license under *Lukumi* and *Carson*.[15]

Finally, the Burkes claim that the LGBTQ+ Requirements disproportionately burden religious adherents, but when faced with record evidence demonstrating that Catholic applicants are just as likely to be licensed by DCF as non-Catholics, they rest on a nonsensical heads-I-win-tails-you-lose argument. P.Opp. 15. But this evidence, admissible through the testimony of defense witnesses, illustrates that no competent evidence of a gerrymander exists, including any statistical evidence. The statistics show that an objectively reasonable social worker in 2023 would have had no reason to suspect that the LGBTQ+ Requirements targeted Catholics, even if they delved into the religious demographics of DCF's licensees. The Burkes would have this Court elevate *any* religious reason for failing to satisfy a licensing standard to a "gerrymander." That is not the law under *Lukumi* or *Carson*, and it certainly was not "clearly established" in March 2023.

---

15 Exhibit T also does not support the Burkes' arguments. *Supra*, p. 7; D.Opp.3, n.3 & 19.

**5. No Case Cited as to Count V Clearly Established a Violation.**

Relying on cases about attorney IOLTA accounts and terrorist organizations, the Burkes argue that it was "clearly established" that ensuring that foster parents are respectful of how a foster child wishes to be identified and support and respect the child's identity is a "classic free-speech violation." P.Opp. at 15-16. They offer only general statements about free speech rights in cases that bear no resemblance to this one, because no controlling authority required Defendants to elevate the Burkes' speech rights over the well-being of children in DCF custody. The lack of controlling or persuasive authority shows that no reasonable child welfare worker in March 2023 would conclude that the Constitution compelled them to create a captive audience of foster children for conduct and speech that a significant body of research shows is harmful. *See* D.SOF ¶ 67-89.

The Burkes never address the vital societal interest at the heart of this case—the well-being of foster children, and DCF's obligation to protect them. As described, D.Br. 27-28, when the state stands *in loco parentis*, it has a "special interest in regulating speech," and courts afford it "special leeway." *Mahanoy Area Sch. Dist. v. B. L.*, 594 U.S. 180, 187-89 (2021). The Burkes admit DCF stands *in loco parentis*, but argue, mistakenly, that what triggers this "special leeway" is the identity of the speaker (P.Opp. 18-19) and location ("the schoolhouse," P.Opp. 18) rather than the well-being of the audience of children. Both claims are wrong. The state has a duty when "acting *in loco parentis*, to protect *children*—especially in a captive audience—*from exposure* to" speech that in other contexts would be protected. *Bethel School Dist. 403 v. Fraser*, 478 U.S. 675, 684 (1986) (emphasis added).[16] And this principle extends beyond the schoolhouse. *See Mahanoy*, 594 U.S.

[16] Decades of Supreme Court authority holds that, regardless of the speaker, speech can be restricted due to its potential impact on children. *See, e.g.*, *Tinker v. Des Moines Indep. Comm. Sch. Dist.*, 393 U.S. 503, 513 (1969) (permitting regulation of speech that is "materially disrupt[ive]" to its audience or "inva[des] . . . the rights of others"); *F.C.C. v. Pacifica Found.*, 438

at 188 (“significant” “regulatory interest[]” in certain “off campus” speech). Indeed, the state’s interest in regulating speech is heightened when the speech reaches someone at home. *See F.C.C. v. Pacifica Found.*, 438 U.S. 726, 748 (1978) (recognizing speech has “a uniquely pervasive presence” when it “confronts the citizen, not only in public, but also in the privacy of the home”).

Moreover, the First Circuit has recognized that an adult’s free speech rights must yield to the interests of children, including when the speech has the potential to cause disruption. For example, in *MacRae v. Mattos*, 106 F.4th 122 (1st Cir. 2024), a school fired a teacher for social media posts that it anticipated would have a “negative impact on student learning.” *Id.* at 126. No free speech violation occurred, because the state “has a legitimate and ‘strong interest in preventing unnecessary disruptions and inefficiencies in carrying out its public service mission.’” *Id.* at 137 (citation omitted); *see also Manchester v. Town of Ludlow*, 780 F. Supp. 3d 296, 310-11 (D. Mass. 2025). The LGBTQ+ Requirements lawfully sought to prevent that very outcome—exposing a captive audience of foster children to a lack of support and respect for their identities, followed by the harm of disruption and displacement. *See L.M. v. Town of Middleborough*, 103 F.4th 854, 859, 882 (1st Cir. 2024). A reasonable social worker could understand that applying the LGBTQ+ Requirements to all families, including the Burkes, was necessary to avoid disruptions and harm.

The Burkes respond first by citing *Meriwether v. Hartop*, 992 F.3d 492, 506-07 (2021)—an out-of-circuit decision applying “the academic-freedom exception to *Garcetti*” to a professor’s statements to adults, which has no bearing on this case. P.Opp. 19. The Burkes next argue that

---

U.S. 726, 749-50 (1978) (affirming broadcasting restrictions of “otherwise protected expression” given “the government’s interest in ‘the well-being of its youth’”) (citation omitted); *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 272 (1988) (recognizing the state “must be able to take into account the emotional maturity of the intended audience”); *Free Speech Coalition, Inc. v. Paxton*, 606 U.S. 461, 473-74 (2025) (“States have a specific interest in protecting *children*” because they are “more susceptible to [the speech’s] harmful effects”).

any consideration of DCF's interests in "operat[ing]" its child welfare system "efficiently and effectively" by reducing rejection and placement disruptions, *Garcetti v. Ceballos*, 547 U.S. 410, 419 (2006), was "rejected . . . in *Fulton*." P.Opp. 19. But the Burkes leave out that the *Fulton* Court expressly declined to any address claims under the "Free Speech Clause" and so could not possibly clearly establish free speech rights. *Fulton*, 593 U.S. at 543.

Finally, the Burkes cite *Agency for International Development v. AOSI*, 570 U.S. 205, 218 (2013), P.Opp. 17, but that case supports the LGBTQ+ Requirements. As the Burkes note, that case disapproved of conditions on state-funded programs that affect "protected conduct *outside the scope* of the . . . program." 570 U.S. at 217. But the LGBTQ+ Requirements address a matter directly *within* the scope of the child welfare system—how foster parents would treat LGBTQ+ foster children placed by DCF into their care. While this conduct may include speech, *AOSI* does not support the Burkes' argument that foster parents can deliver virtually any message they wish to a foster child.[17] And it certainly does not "clearly establish" any such right.

The Burkes nonetheless argue that DCF sought "to regulate public ideas" by "work[ing] with 'inclusive' churches and mak[ing] parents leave 'unaffirming' churches." P.Opp. 18. This is demonstrably false and misleading.[18] DCF will work with any family, regardless of their denomination or beliefs, that is able to meet its licensing requirements. DCF engages in

---

17 "'[I]t has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed.'" *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 62 (2006) (citation omitted).

18 The Burkes cite (1) testimony of a 30(b)(6) witness stating she did not know how DCF defines its "mission of inclusivity" in a recruitment document; (2) testimony of an expert witness regarding her personal "opinion" about whether it would be possible to take a child to "a church that is explicitly stating that homosexuality is sinful and then somehow counteract that with another measure"; and (3) a license study stating that another family described their own church as "very open and progressive." P.Opp. 18.

recruitment activities in a variety of places, including churches, and some applicants describe their churches as open and progressive. DCF does not seek to regulate public ideas or interfere with public discourse, and the Burkes' suggestion to the contrary is utterly meritless.

## II. The Burkes Failed to Prove DCF Violated the Constitution.

The Burkes do not contest the LGBTQ+ Requirements withstand rational basis review. *See* D.Br. 22-23; D.Opp. 14. As previously discussed, the Burkes also cannot prevail under strict scrutiny. In this analysis, DCF's 2025 policy changes are not admissible, D.Res. ¶ 153-165, and, in any case, do not indicate the prior policies were unconstitutional. D.Opp. 23-24. Nor do the choices of other states, where DCF's policies responded to a Massachusetts state agency identifying "the status quo for LGBTQ youth in DCF [as] an emergency." P.Res. ¶ 35-37.

### A. DCF's Interest in Protecting LGBTQ+ Foster Children is Compelling.

The Burkes have not shown that DCF's interest in protecting LGBTQ+ foster children is not compelling. The Burkes argue *Fulton* "rejects" Defendants' arguments, P.Opp. 23, but *Fulton* was not focused on the state's compelling interests as *custodian* to foster children. *See Fulton*, 593 U.S. at 530. This difference is critical. "[A] foster child, . . . relie[s] upon the State . . . via its placement of him in a foster home, for his basic human needs." *Schwartz v. Booker*, 702 F.3d 573, 585 (10th Cir. 2012). Here, consistent with a significant body of research, DCF concluded that the LGBTQ+ Requirements were necessary to prevent harm to LBGTQ+ foster children. *See* D.SOF ¶ 67-89. This justified DCF's conclusion that its compelling interest in ensuring the wellbeing of LGBTQ+ foster youth would be undermined by approving the Burkes' application.

Further, as discussed above, DCF's consideration of foster parent preferences and limitations, as well as the statutory right of foster parents to decline individual placements, does not undermine DCF's compelling interest in ensuring that an LGBTQ+ child is not placed in an

unsupportive home. None of the scenarios that the Burkes purport to describe as "exceptions" to DCF's policies would have that effect. P.Opp. 23-30. And, as also discussed above, to "prove" that DCF has a "system of exceptions" to the LGBTQ+ Requirements, the Burkes mischaracterize the record concerning preferences and limitations, D.Res. ¶ 69-75, the statutory right to decline placements, D.Res. ¶ 56-57, varying uses of the term "affirming," D.Res. ¶ 68-75, and particular licensing decisions, D.Res. ¶ 36. They cannot prevail at summary judgment on such distortions.

### B. The LGBTQ+ Requirements Were Narrowly Tailored to That Interest.

As discussed *supra* and D.Br. 24-26, D.Opp. 28-30, the Burkes' two proposed "less-restrictive alternatives" do not equally achieve Defendants' goal in ensuring that LGBTQ+ foster children are placed in homes that will support that aspect of their identity, with all the positive outcomes that such support encourages. A license with "conditions" is not the same as a statement of preferences, *see supra* pp. 8-10, particularly where the purported "condition" relates to a characteristic that by definition can arise at any time and cannot be predicted in advance. D.SOF ¶ 61-64. While the Burkes claim DCF already "allows" placement instability, P.Opp. 28-29, placement instability is not the only harm associated with the Burkes' proposals. *E.g.,* D.SOF ¶ 72, 74, 80-83. Nor does the Constitution require that LGBTQ+ foster youth be subjected to unnecessary and harmful placement disruptions, just because DCF is not always able—despite its best efforts—to meet its stated goal that "a child's first placement is their only placement." D.SOF ¶ 28. Where DCF recognizes placement instability as harmful and to be avoided wherever possible, D.SOF ¶ 27-34, this aspect of *any* child welfare system should not be used to justify imposing *more* harm on a particularly vulnerable population of children within DCF custody.

## CONCLUSION

Defendants' summary judgment motion should be granted, and the Burkes' denied.

Respectfully submitted,

DEFENDANTS

By and through their Attorneys,

ANDREA JOY CAMPBELL
ATTORNEY GENERAL

/s/ *Grace Gohlke*
Grace Gohlke (BBO No. 704218)
Michael Shiposh (BBO No. 680131)
Benjamin E. Bryant (BBO No. 714077)
Assistant Attorneys General
One Ashburton Place
Boston, MA 02108
(617) 963-2527
grace.gohlke@mass.gov
michael.shiposh@mass.gov
benjamin.e.bryant@mass.gov

Dated: April 17, 2026

**CERTIFICATE OF SERVICE**

I certify that today, April 17, 2026, I caused this document to be filed through the Court's ECF system, which cause it to be sent electronically to all registered members as identified on the Notice of Electronic Filing (NEF) today, which includes all counsel of record.

/s/ *Grace Gohlke*
Grace Gohlke